No. 03-288C
(Chief Judge Damich)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CHEVRON, U.S.A., INC, TEXACO, INC, and TEXACO DOWNSTREAM LLC,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT AND DEFENDANT'S APPENDIX

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

STEVEN J. GILLINGHAM
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Tele: (202) 616-2311
Fax: (202) 353-7988

Attorneys for Defendant

OF COUNSEL:

HOWARD M. KAUFER
Assistant Counsel
Office of Counsel
Defense Energy Support Center
Ft. Belvoir, VA

DONALD S. TRACY
Trial Attorney
Defense Supply Center
Richmond, VA

April 13, 2006

**TABLE OF CONTENTS**

STATEMENT OF THE ISSUES .......... 1

STATEMENT OF THE CASE .......... 3

I. Nature Of The Case .......... 3

SUMMARY OF MATERIAL FACTS .......... 4

I. Chevron's Contracts .......... 4

II. DESC's Small Business Set-Aside Program .......... 6

SUMMARY OF THE ARGUMENT .......... 8

ARGUMENT .......... 10

I. Standard of Review .......... 10

II. DESC's EPA Clauses Are Authorized by FAR 16.203-1 .......... 11

A. EPA Clauses Need Not Be Based Upon The Contractor's Own Prices .......... 12

B. Chevron's Fair Market Value Allegations Do Not State A Cause of Action .......... 16

C. Chevron's FAR 15.802(b) Allegation Does Not State A Cause of Action .......... 17

D. Summary .......... 20

E. Chevron Cannot Demonstrate Harm .......... 21

III. Chevron's Alternative Illegality Theories In Counts II-VI Must Be Dismissed .......... 23

A. Count II (Misrepresentation) .......... 23

B. Count III ("Breach of Contract") .......... 24

C. Count IV ("Implied-In-Fact Contract") .......... 24

D. Count V ("Failure of Consideration and Frustration of Purpose") .......... 25

E. Count VI (Mistake) .......... 25

1. Mutual Mistake ........ 26

2. Unilateral Mistake ........ 27

IV. Count VII (Takings Allegation) Fails To State A Claim ........ 29

V. Chevron's Small Business Program Complaints Must Be Dismissed ........ 31

A. The Court Lacks Jurisdiction To Entertain The Fifth Amendment Complaint ........ 31

B. DESC's Small Business Does Not Constitute An Auction ........ 32

C. The Court Lacks Jurisdiction To Entertain The Complaint That DESC's Small Business Program Violates FAR 52.219-7, Which It Does Not .. 34

VI. Waiver and Estoppel Bar Chevron's Claims ........ 35

CONCLUSION ........ 39

**INDEX TO THE APPENDIX**

Declaration of John R. Walker ........ 1

DESC Clauses ........ 10

FAR Part 15, 15.610 Written or oral discussion ........ 14

52.219-7 Notice of Partial Small Business Set-Aside (Oct. 1995) ........ 16

Notice of Evaluation Preference for Small Disadvantaged Business Concerns (Jun. 1997) ....... 17

Notice of Partial Small Business Set-Aside With Preferential Consideration for Small Disadvantaged Business Concerns Clause (May 1995) ........ 20

DFSC Memo, re: Base Reference Date for EPA References Tied to Petroleum Marketing Monthly (PMM), dated January 6, 1986 ........ 28

Defense Logistics Agency Inter-Office Memorandum, dated December 2, 1987 Subject: Economic Price Adjustment in the Domestic Bulk Program ........ 30

Excerpt of Deposition of Lawrence Ervin, dated December 1, 2003 ........ 37

Request for Deviation dated September 6, 1994 ........ 47

Request for Class Deviation and Permanent Coverage in DLAR, dated May 12, 1995 ............. 51

Certified Claim of Chevron USA, Inc., Contract DLA600-90-D-0531 ..................................... 56

Exhibit 1 to Chevron's claim, Contract DLA600-90-D-0531 .................................................... 83

DESC's February 11, 2002 Final Decision, re Texaco ............................................................. 98

DESC's July 11, 2002 Final Decision, re Chevron USA ........................................................ 104

Chevron's February 12, 2003 letter to DESC ........................................................................ 113

DESC's February 24, 2003 letter to Chevron USA ................................................................ 114

Chevron's March 3, 2003 letter to DESC .............................................................................. 115

DESC's March 4, 2003 letter to Chevron .............................................................................. 116

Comptroller General Opinion re: DFSC Small Business Set-Aside Procurements .................. 117

Excerpt from Platts web site ................................................................................................ 122

Excerpts from NYMEX web site .......................................................................................... 125

Excerpts from OPIS web site ............................................................................................... 127

Excerpts from Chevron web site ........................................................................................... 128

## TABLE OF AUTHORITIES

### CASES

All Phase Environmental, Inc.,
B-292-919.2, 2004 CPD ¶ 2004 WL 437450 ........................................................... 19

Am. Tel. & Tel. Co. v. United States,
177 F.3d 1368 (Fed. Cir.1999) ........................................................................... 19

Am. Tel. & Tel. Co. v. United States,
307 F.3d 1374 (Fed. Cir. 2002) ........................................................................ passim

American Commerce National Bank v. United States,
38 Fed. Cl. 271 (1997) ...................................................................................... 30

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) ........................................................................................ 10

Atlas Corp. v. United States,
895 F.2d 745 (Fed. Cir. 1990) ........................................................................ 26

Barrett Refining v. United States,
242 F.3d. 1055 (2001) ..................................................................................... 25

Bernaugh v. United States,
38 Fed. Cl. 538 (1997), aff'd., 168 F.3d 1319 (Fed. Cir. 1998) (table) .......................... 29

Brookhard v. Janis,
384 U.S. 1 (1966) ............................................................................................ 36

Calcasieu v. United States, 2003 WL 22049528 ............................................................. 37

CCD Distributors, Inc. v. U.S., 69 Fed. Cl. 277 (2006) ................................................... 16

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) ........................................................................................ 10

Conley v. Gibson,
355 U.S. 41 (1957) .......................................................................................... 11

DGS Contract Services, Inc. v. United States,
43 Fed. Cl. 227 (1999) ................................................................................... 33

Dairyland Power Cooperative v. United States,
16 F.3d 1197 (Fed. Cir. 1994) ........................................................................ 26

Dale Ingram, Inc. v. United States,
201 Ct. Cl. 56, 475 F.2d 1177 (1973) .............................................................. 27

Durable Metals Prods., Inc. v. United States,
27 Fed. Cl. 472 aff'd, 11 F.3d 1071 (Fed. Cir. 1993) (table) ........................................ 20

Dynalectron Corp. v. United States,
4 Cl. Ct. 424 (1984), aff'd, 758 F.2d 665 (Fed. Cir. 1984) ............................................ 31

E. Walters & Co., Inc. v. United States,
217 Ct. Cl. 254, 576 F.2d 362 (1978) ......................................................... passim

Eastport Steamship Corp. v. United States,
178 Ct. Cl. 599, 372 F.2d 1002 (1967) ............................................................ 31

Everett Plywood Corp. v. United States,
227 Ct. Cl. 415, 651 F.2d 723 (1981) .......... 25

Far West Fed. Bank v. OTS,
119 F.3d 1358 (9th Cir. 1997) .......... 25

Florida Rock Indus. Inc. v. United States,
791 F.2d 893 (Fed. Cir. 1986) .......... 29

Fraass Surgical Mfg. Co., Inc. v. United States,
215 Ct. Cl. 820, 571 F.2d 34 (1978) .......... 28

Freightliner Corp. v. Caldera,
225 F.3d 1361 (Fed. Cir. 2000) .......... 18

Glopak Corporation v. United States,
12 Cl. Ct. 96 (1987), aff'd., 851 F.2d 334 (1988) .......... 29

Gold Line Refining v. United States, 54 Fed. Cl. 285 (2002) .......... 37

Gould, Inc. v. United States,
935 F.2d 1271 (Fed. Cir. 1991) .......... 11

Gratz v. United States,
25 Cl. Ct. 411, aff'd, 985 F.2d 583 (Fed. Cir. 1992) .......... 30

Hermes v. United States, 58 Fed. Cl. 3, 19 (2003) .......... 38

Hermes v. United States,
58 Fed. Cl. 409 (2003) .......... passim

Hughes Communications Galaxy, Inc. v. United States,
271 F.3d 1060 (Fed. Cir. 2001) .......... 30

Hume v. United States,
21 Ct. Cl. 328 (1886), aff'd., 132 U.S. 406 (1889) .......... 28

Inupiat Community of the Arctic Slope v. United States,
230 Ct. Cl.647, cert. denied, 459 U.S. 969 (1982) .......... 32

J&E Salvage v. United States,
37 Fed. Cl. 256 (1997) .......... 27, 28

John Massman Contracting Co., v. United States,
23 Cl. Ct. 24 (1991) .......... 23

LaBarge Prods., Inc. v. West,
46 F.3d 1547 (Fed. Cir. 1995) .......... 21, 35

La Gloria v. United States, 56 Fed. Cl. 211 (2003) .......... 21, 37

Larson v. Domestic & Foreign Commerce Corp.,
337 U.S. 682 (1949) .......... 30

LeBlanc v. United States,
50 F.3d 1025 (Fed. Cir. 1995) .......... 32

Liebherr Crane Corp. v. United States,
810 F.2d 1153 (Fed. Cir. 1987) .......... 28

Ling-Temco-Vought, Inc. v. United States,
201 Ct. Cl. 135 (1973) .......... 37, 39

MAPCO Alaska Petroleum, Inc. v. United States,
27 Fed. Cl. 405 (1992) .......... passim

Montana v. United States,
124 F.3d 1269 (Fed. Cir. 1999) .......... 10

Morrison-Knudsen Co. v. United States,
170 Ct. Cl. 712 (1965) .......... 23

Mullenberg v. United States,
857 F.2d 770 (Fed. Cir. 1988) .......... 32

Navajo v. United States, 58 Fed. Cl. 200, 213 (2003) .......... 37

Northern Helex Co. v. United States,
197 Ct. Cl. 118 (1972) .......... 37

Perpetual Financial Corp. v. United States,
61 Fed. Cl. 126 (2004) .......... 25

Reservation Ranch v. United States,
39 Fed. Cl. 696 (1997), aff'd, 217 F.3d 850 (Fed. Cir. 1999) (table) .......... 36

Rochman v. United States,
27 Fed. Cl. 162 (1992) .......... 11

Seaboard Lumber Co. v. United States,
903 F.2d 1560 (Fed. Cir. 1980) ........................................................................ 36

Seaboard Lumber v. United States,
308 F.3d 1283 (Fed. Cir. 2002) ........................................................................ 25

Sherwood v. Walker,
66 Mich. 568, 33 N.W. 919 (1887) .................................................................... 26

Short Bros., PLC v. United States,
65 Fed. Cl. 695 (2005) .............................................................................. 18, 19

Spalding & Sons, Inc. v. United States,
28 Fed. Cl. 242 (1993) ...................................................................................... 25

Sun Oil Co. v. United States,
215 Ct. Cl. 716, 572 F.2d 786 (1978) ............................................................... 30

Sunoco v. United States, 59 Fed. Cl. 390, 398 (2004) ........................................... 37

Sweats Fashions, Inc. v. Pannill Knitting Co.,
833 F.2d 1560 (Fed. Cir. 1987) ........................................................................ 11

Tabb Lakes, Ltd. v. United States,
10 F.3d 796 (Fed. Cir. 1993) ............................................................................ 29

Tesoro v. United States, 58 Fed. Cl. 65 (2003) ...................................................... 37

Tesoro et al. v. United States,
405 F. 3d 1339 (Fed. Cir. 2005) ................................................................... passim

Tony Downs Foods Co. v. United States,
209 Ct. Cl. 31, 530 F.2d 367 (1976) ................................................................. 28

Trauma Service Group v. United States,
104 F.3d 1321 (Fed. Cir. 1997) ........................................................................ 24

United States v. Connolly,
716 F.2d 882 (Fed. Cir. 1983), cert. denied, 104 S. Ct. 1414 (1984) ............................ 31

United States v. Hamilton Enterprises,
711 F.2d 1038 (Fed. Cir. 1983) ................................................................... 27, 28

United States v. Mitchell,
445 U.S. 535 (1980) .......... 32

United States v. Sherwood,
312 U.S. 584 (1941) .......... 31

United States v. Testan,
424 U.S. 392 (1976) .......... 31

Whittaker Electronic Systems v. Dalton,
124 F.3d 1443 (Fed. Cir. 1997) .......... 36

**STATUTES**

10 U.S.C. § 2306(a) .......... 20

10 U.S.C. § 2323 .......... 7

15 U.S.C. § 644 .......... 6

15 U.S.C. § 772 .......... 5

28 U.S.C. § 1491 .......... 31

41 U.S.C. § 423 .......... 33

FAR 15.402(a) .......... passim

FAR 15.610 .......... 32, 33

FAR 15.802(b) .......... passim

FAR 15.804-3 .......... 13, 16

FAR 16.103(a) .......... 20

FAR 16.104 .......... 20

FAR 16.203-1 .......... passim

FAR 16.203-1(a) .......... 12

FAR 16.203-2 .......... 13

FAR 16.203-3 .......... 14, 15

FAR 16.203-4 .......... 12, 20

FAR 19.502-3(c) .......... 33

FAR 52.219-7 .......... 33, 34

**MISCELLANEOUS**

Formation of Government Contracts (3rd Ed. 1998) at 1279 .......... 19

Restatement (Second) of Contracts § 151a .......... 27

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CHEVRON, U.S.A., INC, TEXACO, INC, and TEXACO DOWNSTREAM LLC, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 03-288C (Chief Judge Damich) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

The United States respectfully requests that the Court dismiss paragraphs 47 and 48 of the Second Amended Complaint ("Compl.") pursuant to RCFC 12(b)(1), and the remainder of the complaint pursuant to RCFC 56(b) or RCFC 12(b)(6), as explained further below. In support of this motion, we rely upon the Second Amended Complaint, the following brief, our proposed findings of uncontroverted fact ("PFF"), and our attached appendix ("App.").

**STATEMENT OF THE ISSUES**

1. Whether the Defense Energy Support Center ("DESC")[1] contracts at issue were illegal because their Economic Price Adjustment ("EPA") clauses were based upon "indexes rather than on Plaintiffs' own established fuel prices," "were not market-based, were not designed or intended to be used to set or adjust prices, and did not reflect at least the fair market value of military fuel," as alleged in Count I of the Second Amended Complaint.

2. Whether the allegation contained in Count II that the "PMM [Petroleum Marketing Monthly] indexes were not designed or intended to be used to set or adjust prices and

[1] Until 1998, DESC was called the Defense Fuel Supply Center ("DFSC"). We use the current name. We refer to plaintiffs collectively as "Chevron."

which did not reflect at least the fair market value of military fuel" states a claim upon which relief can be granted.

3. Whether the allegation contained in Count I that the EPA clauses violate the Federal Acquisition Regulation ("FAR") 15.402(a) states a claim upon which relief can be granted.

4. Whether, if the answers to Issues 2 and 3 are in the negative, Counts II-VI, which state alternative theories of relief based upon the same allegations concerning the PMM and are labeled as "Misrepresentation," "Breach of Contract," "Implied-In-Fact-Contract," "Failure of Consideration and Frustration of Purpose," and "Mistake," also should be dismissed for failing to state a claim upon which relief can be granted.

5. Whether the allegation contained in Count VII, that the contracts at issue effected a taking, states a claim upon which relief can be granted.

6. Whether this Court has jurisdiction to entertain the allegation contained in paragraph 48 that DESC violated "the equal protection component of the fifth amendment's due process clause by extending to minority-owned businesses bidding preferences."

7. Whether this Court has jurisdiction to entertain the allegation contained in paragraph 47 that DESC improperly solicited and awarded "portions of the procurements set aside for small businesses together with those for large businesses" and, if so, whether that is true.

8. Whether DESC used "prohibited auction techniques, whereby DESC awarded contracts to bidders that agreed to match other bidders' prices," as alleged in paragraph 46 of the complaint.

9. If the answers to any of the above are in the affirmative, whether Chevron has waived any applicable benefit, or is estopped from litigating their applicability.

**STATEMENT OF THE CASE**

I. Nature Of The Case

This case arises from 32 fuel supply contracts between DESC and ChevronUSA, and seven contracts between DESC and Texaco, Inc. Compl. ¶¶ 34, 36.[2] Chevron complains that the EPA clauses contained in DESC fuel contracts were illegal and pads these complaints with various common-law theories of relief and a takings theory of relief, premised upon the very same illegality. Chevron also asserts that certain features of DESC's small business program also were illegal. Presuming it has thus eviscerated the very contracts it made and performed without complaint, Chevron concludes that it is entitled to recover without reference to those contracts and, instead, "the fair market value of the fuel it delivered to DESC." Compl. ¶ 51.

In an earlier phase of this litigation, this case was stayed pending the outcome of an interlocutory appeal certified by this Court, and eventually resolved in Tesoro et al. v. United States, 405 F. 3d 1339 (Fed. Cir. 2005), *petition for reh'g. en banc denied*, No. 04-5064 (Fed. Cir. Aug. 22, 2005) ("Tesoro"). In Tesoro, the Federal Circuit held that DESC's PMM-based EPA clause was legal, and declined to reach the waiver issue. Following the decision in Tesoro, the Court permitted Chevron to file its Second Amended Complaint, which includes what we consider to be immaterial factual allegations concerning the PMM and to assert a cause of action

---

[2] On February 12, 2003, based solely upon its own invoices, Chevron submitted a claim for deliveries of JP-4 and F-76 associated with unspecified contracts. PFF 37; Compl. ¶ 35. Because Chevron cannot identify the contracts, prove the applicable pricing provision, or demonstrate whether Chevron even delivered fuel, paragraph 35 should be summarily dismissed.

pursuant to FAR 15.402(a) (contracting officer's duty to assure prices offered are fair and reasonable). See Compl. ¶ 45.

## SUMMARY OF MATERIAL FACTS

The evidence set forth in the accompanying proposed findings of uncontroverted fact is sufficient to establish the Government's right to dismissal of the complaint. Generally, the proposed findings describe the market-based nature of the EPA clauses at issue, DESC's long, controversy-free use of those clauses, Chevron's failure to object to the use of, or application of, the clauses, until many years after performing the contracts, and Chevron's long history and familiarity with these clauses. They also demonstrate that DESC's small business program is consistent with applicable laws and regulations.

### I. Chevron's Contracts

Chevron is the world's fifth-largest integrated energy company. PFF 1. Between 1987 and 1999, Chevron entered into 39 contracts with DESC. PFF 4, 5. At issue are DESC-drafted price adjustment clauses. PFF 9-14.[3] These clauses adjusted the per-gallon "base price" offered by fuel suppliers. PFF 10. Offerors also acknowledged a "reference price" for comparable petroleum products, which, since the early 1980s, has been taken from a number of widely-available petroleum price publications. PFF 10-14. After award, the base price per gallon was periodically adjusted up or down, by the exact number of fractions of a cent that the published reference price had risen or fallen since the last adjustment. PFF 10.

---

[3] DESC began using EPA clauses during the 1973 oil embargo. At that time, the agency allowed offerors to choose between basing price adjustments upon either published prices of refined products, or actual crude oil costs. DESC began using market-prices exclusively in the early 1980s, primarily because the prior practice made it difficult to compare offers for evaluation purposes. PFF 9.

Chevron contracts in 1983 and from 1986-1994, contained an EPA clause tied to monthly average sale prices of refined petroleum products, by region, as reported by the PMM. PFF 13. The PMM is published by the Department of Energy's Energy Information Administration, and reports transaction prices that refiners, including Chevron, are required by law to submit monthly. PFF 15; 15 U.S.C. § 772.

Pursuant to the PMM-based EPA clause, suppliers' per-gallon prices were adjusted monthly. PFF 16. For example, in 1990, Chevron bid base prices from .62950 to .660300 cents per gallon for JP-4, tied to a PMM-based reference price, supplied by DESC, of .660300 cents per gallon for February, 1990. App. 85. Assuming hypothetically that, for the first month in which Chevron delivered fuel, the reference price increased .10 cents, the contract price for that first month would have been the base price plus the same .10 cents per gallon.

In 1995, DESC adopted as its EPA escalator a widely-used industry publication, Platts Oilgram Price Report ("Platts") or the Oil Price Information Service ("OPIS"). PFF 14. Accordingly, Chevron's 1995-1999 contracts used Platts or OPIS as their price reference. Id.[4] DESC adopted these references, because, despite substantial advantages offered by the PMM, including the fact that it was a report of actual sale prices, the report of those prices was not available until three months after the sales took place. PFF 15-16. The EPA clauses, however, required monthly payments and, therefore, price adjustments. To accommodate this gap between the payment date and the availability of the data necessary to calculate the economic price adjustment applicable to those payments, DESC made an estimated interim payment and then reconciled that payment with the amount properly due when the applicable PMM sales data

[4] EPA clauses in two fiscal year 1982 contracts also were based upon Platts. PFF 11.

became available. Id. Thus, Chevron's suggestion that the change from PMM demonstrates that a PMM-based clause was illegal or not market-based is, simply, hyperbole. See, e.g., Compl. ¶¶ 16-22.

Chevron never objected to the legality of any version of the EPA clause, or to any of the hundreds of price adjustments made pursuant to the clauses. PFF 33. Indeed, it was not until Chevron submitted its first certified claims in 2001 – approximately 20 years after the first contract was awarded, and nine years after MAPCO, 27 Fed. Cl. 405, was decided – that it alleged that the EPA clauses were illegal. Compl. ¶¶ 34, 36; PFF 33.

II. DESC's Small Business Set-Aside Program

In accordance with 15 U.S.C. § 644 and FAR Part 19, DESC's Bulk Fuels Program solicitations included partial small business set-asides. PFF 29-31; App. 10. DESC's domestic bulk fuels partial small-business set-aside program was described in solicitations in DESC clauses I237.05 and I237.06 (DEVIATION). PFF 29-30. Although small businesses could compete for non set-aside amounts, the price for awards of the set-aside amounts was to be "negotiated by the Contracting Officer based upon prices the Government would otherwise pay under this solicitation had there been no set-aside for supply of the location at which the set-aside is placed, adjusted for transportation and other factors." App. 10 (subparagraph (d)). During the negotiations, the contracting officer did not provide small business concerns with either the identity or the prices of other offerors. PFF 32.

Beginning in 1988, pursuant to 10 U.S.C. § 2323, DESC solicitations also included an evaluation preference of up to 10 per cent for small disadvantaged business concerns. PFF 29. DESC solicitation clauses I237.05, Notice of Evaluation Preference for Small Disadvantaged Business Concerns (DEVIATION), and I237.06, Notice of Partial Small Business Set-Aside

with Preferential Consideration for Small Disadvantaged Business Concerns (DEVIATION) set forth the operation of this programs. PFF 29. The clauses provided that awards will be made to those small disadvantaged concerns whose offered price does not exceed the highest price the Government would pay for the non-set-aside portion plus ten percent, as adjusted for transportation and other factors. App. 11, 12 (subparagraph (c)).

DESC's method of awarding partial set asides in its bulk fuels acquisitions differs from the standard FAR and DFARS procedures, in that DESC makes offers for the set aside quantities before award of the basic quantities. PFF 31. The standard FAR and DFARS procedure is to offer set aside quantities after award of the basic quantities. App. 16-23. Pursuant to DESC's clauses, following any set-aside failure, non awarded quantities are awarded to the low offeror for the basic quantity rather than being re-solicited as a new requirement. PFF 31. This procedure avoids the delay that would take place in re-soliciting set aside failure quantities under the standard FAR and DFARS procedures. Id. DESC has used this method since the 1960's pursuant to authorized deviations. Id.; App. 117. The DESC procedure has been approved by the Government Accountability Office ("GAO"), formerly the General Accounting Office, on several occasions. App. 117.

## SUMMARY OF THE ARGUMENT

This case presents the incredible claim that an experienced Government supplier that performed at least 39 DESC contracts over 18 years, without complaint, now is entitled to damages due to alleged defects in those contracts. Remarkably, Chevron does not even allege that it misunderstood the clauses at issue, or that the clauses did not operate as their plain language suggests they would.

In Tesoro, 405 F.3d 1339, the Federal Circuit explicitly rejected Chevron's stubborn contention that the clauses were illegal because they were based upon "indexes rather than on Plaintiffs' own established fuel prices" (Compl. ¶ 43) and that DESC's PMM-based EPA clause is prohibited by the FAR. Tesoro also effectively disposed of Chevron's miscellaneous complaints concerning the EPA clauses, found in Count I. In Tesoro, the court held that, in order to pass muster under FAR 16.203-1, EPA clauses may rely upon "industry-based prices," which "may be established by reference to either a catalog or market sources independent of the manufacturer or vendor." Id. at 1347. DESC's EPA clauses pass muster under Tesoro, because they are undeniably based upon "market sources independent of the manufacturer or vendor."

Chevron contends that the EPA clauses are suspect because they were not "designed or intended" to set prices and did not "reflect at least the fair market value of military fuel." These allegations do not invoke any part of the legal test for EPA clauses and, therefore, fail to state a claim upon which relief may be granted. Indeed, even if the EPA clauses were shown to be inconsistent with the FAR, Chevron never has demonstrated that they were administered or interpreted in a manner inconsistent with Chevron's own understanding and expectations. In short, Chevron cannot demonstrate an essential element of any request for equitable adjustment, harm.

Chevron's parallel common law and takings allegations fare no better. The former, Counts II-VI, simply repackage Chevron's illegality count as "Breach of Contract," "Implied-In-Fact-Contract," "Failure of Consideration and Frustration of Purpose," and "Mistake" counts. All are based upon the legally-unfounded premise that DESC owed a duty to Chevron to utilize price references that were "designed or intended to be used to set or adjust prices," that the references "reflect at least the fair market value of military fuel," and that DESC pay "fair

market value." None is grounded in the language of Chevron's actual contracts or the Federal Circuit's standard for assessing the legality of EPA clauses. All are thinly-disguised, back-door attempts to alter the legal standard for EPA clauses, established and applied in Tesoro. Accordingly, none of these states a cause of action upon which relief may be granted. To the extent they might, Chevron simply cannot demonstrate the elements of proof necessary to sustain these traditional causes of action. The same is true of Count VII, which asserts that DESC's possession of the fuel purchased, *pursuant to the contracts at issue*, effected a taking. Count VII fails for the same reason as Counts II-VI. Moreover, it is well-established that, when the Government action at issue is subject to a contract claim, no Fifth Amendment takings may lie. Accordingly, Count VII, too, should be dismissed.

The complaint also quarrels with various aspects of DESC's small business program, without demonstrating what relationship or harm even a demonstrable violation might have had upon any of Chevron's contracts. Specifically, the complaint alleges that: (1) DESC's small business set-aside program violates the FAR's anti-auction provisions; (2) that program violates the FAR's prohibition against "awarding portions of the procurements set aside for small business together with those for large businesses"; and (3) DESC's small disadvantaged business program violates the equal protection component of the Fifth Amendment. These counts offer little reason to keep this litigation afloat. First, Chevron cannot demonstrate any link between these allegations and its contracts. Second, this Court has no jurisdiction to address an equal protection claim or the facial attack concerning the order of procurement award. Third, the programs were administered pursuant to applicable regulations. Fourth, for at least four of Chevrons' contracts, there was no small business set-aside. PFF 32.

Finally, if Chevron's various allegations are not subject to dismissal for the reasons summarized above, we still are entitled to summary judgment, because, years ago, Chevron abandoned any rights the FAR, the Fifth Amendment, or small business regulations might have conferred. Chevron also forfeited any right it might have had to test those rights in litigation when it waited as many as 20 years to file the necessary claims. In a case involving similar circumstances, this Court already has held as much. Hermes II, 58 Fed. Cl. 409 (concerning the alleged FAR 16.203 violation). Although the Hermes Court did not explicitly address Chevron's common law, takings and other auxiliary illegality causes of action, there is no principled basis for treating them differently.

## ARGUMENT

I. Standard of Review

Summary judgment is warranted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." RCFC 56(c); accord Montana v. United States, 124 F.3d 1269, 1273 (Fed. Cir. 1999). A factual issue is material if it could affect the outcome of the case in light of the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute exists only if a reasonable trier of fact could find for the nonmoving party. Id. The movant need not "produce evidence" of the absence of factual disputes; it need only "point[] out" that the record does not support the other party's case. Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1563 (Fed. Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

We have moved to dismiss some counts of the Second Amended Complaint pursuant to RCFC 12(b)(6), which permits the dismissal of an allegation that fails to state a claim upon which relief may be granted. Dismissal upon this ground is appropriate whenever "it appears

beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

In making this determination, the Court must accept the factual allegations set forth in the complaint as true and "indulge in all reasonable inferences in favor of the nonmovant." Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991).[5]

II. DESC's EPA Clauses Are Authorized by FAR 16.203-1

In Count I, Chevron presents several theories concerning the illegality of DESC's EPA clauses: (1) that the clauses were illegal because there were not based upon "Plaintiffs' own established fuel prices" (Compl. ¶ 43); (2) that the clauses were illegal because they were "not market-based, were not designed or intended to be used to set or adjust prices, and did not reflect at least the fair market value of military fuel" (Compl. ¶ 44); and (3) that the contracts were awarded in violation of FAR § 15.802(b) (currently codified at FAR 15.402(a)) (contracting officer's duty to review offers for price reasonableness) (Compl. ¶ 45). As explained below, none of these allegations entitle Chevron to readjust its contracts' prices, because, pursuant to the standards enunciated in Tesoro, the clauses are legal. In short, Chevron's illegality allegations are based upon standards not found in the law and, therefore, fail to state a claim.

A. EPA Clauses Need Not Be Based Upon The Contractor's Own Prices

FAR 16.203-1 provides as follows:

> A fixed-price contract with economic price adjustment provides for upward and downward revision of the stated contract price upon the occurrence of specified contingencies. Economic price adjustments are of three general types:

[5] However, "legal conclusions, deductions, or opinions couched as factual allegations are not given a presumption of truthfulness." Rochman v. United States, 27 Fed. Cl. 162, 168 (1992)(quoting 2A Jeremy C. Moore, Moore's Federal Practice, ¶ 12.07 [2.-5] (2d ed. 1992)).

> (a) Adjustments based on established prices. These price adjustments are based on increases or decreases from an agreed-upon level in published or otherwise established prices of specific items or the contract end items.
>
> (b) Adjustments based on actual costs of labor or material. These price adjustments are based on increases or decreases in specified costs of labor or material that the contractor actually experiences during contract performance.
>
> (c) Adjustments based on cost indexes of labor or material. These price adjustments are based on increases or decreases in labor or material cost standards or indexes that are specifically identified in the contract.

FAR Section 16.203-1(a) describes two types of "established" price adjustments -- those based upon "published" prices and those based upon "otherwise established" prices – but does not define those terms. However, FAR 16.203-4(a), and (b) ("Clauses"), which prescribe standardized clauses for "adjustments based on established prices," specifically refer to the use of established prices for supplies that have either established "catalog" or "market prices." Since January 1997, FAR 16.203-4 has not explicitly defined the terms "catalog" or "market prices."[6] However, its predecessor made clear that the terms referred to the definitions found in FAR 15.804-3. The predecessor stated that, before using a "published or otherwise established price" EPA clause, the contracting officer must determine that "the requirement is for . . . supplies that have an established catalog or market price <u>verified using the criteria in FAR 15.804-3</u>" (emphasis added). Section 15.804-3 (c), in turn, defined "established catalog prices" as "prices (including discount prices) recorded in a catalog, price list, schedule, or other verifiable and established record that (A) are regularly maintained by the manufacturer or

[6] This provision was deleted from the FAR effective January 2, 1997.

vendor; and (B) are published or otherwise available for customer inspection." FAR 15.804-3(c)(1) (1995). It defined "established market prices" as "current prices that (i) are established in the course of ordinary and usual trade between buyers and sellers free to bargain and (ii) can be substantiated by data from sources independent of the manufacturer or vendor." Id. § 15.804-3(c)(2) (emphasis added).

In Tesoro, the Federal Circuit, reviewing the PMM-based EPA clause at issue here, held that FAR 15.804-3 supplies the meaning for "established prices," which need not be, as Chevron asserts here, still, the contractor's own prices:

> Although the term "established price" is not expressly defined in FAR § 16.203, the definition of the term in FAR § 15.804-3 is incorporated by reference. FAR § 15.804-3 defines "established prices" to include contractor-specific prices, namely "established catalog prices," and industry-based prices, namely "established market prices." As indicated by FAR § 16.203-2 and FAR § 15.804-3, the policy behind requiring use of "established prices" is to avoid contracts subject to the operational whims of individual contractors.

Tesoro, 405 F.3d at 1347 (emphasis added).

Rejecting Chevron's theory, the court held explicitly that the theory that "FAR 16.203-3 requires that adjustments be based only on changes in the prices charged by individual contractors eviscerates the regulatory meaning of the term 'established prices' and the policy reasons for using it." Id. Summarizing, the court explained that: "According to the interplay of all four sections of FAR § 16.203, a 'contractor's established price' may be established by reference to either a catalog or market sources independent of the manufacturer or vendor." Id. at 1347 (emphasis added).

The court did not stop there, however. Rather, it explicitly considered whether DESC's PMM-based EPA clause was an "established prices" clause contemplated by FAR § 16.203-1

and held that it was – foreclosing consideration of the question anew. Indicating that it was indeed considering the legality of the PMM-based EPA clause, the court recited the PMM's various features as well as the parties' contentions concerning the effect of those features upon the viability of the PMM-based EPA clause. The court's specific recitations concerning the PMM included the following.

- The court's statement of the certified question as "Did DESC establish the price of fuel in violation of law by employing economic price adjustment clauses indexed to PMM?" Tesoro, 405 F.3d at 1342 (emphasis added).

- "The reference prices to which the price adjustments were tied were drawn from market publications. Until June 23, 1994, DESC drew its EPA reference prices from the market publication known as the [PMM]." Id. at 1341.

- The court's observation that the PMM is published by DOE and reports "monthly average sales figures for specified fuels for five fuel regions known as Petroleum Administration for Defense Districts ('PADDS')." Id.

- "All refiners, including Tesoro and Hermes, are required by law to submit monthly sales data to the DOE, which then compiles the data to report the monthly average sales prices per PADD for various products." Id.

- The observation that the complaints in both suits claimed that "DESC's actions were per se illegal because the PMM-based EPA clause was inconsistent with the applicable section of the FAR." Id. at 1342 (emphasis added).

- The observation that the contractors argued that "DESC's use of an EPA clause tied particularly to the PMM does not comport with the express requirements of FAR § 16.203-3 . . . Relying on the language of MAPCO, Appellants claim that a PMM-based EPA clause fails to address either of the "mischiefs" specified in FAR § 16.203-3, because the PMM is an "amalgamation" of petroleum sales that does not reflect the product, the market, or the price for the military fuel Tesoro and Hermes supplied." Id. at 1348 (emphasis added).

- A review of the MAPCO analysis of the PMM itself, which was distinct from MAPCO's analysis of whether, in general, EPA clauses must be based upon the contractor's prices. See MAPCO, 27 Fed. Cl. at 410-11.

- The appellate court's review included MAPCO's dissection of the PMM, including the fact that it was an "amalgamation of the previous month's sales data" and, as such, did not comport with the dictionary definition of

> "established." The review also recited MAPCO's conclusion ("In sum, the index at issue is neither the contractor's, nor does it reflect an established price"), which underscored the fact that the appellate court and the MAPCO court considered the general question of whether an "established prices" EPA clause could be market based as well as whether DESC's PMM clause was an "established prices" clause. Id. at 1347 (emphasis added).

Following these recitations, the court concluded, in unmistakable language, that the PMM-based EPA clause was, indeed, a permissible EPA clause:

> Because we conclude that DESC's use of a market-based EPA clause tied to the PMM was authorized under the FAR, we do not reach the other issues raised in the certified questions . . . . Our holding that the use of the PMM-based EPA clause was authorized under the statute moots the issue of [waiver].
>
> * * *
>
> For the foregoing reasons, we hold that the Court of Federal Claims erred in holding that DESC's use of a PMM-based EPA clause was not authorized under the FAR.

Id. at 1348-49 (emphasis added).

The appellate court's conclusion is not surprising. The PMM is based upon sales data from a large number of refiners and sellers of petroleum products. It reports averages of the actual prices sellers have charged and buyers have paid for various petroleum products in different states and regions of the country. PFF 15. Because the prices are established in actual sales between a number of sellers and buyers, they clearly are "market prices," and satisfy the FAR 15.804-3 requirement that market prices be established in the course of ordinary business between "buyers and sellers free to bargain."

Platts, OPIS, and BLS[7] also are market-based publications and are widely used to adjust prices. PFF 14, 25-27; App. 122-27. Indeed, Chevron's own "fair market value" claim is based upon Platts. PFF 35. Accordingly, Chevron's Platts-based EPA clauses easily pass muster under Tesoro's "market sources"/ "market-based" standard. Chevron's complaint does not assert otherwise. Indeed, Chevron's sole complaint concerning these publications is that: "[o]n information and belief, DESC also knew that some of the other indexes it used to set or adjust prices were not appropriate for these purposes." Compl. ¶ 28. This allegation appears to be of the same character as Chevron's alternative EPA clause illegality argument, i.e., that EPA clauses must meet a higher standard than that defined in Tesoro. We discuss that argument in the next section.

B. Chevron's Fair Market Value Allegations Do Not State A Cause of Action

The above analysis establishes that DESC's EPA clauses pass muster under the Tesoro standard for EPA clauses and, therefore, are legal. However, Chevron asserts that the clauses may not be considered legal, because they were "not market-based, were not designed or intended to be used to set or adjust prices, and did not reflect at least the fair market value of military fuel" (Compl. ¶ 44). But, we are aware of no legal basis for invalidating EPA clauses upon these grounds and the complaint identifies none. Indeed, contractors may bid below cost. See CCD Distributors, Inc. v. U.S., 69 Fed. Cl. 277 (2006) ("However, the fact that an offer [for a fixed-price contract] may not include any profit or may be an attempted buy-in (below cost) does not, in itself, render an otherwise responsible firm ineligible for award."). In short,

[7] Three Chevron 1983 and 1984 contracts contained EPA clauses based upon prices published by the United States Department of Labor's Bureau of Labor Statistics ("BLS"). PFF 12.

Chevron's effort to raise the standard for EPA clauses is rooted neither in Chevron's contracts nor the applicable law. Accordingly, we see no apparent ground upon which these allegations might state a claim.

C. Chevron's FAR 15.802(b) Allegation Does Not State A Cause of Action

In yet another effort to create an unfounded legal test for EPA clauses, Chevron asserts that the clauses were illegal because they somehow violated FAR § 15.802(b) (currently codified at FAR 15.402(a)). Compl. ¶ 45. As this Court has already held, that regulation does not create rights for contractors. In other words, a complaint rooted in this regulation fails to state a claim upon which relief can be granted.

FAR 15.402(a) provides that:

> Contracting officers must-
>
> (a) Purchase supplies and services from responsible sources at fair and reasonable prices. In establishing the reasonableness of the offered prices, the contracting officer must not obtain more information than is necessary. To the extent that cost or pricing data are not required by 15.403-4, the contracting officer must generally use the following order of preference in determining the type of information required:
>
> (1) No additional information from the offeror, if the price is based on adequate price competition, except as provided by 15.403-3(b).
>
> (2) Information other than cost or pricing data:
>
> (i) Information related to prices (e.g., established catalog or market prices or previous contract prices), relying first on information available within the Government; second, on information obtained from sources other than the offeror; and, if necessary, on information obtained from the offeror. When obtaining information from the offeror is necessary, unless an exception under 15.403-1(b)(1) or (2) applies, such information submitted by the offeror shall include, at a minimum, appropriate information on the prices at which the same or similar items have been sold previously, adequate for evaluating the reasonableness of the price.

> (ii) Cost information, that does not meet the definition of cost or pricing data at 2.101.
>
> (3) Cost or pricing data. The contracting officer should use every means available to ascertain whether a fair and reasonable price can be determined before requesting cost or pricing data. Contracting officers must not require unnecessarily the submission of cost or pricing data, because it leads to increased proposal preparation costs, generally extends acquisition lead time, and consumes additional contractor and Government resources.

We start with the proposition that not every regulation provides the contractor with an "enforceable interest." Am. Tel. & Tel. Co. v. United States, 307 F.3d 1374, 1381 (Fed. Cir. 2002) ("AT&T V"). And that is precisely where this Court started in Short Bros., PLC v. United States, 65 Fed. Cl. 695, 764-65 (2005). In rejecting the very argument that Chevron advances here, the Court explained:

> The FAR provisions cited by plaintiff purport to do no more than to provide internal government direction. For example, FAR § 15.802 (1993), entitled "Policy," only requires that the contracting officer "[p]urchase supplies and services from responsible sources at fair and reasonable prices [.]" FAR § 15.802(b) . . . It does not afford a judicial remedy.

Short Bros. is consistent with the principle that contractors lack standing to bring suit based upon regulations issued for the Government's benefit. E.g., Freightliner Corp. v. Caldera, 225 F.3d 1361(Fed. Cir. 2000). The decision also is consistent with AT&T V's application of that principle. In AT&T V, the court considered a contractor's allegation that, in selecting a fixed-price contract, the Navy had "violated a variety of procurement regulations and directives that guide a contracting officer's selection of contract type." 307 F.3d at 1379. Specifically, the contractor alleged, and there was no dispute, that Navy contracting officials had failed to obtain a statutorily-mandated departmental-level certification that would have permitted it to enter into

the fixed-price shipbuilding contract at issue. But, the court refused to entertain the contractor's claim, finding no intent in the legislation to "make any provision for judicial enforcement" (id.) -- and this was so, despite the fact that passage of the statute was prompted by shipbuilding claims of the sort at issue. See Am. Tel. & Tel. Co. v. United States, 177 F.3d 1368, 1370-71 (Fed. Cir.1999) (en banc).

If the court could not find an enforceable interest for contractors in a statute, the enactment of which was motivated by contractors having to bear cost overruns, Chevron will be hard pressed to find one here. Indeed, the purpose of FAR 15.402(a) is not to protect contractors (other than from needless demands for documents), but to protect the Government from prices that are "higher than warranted." All Phase Environmental, Inc., B-292-919.2, 2004 CPD ¶ 62, 2004 WL 437450 at 6. That purpose is evident, for example, in the regulation's warning against prices that include "contingency" amounts, i.e., amounts that would make a price "higher than warranted." Professors Nash and Cibinic agree, explaining that: "The primary focus of these requirements is to ensure that the Government does not pay unreasonably high prices," although they caution that "prices that are unreasonably low must also be dealt with before an award is made, because they could be evidence of mistake, non-responsibility, lack of understanding of the work, or a buy-in." Formation of Government Contracts (3rd Ed. 1998) at 1279.[8]

Indeed, if, as Chevron argues, the contracting officer's obligation to assess price reasonableness is actionable, contract pricing never would be binding, because contractors who failed to realize the *post hoc* demands of their owners or investors could occasion this Court's intervention with no more substantial an allegation than "our price was unfair" That is precisely

---

[8] We are not aware of any allegation of pricing mistake here of the sort referred to in this treatise.

what Chevron seeks to do here: insist that it be paid what it calls "fair market value," a term apparently to be defined by an expert at trial.

D. Summary

At bottom, Chevron's complaint concerns the type of market-based clause selected. However, absent a prohibition, the agency had the discretion to select an appropriate clause. See AT&T V, 307 F.3d at 1378-80; accord 10 U.S.C. § 2306(a) (agency head generally "may enter into any kind of contract that he considers will promote the best interests of the United States"); see also FAR 16.103(a) ("Selecting the contract type is generally a matter for negotiation and requires the exercise of sound judgment."); FAR 16.104 (selection of contract type turns upon "many factors"). Indeed, the FAR expressly affords the contracting officer latitude to use agency-prescribed EPA clauses when the standard FAR clauses are "inappropriate." FAR 16.203-4 (a)(2), (b)(2), and (c)(2) (1995).

To borrow this Court's phrase: "An important consideration is the prevailing view among courts that determinations in procurement matters should ordinarily be left to the discretion of administrative officials exercising procurement authority." Durable Metals Prods., Inc. v. United States, 27 Fed. Cl. 472, 477 n.6, aff'd, 11 F.3d 1071 (Fed. Cir. 1993) (table). Any doubt concerning the agency's exercise of discretion in this case should be erased by the uncontroverted facts of this case: during years of contract performance, Chevron did not complain about the legality of its contracts' formation or operation. PFF 33. That silence is telling. There simply is nothing inherently suspicious or illegal about DESC's fuel contracts. Chevron, which, as claimant must prove otherwise, has not done so.

E. Chevron Cannot Demonstrate Harm[9]

To maintain a cause of action against the Government, Chevron must demonstrate that it was injured, damaged, or harmed by the Government's allegedly wrongful action. Failure to prove harm or the existence of injury as part of entitlement is a failure of a cause of action. Pennsylvania Dept. of Transp. v. United States, 226 Ct. Cl. 444, 451, 643 F.2d 758, 762-63 (1981) (observing the "well-established rule" that Government contractors have the "burden of establishing the fundamental facts of liability, causation, and resultant injury"); Servidone Construction Corp. v. United States, 931 F.2d 860 (Fed. Cir. 1991); Elter, S.A., ASBCA No. 52451, 2001-1 BCA ¶ 31,373 (denying entitlement because the contractor failed to establish that a Government delay caused injury); see also 1 Dobbs' Law of Remedies § 3.1 (2d. ed. 1993) ("The amount of harm may be either more or less than the amount of damages. . . . [T]he term damages is best reserved for the claim or the remedy rather than the underlying loss or injury."). The appellate court's decision in LaBarge Prods., Inc. v. West, 46 F.3d 1547, 1557 (Fed. Cir. 1995), is instructive. There, plaintiff asserted that it was entitled to reformation of its contract, because the Government had violated the FAR by sharing plaintiff's prices with a competitor. The court disagreed, explaining that "Even though the [price] disclosures to [a competitor] clearly violated the FAR . . . LaBarge was not harmed by the disclosures in any concrete way contemplated by the FAR and, therefore, is not entitled to relief." Id. at 1556. See also PCL Construction, 41 Fed. Cl. 242 (no damages where plaintiff could not demonstrate prejudice

[9] Some judges of this Court have disagreed with this argument, as applied to the FAR 16.203-1-based illegality argument. See, e.g., La Gloria v. United States, 56 Fed. Cl. 211 (2003) (reasoning that the argument could be addressed in connection with any damages determination and that, once the EPA clause at issue was stricken, harm would be, in essence, irrelevant to the damages). In our review, that argument conflates the harm and damages elements of proof.

stemming from the Government's inclusion of an unauthorized "subject to availability of funds" clause in its contract).

Thus, assuming there still exists otherwise viable causes of action, before Chevron will be entitled to a remedy, it first must demonstrate that it was harmed in some way, e.g., that it was caused to do or refrain from doing something to its detriment -- for example by offering prices it otherwise would not have offered. In other words, simply alleging the Government acted incorrectly alone is an allegation of "injury without harm" and, therefore, must be dismissed.

III. Chevron's Alternative Illegality Theories In Counts II-VI Must Be Dismissed

In addition to its core complaint, that the EPA clauses violate the FAR, Chevron presents several common-law theories of relief in Counts II-VI. These trojan horse allegations merely repackage the premise discussed in Sections II.B. and C., above: that EPA clauses must be "designed and intended," and, in fact, provide for the payment of "fair market value." As explained, however, this premise arises neither from Chevron's contracts nor from the Federal Circuit's announced standard for EPA clauses. As explained below, the premise gains no traction in a common law guise and, therefore, Counts II-VI also fail to state a claim.

A. Count II (Misrepresentation)

In sum, Count II alleges that DESC "misrepresented and otherwise failed to disclose that PMM and other indexes were not designed or intended to be used to set or adjust prices and did not reflect at least fair market value." Compl. ¶ 60. The apparent premise for this allegation is that "[i]n basing price adjustments on PMM, DESC represented and warranted that PMM accurately reflected at least the fair market value for fuel and that prices for military fuel were fair and reasonable." Compl. ¶ 14.

"Misrepresentation occurs when the government misleads a contractor by a negligently untrue representation of fact, or fails to disclose information it has a duty to disclose." John Massman Contracting Co., v. United States, 23 Cl. Ct. 24, 32 (1991) (citing Morrison-Knudsen Co. v. United States, 170 Ct. Cl. 712 (1965)). Chevron has not identified a fact that DESC had a duty to disclose or one that was material to its bargain. The essential terms of the DESC contracts are that Chevron would supply fuel at a given location and that DESC would pay Chevron according to a specified formula. Chevron has not alleged that any part of the contract was ambiguous, that DESC failed to honor the pricing clause, or that the clause failed to operate as described in the contract.

B. Count III ("Breach of Contract")

Count III is based upon the premise that "DESC's basing price adjustments on PMM and other indexes that were adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value was a material condition of the contracts upon which Plaintiffs reasonably relied in entering the contracts." Compl. ¶ 68. The complaint also alleges that a material part of the parties' bargain was DESC basing price adjustments "on standards that were designed or intended to be used to set or adjust prices," id. at ¶ 69, and DESC's "paying at least fair market value." Id. at ¶ 70. The short answer is that there is nothing in the contract that recites any such condition. Accordingly, there is no basis for concluding that these were "material" conditions of the contracts or that the contracts were breached, even assuming that these conditions never materialized.

C. Count IV ("Implied-In-Fact Contract")

Count IV alleges that DESC committed a "violation of law and regulation" in awarding and administering Chevron's contracts. Compl. ¶ 81. As we have explained, there has been no violation of law or regulation. Nonetheless, an "implied-in-fact contract cannot exist if an express contract already covers the same subject matter." Trauma Service Group v. United States, 104 F.3d 1321, 1326 (Fed. Cir. 1997). Here, the alleged implied-in-fact contract concerns the same subject as that addressed directly by the contracts at issue, the price of fuel already bought and sold. Accordingly, if, according to the contracts, Chevron is entitled to additional compensation, contracts and contract principles will provide Chevron its remedy.[10]

D. Count V ("Failure of Consideration and Frustration of Purpose")

Count V, too, is based upon the triumvirate of premises discussed above, that DESC was required to: (1) base prices upon an index "adequate" to "protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value;" (2) base prices upon an index "designed or intended to be used to set or adjust prices" and that did "reflect at least fair market value;" (3) and pay "fair and reasonable prices" and "at least fair market value." Compl. ¶¶ 88-90.

As we have explained, these allegations are not the proper basis for a contractually-based claim and pleading them as a breach-type claim does not increase their heft. Moreover, these theories are bases for avoiding performance, and not applicable here, because performance

---

[10] We understand that this allegation has not been plead as an independent ground for relief, but as an allegation of law concerning how a remedy might be obtained should the contract's express pricing clause be stricken as illegal. See Barrett Refining v. United States, 242 F.3d. 1055, 1060 (2001) (remedy for illegal pricing term is found in any implied contract concerning that term). However, as we have noted, these contracts are legal. Thus, this count adds no new allegations or necessary cause of action and should be dismissed.

already has occurred. See, e.g., Everett Plywood Corp. v. United States, 227 Ct. Cl. 415, 423-24, 651 F.2d 723, 728-29 (1981) (frustration excuses performance); Far West Fed. Bank v. OTS, 119 F.3d 1358, 1364 (9th Cir. 1997)(frustration of purpose is an excuse for non-performance, not a cause of action (citing Restatement (Second) of Contracts sec. 265)); Perpetual Financial Corp. v. United States, 61 Fed. Cl. 126, 138 (2004) (frustration of purpose count must be dismissed); Spalding & Sons, Inc. v. United States, 28 Fed. Cl. 242, 248-49 (1993) (frustration is a "rule respecting discharge," based on frustration of purpose, citing section 265 of the Restatement (Second) of Contracts).

But, even if the Court were to recognize frustration as an affirmative cause of action, the frustration allegations would fail. The Federal Circuit has held that, to excuse performance based upon frustration of purpose, a party must establish that: (1) a supervening event occurred; (2) the moving party did not bear the risk of the supervening event; and (3) the event rendered the value of performance worthless. Seaboard Lumber v. United States, 308 F.3d 1283, 1295 (Fed. Cir. 2002). Chevron has not alleged such factors.

E. Count VI (Mistake)

In Count VI, Chevron argues that the same "no fair prices, no fair market value, no intent to track fair market value" litany presented in the other alternative counts entitles Chevron to reprice its DESC contracts. Compl. ¶¶ 106-108. In Count VI, the litany is further fractured into yet two more alternatives -- mutual mistake and unilateral mistake. However, because the litany (in addition to being untrue) has no legal significance, Count VI, too, must be dismissed.

1. Mutual Mistake

To establish mutual mistake so as to justify rescission of a contract, a party must demonstrate that: (1) at the time of their agreement, both parties shared a mistaken belief "regarding a fact"; (2) that the mistaken belief "constituted a basic assumption underlying the contract"; (3) that the mistake "had a material effect on the bargain;" and (4) the claimant did not assume the risk of mistake. Dairyland Power Cooperative v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994); Atlas Corp. v. United States, 895 F.2d 745, 750 (Fed. Cir. 1990).

The kind of "mistake" necessary to support reformation of a contract concerns a belief not in accord with the facts in existence at the time of contracting. Atlas Corp., 895 F.2d at 750 (rejecting claim of mutual mistake where fact had not come into existence at time of contracting).[11] Therefore, "'[a] party's prediction or judgment as to events to occur in the future, even if erroneous, is not a 'mistake' as that word is defined [under the doctrine of mutual mistake of fact].'" Dairyland Power Cooperative, 16 F.3d at 1202 (citing cases and treatises).

Here, Chevron's contention is that the PMM does not track fair market value. But, Chevron offers no evidence concerning the elements of a mistake claim, including that both parties held an unrealized belief concerning a basic assumption underlying their bargain. Indeed, Chevron is unlikely to do so, inasmuch as the best evidence of what the parties believed concerning their agreement is the plain language of the contract itself. Yet, Chevron has identified no evidence that the parties believed that the PMM or Platts were anything other than what they are: publications of certain price data. Moreover, the gravaman of the complaint is

[11] The archetypal example is Sherwood v. Walker, 66 Mich. 568, 576, 33 N.W. 919 (1887). There, a seller was permitted to void his contract to sell a cow that the parties had supposed was barren, when, in fact, she was fertile, and of good breeding stock.

not that the parties failed to understand the EPA clauses, but that they were illegal. However, in light of the Federal Circuit's decision in Tesoro, that is not the case. As a result, if there was any mistake, it was Chevron's legal conclusion at the time it filed its claim -- and not one concerning a fact "existing" at contract formation.

2. Unilateral Mistake

To succeed on a claim of unilateral mistake, a party must demonstrate:

> (1) mistake by one party, not bearing the risk of such mistake, as to a basic assumption on which he made the contract;
>
> (2) that has a material effect on the agreed exchange of performance; and
>
> (a) the effect of the mistake is such that enforcement of the contract would be unconscionable; or
>
> (b) the other party to the contract has reason to know of the mistake.

J&E Salvage v. United States, 37 Fed. Cl. 256, 265 (1997) (citing Restatement (Second) of Contracts § 153 (1981)).

A contract will not be reformed because of a unilateral mistake in a bid unless the contractor establishes that the mistake resulted from a clear cut clerical or arithmetical error, or a misreading of the specifications. United States v. Hamilton Enterprises, 711 F.2d 1038, 1046 (Fed. Cir. 1983); Dale Ingram, Inc. v. United States, 201 Ct. Cl. 56, 74, 475 F.2d 1177, 1186 (1973). But, an agreement cannot be revised to reflect one party's subjective understanding of which the other party does not and should not have been aware. Id. Accordingly, the doctrine of mistake of fact does not apply when the error made by one of the parties was based upon an erroneous prediction or judgment. Restatement (Second) of Contracts § 151a.

An actionable "mistake" is a discrepancy between an offeror's state of mind and his offer. Tony Downs Foods Co. v. United States, 209 Ct. Cl. 31, 530 F.2d 367, 372 (1976) (holding that "difficulty of performance or losses in carrying out a contract will not be treated as a basis for relief by the courts in the absence of special clause in the contract stipulations providing for such relief"). In Hamilton Enterprises, 711 F.2d at 1046, the court found no mistake because the contractor could not demonstrate that the price it bid was not "the price it intended to bid." Accord Liebherr Crane Corp. v. United States, 810 F.2d 1153, 1157 (Fed. Cir. 1987) ("there is no difference in this case between Liebherr's intended bid and the bid Liebherr actually submitted”).

Chevron cannot make the necessary showing, because the vague allegations concerning the inappropriateness of the EPA clauses are, at best, legal characterizations of the clauses or of payment eventualities that postdated Chevron’s offers (the payment, or not, of "fair market value”) – and not true mistakes concerning what Chevron intended to bid. Indeed, if that were not true, we would expect to see allegations and supporting declarations concerning the state of mind of Chevron’s contract pricing teams. Instead, we have Chevron’s thinly-disguised, and now debunked, allegations of law concerning the legal nature of the EPA clauses - and none concerning the factual circumstances of Chevron’s offers.

The final test (the alternative second prong) of a unilateral mistake claim is that the contract was unconscionable. J&E Salvage, 37 Fed. Cl. at 265. This jurisdiction has defined an unconscionable contract as one "which no man in his senses, not under delusion, would make on the one hand, and which no fair and honest man would accept on the other...." Hume v. United States, 21 Ct. Cl. 328, 330 (1886), aff'd., 132 U.S. 406 (1889); accord Fraass Surgical Mfg. Co., Inc. v. United States, 215 Ct. Cl. 820, 571 F.2d 34 (1978).

As this Court has explained:

> In analyzing the allegation of unconscionability the court should look for some type of oppression, unfair surprise and lack of consent at the time of entering into the contract. Gregory Lumber, 11 Cl. Ct. at 504 . . . . As pointed out in the Fraass decision . . . "discretion to deny enforcement to an unconscionable clause ... is not extended to permit courts to redistribute risks allocated by differences in bargaining power, but rather to prevent oppression and unfair surprise." Fraass, 215 Ct. Cl. at 830, 571 F.2d at 40.

Glopak Corporation v. United States, 12 Cl. Ct. 96, 102 (1987), aff'd., 851 F.2d 334, 338 (1988).

Here, nothing about the award was unconscionable. As many as eight years of Chevron silence tells us that.

IV. Count VII (Takings Allegation) Fails To State A Claim

In yet another expression of Chevron's legal view of the EPA clauses, Count VII states: "With no fully supporting claim of right DESC took possession of and infringed upon Plaintiff's property rights in and in relation to the fuel it delivered." Compl. ¶ 133.[12] The Complaint further supposes that the fuel was taken "in conjunction with a violation of law and regulation." Id. at ¶ 135. Although the Court possesses jurisdiction under the Tucker Act to entertain claims properly founded upon the Takings Clause of the Fifth Amendment, these allegations fail to state such a claim.

The Takings Clause mandates "just compensation" when the Federal Government appropriates private property for "public use." U.S. Const. amend V; Bernaugh v. United States,

---

[12] If by this, Chevron means that DESC took the fuel illegally, it has failed to state a claim under the Fifth Amendment, because, to maintain an action based upon a Fifth Amendment taking, a plaintiff "must concede the validity of the government action which is the basis of the taking claim." Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 802 (Fed. Cir. 1993) (citing Florida Rock Indus. Inc. v. United States, 791 F.2d 893, 899 (Fed. Cir. 1986)). "The remedy for an unlawful seizure of property is in tort," which is beyond this Court's jurisdiction. American Commerce National Bank v. United States, 38 Fed. Cl. 271, 272-73 (1997).

38 Fed. Cl. 538, 542 (1997), aff'd., 168 F.3d 1319 (Fed. Cir. 1998) (table). Here, however, the Government did not "take" property. Rather, according to the complaint, the Government purchased fuel in alleged breach of a contract.[13] "This Court's predecessor has cautioned against commingling takings compensation and contract damages." Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1070 (Fed. Cir. 2001). As the court explained, "In such instances, interference with such contractual rights generally gives rise to a breach claim not a taking claim." Id. at 1070 (quoting Sun Oil Co. v. United States, 215 Ct. Cl. 716, 769-70, 572 F.2d 786, 818 (1978)). In other words, remedies for alleged infringement of rights established contractually generally lie in contract, not the Fifth Amendment, as it is the terms of the contract that govern the parties' respective rights and obligations. Sun Oil, 215 Ct. Cl. at 769-70, 572 F.2d at 818; accord Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 703 n.27 (1949) (if there is a contract remedy, party cannot pursue takings claim in this Court).

These decisions are consistent with the important distinction courts draw between the Government's actions in its sovereign capacity and those undertaken in its proprietary capacity. "A taking can occur only when the Government acts in a sovereign capacity." Gratz v. United States, 25 Cl. Ct. 411, 420, aff'd, 985 F.2d 583 (Fed. Cir. 1992). By contrast, when the Government negotiates and enters into a contract with a private party, "this represents activity by [the Government] in a proprietary capacity." Id. (citing Sun Oil, 215 Ct. Cl. at 770, 572 F.2d at 818). As the Gratz court explained: "This transaction is a classic illustration of the

[13] As the complaint describes it, "Plaintiff has property rights in and in relation to the fuel it delivered to DESC. In addition, Plaintiff has property rights in relation to DESC's procurement of the fuel Plaintiff delivered." Compl. ¶ 132.

Government's acting in a proprietary capacity. Each side incurred rights and responsibilities. Plaintiff's sole remedy is a breach of contract action." Id. at 420.

Here, Chevron does not allege – and cannot – that DESC's alleged breach resulted in the taking of the contract itself, or its potential contractual remedies. Thus, its remedies, if any, are those provided by contract law – and not the Fifth Amendment.

V. Chevron's Small Business Program Complaints Must Be Dismissed[14]

A. The Court Lacks Jurisdiction To Entertain The Fifth Amendment Complaint

In paragraph 48 of the Second Amended Complaint, Chevron asserts that DESC's "minority-owned business bidding preferences" violate the equal protection component of the Fifth Amendment. The Court lacks jurisdiction to entertain such a complaint.

This is a court of limited jurisdiction. Dynalectron Corp. v. United States, 4 Cl. Ct. 424, 428 (1984), aff'd, 758 F.2d 665 (Fed. Cir. 1984). Absent congressional consent to entertain a claim against the United States, the Court lacks authority to grant relief. United States v. Testan, 424 U.S. 392, 399 (1976); United States v. Sherwood, 312 U.S. 584, 586 (1941). The central provision granting consent to suit in this Court is the Tucker Act, 28 U.S.C. § 1491.

In other words, the Tucker Act itself does not create a substantive right of recovery against the United States. Testan, 424 U.S. at 398; Eastport Steamship Corp. v. United States, 178 Ct. Cl. 599, 605-07, 372 F.2d 1002, 1007-09 (1967); United States v. Connolly, 716 F.2d 882, 885 (Fed. Cir. 1983) (en banc), cert. denied, 104 S. Ct. 1414 (1984). Accordingly, a claimant must identify a contract or some other provision of law that mandates compensation.

---

[14] At a minimum, because at least four of the contracts were awarded in response to solicitations that apparently did not include set-asides, the claims pertaining to those contracts should be summarily dismissed. See PFF 32.

United States v. Mitchell, 445 U.S. 535, 538 (1980). The equal protection clause of the Fifth Amendment, however, does not provide the requisite substantive right of recovery. Mullenberg v. United States, 857 F.2d 770, 773 (Fed. Cir. 1988); accord LeBlanc v. United States, 50 F.3d 1025, 1028 (Fed. Cir. 1995) (no Tucker Act jurisdiction based on the equal protection clause); Inupiat Community of the Arctic Slope v. United States, 230 Ct. Cl. 647, 662, 680 F.2d 122, 132, cert. denied, 459 U.S. 969 (1982).

Here, Chevron asserts that DESC's contract awards violate the "the equal protection component of the fifth amendment's due process clause by extending to minority-owned businesses bidding preferences that were not narrowly tailored to further a compelling governmental interest." Compl. ¶ 48 (Count I). However, even if that were so, that has nothing to do with the contract claims before this Court, because those claims are based upon contracts actually awarded to Chevron – not contracts diverted to minority-owned businesses, rightly or wrongly. Accordingly, Chevron's complaint is nothing more than a facial attack upon the constitutionality of DESC's fuel acquisition program – and does not concern the award or administration of *Chevron's* contracts. As such, Chevron cannot be heard to complain that it is its contracts that support the Court's jurisdiction, and, therefore, its complaint concerning DESC's minority-owned business program must be dismissed.

B. DESC's Small Business Set-Aside Program Does Not Constitute An Auction

In Count I, Chevron contends that DESC violated ("inter alia,") the "Office of Federal Procurement Policy Act ["OFPP Act"] and its implementing regulations (and, prior to its enactment, FAR § 15.610) by using prohibited auction techniques, whereby DESC awarded contracts to bidders that agreed to match other bidders' prices." Compl. ¶ 46. Apparently, Chevron is referring to DESC's small business set-aside program, which DESC effects by a

technique known as the "match price method." Under this method, DESC informs small businesses of the price that the Government would otherwise pay for a particular fuel product (as the result of a pending solicitation), including, if applicable, the Government's cost for transporting that fuel from the refiner to the ultimate consumer. The small businesses are not informed of any other offeror's actual bid prices or of their identities. PFF 30.

FAR 15.610, the applicable regulation that was in effect in 1995, provided that:

> e) The following conduct may constitute prohibited conduct under section 27 of the Office of Federal Procurement Policy Act, as amended (41 U.S.C. 423), and Subpart 3.104 to which civil and criminal penalties and administrative remedies apply.
>
> (1) Technical transfusion (i.e., Government disclosure of technical information pertaining to a proposal that results in improvement of a competing proposal); or
>
> (2) Auction techniques, such as--
>
> (i) Indicating to an offeror a cost or price that it must meet to obtain further consideration;
>
> (ii) Advising an offeror of its price standing relative to another offeror (however, it is permissible to inform an offeror that its cost or price is considered by the Government to be too high or unrealistic); and
>
> (iii) Otherwise furnishing information about other offerors' prices.

This Court has defined an auction as "direct bidding of price between two competing offerors." DGS Contract Services, Inc. v. United States, 43 Fed. Cl. 227, 239 (1999). Yet, as the contracting officer has explained, these prohibited "auction techniques" were not a part of the DESC small business set-aside program. PFF 30. Either the small business concern met the price or it did not. There was not "bidding." Id. Indeed, as evinced by the set-aside clauses themselves, DESC followed the FAR provisions (FAR 52.219-7, and FAR 19.502-3(c)), which

authorized this procedure. For that reason, the Comptroller General has found that DESC's small business procedures are consistent with applicable procurement and small business laws and regulations. See 1988 WL 227932 (Comp. Gen.), B-230556, March 23, 1989. App. 117.

C. The Court Lacks Jurisdiction To Entertain The Complaint That DESC's Small Business Program Violates FAR 52.219-7, Which It Does Not

Chevron also alleges that DESC violated the Defense Federal Acquisition Regulation Supplement, part 219 by "improperly soliciting and awarding portions of the procurement set aside for small businesses together with those for large businesses." Compl. ¶ 47. The applicable FAR provision, 52.219-7 ("Notice of Partial Small Business Set-Aside") provides that:

> b) General.
>
> (1) A portion of this requirement, identified elsewhere in this solicitation, has been set aside for award to one or more small business concerns.
>
> (2) Offers on the non-set-aside portion will be evaluated first and award will be made on that portion in accordance with the provisions of this solicitation.
>
> (3) The set-aside portion will be awarded at the highest unit price(s) in the contract(s) for the non-set-aside portion, adjusted to reflect transportation and other costs appropriate for the selected contractor(s).
>
> (4) The contractor(s) for the set-aside portion will be selected from among the small business concerns that submitted responsive offers on the non-set-aside portion. Negotiations will be conducted with the concern that submitted the lowest responsive offer on the non-set-aside portion. If the negotiations are not successful or if only part of the set-aside portion is awarded to that concern, negotiations will be conducted with the concern that submitted the second-lowest responsive offer on the non-set-aside portion. This process will continue until a contract or contracts are awarded for the entire set-aside portion.

As explained by the contracting officer, the DESC small business set-aside procedure is substantially similar to the one set forth in the FAR and is specifically in keeping with the authorized DESC deviation clause contained in the solicitation. PFF 29-31. That clause permits DESC to determine whether small businesses will qualify for awards. If they do, separate awards are made. If not, the affected fuel set-aside is returned to the non set-aside portion. This procedure avoids the delay that would take place in re-soliciting set aside failure quantities under the standard FAR and DFARS procedures, has been used since the 1960's pursuant to authorized deviations, and has been approved by the GAO on several occasions. PFF 31.

In any event, the complaint fails to demonstrate that Chevron was "harmed in [a] concrete way contemplated by the FAR . . . ." LaBarge Prods., Inc. v. West, 46 F.3d 1547, 1556 (Fed. Cir. 1995) (contractor complaining of unauthorized disclosure of procurement information must demonstrate that it was harmed by the disclosure). In fact, the complaint does nothing to link any particular action taken under this program to any contract Chevron was awarded. Accordingly, the complaint presents nothing more than a facial attack upon DESC's small business program, an attack that this Court possesses no jurisdiction to entertain.

## VI. Waiver and Estoppel Bar Chevron's Claims

As explained above, neither the FAR, any of the other plead small business statutes and regulations, nor the common law confer any unrealized right upon Chevron. However, even assuming that were not the case, we are entitled to summary judgment concerning all counts for which the Court has not already decided our waiver argument, because, long ago, Chevron waived whatever rights it imagines these sources of law might have been conferred upon it. Similarly, through its years of inaction, Chevron is estopped from pursuing any of these rights in litigation.

Waiver has been defined as an "intentional relinquishment or abandonment of a known right or privilege." Hermes II, 58 Fed. Cl. at 409 (quoting Johnson v. Zerbst, 304 U.S. 458 (1938)); see also Seaboard Lumber Co. v. United States, 903 F.2d 1560, 1563 (Fed. Cir. 1980) (citing Brookhard v. Janis, 384 U.S. 1, 4, 5 (1966)). Absent an affirmative congressional prohibition, a party may waive regulatory, statutory, and even constitutional rights Reservation Ranch v. United States, 39 Fed. Cl. 696, 712 (1997), aff'd, 217 F.3d 850 (Fed. Cir. 1999) (table). This circuit already has held that the defense of waiver is applicable against claims of illegality founded upon assertions that the Government has violated the FAR. E.g., E. Walters & Co., Inc. v. United States, 217 Ct. Cl. 254, 576 F.2d 362 (1978); Whittaker Electronic Systems v. Dalton, 124 F.3d 1443 (Fed. Cir. 1997).

Here, Chevron performed 39 one-year DESC contracts of the sort about which it now complains, over approximately 18 years, and waited 20 years from its first contract to file a complaint. In Hermes II, this Court held that a contractor that had performed nine such contracts, over a seven-year period, and waited 14 years after entering its first PMM-based contract before filing its complaint, had waived its right to complain that those contracts were illegal. Hermes II, 58 Fed. Cl. at 413.

In reaching its conclusion, the Court first considered whether the defense of waiver was available in this circuit, against a claim of illegality. In concluding that waiver was available, the Court observed that the Federal Circuit "*seems* to be of two minds on this issue," observing that Whittaker Elec. Sys., 124 F.3d 1443, E. Walters & Co., Inc. v. United States, 217 Ct. Cl. 254, 576 F.2d 362 (1978) (per curiam), and AT&T V, 307 F.3d 1374 support the availability of waiver, whereas the Beta/Chris Berg line of cases can be seen as supporting an alternate view. Hermes, 58 Fed. Cl. at 412.

The Court reconciled the apparent division of authority by identifying a "key factual distinction" between the two lines of cases cited, i.e., that, where waiver was not found, "the contractors either complained during contract formation or, at the very least, at an early stage in the history of the conflict." Id. at 413 (quoting Hermes I, 58 Fed. Cl. 3, 19 (2003)). In Hermes II, the Court noted, the contractor "astonishingly waited 14 years after entering the first [contract at issue] and eight years after entering the last [contract at issue] before litigating." 58 Fed. Cl. at 413.[15]

Reasoning that the defense of waiver was available under the right circumstances, the Court proceeded to find that the contractor had, in fact, waived its claims, because knowledge of its rights under the law could be presumed, as knowledge of the law generally is, and that "intelligent waiver" could be discerned from Hermes' general sophistication and lengthy failure to signal its dissatisfaction whatsoever. Id. at 416-18. As the Court explained it:

> It is almost universally conceded that "'wherever a contract not already fully performed is continued in spite of a known breach, the wronged party cannot avail himself of that excuse . . . . As a general proposition, one side cannot continue after a material breach by the other . . ., act as if the contract remains fully in force (although stopping performance would be fair and convenient), run up damages, and then go suddenly to court.'"

Id. at 418 (citing Ling-Temco-Vought, Inc. v. United States, 201 Ct. Cl. 135, 146 (1973) (quoting Northern Helex Co. v. United States, 197 Ct. Cl. 118, 125-26 (1972)).

---

[15] In Calcasieu v. United States, 2003 WL 22049528, *13 (Fed. Cl.) and Sunoco v. United States, 59 Fed. Cl. 390, 398 (2004), the Court agreed that the asserted illegality claims were waivable, but declined to enter summary judgment, without further discovery. Other judges of the Court have disagreed. See, e.g., Navajo v. United States, 58 Fed. Cl. 200, 213 (2003), Tesoro v. United States, 58 Fed. Cl. 65 (2003), La Gloria, 56 Fed. Cl. 211, Gold Line Refining v. United States, 54 Fed. Cl. 285 (2002). In Tesoro, the waiver question was certified for interlocutory review, which, although accepted by the Federal Circuit, was not reached.

The Court's conclusion in Hermes applies with equal force to Chevron's variously alleged causes of action, for it, too, is a sophisticated contractor (see PFF 1), with a history with and, therefore, understanding of DESC contracts. Indeed, Chevron performed these contracts for approximately 18 years, did not complain about their award or administration, and did not even submit a claim until 2001 – approximately 20 years after the first contract was awarded, and nine years after MAPCO, 27 Fed. Cl. 405, was decided. This conclusion applies with equal force to Counts II-VII, which merely repackage Chevron's illegality claim. Given Chevron's long history with DESC's fuel acquisition program, its evident sophistication in these matters, and its long silence, there is nothing about Counts II-VII that suggests that waiver does not apply. The gravaman of these counts is that Chevron has been deprived of a contractually-based right. Yet, Chevron does not even allege that the contracts changed in any material fashion in Chevron's 18 years of performing them.

Estoppel also is applicable. Estoppel requires that the party asserting estoppel rely to its detriment upon its opponent's action or inaction. E.g., E. Walters & Co., Inc. v. United States, 217 Ct. Cl. 254, 576 F.2d 362 (1978). Here, because of its superior knowledge of its own costs, its market options, and because of its extensive experience with the clauses at issue, Chevron was in the best position to assess the efficacy of the EPA clauses regarding its own situation. By adopting the EPA clauses in its offers with the text of the FAR available to it, Chevron signaled its intent to forego any presumed benefits contained in what it now urges as the FAR's required clause. Now, it is too late to revoke that election, because Chevron continued willingness to offer these clauses, coupled with its failure to protest their inclusion, clearly prejudiced the Government, because, as subsequent events showed, the Government could have obtained a deviation or refused Chevron's offers and turned elsewhere. PFF 25-26. The same can be said

of Chevron's remaining complaints. Either option would have been a "relatively painless alternative" to the after-the-fact, competition-free, speculative recovery Chevron now seeks. Indeed, as did the contractor in Ling-Temco-Vought, Chevron has "in effect retained all options for itself . . . made its calculations entirely in its own favor, without proper consideration of the defendant's position," and violated the "basic principle calling for fair treatment of both parties." 201 Ct. Cl. at 148, 475 F.2d at 638.

## CONCLUSION

For these reasons, defendant respectfully requests that the Court dismiss the Second Amended Complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Steven J. Gillingham
STEVEN J. GILLINGHAM
Assistant Director
Commercial Litigation Branch
Civil Division
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Department of Justice
Washington, D.C. 20530
Tele: (202) 616-2311
Fax: (202) 353-7988

OF COUNSEL:

DONALD S. TRACY
Trial Attorney
Defense Supply Center Richmond
Richmond, VA 23297

HOWARD M. KAUFER
Assistant Counsel
Office of Counsel
Defense Energy Support Center
Ft. Belvoir, VA

Attorneys for Defendant

April 13, 2006

CERTIFICATE OF FILING

I hereby certify that on April 13, 2006, a copy of the foregoing document was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Steven J. Gillingham

# DEFENDANT'S APPENDIX

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CHEVRON U.S.A. INC., TEXACO INC., and TEXACO DOWNSTREAM LLC, Plaintiffs, v. THE UNITED STATES. | ) | No. 03-288C (Chief Judge Damich) |

DECLARATION OF JOHN R. WALKER

1. My name is John R. Walker and I am a contracting officer with the Defense Energy Support Center (DESC). I have been with DESC since 1983, except for a period from 1987-1989, when I worked for the Naval Sea Systems Command. I have been a DESC contracting officer since 1989.

2. DESC or its predecessor, the Defense Fuel Supply Center (DFSC), awarded Chevron USA, Inc. or Chevron Products Company (Chevron USA), 32 DESC contracts between 1981 and 1999 that are the subject of economic price adjustment (EPA) claims. Between 1983 and 1989 plaintiff Texaco Inc., or Texaco Downstream LLC (Texaco) entered into 7 DESC contracts that are also the subject of EPA claims.

3. Chevron USA supplied Jet A-1, JP-4, JP-5 and JP-8 jet fuel, DFM, F-76 and DFA diesel fuel, and MUM and MUR gasoline under the contracts. Texaco supplied JP-4 jet fuel. Jet A-1 is a kerosene based jet fuel made to commercial specifications modified for military use. JP-4 is a naphtha based jet fuel, and was primarily used by the Air Force and Army in aircraft. JP-8 is a kerosene based jet fuel used primarily in Air Force and Army aircraft, and similar in

composition to commercial jet fuel Jet A. JP-5 is a kerosene based jet fuel used by the Navy. Its salient characteristic is a high flashpoint, which enhances its safety for use in planes that land on aircraft carriers. F-76/DFM is used by the Navy for ship propulsion. It is similar to various commercial diesel fuels. DFA is arctic grade diesel fuel. MUM and MUR are regular and mid-grade unleaded gasolines used in ground vehicles.

4. Texaco's contracts were all awarded in DESC's program for the supply of bulk fuels to various military locations. Chevron USA's contracts were awarded in the bulk fuels program except for contract DLA600-89-D-1017, which was awarded in DESC's "cool barge" program to supply petroleum products to locations in Alaska. Most of the contracts were indefinite quantity-type contracts for one year and called for the delivery of large volumes of fuel.

5. The contracts contained a base price for each line item, which was the price offered by the offeror and upon which the contract was awarded. The base price was subject to adjustment by an EPA clause. The contracts provided that the contract base prices would be adjusted as called for in the EPA clause because the petroleum market is dynamic and ever changing. Using any petroleum market escalator, whether daily, weekly, or monthly will result in contract price adjustments. Thus, the base price in the contracts was used for contract award evaluation purposes, and as the baseline from which price adjustments were calculated under the EPA clauses in the contracts. As a result of the operation of the EPA clauses, when the market declines below the level it was at as of the effective date of the base price as measured by the escalator, the contractor is paid less than the base price.

6. The contracts were awarded pursuant to competitive negotiated solicitations Federal Acquisition Regulation (FAR) Part 15, and later under FAR Part 12. Most of the solicitations were done on an annual basis. DESC's general practice with regard to making the FAR 16.203-3

determination to use an economic price adjustment clause is to include the determination in the acquisition plan for the solicitation. The acquisition plan is maintained in what we call the pre-award or solicitation file, because the plan applies to the solicitation as a whole. Copies of the plan are not kept in individual contract files.

7. DESC, on the domestic bulk solicitations for the annual requirements, typically receives dozens of offers, which in combination exceed the Government's requirements. The Government's annual fuel requirements are sufficiently large that no single offeror is capable of satisfying them. Consequently the Government accepts that combination of offers from multiple suppliers that results in the lowest overall cost.

8. DESC ensured that contracts were awarded at fair and reasonable prices as mandated by the FAR. Prices were determined fair and reasonable based on adequate price competition or on established catalog or market prices of commercial items sold in substantial quantities to the general public. See FAR 15.402, formerly 15.804-3.

9. The contracts used different EPA clauses depending on the DESC program in which the contract was awarded and the date the contract was awarded. Chevron USA's contracts DLA600-82-D-0492 and DLA600-82-D-0621 contained EPA clauses based on prices published in Platts Oilgram Price Reports ("Platts"), a commercial petroleum industry price publication. Texaco's 1983 contract and Chevron USA's contracts DLA600-83-D-0558, DLA600-84-D-0484 and DLA600-84-D-0602 contained EPA clauses based on prices published by the U.S. Department of Labor Bureau of Labor Statistics (BLS). BLS is a widely used Government publication specifically authorized in the Department of Defense FAR supplement for use in cost based EPA clauses. From 1984-1994, the EPA clause in the domestic bulk fuels contracts, B19.33, provided for price adjustments based upon the monthly average sales price or market

price of refined petroleum products as reported by the Department of Energy, Energy Information Administration, in its publication the Petroleum Marketing Monthly ("PMM"). Prices under the PMM clause were effective for one month. With the exception of the 2 1984 Chevron USA's contracts that contained BLS EPA clauses, Chevron USA's other 1984-1994 bulk fuels contracts contained PMM based EPA clauses. Texaco's 1984-1989 contracts contained PMM based EPA clauses.

10. The PMM is a compilation of transaction prices in U.S. petroleum markets. Refiners, including Chevron USA and Texaco, are required by law to submit sales data to DOE on a monthly basis. The PMM price averages are based on petroleum product sales information reported to DOE and grouped by product, type of sale, states, and by geographic regions. Because the PMM contains averages of actual sales prices, DESC considers it to be a reliable indicator of price movements in the petroleum products market. There is a three-month lag time for DOE to obtain the sales data and publish the PMM. Thus, for example, January sales data is published in April, and February data in May. Prices were adjusted monthly under the PMM clause. Because of the time lag, interim adjustments were made, subject to reconciliation when the PMM was published.

11. Beginning in 1995, these domestic bulk fuels contracts included an EPA clause based upon regional average prices reported in widely used industry publications, either Platts Oilgram Price Report (Platts), or Oil Price Information Service (OPIS). Chevron USA's 1995-1999 bulk fuels contracts, and its 1989 "cool barge" contract (DLA600-89-D-1017), contained EPA clauses based on prices in Platts or OPIS. Platts is published daily on weekdays. Contract prices under the Platts-based EPA clause were adjusted weekly based on weekly averages of Platts prices. OPIS prices were published weekly, and prices were adjusted weekly in contracts containing

OPIS EPA references.

12. These EPA clauses ensured that the prices that were offered and agreed to in the contracts were adjusted according to the movements of fuel prices in the publications. If the market price went up one cent, the contract price would likewise go up one cent. If the market price went down a penny, the contract price went down a penny. The contract prices were adjusted in this way on a regular basis through the term of the contracts.

13. Based on my review of the contract files, neither Chevron USA nor Texaco ever objected to the legality of the EPA clauses, and never complained that they were not being paid a fair price for the products until they submitted the claims. For each contract where the Government's contract file still exists, Chevron USA and Texaco specifically stated in their offers that they agreed to the EPA clauses. Price change modifications were issued either weekly or monthly, depending on the clause in a particular contract, for the products that are the subject of the claims under these contracts. Neither Texaco nor Chevron USA objected to any of these hundreds of price change notices. Chevron USA submitted offers continually during the period 1981-1999, and Texaco submitted offers continually from 1983-1989.

14. Chevron USA submitted 32 certified claims between December 6, 2001 and January 31, 2002, for nearly $386 million. Texaco submitted 7 certified claims between September 10, 2001 and October 10, 2001, for nearly $45.4 million. Their principal contention was that the EPA clause in their contracts was illegal, citing the <u>MAPCO</u> court decision.

15. I denied Chevron USA's claims in a final decision dated July 2, 2002. I denied Texaco's claims in a final decision dated February 11, 2002. I concluded that the EPA clauses were legal and authorized and that Chevron USA and Texaco had received fair market value for their fuel. On February 12, 2003 Chevron USA submitted 2 certified claims totaling $18.8



5

million for alleged deliveries of JP-4 jet fuel and F-76 diesel fuel to DESC from 1982-1984. By letter dated March 4, 2003, I notified Chevron USA that I would not issue a decision on the claims because they were so lacking in basic facts that I was unable to determine the basis for the claims. The claims did not identify the contracts under which Chevron USA made the purported deliveries, did not identify the EPA clauses alleged to be unauthorized, and did not provide any evidence that Chevron USA actually made any deliveries.

16. Prior to the MAPCO decision, DESC contracting officers believed that the market-based EPA clauses were authorized and that they protected contractors in the ways identified in the FAR. In response to the Court's decision in the MAPCO case, however, DESC took steps to ensure the validity of its EPA clauses by obtaining FAR deviations authorizing the use of the market-based EPA clauses. In January, 1993, in accordance with FAR 1.403, DESC obtained an "individual deviation" which authorized the use of market based EPA clause for contracts awarded pursuant to DESC Request for Proposals (RFP) DLA600-93-R-0061. Chevron USA's contract DLA600-93-D-0507 was awarded under that RFP.

17. In late 1994, following a study by DESC's Office of Market Research and Analysis, DESC decided to switch domestic bulk EPA references from the PMM to two industry price publications, Platts and OPIS, because their assessments were found to adequately track PMM's sales prices and because there would no longer be a need to use an interim adjustment. DESC sought a class deviation for the new clause, publishing it for comment in the February 28, 1995, Federal Register. Chevron USA, or Texaco did not comment on the proposal, nor did any other oil company. On October 5, 1995, the Director of Defense Procurement, who has authority to approve clauses, approved DESC's EPA clauses. Chevron USA Contracts SP0600-96-D-0520, SP0600-97-D-0514, SP0600-98-D-0507, SP0600-98-D-0534, SP0600-99-D-0535, and SP0600-

99-D-0555 were awarded pursuant to the class deviation and contain authorized EPA clauses.

18. While DESC was seeking the class deviation, it obtained a series of individual deviations to allow the use of the revised EPA clauses. These deviations included one issued on November 15, 1994, which covered contracts awarded under RFP SP0600-95-R-0061. Chevron USA contract SP0600-95-D-0462 was awarded under that RFP. DESC also obtained an individual deviation on March 2, 1995, which covered contracts awarded under RFP SP0600-95-R-0161. Chevron USA contract SP0600-95-D-0521 was awarded under that RFP.

19. Many of the solicitations for these contracts provided that a portion of the requirement was set aside for participation by small business concerns. A copy of a sample of the DESC clause implementing the partial small business set aside, I237.07, is included in Defendant's appendix immediately following this declaration at Appendix (App.) 10. Prior to 1988, similar clauses were included in DESC's solicitations. Beginning in 1988, many DESC solicitations included an evaluation preference of up to 10 percent for small disadvantaged business concerns, a copy of DESC clause I237.05, which implemented this preference, is included at App. 11. Beginning in 1988 many DESC solicitations also included DESC clause I237.06, which provided that a portion of the requirement was set aside for exclusive participation by small business concerns with preferential consideration for small disadvantaged business concerns. A copy of that clause is at App. 12. I have reviewed the Chevron USA and Texaco contract files that are still available and determined that the following 4 Chevron USA contracts were awarded pursuant to solicitations that did not include small business set-asides: DLA600-86-D-0891, DLA600-92-D-0460, DLA600-92-D-0513 and SP0600-99-D-0555.

20. DESC's partial set aside clauses operated in substantially the same manner as the standard FAR and DFARS clauses for partial small business set asides. After offers were

received under the solicitations, they would be evaluated as if there were no set aside quantity. The set aside quantities would then be offered to small businesses based upon prices that DESC would otherwise pay under the solicitation had there been no set aside for supply of the location at which the set aside was placed, adjusted for transportation charges. In awarding the set aside quantities, the contracting officer would not furnish either the identity of the offeror, or the amount of the offered price that DESC would otherwise pay.

21. The difference between the standard FAR and DFARS set aside clauses and procedures and DESC's bulk acquisitions clauses was that DESC's set aside quantities were offered to small businesses and small, disadvantaged businesses before award of the basic quantities. If no small or small, disadvantaged business offeror accepted the set aside quantities at the offered price, *i.e.*, there was a set aside "failure," the set aside quantities would be added back to the basic quantities and awarded to the low offeror. The standard FAR and DFARS procedures provide that set aside quantities are offered after the basic quantities are awarded. Under the standard FAR and DFARS procedure, if there is a set aside failure, the quantities are not awarded under the basic acquisition, but are re-solicited under a new acquisition. The reason DESC awards set aside failure quantities under the original acquisition rather than re-soliciting is due to the complexity and size of the annual bulk acquisition of fuels. This procedure enables DESC to acquire the entire requirement for bulk fuels without re-soliciting, thereby reducing procurement lead-time and saving considerable effort. The delay that would result from re-solicitation could adversely affect the mission and readiness posture of military units dependent upon those requirements. As the clauses at App. 10-13 show, DESC has, for decades, had deviations authorizing the use of its clauses and procedures.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 4-10-06.

JOHN R. WALKER
Contracting Officer

The following clause applies only to other than DoD set-aside items.

1237.07 NOTICE OF PARTIAL SMALL BUSINESS SET-ASIDE (DFSC AUG 1984) (DEVIATION)

(a) Any offer imposing a minimum of the quantity which may be awarded, which is in excess of the non-set-aside quantity of the item or items involved, will not be considered.

(b) General Information.

(1) A portion of certain items of this procurement, as listed in the Schedule, has been set- aside for award to eligible small business concerns. The quantities indicated for such items in the Schedule include the set-aside portion. All offerors are urged to offer the maximum quantities they desire and are capable of delivering. A small business concern interested in receiving a set-aside contract should submit an offer in the same manner as though there were no set-aside. To be considered for the set-aside portion of this procurement, an offeror qualifying as a small business concern must offer on the non-set-aside and set-aside portions of the procurement. Separate offers should not be submitted on the non-set-aside and set-aside portions.

(2) The successful contractors for the set-aside portion will be determined in accordance with the procedures set forth below. The partial small business set-aside of the procurement is based on a determination by the Contracting Officer that it is in the interest of maintaining or mobilizing the nation's full production capacity, or in the interest of national defense programs, or in the interest of assuring that a fair portion of Government procurement is placed with small business concerns.

(3) The offeror must recognize that if it accepts a set-aside contract, its obligation is to furnish product which conforms with all small business requirements set forth herein.

(c) Award Procedure.

(1) All of the offers received under this solicitation will first be negotiated as to price and an evaluation will be made as though there were no set-aside. The price for the set-aside portion of this procurement will be negotiated by the Contracting Officer based upon prices the Government would otherwise pay under this solicitation had there been no set-aside for supply of the location at which the set-aside is placed, adjusted for transportation charges and other factors. Awards to small business concerns whose offers are determined by this evaluation to be low for the set-aside portion of an item will be made as to such portion without further negotiation. Contracts for the remaining set-aside portions will be negotiated with those eligible small business concerns who have submitted a responsive offer on the various items for which a set-aside has been indicated.

(2) Negotiations for set-aside awards will commence with the small business concern that has submitted the lowest offer of product on the non-set-aside portion and that has remaining a quantity of product after the award pattern has been established for the set-aside portion. If the low small business concern on the item does not accept the set-aside quantity, the next low small business concern on the item will be given the same opportunity, continuing with the next low small business concern until all small business concerns have been contacted.

(3) For the purpose of negotiation, when an offer contains increments at different prices, each increment will be considered a separate offer. Negotiation will be limited to the quantity offered (except as provided in (4) below) and which is not acceptable under the provision of (1) above.

(4) After set-aside negotiations have been concluded, a final evaluation will be accomplished. All businesses, without regard to the size of the company, will be afforded an opportunity to compete for non-set- aside quantities. The Government reserves the right to make awards to the otherwise low offeror for all or any portion of the set-aside quantities, without regard to the size of the company, if eligible small business concerns do not offer a quantity of product sufficient to meet a set-aside or do not accept set-aside offers. The total quantity which will be awarded a small business concern on both the unreserved and reserved portions will not exceed the total quantity offered under this solicitation by such small business offer. However, if insufficient product is offered by small businesses to meet the quantity setaside for small business, the small business concerns with which negotiations have commenced may be given an opportunity to offer additional product.

(DFSC 52.219-9F07)

1251(F) ANTI-KICKBACK PROCEDURES (OCT 1988)

(a) Definitions.

"Kickback," as used in this clause, means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to any prime Contractor, prime Contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract.

"Person," as used in this clause, means a corporation, partnership, business association of any kind, trust, joint-stock company, or individual.

"Prime Contract," as used in this clause, means a contract or contractual action entered into by the United States for the purpose of obtaining supplies, materials, equipment, or services of any kind.

"Prime Contractor," as used in this clause, means a person who has entered into a prime contract with the United States.

"Prime Contractor Employee," as used in this clause, means any officer, partner, employee, or agent of a prime Contractor.

"Subcontract," as used in this clause, means a contract or contractual action entered into by a prime Contractor or subcontractor for the purpose of obtaining supplies, materials, equipment, or services of any kind under a prime contract.

1211.200 ORDERING (APR 1984)

(a) Any supplies and services to be furnished under this contract shall be ordered by issuance of delivery orders by the individuals or activities designated in the Schedule. Such orders may be issued from Date of Award through 30 September 1996.

(b) All delivery orders are subject to the terms and conditions of this contract. In the event of conflict between a delivery order and this contract, the contract shall control.

(c) If mailed, a delivery order is considered "issued" when the Government deposits the order in the mail. Orders may be issued orally or by written telecommunications only if authorized in the Schedule.

(FAR 52.216-18)

1211.02 ORDERING (CONT'D) (DFSC JAN 1991)

(d) For product funded and paid for by the Defense Logistics Agency, the Contractor will be furnished with a document entitled "Source Identification and Ordering Authorization." This document is for planning purposes only and does not constitute an order under the contract. This document will also indicate the activity(ies) authorized to place orders under this contract. This document does not in any manner modify or limit Contractor's obligation to deliver pursuant to properly placed orders as provided in the contract.

(DFSC 52.216-9F12)

1225 PAYMENTS (APR 1984)

The Government shall pay the Contractor, upon the submission of proper invoices or vouchers, the prices stipulated in this contract for supplies delivered and accepted or services rendered and accepted, less any deductions provided in this contract. Unless otherwise specified in this contract, payment shall be made on partial deliveries accepted by the Government if--

(a) The amount due on the deliveries warrants it; or

(b) The Contractor requests it and the amount due on the deliveries is at least $1,000 or 50 percent of the total contract price.

(FAR 52.232-1)

1229 RESTRICTIONS ON SUBCONTRACTOR SALES TO THE GOVERNMENT (JUL 1985)

(a) Except as provided in (b) below, the Contractor shall not enter into any agreement with an actual or prospective subcontractor, nor otherwise act in any manner, which has or may have the effect of restricting sales by such subcontractors directly to the Government of any item or process (including computer software) made or furnished by the subcontractor under this contract or under any follow-on production contract.

(b) The prohibition in (a) above does not preclude the Contractor from asserting rights that are otherwise authorized by law or regulation.

(c) The Contractor agrees to incorporate the substance of this clause, including this paragraph (c), in all subcontracts under this contract.

(FAR 52.203-6)

If this document contains partial small business set-aside items in the Schedule, the evaluation preference described in the following clause is <u>not</u> applicable to the non-set-aside portion of those items, or to the unreserved portion of items partially reserved for contracting with the SBA under the 8(a) program.

1237.05 NOTICE OF EVALUATION PREFERENCE FOR SMALL DISADVANTAGED BUSINESS CONCERNS (DFSC AUG 1994) (DEVIATION)

(a) DEFINITIONS. The term "small disadvantaged business (SDB) concern," as used in this clause, has the meaning set forth in the REPRESENTATIONS clause of this contract. SDB concerns must supply petroleum product from an SDB manufacturer, who complies with the petroleum products size standards at 13 CFR 121, to be eligible for the evaluation preference.

(b) EVALUATION PREFERENCE.

(1) After all other evaluation factors described in this solicitation are applied, offers will be evaluated by adding a factor of 10 percent to the price of all offers, except--

(i) Offers from SDB concerns that have not waived the preference;

(ii) Otherwise successful offers of eligible products under the Trade Agreements Act when the dollar threshold for application of the Act is exceeded.

(2) The 10 percent factor will be applied on a line item by line item basis or to any group of items on which award may be made. Other evaluation factors described in the solicitation will be applied before application of the 10 percent factor. However, in no event may award be made to an SDB concern at a price that exceeds fair market price (as determined under FAR 19.806-2) by more than 10 percent.

(c) WAIVER OF EVALUATION PREFERENCE.

An SDB may elect to waive the preference, in which case the 10 percent factor will be added to its offer for evaluation purposes.

[ ] Offeror elects to waive the preference in paragraph (b) above.

(DFSC 52.219-9F05)

The following clause applies to set-aside items.

1237.06 NOTICE OF PARTIAL SMALL BUSINESS SET-ASIDE WITH PREFERENTIAL CONSIDERATION FOR SMALL DISADVANTAGED BUSINESS CONCERNS (DFSC AUG 1994) (DEVIATION)

(a) DEFINITIONS.

"Small business concern," as used in this clause, means a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is bidding on Government contracts, and qualified as a small business under the size standards in this solicitation.

"Small disadvantaged business (SDB) concern," as used in this clause, means a small business concern, owned and controlled by individuals who are both socially and economically disadvantaged, as defined by the Small Business Administration at 13 CFR Part 124, the majority of earnings of which directly accrue to such individuals. This term also means a small business concern owned and controlled by an economically disadvantaged Indian tribe or Native Hawaiian organization which meets the requirements of 13 CFR 124.112 or 13 CFR 124.113, respectively. In order to be eligible for preferential consideration set forth in paragraph (c) below, SDB concerns must supply product from an SDB manufacturer.

(b) GENERAL.

(1) A portion of certain items of this procurement, as listed in the Schedule, has been set aside for award to eligible small businesses, with preferential consideration for SDB concerns. The quantities indicated for such items in the Schedule include the set-aside portion. All offerors are urged to offer the maximum quantities they desire and are capable of delivering. Small business and SDB concerns interested in receiving a set-aside contract should submit an offer in the same manner as though there were no set-aside. Volumes offered by qualified small businesses or SDB concerns will be ~~evaluated for the non-set-aside and set-aside portions of the procurement. Separate offers should not be submitted on the non-set-aside and set-aside portions.~~

(2) The partial small business set-aside of the procurement is based on a determination by the Contracting Officer that it is in the interest of maintaining or mobilizing the nation's full production capacity or in the interest of national defense programs, or in the interest of assuring that a fair portion of Government procurement is placed with small business concerns.

(3) All of the offers received under this solicitation will first be negotiated as to price and an evaluation will be made as though there were no set-aside.

(4) For the purposes of set-aside evaluation, when an offer contains increments at different prices, each increment will be considered a separate offer. Except as provided in paragraph (e) below, negotiations will be limited to the offered quantities not awarded under the provision of subparagraph (d)(2).

(c) SET-ASIDE AWARD PROCEDURE (Preferential Consideration for SDB Concerns).

(1) Offers from SDB and small business concerns will be evaluated with preferential consideration, as described below, given to eligible SDB concerns.

(2) Offers from SDB concerns will be reviewed first to determine if an award can be made to an SDB concern at its offered price, beginning with the SDB concern offering the lowest evaluated price for that item. Awards to SDB concerns on the set-aside portion of this procurement will be made at the price offered by the SDB concern if that evaluated price does not exceed the highest award price on the non-set-aside portion by more than 10 percent, as adjusted for transportation charges and other factors. If the SDB price exceeds the highest non-set-aside price by more than 10 percent, the SDB offer will be treated as a small business and the procedures set forth in (d) below will apply.

1237.06 (Cont'd)

(3) Any volumes remaining on the set-aside portion that are not awarded to the lowest priced eligible SDB concern under subparagraph (c)(2) will be awarded to any other SDBs eligible for award under the procedures set forth above, beginning with the SDB concern offering the next lowest price.

(d) SET-ASIDE AWARD PROCEDURE (Small Business Concerns).

(1) After evaluation and award to eligible SDB concerns, if any, negotiations will be conducted with small business concerns for any set-aside volumes not awarded to eligible SDB concerns under paragraph (c).

(2) The price for the small business set-aside portion will be negotiated by the Contracting Officer based upon prices the Government would otherwise pay under this solicitation had there been no set-aside for supply of the location at which the set-aside is placed, adjusted for transportation charges and other factors. For the set-aside portion of an item not already awarded to SDB concerns, awards will be made to the small business concern whose offer is determined by this evaluation to be low without further negotiation. Contracts for the remaining set-aside portions will be negotiated with those eligible small business concerns who have submitted a responsive offer on the various items for which a set-aside has been established.

(3) Negotiations for small business set-aside awards will begin with the small business concern with the lowest evaluated price and a quantity of offered product remaining. If the low small business concern on the item does not offer to supply product at the set-aside price, the next low small business concern on the item will be given the same opportunity and continuing with the next low small business concern until all small business concerns have been contacted.

(e) After set-aside negotiations have been concluded, a final evaluation will be accomplished. All eligible offerors, without regard to the size of the company, will be afforded an opportunity to compete for non-set-aside quantities. The Government reserves the right to make awards to the otherwise low offeror for all or any portion of the set-aside quantities, without regard to the size of the company, if eligible SDB or small business concerns do not offer a quantity of product sufficient to meet a set-aside requirement or do not offer to supply at the set-aside prices. The total quantity which will be awarded a small business or an SDB offeror on both the unreserved and reserved portions will not exceed the total quantity offered under this solicitation by such small business or SDB offerors. However, if insufficient product is offered by small business and SDB concerns to meet the quantity set-aside for small business, SDB and small business concerns with whom the Government has already commenced negotiations may be given an opportunity to offer additional product.

(f) Where the Trade Agreements Act applies to the non-set-aside portion, offers of eligible products will be treated as if they were qualifying country end products.

(g) TOKEN OFFERS.

The Government reserves the right to not consider token offers or offers designed to secure an unfair advantage over other offerors eligible for the set-aside portion.

(DFSC 52.219-9F06)

1251(F) ANTI-KICKBACK PROCEDURES (OCT 1988)

(a) Definitions.

"Kickback," as used in this clause, means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to any prime Contractor, prime Contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract.

"Person," as used in this clause, means a corporation, partnership, business association of any kind, trust, joint-stock company, or individual.

"Prime Contract," as used in this clause, means a contract or contractual action entered into by the United States for the purpose of obtaining supplies, materials, equipment, or services of any kind.

"Prime Contractor," as used in this clause, means a person who has entered into a prime contract with the United States.

"Prime Contractor Employee," as used in this clause, means any officer, partner, employee, or agent of a prime Contractor.

"Subcontract," as used in this clause, means a contract or contractual action entered into by a prime Contractor or subcontractor for the purpose of obtaining supplies, materials, equipment, or services of any kind under a prime contract.

"Subcontractor," as used in this clause, (1) means any person, other than the prime Contractor, who offers to furnish or furnishes any supplies, materials, equipment, or services of any kind under a prime contract or a subcontract entered into in connection with such prime contract; and (2) includes any person who offers to furnish or furnishes general supplies to the prime Contractor or a higher tier subcontractor.

"Subcontractor Employee," as used in this clause, means any officer, partner, employee, or agent of a subcontractor.

(b) The Anti-Kickback Act of 1986 (41 U.S.C. 51-58) (the Act) prohibits any person from--

(1) Providing or attempting to provide or offering to provide any kickback;

(2) Soliciting, accepting, or attempting to accept any kickback; or

(3) Including, directly or indirectly, the amount of any kickback in the contract price charged by a prime Contractor to the United States or in the contract price charged by a subcontractor to a prime Contractor or higher tier subcontractor.

TITLE 48--Federal Acquisition Regulations System
Chapter 1--Federal Acquisition Regulation
Subchapter C--Contracting Methods and Contract Types
Part 15--Contracting by Negotiation
Subpart 15.6--Source Selection

15.610 Written or oral discussion.

(a) The requirement in paragraph (b) below for written or oral discussion need not be applied in acquisitions--

(a)(1) In which prices are fixed by law or regulation;

(a)(2) Of the set-aside portion of a partial set-aside; or

(a)(3) In which it can be clearly demonstrated from the existence of full and open competition or accurate prior cost experience with the product or service that acceptance of the most favorable initial proposal without discussion would result in the lowest overall cost to the Government at a fair and reasonable price; provided, that--

(a)(3)(i) The solicitation notified all offerors of the possibility that award might be made without discussion; and

(a)(3)(ii) The award is in fact made without any written or oral discussion with any offeror.

(b) Except as provided in paragraph (a) above, the contracting officer shall conduct written or oral discussion with all responsible offerors who submit proposals within the competitive range. The content and extent of the discussions is a matter of the contracting officer's judgment, based on the particular facts of each acquisition (but see paragraphs (c) and (d) below).

(c) The contracting officer shall--

(c)(1) Control all discussions;

(c)(2) Advise the offeror of deficiencies in its proposal so that the offeror is given an opportunity to satisfy the Government's requirements;

(c)(3) Attempt to resolve any uncertainties concerning the technical proposal and other terms and conditions of the proposal;

(c)(4) Resolve any suspected mistakes by calling them to the offeror's attention as specifically as possible without disclosing information concerning other offerors' proposals or the evaluation process (see 15.607 and Part 24); and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(c)(5) Provide the offeror a reasonable opportunity to submit any cost or price, technical, or other revisions to its proposal that may result from the discussions.

(d) The contracting officer and other Government personnel involved shall not engage in--

(d)(1) Technical leveling (i.e., helping an offeror to bring its proposal up to the level of other proposals through successive rounds of discussion, such as by pointing out weaknesses resulting from the offeror's lack of diligence, competence, or inventiveness in preparing the proposal);

(d)(2) Technical transfusion (i.e., Government disclosure of technical information pertaining to a proposal that results in improvement of a competing proposal); or

(d)(3) Auction techniques, such as--

(d)(3)(i) Indicating to an offeror a cost or price that it must meet to obtain further consideration;

(d)(3)(ii) Advising an offeror of its price standing relative to another offeror (however, it is permissible to inform an offeror that its cost or price is considered by the Government to be too high or unrealistic); and

(d)(3)(iii) Otherwise furnishing information about other offerors' prices.

[50 FR 1741, Jan. 11, 1985]

Authority: 40 U.S.C. 486(c); 10 U.S.C., Chapter 137; and 42 U.S.C. 2453(c).

Source: 48 FR 42186, Sept. 19, 1983; 50 FR 52429, Dec. 23, 1985, unless otherwise noted.

48 CFR s 15.610

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**52.219-7 Notice of Partial Small Business Set-Aside.**

As prescribed in 19.508(d), insert the following clause:

NOTICE OF PARTIAL SMALL BUSINESS SET-ASIDE (OCT 1995)

(a) *Definitions*.

"Small business concern", as used in this clause, means
a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is bidding on Government contracts, and qualified as a small business under the size standards in this solicitation.

(b) *General*. (1) A portion of this requirement, identified elsewhere in this solicitation, has been set aside for award to one or more small business concerns.

(2) Offers on the non-set-aside portion will be evaluated first and award will be made on that portion in accordance with the provisions of this solicitation.

(3) The set-aside portion will be awarded at the highest unit price(s) in the contract(s) for the non-set-aside portion, adjusted to reflect transportation and other costs appropriate for the selected contractor(s).

(4) The contractor(s) for the set-aside portion will be selected from among the small business concerns that submitted responsive offers on the non-set-aside portion. Negotiations will be conducted with the concern that submitted the lowest responsive offer on the non-set-aside portion. If the negotiations are not successful or if only part of the set-aside portion is awarded to that concern, negotiations will be conducted with the concern that submitted the second-lowest responsive offer on the non-set-aside portion. This process will continue until a contract or contracts are awarded for the entire set-aside portion.

(5) The Government reserves the right to not consider token offers or offers designed to secure an unfair advantage over other offerors eligible for the set-aside

portion.

(c) *Agreement*. For the set-aside portion of the acquisition, a manufacturer or regular dealer submitting an offer in its own name agrees to furnish, in performing the contract, only end items manufactured or produced by small business concerns inside the United States, its territories and possessions, the Commonwealth of Puerto Rico, the Trust Territory of the Pacific Islands, or the District of Columbia. However, this requirement does not apply in connection with construction or service contracts.

(End of clause)

*Alternate I* (OCT 1995). When the acquisition is for a product in a class for which the Small Business Administration has determined that there are no small business manufacturers or processors in the Federal market in accordance with 19.502-2(c), delete paragraph (c).

**252.219-7006 Notice of Evaluation Preference for Small Disadvantaged Business Concerns.**

As prescribed in 219.7003, use the following clause:

**NOTICE OF EVALUATION PREFERENCE FOR SMALL DISADVANTAGED BUSINESS CONCERNS (JUN 1997)**

(a) **Definitions.**

"Historically black colleges and universities," as used in this clause, means institutions determined by the Secretary of Education to meet the requirements of 34 CFR Section 608.2. The term also means any nonprofit research institution that was an integral part of such a college or university before November 14, 1986.

"Minority institutions," as used in this clause, means institutions meeting the requirements of Section 1046(3) of the Higher Education Act of 1965 (20 U.S.C. 1135d-5(3)). The term also include Hispanic-serving institutions as defined in Section 316(b)(1) of such Act (20 U.S.C. 1059c(b)(1)).

"Small disadvantaged business concern," as used in this clause, means a small business concern, owned and controlled by individuals who are both socially and economically disadvantaged, as defined by the Small Business Administration at 13 CFR Part 124, the majority of earnings of whichdirectly accrue to such individuals. This term also means a small business concern owned and controlled by an economically disadvantaged Indian tribe or Native Hawaiian organization which meets the requirements of 13 CFR 124.112 or 13 CFR 124.113, respectively.

"United States," as used in this clause, means the United States, its territories and possessions, the Commonwealth of Puerto Rico, the U.S. Trust Territory of the Pacific Islands, or the District of Columbia.

(b) **Evaluation preference.**

(1) Offers will be evaluated by adding a factor of ten percent to the price of all offers, except --

(i) Offers from small disadvantaged business concerns, which have not waived the preference;

(ii) Offers from historically black colleges and universities or minority institutions, which have not waived the preference;

(iii) Otherwise successful offers of --

(A) Eligible products under the Trade Agreements Act when the dollar threshold for application of the Act is exceeded;

(B) Qualifying country end products (as defined in the Defense Federal Acquisition Regulation Supplement clause at 252.225-7001, Buy American Act and Balance of Payments Program); and

(iv) Offers where application of the factor would be inconsistent with a Memorandum of Understanding or other international agreement with a foreign government.
(2) The ten percent factor will be applied on a line item by line item basis or to any group of items on which award may be made. Other evaluation factors described in the solicitation will be applied before application of the ten percent factor. The ten percent factor will not be applied if using the preference would cause the contract award to be made at a price which exceeds the fair market price by more than ten percent.

(c) **Waiver of evaluation preference.**

A small disadvantaged business, historically black college or university, or minority institution offeror may elect to waive the preference, in which case the ten percent factor will be added to its offer for evaluation purposes. The agreements in paragraph (d) do not apply to offers which waive the preference.
_____ Offeror elects to waive the preference

(d) **Agreements.**

(1) A small disadvantaged business concern, historically black college or university, or minority institution offeror, which did not waive the preference, agrees that in performance of the contract, in the case of a contract for--
(i) Services, except construction, at least 50 percent of the cost of personnel for contract performance will be spent for employees of the concern.
(ii) Supplies, (other than procurement from a regular dealer in such supplies), at least 50 percent of the cost of manufacturing, excluding the cost of materials, will be performed by the concern.
(iii) General construction, at least 15 percent of the cost of the contract, excluding the cost of materials, will be performed by employees of the concern.
(iv) Construction by special trade contractors, at least 25 percent of the cost of the contract, excluding the cost of materials, will be performed by employees of the concern.

(2) A small disadvantaged business, historically black college or university, or minority institution regular dealer submitting an offer in its own name agrees to furnish in performing this contract only end items manufactured or produced in

the United States by small disadvantaged business concerns, historically black colleges or universities, or minority institutions.

(3) Upon request, a historically black college or university or minority institution offeror will provide the Contracting Officer evidence that it has been determined to be an HBCU or MI by the Secretary of Education.

(End of clause)

**252.219-7001 Notice of Partial Small Business Set-Aside with Preferential Consideration for Small Disadvantaged Business Concerns.**
As prescribed in 219.508(d), use the following clause:

**NOTICE OF PARTIAL SMALL BUSINESS SET-ASIDE WITH PREFERENTIAL CONSIDERATION FOR SMALL DISADVANTAGED BUSINESS CONCERNS (MAY 1995)**

(a) **Definitions.**

"Labor surplus area," as used in this clause, means a geographical area identified by the Department of Labor as an area of labor surplus.

"Labor surplus area concern," as used in this clause, means a concern that, together with its first tier subcontractors, will perform substantially in labor surplus areas.

"Perform substantially in labor surplus areas," as used in this clause, means that the costs incurred under the contract on account of manufacturing, production, and performance of services in labor surplus areas exceed 50 percent of the contract price.

"Small business concern," as used in this clause, means a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is bidding on Government contracts, and qualified as a small business under the size standards in this solicitation.

"Small disadvantaged business concern," as used in this clause, means a small business concern, owned and controlled by individuals who are both socially and economically disadvantaged, as defined by the Small Business Administration at 13 CFR Part 124, the majority of earnings of which directly accrue to such individuals. This term also means a small business concern owned and controlled by an economically disadvantaged Indian tribe or Native Hawaiian organization which meets the requirements of 13 CFR 124.112 or 13 CFR 124.113, respectively.

"United States," as used in this clause, means the United States, its territories and possessions, the Commonwealth of Puerto Rico, the U.S. Trust Territory of the Pacific Islands, or the District of Columbia.

(b) **General.**

A portion of this requirement, identified elsewhere in this solicitation, has been set-aside for award to one or more small business concerns. After offers for the non-set-aside portion have been evaluated, negotiations will be conducted for the set-aside portion.

(1) Offers on the non-set-aside portion will be evaluated and award made in accordance with the other provisions of this solicitation.
(2) The set-aside portion will be negotiated, in accordance with this clause, with small business concerns which submitted offers on the non-set-aside portion.

(c) **Award of the set-aside portion.**

(1) Small business offerors on the non-set-aside portion will be selected for negotiation of the set-aside portion based on their standing -- first in terms of group and then in terms of lowest responsive offer on the non-set-aside portion.
(i) Group 1 - Small disadvantaged business concerns which are also labor surplus area concerns.
(ii) Group 2 - Small business concerns which are also labor surplus area concerns.
(iii) Group 3 - Other small disadvantaged business concerns.
(iv) Group 4 - Other small business concerns.
(2) The set-aside portion will be awarded at the highest unit price(s) in the contract(s) for the non-set-aside portion, adjusted to reflect transportation and other costs appropriate for the selected contractor(s), except --
(i) Award of the set-aside portion to a small disadvantaged business concern will be at the lower of --
(A) The price offered by the concern on the non-set-aside portion; or

(B) A price that does not exceed the award price on the non-set-aside portion by more than ten percent.

(ii) When award under the set-aside portion is to a concern offering a nonqualifying country end product and the highest unit price in the contract(s) is for a domestic or qualifying country end product, the set-aside price will be the higher of--

(A) The highest award price for a nonqualifying country end product under the nonset-aside; or
(B) A price which, when adjusted by the Buy American Act evaluation factor, would equal the highest unit price in the contract(s).

(iii) When award under the set-aside portion is to a concern offering a domestic end product and the highest unit price in the contract(s) is for a nonqualifying country end product which was evaluated using the Buy American Act evaluation factor, the set-aside price will be awarded at the evaluated price of the non-qualifying country.
(iv) When award under the set-aside portion is to a concern offering a domestic end product and the highest unit price in the contract(s) is for a

nonqualifying country end product which was evaluated without the Buy American Act factor--

(A) And award was made to a domestic or qualifying country offer at a price lower than the high contract price, the set-aside price will be the highest unit price in the contract(s).
(B) And award was not made to a domestic or qualifying country offer at a price lower than the high contract price, the set-aside price will be the lower of--
(1) The highest unit price under the contract(s) as adjusted by the Buy American Act evaluation factor; or
(2) The lowest offered price for a domestic or qualifying country end product which was not awarded under the nonset-aside.

(v) Where the Trade Agreements Act applies to the nonset-aside portion, offers of eligibleproducts will be treated as if they were qualifying country end products.
(vi) Discount terms used in evaluation of the highest non-set-aside award price will apply to the set-aside award price.
(3) If negotiations are not successful for any part of the set-aside portion, the set-aside will be dissolved for that part and the requirement will be resolicited.

(d) **Token offers.**

The Government reserves the right to not consider token offers or offers designed to secure an unfair advantage over other offerors eligible for the set-aside portion.

(e) **Eligibility for preference as a labor surplus area concern.**

Small business or small disadvantaged business offerors which claim preference for the set-aside portion as a labor surplus area concern, must list the labor surplus area location(s) of offeror or first tier subcontractors, which account for more than 50 percent of the contract price.

Name of Company:
Street Address:
City/County:
State:

(f) **Agreements.**

(1) If awarded a contract as a small disadvantaged business-labor surplus area concern or as a small business-labor surplus area concern, the offeror --

(i) Will perform the contract, or cause it to be performed, substantially in areas classified as labor surplus areas.
(ii) If the contract is in excess of $25,000, will submit a report to the Contracting Officer within 30 days after award that contains the following information--

(A) The dollar amount of the contract.
(B) Identification of each labor surplus area in which contract and subcontract performance is taking or will take place.
(C) The total costs incurred and to be incurred under the contract in each of the labor surplus areas by the contractor and first tier subcontractors.
(D) The total dollar amount attributable to performance in labor surplus areas.

(2) A manufacturer or regular dealer, which claims preference as a small disadvantaged business and submits an offer in its own name, agrees to furnish in performing this contract only end items manufactured or produced by small disadvantaged business concerns in the United States except, as provided in Section 8051 of Pub. L. 103-139,and Section 8012 of Pub. L. 103-335, for contracts awarded during fiscal year 1994,and 1995, a small disadvantaged business manufacturer or regular dealer owned by an Indian tribe, including an Alaska Native Corporation, agrees to furnish only end items manufactured or produced by small business concerns in the United States.

(End of clause)

PCC K/25

PC

PD

P Sig

23 JAN 1981

DFSC-PCC

SUBJECT: Notification of a Change in Contracting Procedures - Economic Price Adjustment Basis

TO: DLA-PPR

1. Pursuant to DLPR 1-350 we are notifying you of a change in contracting procedures. Because of changes occurring in the petroleum market, we no longer plan to accept acquisition cost of crude oil as a basis for economic price adjustment on domestic bulk contracts. We have permitted price adjustments on this basis since 1973. The determining factors in using crude costs as a reference base were the Government controls on domestic crude oil and the fact that, in the aggregate, crude oil prices tracked accurately with product market prices, despite wide fluctuations in individual contractor's crude costs over short periods of time. Government controls on domestic crude oil created a situation wherein acquisition costs of crude oil borne by individual domestic contractors did not reflect world market crude oil prices. This factor contributed significantly to the contractors' inability to determine their actual crude costs and, in effect, shifted the contractor's price risk from a crude oil market basis to a crude oil cost basis. Under these circumstances, we permitted price adjustments based on acquisition cost of crude oil. As Government controls are discontinued and domestic crude oil prices approach world market crude oil prices, the price risk should shift to a crude oil market basis making price adjustments based on the cost of crude no longer necessary. The decontrol aspects of crude oil coupled with the problems of evaluating offers based on crude against the increasing number of offers with EPA based on market considerations in a competitive environment further supports our proposal to eliminate crude as an EPA reference.

2. Several years ago the market stabilized to a point where many major contractors switched to price adjustments based on a posted price in lieu of crude costs. The majority of small refiners, however, insisted on continuing price adjustments based on crude costs. Recognizing the need for both escalation bases, due to inadequate coverage, DLA-PPR letter of 6 June 1980 approved our domestic bulk long-term solicitation which allowed contractors to choose EPA based on postings or crude.

DFSC-PCC
SUBJECT: Notification of a Change in Contracting Procedures - Economic Price Adjustment Basis

Evaluation problems surfaced, however, in comparing prices offered on two such widely varying bases. More recently, the use of the two bases for evaluation has severely complicated calculation of small business set-aside prices. Because of the retroactive nature of determining cost of crude, offers based on crude oil cost escalators are based on reference prices that are 2-3 months old. Comparison of these offers with either the market range, or competitive offers based on postings or publications (all of which represent current prices), results in distortion in the evaluation procedure. We developed techniques to correct this distortion but this results in a highly complex evaluation process.

3. Offers based on crude oil cost escalators pose two basic problems for comparison against commercial market ranges for products. First, crude oil costs are not current, meaning that offered prices tied to crude oil costs cannot be current prices. In order to analyze such an offer, it is necessary to use commercial market product prices for the same time period represented by the crude oil reference. This makes it extremely difficult to determine the reasonableness of offered prices on a current basis. Second, individual contractor's prices based on crude oil cost escalators may not consistently follow product market prices. Problems inherent with crude cost escalations are magnified when competition is present. The lack of a current offered price based on crude is the most obvious problem when trying to compare offered prices based on crude cost to current offered prices based on postings. By taking earlier postings which enable us to calculate posting based prices contemporaneous with crude cost based prices, all offered prices can, for purposes of evaluation, be forced into a relatively common time frame. The difficulty with this approach, however, is that the time frame used for evaluation is significantly prior in time to the time of actual award and the effect of market developments in the interim period is virtually ignored. On the other hand efforts to update offers based on crude cost have been unsuccessful. These problems are further magnified by a changing and unstable market.

4. Our domestic bulk solicitation RFP DLA600-81-R-0061 for East and Gulf Coast requirements recently closed with 122% of the total requirement offered. Fifteen of the offers received are based on crude oil cost escalation. Fourteen of these offers are for JP-4. A breakdown

DFSC-PCC
SUBJECT: Notification of a Change in Contracting Procedures - Economic Price Adjustment Basis

of the JP-4 offers is shown below:

| | | (000/USG) | |
|---|---|---|---|
| Total JP-4 Requirement | - | 1,556,430 | |
| Total JP-4 Offered | - | 2,776,685 (178% of requirement) | 93% |
| JP-4 Offers based on Crude Costs | - | 1,491,685 (54% of total offered) | |
| JP-4 Offers based on market references | - | 1,285,000 (83% of Total Requirement) | |

Of the fourteen JP-4 suppliers whose offers are based on cost of crude, several have already indicated to us that they are willing to consider changing their escalator to a posted price. While we realize the possibility exists that we may not be able to persuade some of the contractors who offered on crude costs to change their reference, we consider that the competitive nature of this procurement warrants an attempt to change from use of crude cost EPA references. We, therefore, propose to amend the solicitation to delete Clause E19.03 Economic Price Adjustment (for acquisition cost of crude). In the event withdrawal of offers should result in a shortage of product, we would resolicit the shortfall separately.

5. Recently we have been successful in persuading several contractors who would not consider switching from cost of crude to a posted price as an EPA reference, to accept EPA based on changes in published prices. We, therefore, request your approval in accordance with DAR 3-404.3(c) and DLPR 3-404.3 to include in the solicitation use of an EPA Clause which permits price adjustments on this basis. The proposed clause (DFSC Clause* E14, copy enclosed) is a revision of the clause approved for EPA based on posted prices which was approved by DLA-PPR letter dated 2 April 1980 as amended by DLA-PPR letter dated 14 November 1980. We will continue to follow the guidance contained in your approval regarding validation and approval of EPA references.

* E19.14

DFSC-PCC
SUBJECT: Notification of a Change in Contracting Procedures - Economic Price Adjustment Basis

6. The East/Gulf Coast solicitation closed 3 December 1980. Delivery period starts 1 April 1981. In view of the fact that negotiations are scheduled to close 4 February 1981, the solicitation amendment should be issued no later than 27 January to allow adequate negotiation time without unduly delaying the purchase program. We, therefore, request that you forward any comments you may have by 26 January 1981.

FOR THE COMMANDER:

CLARENCE W. LEE
Colonel, USAF
Directorate of Contracting and Production

Prepared by: K. College/DFSC-PCC/22 Jan 81/pat

INTERNAL DISTRIBUTION:
DFSC-PCC Record Copy
DFSC-PCC Reading File
DFSC-PC Reading File
DFSC-P Reading File

DFSC-N (A. Harvey/46570/fk) 6 January 1986

SUBJECT: Recommendation to Change Base Reference Date for EPA References Tied to Petroleum Marketing Monthly (PMM)

TO: DFSC-PD

1. The current procedure of adjusting prices on the domestic bulk program has a major drawback. As currently worded, clause B19.33, Part A, (f) states:

> The term "base reference price" means the reference price that will be established when the Petroleum Marketing Monthly publication becomes available for the month prior to the month in which Best and Final offers are due. For example, if Best and Final offers are due in April, the base reference price would be based on the March data of the Petroleum Marketing Monthly's specified Sales Prices of Petroleum Products Tables which would generally be published in mid-June.

2. Since the Best and Final offers are submitted before the base reference is known, offerors must guess at the relationship between their offered price and the reference. In order to compensate for this unknown factor offerors must implicitly increase their price. Whether offerors would admit to this is an interesting question in light of the initial sentence in B19.33:

> The contractor represents that the unit prices set forth in this contract do not include any contingency allowance to cover the possibility of increases in the reference price(s) in the Contractor's bid or proposal.

3. Yet our analysis of the movement of the PMM as compared to other references as used for interim price adjustments indicates that the PMM may have moves as much as one or two cents per gallon out of step with such interim references. This situation is not only difficult for offerors, it provides potentially misleading indications for DFSC.

4. It is the recommendation of this office that the base reference date used on domestic bulk solicitations be changed so that offerors will know exactly the base reference price to which their best and final price is tied. Thus, the best and final offer price would be tied to a known final EPA reference and a known interim EPA reference. For example, if the best and final date were

3274

SUBJECT: Recommendation to Change Base Reference Date for EPA References Tied to Petroleum Marketing Monthly (PMM)

November 15th, the final base EPA reference would be PMM for August and the interim base reference would be the publications(s) as stated in B19.33 Part C for the month of July.

CHRISTOPHER LEE
Director
Office of Market
Research & Analysis

3275

DEFENSE LOGISTICS AGENCY

# Inter-Office Memorandum

IN REPLY REFER TO DFSC-N (L.Ervin/46570/me) 2 December 1987

SUBJECT: Economic Price Adjustment in the Domestic Bulk Program

TO: DFSC-D/DD

1. At the recent prenegotiation briefing for the current East/Gulf domestic bulk procurement, discussion among DFSC-D, -P, and -N concerned the means of price escalation used in the domestic programs. DFSC-N offered to provide DFSC-D with a copy of the decision package on this issue which was prepared last spring for General Griffith. The enclosed material includes the decision paper and related back-up material.

2. The decision problem concerns the use of an administratively cumbersome method of price adjustment which results in contractor complaints and problems in billing and payments by DFSC. The paper discussed four options, including keeping the then current interior/final adjustment system, modifying it to reduce offer price uncertainties, or moving to final-only escalators based on prices published in trade journals. The interested directorates, DFSC-C, -G, -N, and -P, unanimously recommended Option II, a modification of the then current system. General Griffith accepted Option II for use beginning with last summer's Inland/West procurement. At that time, he stated his desire that DFSC move eventually to trade journal-based escalation and asked that the interested directorates work together toward that end.

3. The original decison package included the decision paper and the back-up material at Tabs A through C. The research paper at Tab D was produced prior to the meeting with General Griffith and was discussed at that meeting.

Christopher Lee
CHRISTOPHER LEE
Director
Office of Market Research
and Analysis

cc: DFSC-C
DFSC-G
DFSC-P/PZ

3217

DLA FORM 111 JUL 82 PREVIOUS EDITION MAY BE USED UNTIL EXHAUSTED

U.S. G.P.O. 1986-491-133/52541

# Economic Price Adjustment in the Domestic Bulk Programs

**Issue** - Should the present two-step method of interim and final price adjustment (EPAs or escalators) for domestic bulk fuel contracts be changed to a one-step price adjustment based on current market price indications as published in trade journals? Or should the two-step method be modified to reduce bidder uncertainty with the present system?

**Background** The current system of price adjustment has been used since 1983. All offerors of product to DFSC are required to accept a method of price adjustment based on actual monthly sales price averages as published by the Department of Energy in the Petroleum Marketing Monthly (PMM). Because the PMM data is not published until the third month following the month for which the data is effective, interim billings are paid based on the movement of an interim escalator. The interim escalator is based on prices published in trade journals at the end of the month prior to delivery. Final adjustments in the billings are made according to differences between the interim and PMM (final) escalators when the PMM is published. When market prices vary greatly from month to month, as they have over the last two years, the final billing adjustments can be substantial. The two-step billing process is administratively cumbersome, and has resulted in a number of contractor complaints over the past 3 years (see Tab A). In the words of one contractor, pricing uncertainty is such that, "we never know if we have made or lost money when you (DFSC) lift a cargo."

But of course its going to be the same [illegible] in the future!

**Discussion** There are nine criteria by which proposed escalation systems can be judged, 1) product; 2) geography; 3) timing; 4) timeliness; 5) commonality; 6) independence from contractor influence; 7) basis in actual sales; 8) market risk; and 9) simplicity. The PMM-based system and the alternative trade journal-based systems are evaluated below, according to the criteria.

The current PMM-based system is preferable by three criteria: independence from contractor influence, sales basis, and market risk. Three other criteria, simplicity, timing, and timeliness, favor the switch to trade journals. By the criteria of product, geography, and commonality, there is no clear preference between the alternate systems.

Product - DFSC product prices should escalate with the prices of similar commercial fuels. Both the PMM and trade publications publish prices of the similar commercial products -mogas, jet kerosene, diesel fuels, residual fuels - which are used for bulk price escalation of JP-4, JP-5, and DFM prices. While neither the PMM nor the trade journals publish price data for naphtha-type jet fuel (Jet B or JP-4), escalators for this fuel are constructed by use of mogas and kerojet prices which represent the alternate use-value of the JP-4 blending components. A similar principle is used in the construction of prices and escalators for Navy Special Fuel Oil. Preference based on this criteria - none.

3218

Geography - DFSC product prices should escalate with prices of fuels in the geographical area where the requirements are located. PMM data is published on both a statewide and regional (multistate) basis. Trade publication prices are published for most large cities in the United States. Preference: none.

Timing - DFSC prices should escalate concurrently with commercial prices, not with a lead or lag. This reduces the possibility that contractors will build a contingency premium into their prices. PMM prices are available on a monthly basis, while trade journal prices are published on a daily or weekly basis for most fuels. Given that actual market prices change almost continuously, it is preferable for escalators to change more frequently than on a monthly basis. Preference: trade journals, with weekly or daily price adjustment.

Timeliness - Escalator prices should be available to DFSC and the contractors on or immediately following their respective effective dates. PMM prices are published during the third month following the month of effectiveness. Trade journal prices become available within a day to a week following their effective dates. The long lag on PMM availability is the reason why an interim billing system is used which employs trade journals. Preference: trade journals.

Commonality - Proposed escalators should be acceptable to both DFSC and the contractors for use as references. The PMM system has been used successfully in domestic bulk for three years. DFSC has been successful in obtaining commonality based on trade journals in ground fuels procurements and in overseas bulk programs. Preference: none.

Independent of Contractors - Both the PMM and trade journals are independent of control by DFSC contractors. Given their informal method of conducting market surveys, trade publication prices may be influenced by the moves of large market players who may be DFSC contractors. Although this has not been a general problem in ground fuels procurements where trade journals are routinely used for price escalation, there have been situations where questions have been raised regarding independence of the contractor's control. Since this may be a more serious problem in the bulk program, where DFSC contractors may be large market players, any proposed trade publication escalation system would require careful review of the system's susceptibility to manipulation by prospective contractors.

Basis in Actual Sales - The PMM is based on a mandatory DOE survey of actual sales by refiners and gas plant operators. This survey is subject to DOE audit, although actual audits are rarely performed. Trade journal prices are generally based on seller quotations rather than actual sales because the latter are not generally available to informal, private canvassers. These price series are not auditable. However trade journal prices are closely reflective of actual sales, as these price

3219

How do Commercial Buyers & Sellers do business (what escalator?)

series are closely correlated with PMM prices over time, particularly if prices are adjusted on a weekly basis (see graphs at Tab B). Contractor complaints about the performance of trade journal escalators have been received in the ground fuels program. Although nearly all of these complaints are unfounded, several complaints have been justified and have required substitution of a replacement economic price adjustment reference. Because trade journal data is a less direct measure of actual market sales, complaints concerning trade journals are more difficult to analyze and defend. Preference: PMM.

Market Risk - DFSC contract prices are susceptible to market risk if they escalate on indices which do not correlate well with actual sales prices. PMM prices are actual sales price averages. Although they generally track sales data quite well, trade journals are more variable in quality, and occasionally are replaced in those programs in which they are used due to poor performance in reflecting market conditions. In ground fuel procurements, a poorly performing escalator can be readily replaced with a substitute from another publication for most fuels in most locations. This would be true for bulk mogas and diesel requirements as well. However, only one trade journal has published jet kerosene prices for the last several years (Platt's Oilgram). While these jet fuel series closely correlate with actual sales, there is, as yet, no substitute publication available should the Platt's data series be discontinued or should it fail to continue to track the market. This potential problem affects both JP-4 and JP-5 escalation in CONUS. Oil Price Information Service has recently begun to publish jet fuel prices, but the reliability of this source will not be established until 12 months of historical data have been accumulated. This will occur by April 1988 in several localities. Preference: PMM.

Another aspect of market risk with trade journals concerns the relative speed with which their prices reflect actual market price changes. Given that the journals generally survey seller quotations, or "postings", some asymmetrical behavior may be expected. Sellers tend to raise postings quickly when actual prices are rising, and to resist lowering postings when actual prices are falling. Sellers may also lower prices by granting hidden discounts off of stable postings. Thus, one would expect that the use of trade journal prices for escalation would cost DFSC money through relative "price stickiness" during periods of declining prices. An analysis of alternative bulk escalation systems by DFSC-N (see attached study at Tab C) found some evidence of this potential problem in the behavior of trade journal prices over the 1984-86 period (which included a major price drop). The analysis assumed that the choice of escalation system had no effect on the level of the initial offer prices. Overpayment due to lagged declines in postings were offset by underpayments due to lagged increases when prices were adjusted weekly. Some evidence of downside stickiness was found in the analysis of twice-monthly and monthly changes. In these cases, over payments would have exceeded under payments and would have resulted in greater expense to the government. Weekly price changes did not suffer from this problem, in general.

3330

Simplicity - Any escalation system should be simple to explain to contractors and simple for DFSC to administer. The trade journal-based system is clearly simpler than the PMM system.

The issue of simplicity is important when the problem of bid preparation is considered. Domestic bulk offerors must submit best-and-final prices which are effective for the month prior to receipt of best-and-final offers. This raises two problems: price timing and margin uncertainty. In the first case, some offerors may bid based on current prices rather than prior-month prices (See study at Tab D). If current prices are lower than prior-month prices (as in July 1986), the offeror's bid will be lower than if it were properly prepared. If market and bid prices are much lower, a mistake-in-bid may eventually be claimed by the offeror. On the other hand, if current prices are higher than the prior-month prices (as in January 1987) this offeror's bid price may be higher than it otherwise would be. It may be so high that it is not in line for award. In fact, price reasonableness of offers may become a serious issue if current prices are higher than prior-month prices, because bid prices will be compared to prior-month market ranges. If such offers are awarded, the government will be paying higher prices than if a simplified one-step escalation system is used. A switch to weekly escalation based on trade journals would enable current prices rather than prior-month prices to be bid and evaluated, and would greatly reduce this preparation problem.

The current method of escalation introduces another element of uncertainty into the bid preparation process. At the time of receipt of best-and-final offers, the offer price and the relationship (margin) between the interim escalator and the offer price is fixed. However, the margin between the offer price and the final escalator (PMM) is unknown and remains so for some two months following the receipt of best-and-finals. While the base value of the interim escalator is known, the relationship between the base values of the interim and final escalators is subject to statistical uncertainty. Because the margin between the offer price and the base final reference (PMM) determines the actual margin (and, thus, the actual price) for final billing purposes, offerors who are risk-averse may build a contingency premium into their offer price to protect themselves against uncertainty about the ultimate level of their margin. To the extent that offerors perceive this as a problem, the prices that the government pays for fuel will be higher than under a one-step escalation system based on trade journals. Recent experience and contractor comment suggest that both the margin problem and the bid preparation problem are real and significant.

Another way of reducing the problem of bid preparation would be to have offerors bid with prices effective with the most recent PMM available. Offerors on the recent East and Gulf procurement would have made their bids (in January 1987) effective in

3221

October 1986 rather than December 1986 as was done during that procurement. This would have had the effect of eliminating margin uncertainty. The process would still have been susceptible to the generally upward market price movement over that period. In this case, however, at least one company was able to agree to a price reduction (when requested by DFSC-P), after the December PMM became available, in part as a result of margin certainty with December pricing. On the previous Inland and West procurement, one company reduced its offered volume when the June PMM became available prior to time of award, and actual June price levels were found to have been higher than this company assumed when it prepared its bid. In this case, the latest PMM at the time of receipt of best and final offers contained April prices. Under a modified bid process, offerors would have made their best and final prices effective in April rather than in June. Several individuals and contractors have suggested that DFSC modify its current system in this manner. The experience with the recent bulk procurements and with an analagous situation several years ago in an overseas procurement suggest that this is a feasible improvement on the current escalation system.

## Decision Options

Option I - Maintain current two-step method of domestic bulk price escalation.

Pro - This system is already in use and contractors are familiar with it. There is no market risk to continuation of its use. DFSC prices are adjusted according to the movement of actual monthly sales price averages.

Con - This system is complex and administratively cumbersome. There are 12 monthly escalations plus 12 monthly corrections. The problems associated with bid preparation probably result in additional expense to the U.S. Government. There will continue to be contractor complaints about the size of final payment adjustments. This system, by escalating on monthly averages, fails to reflect intramonthly price movements.

How much

Option II - Modify the current two-step escalation method so that offerors can establish their bid prices as effective with the month of the most recent PMM.

Pro - This system has the same advantages as Option I, and removes margin uncertainty from the offerors' bid preparation problem.

Con - This system has the same disadvantages as Option I, and forces the offeror to focus on a point two months further into the past when formulating the bid prices, thus possibly making the process even more susceptible to market price movement over the intervening period between the most recent PMM and the date of best and final offers.

8282

Option III - Change to twice-monthly escalation using trade journals escalating with prices effective on the 1st and 15th of the month.

Pro - This system is administratively simpler than the current system (with 24 "final-only" escalations). There is no need for final billing adjustments. There is less need for contractors to build contingency premiums into their offer prices due to margin uncertainty.

Con - There is market risk associated with the move away from escalation on actual sales, particularly with respect to jet kerosene. Twice-monthly price changes do not track actual sales as well as weekly changes, so offerors may still add contingency premiums to their prices. There will likely be several contractor complaints each year about the short-term performance of these escalators.

Option IV - Change to weekly escalation using trade journals.

Pro - This system can be administered as easily as the identical system currently used in ground fuels. There is no need for final billing adjustments. The bid preparation problems would be virtually eliminated. Weekly price changes track actual sales better than monthly or twice-monthly price changes, because they better reflect the continuous nature of price movements in the marketplace. Thus there is even less need for contractors to build in contingency premiums as offer prices can be updated to the time of receipt of best-and-final offers.

Con - There is market risk associated with the move away from escalation on actual sales, particularly with respect to jet kerosene. There would be 52 price escalations per year, more than twice the number in Options I, II, and III. There will likely be several contractor complaints each year concerning the short term performance of these escalators.

Staff Recommendations:

Option II is favored by all of the interested directorates (DFSC-C, -G, -P, and -N). Should the implementation of Option II fail to alleviate the bidding difficulties, the issue can be revisited. In any event, the trade journal options do not appear to be truly viable before mid-1988 at the earliest.

3223

UNITED STATES COURT OF FEDERAL CLAIMS

LA GLORIA OIL AND GAS COMPANY, :

Plaintiff, :

v. : No. 02-465C

THE UNITED STATES, : (Judge Hewitt)

Defendant. :

: Pages 1 - 59

- - - - -

Deposition of Lawrence Ervin

Ft. Belvoir, Virginia

Monday, December 1, 2003

Reported by: Marian E. Cummings, Notary Public

Job No.: 156783

December 1, 2003

12:01 p.m.

Deposition of Lawrence Ervin, held the offices of:

Defense Energy Support Center
8725 John J. Kingman Road
Ft. Belvoir, Virginia 22060-6217

Pursuant to notice, before Marian E. Cummings, a Notary Public of the Commonwealth of Virginia.

APPEARANCES:

Mayer, Brown, Rowe & Maw
For the Plaintiff
1909 K Street, Northwest
Washington, D.C. 20006-1101
(202) 263-3208
BY: J. Keith Burt, Esq.
William L. Olsen, Esq.

United States Department of Justice
For the Defendant
Room 4050
1100 L Street, Northwest
Washington, D.C. 20530
(202) 616-2311
BY: Steve Gillingham, Esq.

Defense Energy Support Center
For the Defendant
Suite 1565
8725 John J. Kingman Road
Ft. Belvoir, Virginia 22060
(703) 767-5009
BY: Howard Kaufer, Esq.

Defense Supply Center
Richmond, Virginia
(804) 279-1423
BY: Donald Tracy, Esq.

CONTENTS

EXAMINATION OF LAWRENCE ERVIN PAGE

MR. BURT 6

-0-

EXHIBITS

ERVIN DEPOSITION EXHIBITS: PAGE:

(None)

-0-

PROCEEDINGS

Thereupon,

LAWRENCE ERVIN

the Witness, called for examination by counsel for the Plaintiff, and, after having been sworn by the notary, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. BURT:

Q Would you state your name for the record.

A Lawrence Calvin Ervin.

Q Mr. Ervin, what is your current position?

A I'm the chief of the market research office at the DECS.

Q And how long approximately have you held that position?

A Eight plus years.

Q And generally what are the responsibilities of that position?

A Well, overseeing an effort to -- we do interscreen, analyses of support of the procurement operations center, do support for price negotiation work in the pricing work done in contracting divisions.

There's a certain amount of affiliate work we do for contingency folks.

We actually manage the strategic petroleum program to the extent we're involved with the -- help the budget folks who work for the comptroller with their out year budget projections, price of oil in the future, forecasting, that sort of stuff. I think that I -- probably everything we do falls within that general description.

A The responses is often oral. And the document, it gets generated, provided to the person who asked it. We kind of rely heavily on the contract files to be the repository of that since it's, you know, sort of proprietary information.

Q The contract files meaning an office other than yours or is that a contract file in your office?

A No, we don't maintain contract files.

Q So when you provide some market analysis to the bulk fuels group in connection with their procurement and when that analysis is in writing do you keep a copy of what you give to the bulk fuels group?

A Well, I think the short answer to that is no and maybe something momentarily. Again, it would rely heavily on the contract file.

Q All right. Let's turn to page 6 of Plaintiff's Exhibit 2, request number 15 reads, "All documents relating to DESC's decision to use the PMM indexes, Platts, or OPIS as a basis for adjusting prices in its price adjustment clauses."

A Recollection was that '87 study which I believe you've been provided and a prior '84 study.

Q Can you generally describe those studies for me?

A '84, '87 I was involved in producing and we looked at comparing PMM versus Platts and OPIS and the issue of SC escalating on a different time frame and the documents looked at various things which are nice to have in an escalator. They track -- the '87 study wound up recommending making an adjustment to the PMM based status quo at the time.

The '84 study which I did not prepare, my understanding and recollection is that it's mainly, it deals mostly with the move from the ELS to PMM which was prior to 1985.

Q Where did you find those studies?

A Well, I didn't, I don't think I found the first one.

Q Okay.

A The '84 one, and '87 I had basically on my shelf.

Q Mr. Ervin, I believe that in approximately 1995 DESC switched from using Platts to using PMM as an escalator to using Platts; is that correct?

A Sometime back in there, yeah.

Q Do you know whether there was any sort of any studies or analysis of reports prepared by your office in connection with that change from using the PMM to using Platts?

A Well, there wasn't because I was sitting in a room when the decision happened and it was made in response to some pressure from headquarters to do things differently. So the analysis is based on, basically is the analysis in the '87 study. Some people who have read the '87 studies that they would draw different conclusions than what was presented at the end of the study, certainly a close call. Analysis would have supported that as well so it's really the '87 study which is the basis for that move. That and some pressure from headquarters to, you know, be doing things differently and doing things different in a visible fashion to hopefully over the course of time produce substantial cost savings to the taxpayer.

PPR
PPR
G
PZ
PD
P Sign

0 6 SEP 1994

DFSC-PPR

SUBJECT: Request for One-Time Deviation to FAR 16.203-1 for Approval of New Method of Economic Price Adjustment (EPA)

TO: AQPLL

1. We request a one-time deviation to FAR 16.203-1 for approval of a proposed EPA clause to cover all domestic bulk fuels solicitations for a period of one year or until a class deviation is approved. Details of the request are contained in the enclosure.

2. We appreciate your prompt attention to this request. The point of contact for this office is Betsy Murray, extension 45500, for any questions you may have.

Original Signed By
L. H. CARPENTER
Captain, SC, USN
Director, Contracting
and Production

Encl

PREPARED BY: BETSY MURRAY/PPR/45500/30 AUG 94/EPA-PZ.DOC
INTERNAL DIST.: DFSC-PP READ DFSC-PPR READ & RECORD

MEMORANDUM FOR THE EXECUTIVE DIRECTOR (PROCUREMENT), DEFENSE LOGISTICS AGENCY

SUBJECT: Request for One-Time Deviation from FAR 16.203-1

## I. PROBLEM.

The current system of price adjustment for the Defense Fuel Supply Center's (DFSC) domestic bulk fuels programs requires all offerors to accept a method of price adjustment based on actual monthly sales price averages as published by the Department of Energy in the *Petroleum Marketing Monthly (PMM)*. Because the PMM data is not published until the third month following the month for which data is effective, interim adjustments are made based on the movement of an interim escalator. The interim escalator is based on prices published in trade journals at the end of the month prior to delivery. Final adjustments in the billings are made according to differences between the interim and PMM (final) escalators when the PMM is published. When market prices vary greatly from month to month, the final billing adjustments can be substantial. Although this method has proved to be a reliable means of price adjustment, it has several disadvantages. First, it requires double calculations of price adjustments. Second, because of the time lag between interim and final billing, contractors likely build in a price cushion. Finally, the process is overly complicated.

## II. RECOMMENDATION.

Authorize a one-time deviation to FAR 16.203-1 for approval of a proposed EPA clause for domestic bulk fuels, which will replace the current DFSC clause for domestic bulk, Clause B19.33, ECONOMIC PRICE ADJUSTMENT - PUBLISHED MARKET PRICE (DOMESTIC BULK). We request the use of this clause to cover all domestic bulk fuel solicitations for a period of one year or until a class deviation is approved.

## III. DISCUSSION.

A. DFSC began using EPA provisions in its contracts in 1973 as a result of market changes resulting from the oil embargo that year. Prior to that time, our contracts were awarded on a firm fixed price basis. At that time, we determined to use crude oil prices as the EPA reference base because there were Government controls on domestic crude oil prices and because, in the aggregate, crude oil prices tracked accurately with product market prices, despite wide fluctuations in individual contractors' crude costs over short periods of time. When Government crude price controls were discontinued, many major contractors agreed to price adjustment based on refined product posted prices, but most

small refiners insisted on continuing to use an EPA clause based on crude oil costs. In 1980, with DLA's approval, we began allowing contractors to choose between the two methods of price adjustment.

B. DFSC encountered several evaluation-related problems with allowing contractors to choose postings or crude oil. As a result, DFSC, with DLA's approval, abandoned the use of crude oil costs as an adjustment mechanism in 1981. Contractors were only allowed to use product postings for price adjustment purposes. For JP5 only, again with DLA's approval, we changed in 1982 to using a listing from the Bureau of Labor Statistics (BLS) Producer Price Index, because there were no commercially published postings for JP5. Because the BLS figures for a given month were not published until two or three months later, DFSC calculated an interim price adjustment based on company postings, followed by a final adjustment based on BLS statistics. Because BLS proved to be a good basis for price adjustment, we shortly changed the EPA basis for the other bulk products to BLS figures. DLA approved the change. The interim reference was an independent price listing, the Oil Price Information Service (OPIS) PAD report in lieu of company postings, with BLS figures for the final adjustment.

C. In 1984, we began to use monthly sales price averages published in the *Petroleum Marketing Monthly (PMM)*, published by the Department of Energy. We switched to the PMM because it was superior to BLS and because BLS changed to recording pricing patterns in a manner that rendered it unacceptable for our purposes as an EPA basis. In 1987, a minor change was made in that the basic reference was kept but the effective dates of offer prices was changed to allow offerors to know the base reference price prior to submission of best and final offers.

D. The current system of price adjustment has been used since 1987. All offerors of product to DFSC are required to accept a method of price adjustment based on actual monthly sales price averages as published by the Department of Energy in the PMM. Because the PMM data is not published until the third month following the month for which data is effective, interim billings are paid based on the movement of an interim escalator. The interim escalator is based on prices published in trade journals at the end of the month prior to delivery. Final adjustments in the billings are made according to differences between the interim and PMM (final) escalators when the PMM is published. When market prices vary greatly from month to month, the final billing adjustments can be substantial. In 1992, the Defense Management Review, as part of a review of all agency clauses, approved the use of the PMM-based EPA clauses. Our authority to use the PMM was reconfirmed by the Director of Defense Procurement in 1993.

E. We propose to substitute industry publications, a more current EPA basis, for the existing PMM methodology. This will provide a number of advantages. First, it will

eliminate the current method, which requires double calculation of price adjustments. Second, because of the time lag between interim and final billing, contractors likely build in a price cushion. It is probable that the Government would save money with contractors no longer having to include a cushion to cover them for price adjustments. Third, the new EPA method is more similar to the way adjustments are done commercially in that commercial publications are widely accepted by industry. Finally, the new method will be much simpler for all parties to use. The DFSC Office of Market Research and Analysis has studied the proposed EPA provisions and found them to be reliable bases for price adjustments. These publications are already used for EPA purposes in other DFSC programs.

F. We are requesting this one-time deviation to cover all bulk requirements for CONUS for a one-year period or until a class deviation is approved. A permanent change will be subsequently requested under separate cover. At this time, the reference price will be based on the spot assessment quotation from Platt's Oilgram Price Report, or, for the Rocky Mountain area, on the OPIS publication. It will be firm for weekly periods. It will be defined as the weekly average of the high and low of the price Monday through Friday (excluding holidays) and shall be effective the following Tuesday through Monday. We also request flexibility to (1) change the frequency of price escalation (e.g., from weekly changes to daily) should that become appropriate in the future, and (2) if recommended by DFSC's Office of Market Research and Analysis, to change publications as circumstances warrant. A copy of the new clause is enclosed.

G. We intend to use B19.34-1 in all domestic bulk solicitations. In those instances where we have additional publications to be used for other line items in a solicitation, we will designate those clauses as B19.34-2, B19.34-3, and so on, as appropriate, for purposes of that solicitation..

H. This is the first request for this deviation.

TOTAL P.06

DEFENSE LOGISTICS AGENCY
DEFENSE FUEL SUPPLY CENTER
CAMERON STATION
ALEXANDRIA, VIRGINIA 22304-6160

IN REPLY REFER TO DFSC-PPR

12 MAY 1995

SUBJECT: Request for Class Deviation and Permanent Coverage in DLAR

TO: AQPLL

1. As you requested, enclosed is a revised Memorandum for the Director of the DAR Council which addresses the one public comment received in response to the Economic Price Adjustment coverage published in the 28 February 1995 edition of the Federal Register.

2. We appreciate your prompt attention to this request. The point of contact for this office is Kerry Pilz, extension 45500, for any questions you may have.

Original Signed By
L. H. CARPENTER
Captain, SC, USN
Director, Contracting
and Production

Encl

MEMORANDUM FOR THE DIRECTOR OF THE DAR COUNCIL

I. PROBLEM:

By letters dated 8 January 1992 and 1 May 1992, the Director of Defense Procurement approved the Defense Fuel Supply Center's (DFSC) economic price adjustment (EPA) clauses as part of the regulatory relief task force review. These clauses, or variations, are in effect today. DFSC wishes to revise the clause used in its domestic bulk fuels programs. None of the three economic price adjustment types currently encompassed by the FAR are appropriate for many of the competitive procurements of commercial products undertaken by DFSC and other DLA contracting offices. The use of an EPA reference based on an individual contractor's established price or cost of materials is impractical for procurements under which indefinite quantity contracts will be issued. Unique EPA references for each offeror engender relative price variations during the delivery period, making it impossible to determine the most favorable offer at time of award. This creates a significant price risk for the Government and undermines the competitive process. Given the need for a common EPA reference, a reference that more closely follows market prices for the end item reduces price risk for both the Government and the contractor. Such references are also more in conformance with commercial practice.

II. RECOMMENDATION:

A class deviation, lasting longer than three years, should be incorporated into the DLAR. This deviation expands the use of EPAs based on established prices to encompass industry-wide and geographically based market price references and expands the use of EPAs based on indexes to encompass indexes for commercial products or services which are identical to or similar to the end products to be provided under the contract. The appropriate coverage in DLAR at 16.203 should read:

*16.203-1 Description*

*(a)(90) Adjustment based on established prices. Established prices may reflect industry-wide and/or geographically based market price fluctuations for commodity groups, specific supplies or services, or contract end items.*

*(c)(90) Adjustments based on cost indexes of labor or material. These price adjustments may also be based on increases or decreases in indexes for commodity groups, specific supplies or services, or contract end items.*

*16.203-3 Limitations*

*(90) A fixed price contract with economic price adjustment may also be used to provide for price adjustments authorized in this section.*

*16.204-4 Contract clauses.*

*(90) When the contracting officer determines that an existing EPA clause is not appropriate, the contracting officer may develop and use another EPA clause in accordance with 16.203-1(a)(90) or (c)(90). Established prices in such clauses need not be verifiable using the criteria in 48 CFR (FAR) 15.804-3. Established prices and cost indexes need not reflect changes in the costs or established prices of a specific contractor. The established price or cost index may be derived from sales prices in the marketplace, quotes, or assessments as reported or made available in a consistent manner in a publication, electronic database, or other form, by an independent trade association, Governmental body, or other third party independent of the contractor. More than one established price or cost index may be combined in a formula for economic price adjustment purposes in the absence of an appropriate single price or cost index.*

III. DISCUSSION:

A. Prior to FARS DEV 94-24, DFSC's current system of price adjustment for bulk petroleum had been used since 1987. All offerors of product to DFSC were required to accept a method of price adjustment based on actual monthly sales price averages as published by the Department of Energy in the *Petroleum Marketing Monthly* (PMM). Because the PMM data is not published until the third month following the month for which data is effective, interim billings are paid based on the movement of an interim escalator. The interim escalator is based on prices published in trade journals at the end of the month prior to delivery. Final adjustments in the billings are made according to differences between the interim and PMM (final) escalators when the PMM is published. When market prices vary greatly from month to month, the final billing adjustments can be substantial. In 1992, the Defense Management Review, as part of a review of all agency clauses, approved the use of the PMM-based EPA clauses. Our authority to use the PMM was reconfirmed by the Director of Defense Procurement in 1993.

B. The revised bulk fuels clause substitutes industry publications, a more current EPA basis, for the prior PMM methodology. This provides a number of advantages. First, it eliminates the need for double calculations of price adjustments, a significant savings to the government. Second, because of the time lag between interim and final billing, contractors likely build in a price cushion. It is probable that the Government would save money with contractors no longer having to include a cushion to cover them for price adjustments. Third, the new EPA method is more similar to the way adjustments are done commercially in that commercial publications are widely accepted by industry. Finally, the new method will be much simpler for all parties to use. The DFSC Office of Market Research and Analysis has studied the proposed EPA provisions and found them to be reliable bases for price adjustments. The publications are already used for EPA purposes in other DFSC programs.

C. DFSC has used the industry market price concept since the early 1980's and has found it to be a reliable method of price adjustment. It is unnecessary to review the deviation every three years as with most class deviations. Therefore, we request that the deviation be made permanent and be included in the DLAR.

D. Additional DFARS 201.402(3) Requirements.

1. This class deviation request has been reviewed and approved by the DFSC Office of Counsel.

2. This class deviation corresponds most closely with the deviation definition of FAR 1.401(c).

3. This is the first request for this class deviation to be published in the DLAR.

4. This class deviation was published in the Federal Register on 28 February 1995. It offered the public 60 days in which to comment on the proposed DLAR language. One public comment was received on 2 May 1995, after the expiration of the public comment period. DFSC, however, addresses the letter received from The National Security Industrial Association as follows.

The National Security Industrial Association is concerned that the EPA references chosen by the contracting officer might not reflect actual market prices and therefore, the price available to the contractor. They stated, "Such a situation could unfairly shift the risk of price uncertainty to the contractor."

DFSC responds that the commentor seems concerned about implementing the market price concept, not the concept itself. Because DFSC sucessfully used the market price EPA concept since the early 1980's, we do not believe that any concern is warranted. None of DFSC's contractors have filed comments regarding the proposal. In any event, DFSC's EPA clauses contain provisions for revising market price indicators, if the contracting officer finds a reference has been discontinued, or if it substantially and consistently fails to reflect market conditions. If these conditions occur, the parties may agree upon an appropriate substitute for the inadequate indicator. If the parties fail to reach agreement, the supplier can utilize the provisions contained in the DISPUTES clause of the contract. DFSC makes every effort to utilize market price indicators that consistently reflect actual market conditions. The National Security Industrial Association recognizes the benefit of such behavior by agreeing in its letter with the Government's statement in the Federal Register: "a reference that more closely follows market prices for the end item reduces price risk for both the Government and the contractor." Accordingly, the comment does not warrant revising the proposed DLAR coverage.

IV. COLLATERALS:

A. The proposed class deviation and DLAR coverage do not impose any paperwork burdens or informal collection requirements. Thus the Paperwork Reduction Act does not apply.

B. The proposed class deviation and DLAR coverage is not expected to have a significant impact on a substantial number of small entities within the meaning of the Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.* since the elimination of interim billing will greatly simplify

**administrative procedures required of contractors. A regulatory flexibility analysis, therefore, is not required.**

**CERTIFIED CLAIM OF**

**CHEVRON USA, INC.**

**SUBMITTED PURSUANT TO**

**THE CONTRACT DISPUTES ACT OF 1978**

**CONTRACT NO. DLA600-90-D-0531**

Chevron USA, Inc.
575 Market Street
San Francisco, California

## TABLE OF CONTENTS


| | | Page No. |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | DFSC'S PRICE ADJUSTMENT CLAUSE WAS ILLEGAL | 2 |
| III. | CHEVRON IS ENTITLED TO BE PAID THE FAIR MARKET VALUE OF THE FUEL IT SUPPLIED | 5 |
| | A. Illegality | 5 |
| | B. Misrepresentation | 7 |
| | C. Breach of Contract | 9 |
| | D. Failure of Consideration | 9 |
| | E. Mutual Mistake | 11 |
| | F. Fifth Amendment Taking | 13 |
| IV. | CHEVRON IS ENTITLED TO RECOVER $5,194,204.86 | 17 |
| | A. Claim Methodology | 18 |
| | B. DFSC's Right To Offset | 20 |
| | C. Claim Calculation | 23 |
| V. | CONCLUSION | 24 |

APPENDIX

| | |
|---|---|
| Contract No. DLA600-90-D-0531 | Exhibit 1 |
| Fair Market Value of JP-4 | Exhibit 2 |
| Total Payments For JP-4 | Exhibit 3 |
| Certification | Exhibit 4 |

# CERTIFIED CLAIM OF CHEVRON USA, INC.

Pursuant to the Contract Disputes Act ("CDA"), Chevron USA, Inc. ("Chevron") hereby submits its certified claim in the amount of $5,194,204.86 under Contract No. DLA600-90-D-0531 between Chevron and the Defense Fuel Supply Center ("DFSC"). Chevron requests a final decision on its claim within sixty days.

## I. INTRODUCTION

Chevron and DFSC[1] entered into Contract No. DLA600-90-D-0531 ("the Contract") in 1990. (Ex. 1.) The Contract provided for Chevron to deliver JP-4 at its refineries in Pearl City, Hawaii, El Segundo, and Richmond, California. (Ex. 1, at 2.) The Contract established initial prices for delivering JP-4 and provided that these prices could be adjusted during the contract period under DFSC's standard economic price adjustment clause. (Ex. 1, at 4-6.)

DFSC's price adjustment clause, designated "Clause B19.33," permitted the prices Chevron received for fuel to be adjusted by as much as eighty percent of the original contract price. (Ex. 1, at 6.) Price adjustments were made monthly based on changes in indexes of sales of petroleum products published by the Department of Energy in the *Petroleum Marketing Monthly* (hereafter "PMM indexes"). (Ex. 1, at 5-6.)

DFSC used the PMM indexes to make price adjustments even though the Department of Energy did not design or intend for the PMM indexes to be used to set or adjust prices,[2] and despite that the PMM indexes were not appropriate for this purpose. Indeed, in awarding fuel contracts, DFSC maintained that use of its price adjustment clause and the PMM indexes was nonnegotiable.

---

[1] DFSC subsequently was renamed the Defense Energy Support Center ("DESC"). For simplicity, the designation "DFSC" is used throughout.

[2] Testimony of Dr. John Cook, Director of the Petroleum Marketing Division of the Department of Energy's Energy Information Administration.

## II. DFSC'S PRICE ADJUSTMENT CLAUSE WAS ILLEGAL

In *Barrett Refining Corp. v. United States*, 242 F.3d 1055 (Fed. Cir. 2001), the United States Court of Appeals for the Federal Circuit found that DFSC's "standard price adjustment clause . . . was unenforceable because it failed to comply with the Federal Acquisition Regulations." *Id.* at 1058. In holding DFSC's price adjustment clause to be "unauthorized and unenforceable," the Federal Circuit adopted the rationale in *MAPCO Alaska Petroleum, Inc. v. United States*, 27 Fed. Cl. 405 (1992), where the United States Court of Federal Claims first held DFSC's price adjustment clause to be illegal. *Id.* at 1058, 1060 & n.2.

In *MAPCO*, the supplier had a one-year contract with DFSC to deliver JP-4, DFA, and MUR. 27 Fed. Cl. at 406. The contract contained DFSC's price adjustment clause B19.33, the same clause used in Chevron's contract, which provided for fuel prices to be adjusted based on changes in specified PMM indexes. *Id.* During the contract, the price adjustment clause reduced fuel prices by thirty-five percent, while crude oil prices rose by ninety-five percent. *Id.* at 407. The supplier sustained a $10 million loss under the contract.

The court in *MAPCO* found that the supplier sustained this loss because DFSC's price adjustment clause "did not divide the risk of economic uncertainty between the parties" as the Federal Acquisition Regulation ("FAR") required. *Id.* at 408, 412. The court held that the FAR, in order to protect contractors, authorizes prices to be adjusted in only one of three ways. *Id.* at 408, 414. The PMM indexes, the court held, did not adjust prices in an authorized way. *Id.* at 408-11.

As the court explained, FAR § 16.203-1 provides:

> Description.
>
> A fixed-price contract with economic price adjustment provides for upward and downward revision of the stated contract price upon the occurrence of specified contingencies. Economic price adjustments are of three general types:
>
> (a) *Adjustments based on established prices.* These price adjustments are based on increases or decreases from an

> agreed upon level in published or otherwise established prices of specific items or the contract end items.
>
> (b) *Adjustments based on actual costs of labor or material.* These price adjustments are based on increases or decreases in specified costs of labor or material that the contractor actually experiences during contract performance.
>
> (c) *Adjustments based on cost indexes of labor or material.* These price adjustments are based on increases or decreases in labor or material cost standards or indexes that are specifically identified in the contract.

27 Fed. Cl. at 408.

In considering whether DFSC's price adjustment clause complied with these provisions, the court initially held that DFSC's use of the PMM indexes did not provide for price adjustments based on established prices, as set forth in FAR § 16.203-1(a), because price adjustments were based on an average of market prices and not on the contractor's own established prices. 27 Fed. Cl. at 408-11. The court then held that DFSC's use of the PMM indexes did not provide for price adjustments based on actual costs, as set forth in FAR § 16.203-1(b), because price adjustments were not based on costs. *Id.* Finally, the court held that DFSC's use of the PMM indexes did not provide for price adjustments based on cost indexes, as set forth in FAR § 16.203-1(c), because adjustments were based on an index of prices, not costs. *Id.*

Because DFSC's use of the PMM indexes did not adjust prices in one of the three ways authorized by the FAR, the court held that DFSC's price adjustment clause was illegal. *Id.* at 408. The Court admonished DFSC that, where the government violates the law in pricing a contract, "the government cannot, by law, benefit from it." *Id.* at 408 (quoting *Beta Systems, Inc. v. United States*, 838 F.2d 1179, 1185 (Fed. Cir. 1988)); *see generally LaBarge Products, Inc. v. West*, 46 F.3d 1547, 1552-53 (Fed. Cir. 1995) (a contractor may "seek reformation of its price

term, even after performance, if that term was allegedly diminished by unlawful government acts").

As a result of the decision in *MAPCO*, DFSC has been forced to concede the illegality of its price adjustment clause in the Federal Circuit, the United States Court of Federal Claims, and the *Federal Register*. *Barrett Refining Corp. v. United States*, 242 F.3d 1055, 1060 (Fed. Cir. 2001) (reflecting DFSC's contention that it made payments under the illegal price adjustment clause by mistake); *Phoenix Petroleum v. United States*, No. 98-5124, 1999 U.S. App. LEXIS 16939 at * 5 (Fed. Cir. July 23, 1999); *Pride Companies, L.P. v. United States*, No. 95-597C (Fed. Cl. May 10, 2000); *Gold Line v. United States*, 43 Fed. Cl. 291, 292 (1999); 64 Fed. Reg. 41,834 (Aug. 2, 1999).[3]

---

[3] In addition to violating the FAR's restrictions on price adjustments, DFSC violated the law in several other respects in awarding Chevron's contract. Most notably, DFSC awarded the contract pursuant to an illegal auction. Under DFSC contract clauses providing for preferential evaluation and consideration of bids submitted by small and small disadvantaged businesses, DFSC disclosed to small and small disadvantaged businesses the amount of the lowest bids submitted. Small and small disadvantaged businesses were then permitted to match these bids (sometimes within ten percent). Such an auction violated the Office of Federal Procurement Policy Act, 41 U.S.C. § 423 (1990), and FAR 15.610(e). In *LaBarge Products, Inc. v. West*, 46 F.3d 1547 (Fed. Cir. 1995), the Federal Circuit held that an auction violating these provisions rendered a contract illegal. *Id.* at 1552-53.

In addition, DFSC did not award the contract in compliance with DFAR § 252.219-7001. Contrary to the requirements of this provision, DFSC did not award the portions of the procurement for large businesses before awarding the portion of the procurement set aside for small and small disadvantaged businesses. Nor did DFSC re-solicit to large businesses the portions of the procurement set aside for, but not ultimately awarded to, small and small disadvantaged businesses.

Finally, contrary to the Supreme Court's decision in *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995), DFSC's extension of preferences to small disadvantaged businesses violated the equal protection component of the Fifth Amendment's due process clause, because they were not narrowly tailored measures that furthered compelling government interests through remedying prior harms or otherwise. *See also Adarand Constructors, Inc. v. Mineta*, 121 S. Ct.

*(Footnote cont'd on next page)*

## III. CHEVRON IS ENTITLED TO BE PAID THE FAIR MARKET VALUE OF THE FUEL IT SUPPLIED

The Federal Circuit has held that suppliers of fuel to DFSC are entitled to be paid the fair market value of the fuel they delivered under contracts containing DFSC's illegal price adjustment clause. *Barrett Refining Corp. v. United States,* 242 F.3d 1055 (Fed. Cir. 2001); *see also Pride Companies, L.P. v. United States,* No. 95-597C, (Fed. Cl. May 10, 2000). A number of different legal theories support Chevron's right to be paid the fair market value of the fuel it supplied to DFSC. Each of these legal theories is discussed separately below.

### A. Illegality

Where the government violates the law in pricing a contract, a contractor is entitled to "equitable relief." *Gould, Inc. v United States*, 935 F.2d 1271, 1275 (1991). The government's violation of the law gives rise to three different equitable remedies: *quantum valebant*, reformation, and rescission and restitution.

*Quantum valebant* permits recovery of the fair market value of goods delivered under an illegal contract. *Urban Data Systems v. United States,* 699 F.2d 1147, 1155 (Fed. Cir. 1983). In *Barrett*, the Federal Circuit affirmed an award of *quantum valebant* to a DFSC supplier for fuel delivered under DFSC's illegal price adjustment clause. 242 F.3d at 1059-61. The Federal Circuit expressly upheld the lower court's finding that "'once the unauthorized [price escalation]

*(Footnote cont'd from previous page.)*

1401 (2001) (granting *cert.* to review the lower court's implementation of the Supreme Court's original *Adarand* decision).

All of these illegalities affected the contract price Chevron received and entitle Chevron to be paid the fair market value of the fuel it delivered to DFSC under the same legal theories and in the same amounts applicable to Chevron's recovery for DFSC's illegal price adjustment clause.

clause is struck out, . . . [the] express contract simply incorporates an implied-in-fact promise by the government to pay at least fair market value for the fuel delivered.'" *Id.* at 1059 (brackets and ellipses original).

Consistent with the holding in *Barrett*, in *Pride*, a DFSC supplier recovered $45 million in *quantum valebant* because of DFSC's illegal price adjustment clause. *Pride*, slip op. at 8. Similarly, in *Gold Line*, the court upheld the supplier's right to recover *quantum valebant*, although the amount of recovery was left for further proceedings. *Gold Line*, 43 Fed. Cl. at 296. Like the suppliers in *Barrett*, *Pride* and *Gold Line*, Chevron is entitled to recover under *quantum valebant* the fair market value of the fuel it supplied to DFSC. *See generally Phoenix Petroleum*, No. 98-5124, 1999 U.S. App. LEXIS 16939, at *5 (noting that "other parties have since prevailed before the Court of Federal Claims in recovering government underpayments stemming from illegal application of B19.33 [DFSC's illegal price adjustment clause]").[4]

Alternatively, where the government violates the law in pricing a contract, a contractor may seek to reform the contract price. In *Beta Systems, Inc. v. United States*, 838 F.2d 1179 (Fed. Cir. 1988), the government used an illegal price adjustment clause and the Federal Circuit held that "reformation was appropriate." *Id.* at 1186. In *LaBarge Products, Inc. v. West*, 46 F.3d 1547 (Fed. Cir. 1995), the government allegedly established the price of a contract through an illegal auction. *Id.* at 1552. The Federal Circuit held that the contractor could "seek reformation

[4] The holding in *Northrop Grumman Corp. v. United States*, 47 Fed. Cl. 20, 40-41 (Fed. Cl. 2000), that the Court of Federal Claims lacks jurisdiction to award recovery under *quantum valebant* was overruled in *Barrett Refining Corp. v. United States*, 242 F.3d at 1059-61. *See also AT&T v. United States*, 177 F.3d 1368, 1374 (Fed. Cir. 1999); *Clark v. United States*, 95 U.S. 539, 542 (1877); *Crocker v. United States*, 240 U.S. 74, 81 (1916); *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 566 n.22 (1961). Indeed, the government was compelled to stipulate to recovery under *quantum valebant* in *Pride*.

of its price term, even after performance, if that term was allegedly diminished by unlawful government acts." *Id.* at 1552-53. In *Gold Line*, the court expressly held that reformation was an available remedy for DFSC's illegal price adjustment clause. *Gold Line*, 43 Fed. Cl. at 298. As in *LaBarge*, *Beta Systems*, and *Gold Line*, Chevron is entitled to reform the price of its contract to reflect the fair market value of the fuel it supplied.

Finally, where the government violates the law in pricing a contract, the contractor may rescind the contract and recover restitution. *See* 6A Arthur Linton Corbin, *Corbin on Contracts*, § 1540 (1962). The measure of Chevron's restitution is the fair market value of the fuel it delivered to DFSC. *Id.*[5]

### B. Misrepresentation

A misrepresentation is an assertion not in accordance with the facts. *Morris v. United States*, 33 Fed. Cl. 733 (1995) (citing *Restatement (Second) of Contracts* § 159). It may be expressed through words or conduct or may occur where a party failed to disclose facts that related to a basic contract assumption. *Restatement (Second) of Contracts* §§ 159, 161.

A misrepresentation is actionable if it is either "material" or "fraudulent." *Badgley v. United States*, 31 Fed. Cl. 508, 514 (1994) (citing *Restatement (Second) of Contracts* § 164); *CTA Incorporated v. United States*, 44 Fed. Cl. 684, 698 (1999) (same). A material misrepresentation is one that is reasonably likely to induce assent, whereas a fraudulent

[5] The remedy of rescission and restitution is equally available before and after completion of performance. *Aluminum Company of America v. Essex Group, Inc.*, 499 F. Supp. 53, 78 (W.D. Pa. 1980) ("where one or both parties have performed under the supposed contract, the courts award appropriate restitution in light of the benefits the parties have conferred on each other"); G. Palmer, II *Law of Restitution* § 8.6 at 206 (1979) ("If both parties were mistaken as to the facts making the transaction illegal, restitution should be granted . . . no policy justifies denial of relief to the faultless party when the other party has been unjustly enriched.").

misrepresentation is a knowing or recklessly made misrepresentation. *Restatement (Second) of Contracts* § 162. A fraudulent misrepresentation is actionable even if not material. *Restatement (Second) of Contracts* § 164 cmt. b.

DFSC's award of the contract was an affirmative misrepresentation that the contract complied with the law. *See Northrop Grumman Corp. v. United States*, No. 97-276C, slip op. at 11-13 (Fed. Cl., Dec. 20, 1999) (rejecting the government's assertion that the award of an allegedly illegal contract constituted "no affirmation of fact or promise" sufficient to create a warranty that the Navy complied with the FAR in awarding the contract). In addition to this affirmative misrepresentation, DFSC's failure to disclose its violation of the law was a misrepresentation because the legality of the contract was a basic contract assumption. *See Restatement (Second) of Contracts* §§ 159 cmt. a, 160-161 (1981). Furthermore, through awarding the contract, DFSC affirmatively misrepresented and otherwise failed to disclose that the Department of Energy had not designed or intended for the PMM indexes to be used to set or adjust prices.

These material and/or fraudulent misrepresentations by DFSC (including by the contracting officer) were relied upon by Chevron and induced Chevron to enter the contract. DFSC's misrepresentations entitle Chevron to be paid the fair market value of the fuel it delivered to DFSC, whether by way of rescission and restitution, damages, or reformation. *See T. Brown Constructors, Inc. v. Pena*, 132 F.3d 724, 728 (Fed. Cir. 1997) (damages); *Rosenberg Lumber Co. v. Madigan*, 978 F.2d 660, 665-67 (Fed. Cir. 1992) (rescission and restitution and reformation).

### C. Breach of Contract

When DFSC entered the contract, it had a contractual obligation to comply with the law. *Slagan v. John Whitman & Assoc.*, No. 97-3961, 1997 U.S. Dist. LEXIS 14146, *10-11 (E.D. Pa. Sept. 10, 1997); *Hartzell v. Burdick*, 398 N.Y.S.2d 649, 650 (1997). When DFSC violated the FAR by using an illegal price adjustment clause, DFSC breached the contract. *Id.*

In *Northrop Grumman Corp. v. United States*, No. 97-276C (Fed. Cl., Dec. 20, 1999), the contractor alleged that the Navy's award of a fixed-price development contract in violation of the FAR was a breach of contract. *Id.* slip op. at 11. The court held that the contractor's breach of contract claim could proceed to trial, rejecting the government's assertion that the Navy's award of the contract constituted "no affirmation of fact or promise necessary" to support a breach of contract claim. *Id.* slip op. at 11-13.

Like the Navy's alleged breach in *Northrop Grumman,* DFSC breached the contract by violating the FAR. *Id.*; *see also Slagan*, 1997 U.S. Dist. LEXIS 14146, *10-11; *Hartzell*, 398 N.Y.S.2d at 650. Because DFSC breached the contract, Chevron is entitled to be paid the fair market value of the fuel it delivered to DFSC, whether by way of rescission and restitution or damages. *See Estate of Berg v. United States*, 687 F.2d 377, 379 (Ct. Cl. 1982) (damages); *Resolution Trust Corp. v. Federal Savings and Loan Ins. Corp.*, 25 F.3d 1493, 1504-06 (10th Cir. 1994) (rescission and restitution).

### D. Failure of Consideration

A claim of "failure of consideration exists wherever one who has promised to give some performance fails, without his fault, to receive in some material respect the agreed exchange for that performance." *Williston on Contracts* § 814 (3d Ed.) (1962); *see also City of New York v. United States*, 106 Ct. Cl. 141, 151 (1946). The doctrine of failure of consideration supports

contractual relief even in the absence of a breach of contract and without regard to the fault of the non-performing party. *Aerojet-General Corp. v. Askew*, 453 F.2d 819, 831 (5th Cir. 1971) (quoting *Corbin on Contracts*). A failure of consideration may occur "with reference to the formation of the contract or with reference to its performance." Walter H.E. Jaeger, *Williston on Contracts* § 814, p. 16.[6]

In *Davis Airfoils, Inc. v. United States*, 124 F. Supp. 350 (Ct. Cl. 1954), a patent was declared invalid during the term of a license agreement. *Id.* at 353. The Court of Claims found a failure of consideration because the subject matter of the contract never lawfully existed. *Id.* Similarly, in *Louisiana v. Wood*, 102 U.S. 294 (1880), the Supreme Court upheld a claim of failure of consideration by a purchaser of illegally-issued bonds. The Court held that "[t]he consideration on which the payment was made has failed, because the bonds were not, in fact, valid obligations of the city." *Id.* at 298.

Here, as in *Davis Airfoils* and *Wood*, compliance with the law was a material part of the consideration for entering the contract. Like the illegalities in *Davis Airfoils* and *Wood*, the illegality in Chevron's contract caused consideration to fail. *Davis Airfoils*, 124 F. Supp. at 353; *Wood*, 102 U.S. at 298. In addition, a material part of the consideration for the contract was that the PMM indexes were designed and intended to be used to set or adjust prices. The fact that the

[6] While the Federal Rules of Civil Procedure recognize that failure of consideration may be raised as an affirmative defense, Fed. R. Civ. P. 8(c), failure of consideration also may be raised as an affirmative claim for relief. *District of Columbia v. Thompson*, 281 U.S. 25, 32-22 ( 1930); *Louisiana v. Wood*, 102 U.S. 294, 298 (1880); *Woodbury v. District of Columbia*, 92 F.2d 202, 203 (Ct. App. D.C. 1937); *see generally Far West Federal Bank v. Office of Thrift Supervision*, 930 F. 2d 883, 886 (Fed. Cir. 1991) (plaintiff advancing claim with regard to bank conversion agreement on the grounds of failure of consideration).

PMM indexes were not designed and intended to be used to set or adjust prices also caused consideration to fail.[7]

Because there was a material failure of consideration for the contract, Chevron is entitled to rescind the contract and to recover restitution reflecting the fair market value of the fuel it delivered to DFSC. *FDIC v. Air Florida System, Inc.*, 822 F.2d 833, 839 (9th Cir. 1987).

### E. Mutual Mistake

In *Beta Systems, Inc. v. United States*, 838 F.2d 1179 (Fed. Cir. 1988), a contract contained an economic price adjustment clause that violated the DAR, the predecessor regulations to the FAR, because the price adjustment clause did not approximate the changes in the contractor's costs. *Id.* at 1186. Despite this violation of the DAR, the court found that the parties had intended that the contract comply with the law. The court stated:

> The government does not challenge that Beta did not intend to use an index that would effectively eliminate its principal construction material from fair weight in the inflation adjustment. And there is a legal presumption that the government did not intend to use an index that would violate the law as embodied in the DAR.

*Id.* at 1186.

Because both parties intended to comply with the law, the court held the contract could be reformed, stating: "If the contract is in violation of the DAR, and does not meet the

[7] In addition, a material purpose and condition of the price adjustment clause and of the contract itself was that the price adjustment clause and the contract comply with the law and result in prices that reflected fair market value. Because the price adjustment clause and the contract did not comply with the law or result in prices that reflected fair market value, the purpose of the contract was frustrated and a condition of the contract failed. Accordingly, Chevron may recover the fair market value of the fuel it delivered to DFSC by way of rescission and restitution. *Office of the Comptroller General of the Republic of Bolivia v. International Promotions and Ventures, LTD*, 618 F. Supp. 202 (S.D.N.Y. 1985); *Unihealth v. U.S. Healthcare, Inc.*, 14 F. Supp. 2d 623 (D.N.J. 1998); *Restatement (Second) of Contracts* § 377 (1979).

requirement that an index be selected that approximately tracks the economic changes affecting this contract, then reformation is appropriate." *Id.*; *see also Gold Line*, 43 Fed. Cl. at 297 (relying on *Beta Systems* to uphold reformation of DFSC's illegal price adjustment clause); *Craft Machine Works*, 90-3 BCA ¶ 23,095, at 115,696 (relying on *Beta Systems* to reform an EPA clause that violated the FAR and replace it with "an alternate interpretation consistent with the parties' intentions and the law").

Here, Chevron intended to enter a contract that complied with the FAR and which resulted in prices that reflected fair market value. If DFSC did not misrepresent or is not otherwise held to know these facts as previously alleged,[8] then DFSC may be presumed as a matter of law to have intended to comply with the FAR when it entered the contract and to have intended to use a price adjustment clause which resulted in prices that reflected fair market value. *Id.*; *see also Barrett Refining*, 242 F.3d at 1062 (DFSC alleged that it made payments under its illegal price adjustment clause "because of a mistake of law.") Had Chevron and DFSC been aware of their mistake, they would not have used DFSC's illegal price adjustment clause.

In addition, when Chevron entered the contract, it was not aware that the Department of Energy had not designed or intended for the PMM indexes to be used to set or adjust prices. If DFSC did not misrepresent or is not otherwise held to know these facts concerning the PMM indexes, then DFSC may be presumed to have been mistaken concerning them. *Id.* Had both Chevron and DFSC been aware of their mistake, they would not have used DFSC's illegal price adjustment clause.

---

[8] Of course, if DFSC were aware, actually or constructively, of Chevron's mistake concerning DFSC's compliance with the FAR or the design and intent behind the PMM indexes, Chevron may recover on the grounds of a unilateral mistake. *Buesing v. United States*, 42 Fed. Cl. 679, 695 (1999).

Accordingly, because Chevron and DFSC were mutually mistaken about material elements of the price of the contract, Chevron is entitled to reform the contract to correct the parties' mutual mistake and to reflect their intent to provide for payment of the fair market value of the fuel Chevron delivered. *Beta Systems*, 838 F.2d at 1186; *Craft Machine Works*, 90-3 BCA at 115,696.[9] Alternatively, because of the parties' mutual mistake, Chevron may recover the fair market value of the fuel it delivered by way of rescission and restitution. *Rust Engineering Co.*, B-180071, 74-1 CPD ¶ 101 (mutual mistake concerning applicability of state sales tax supports rescission and restitution); Richard A. Lord, *Williston on Contracts* § 12:6 p. 93 (4th Ed.).

**F. Fifth Amendment Taking**

The government may grant statutory or regulatory rights relating to contracts with the United States. *United States Trust Company v. New Jersey*, 431 U.S. 1, 18-19, n.14 & n.17 (1977); *Del-Rio Drilling Program, Inc. v. United States*, 146 F.3d 1358, 1364 (Fed. Cir. 1998) (determination of property interests may turn on federal statutes or regulations). Statutory or regulatory rights relating to contracts vest when the contract is entered, and a taking occurs when the government violates these statutory or regulatory rights. *Perry v. United States*, 294 U.S. 330 (1935); *Lynch v. United States*, 292 U.S. 571 (1934); *see generally United States v. Winstar*, 518 U.S. 839, 876 (1996) ("it is clear that the National Government has some capacity to make agreements binding future Congresses by creating vested rights.").

---

[9] As *Beta Systems* makes clear, reformation is an available remedy even if the mistake might be characterized as involving a mistake of law. 838 F. 2d 1186; *see also Restatement (Second) of Contracts* § 151 cmt. b; *see generally Blackhawk Hotels Co.*, ASBCA No. 13333, 68-2 BCA ¶ 7265 (contractor would be entitled to an equitable adjustment when the government mistakenly represented that the Service Contract Act did not apply to the procurement), *overruled on other grounds, National Line Co.*, ASBCA No. 18739, 75-2 BCA ¶ 11,400.

In *Perry*, Congress authorized the issuance of bonds redeemable in gold, but later sought to alter those redemption rights. 294 U.S. at 346-47. Because the bondholders' statutory rights to redeem in gold had vested upon purchasing the bonds, Congress' subsequently altering the terms of the bonds was held to have effected a taking. *Id.* at 350-54. Similarly, in *Lynch*, Congress authorized the issuance of war risk insurance policies, but later sought to alter the terms of the policies. 292 U.S. at 575-76. Because the insureds' statutory rights vested upon entering the insurance policies, Congress was held to have effected a taking. *Id.* at 579-89.

Like the rights granted by the government in *Perry* and *Lynch*, the FAR granted Chevron and other contractors a right to contracts with prices that could only be adjusted in certain ways. *See MAPCO*, 27 Fed. Cl. at 412 (FAR regulations governing price adjustment clauses intended to protect contractors). This right vested when Chevron entered the contract. *Perry*, 294 U.S. at 330; *Lynch*, 292 U.S. at 576-77.[10] DFSC abrogated Chevron's rights when it awarded the contract with an illegal price adjustment clause. This effected a taking of Chevron's rights compensible under the Fifth Amendment. *Id.*; *see generally Buse Timber & Sales, Inc. v. United States*, 45 Fed. Cl. 258, 264 (1999) ("takings of contracts have been found where the government . . . repudiates debts to save money").[11]

Furthermore, DFSC had no valid right to possession and use of the fuel Chevron delivered. DFSC could only accede to a right of possession under a lawfully valid contract. As

[10] The government may not argue that Chevron's rights under the FAR were disposed of when DFSC awarded the contract. "Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them." *Greenbriar v. United States*, 193 F.3d 1348, 1356 (Fed. Cir. 1999) (quoting *Connolly v. Pension Benefit Guarantee Corp.*, 475 U.S. 211, 223-24 (1986)).

[11] The fact that DFSC violated the law in connection with taking Chevron's rights does not preclude a takings claim. *Del-Rio Drilling*, 146 F.3d at 1361-64.

the Court of Federal Claims held in *Integrated Logistics Support Systems International, Inc. v. United States*, 42 Fed. Cl. 30 (1998), it is "upon the transfer of property to the Government pursuant to a *lawfully executed* bilateral agreement, [that] the Government cannot be compelled to render just compensation for the alleged taking of such property." *Id.* at 33-34 (emphasis added). The court similarly stated in *Scan-Tech Security, L.P. v. United States,* 46 Fed. Cl. 326 (2000), it is only "when the Government asserts its interest in property obtained *pursuant to a valid contract*, [that] no taking occurs." *Id.* at 341 (emphasis added).

Here, the price term of Chevron's contract was not lawfully valid. DFSC's payment of a price term that was not lawfully valid did not confer on DFSC a fully supporting right to possess and use the fuel: for the payment of a lawful price is the *quid pro quo* for receiving title. *Heydt v. United States*, 38 Fed. Cl. 286, 305 (1997) (a taking occurs when the government "controls rights or property which have not been purchased"). Because DFSC took possession of and used the fuel without a fully supporting claim of right, Chevron has a valid takings claim. *Integrated Logistics Support Systems International*, 42 Fed. Cl. at 33-34; *Scan-Tech Security*, 46 Fed. Cl. at 341. Indeed, courts have consistently held that a "taking occurs when the rightful property, *contract*, or regulatory powers of the government are employed to control rights or property which have not been purchased." *Heydt*, 38 Fed. Cl. at 305 (emphasis added).[12]

---

[12] The mere existence of a contract, of course, cannot preclude a takings claim. As the Court of Federal Claims held in *Integrated Logistics Support*: "That the circumstances confronting plaintiff involve an express contract with the Government is not fatal to plaintiff's Count IV taking claim." 42 Fed. Cl. at 34. Thus, it has long been recognized that, where the government fails to vacate leased property upon termination of a lease, the lessor may assert alternative claims for breach of contract or a Fifth Amendment taking. *Prudential Insurance Co. v. United States*, 801 F.2d 1295, 1300 n.13 (Fed. Cir. 1986); *Allenfield Associates v. United States*, 40 Fed. Cl. 471, 487 (1998).

*(Footnote cont'd on next page)*

Because DFSC effected a taking of Chevron's rights under the Fifth Amendment, Chevron is entitled to compensation based on the fair market value, inclusive of interest, of the fuel it delivered under the contract. *See United States v. Sioux Nation of Indians*, 448 U.S. 371 (1980); *Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299 (1923).[13]

*(Footnote cont'd from previous page.)*

Whether the government's interference with a citizen's property rights gives rise to a takings claim, contractual remedies, or both depends on the circumstances of the interference. *Integrated Logistics Support Systems International, Inc.*, 42 Fed. Cl. at 33-34. However, "[t]aking claims are not presumed to be foreclosed by claims for breach of express contract merely because the claims share the same factual background." *Id.* at 34; *see also Medina Construction v. United States*, 43 Fed. Cl. 537, 559 (1999) (stating that plaintiff "might be able to establish facts sufficient to support a Fifth Amendment taking claim as an alternative to its contract claims against the Government.").

[13] Neither the statute of limitations nor the doctrines of laches or waiver preclude Chevron's claim. The six-year statute of limitations under the CDA was not enacted until October 1995, and does not apply retroactively. *Motorola, Inc. v. West*, 125 F.3d 1470, 1472-73 (Fed. Cir. 1997); FAR § 33.206. Prior to 1995, there was no statute of limitations under the CDA. *Motorola*, 125 F.3d at 1472; *S.E.R., Jobs for Progress, Inc. v. United States*, 759 F.2d 1, 5 (Fed. Cir. 1985); *Dalton v. Sherwood Van Lines, Inc.*, 50 F.3d 1014, 1017 (Fed. Cir. 1995); *Do-Well Machine Shop, Inc. v. United States*, 870 F.2d 637, 639-40 (Fed. Cir. 1989).

In addition, the doctrine of laches does not preclude Chevron's claim because DFSC has not suffered prejudice from any unreasonable delay. *See Jana, Inc. v. United States*, 936 F.2d 1265, 1269-70 (Fed. Cir. 1991); *see also Cupey Bajo Nursing Home, Inc. v. United States*, 36 Fed. Cl. 122, 127 n.8 (1996). All of the data needed to determine what Chevron was paid and the fair market value of the fuel Chevron delivered is readily available. Indeed, DFSC just completed litigating claims from this same period in *Pride* and raised no claim of unreasonable delay or prejudice.

Finally, the doctrine of waiver does not bar Chevron's claim. Chevron was not aware of nor could it as a matter of law have waived DFSC's violation of the FAR. In *Beta Systems*, the Federal Circuit rejected the government's assertion that the contractor waived violation of regulations governing price adjustment clauses when, after objecting to the provisions, the contractor nonetheless accepted the price adjustment. The Federal Circuit held:

> The government's insistence during negotiations on use of Section H-8 in its entirety, and the contractor's acquiescence, does not immunize the government from the consequences of failure of the EPA [economic price adjustment] clause to comply with the law stated in the DAR. . . . The risk of unintentional

*(Footnote cont'd on next page)*

## IV. CHEVRON IS ENTITLED TO RECOVER $5,194,204.86

Chevron is entitled to be paid the fair market value of fuel it supplied to DFSC under each of the legal theories discussed above. The proper methodology for determining the fair market value of fuel Chevron supplied to DFSC under the illegal fuel price adjustment clause was established in *Pride Companies, L.P. v. United States*, No. 95-597C (Fed. Cl. May 10,

---

*(Footnote cont'd from previous page.)*

> failure of a contract term to comply with a legal requirement does not fall solely on the contractor. If the BLS index that was selected does not comply with DAR 3-404.3(c)(3)c.5, even approximately, it is not controlling whether or not *Beta* or the government foresaw, or accepted the risk of failing to foresee, this defect in the index.

*Beta Systems*, 838 F.2d at 1185 (paragraphing omitted).

In *LaBarge*, the Federal Circuit rejected the government's assertion that the contractor waived a violation of the regulations prohibiting auctions. The Federal Circuit held:

> [I]f government officials make a contract they are not authorized to make, in violation of a law enacted for the contractor's protection, the contractor is not bound by estoppel, acquiescence or failure to protest. In cases in which a breach of law is inherent in the writing of the contract, reformation is available despite the contractor's initial adherence to the contract provision later shown to be illegal.

*LaBarge*, 46 F.3d at 1552-53 (citation omitted).

The principles underlying the rule that an illegality in a contract cannot be waived were articulated more than a century ago by the Supreme Court as follows:

> Whenever the illegality appears, whether the evidence comes from one side or the other, the disclosure [of the illegality] is fatal to the case. No consent of the defendant can neutralize its effect. A stipulation in the most solemn form to waive the objection would be tainted with the vice of the original contract, and void for the same reasons.

*McMullen v. Hoffman*, 174 U.S. 639, 658 (1899); *see also Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 81 n.6 (1982) ("and if it be suggested that Kaiser should not have waited so long to assert its defense [of illegality], the Court has held that 'rules of estoppel will not be permitted to thwart the purposes of the laws of the United States.'")

2000). Applying the fair market value methodology established in *Pride*, Chevron is entitled to recover $5,194,204.86, plus interest.

### A. Claim Methodology

The court in *Pride* explained the legal standard for determining fair market value for the fuel delivered under DFSC's illegal price adjustment clause as follows:

> We do not calculate damages as though the contract divided the risk of economic uncertainty properly, or speculate how Pride might have bid the contract with an appropriate EPA [economic price adjustment] provision. We must determine what defendant would have paid for the fuel irrespective of Pride's contract.

*Id.* slip op. at 2-3.

The fair market value, the court held, was "the value of the product to the government." *Id.* at 3. The value to the government was "not based on costs or a reasonable return on investment of the seller, but on the reasonable value in the marketplace of the property sold." *Id.* (quoting *Cities Service Gas Co. v United States*, 500 F.2d 448, 457 (Ct. Cl. 1974)); *see also Urban Data Systems*, 699 F.2d at 1155.[14]

To determine fair market value, the court first determined the value of the fuel on the Gulf Coast, the refining center of the United States. *Pride,* slip op. at 3. More specifically, the court determined the value of fuel at the mouth of the Explorer Pipeline, which is the pricing point for the Gulf Coast spot market and the location where DFSC maintains its largest Defense Fuel Supply Point ("DFSP Houston").

[14] While the court in *Pride* determined fair market value in conjunction with an award of *quantum valebant*, the methodology the court adopted is equally applicable to determination of fair market value under the other legal theories of recovery Chevron advances.

To calculate the dollar value of the fuel on the Gulf Coast, the court used U.S. Gulf Coast Average Spot prices as published in Platts for the analogous commercial fuel or mix of commercial fuels DFSC purchased. *Id.* at 3-5.[15] To reflect the one-year term of DFSC's contracts, as opposed to a one-time spot sale as reflected in Platts, the court added a long-term contract premium.[16] *Id.*

Because DFSC did not purchase the fuel from Pride on the Gulf Coast but rather at specific military facilities, the Court in *Pride* added to the value of the fuel as calculated on the Gulf Coast the transportation rates from the Gulf Coast to each military facility. *Id.* at 5-7. The

---

[15] It may well be appropriate to calculate the value of the fuel on the Gulf Coast by using Platts U.S. Gulf Coast Spot High prices rather than, as the Court did in *Pride*, by using Platts U.S. Gulf Coast Spot Average prices. While Chevron is using Platts Spot Average prices in its claim, Chevron's use of these prices should not be construed as a concession that using Platts Spot Average prices is more appropriate than using Platts Spot High prices.

[16] Chevron uses a total long-term contract premium of $.05, which reflects the $.03 premium for commercial contracts found in *Pride* and an additional $.02 premium for DFSC contracts. *See Pride* slip op. at 3-5. As Mr. Kenneth Riley, former Vice President of ARCO Petroleum Products Company, and Mr. George West, former Business Manager of Distillate and Residual Products for Shell, testified in *Pride*, DFSC's contracts contain an additional $.02 premium above that for commercial contracts because of DFSC's more restrictive contract requirements. While this testimony was presented in *Pride*, the court was not asked nor did it have occasion to address this additional premium for DFSC contracts. This $.05 premium also is supported by the unique refining requirements of DFSC fuels that are not required for commercial fuels.

In addition, while the amount of the long-term premium may have varied during the overall period subject to claim $.05 is an appropriate average. Similarly, while market relationships between suppliers and commercial airlines began to change in the 1990s, in terms both of the backward integration and use of spot formula pricing, the relationship between DFSC and its suppliers has not fundamentally changed, nor has the amount of the appropriate long-term premium for DFSC contracts.

court used DFSC's own transportation rates from DFSP Houston to the military facilities where the fuel was purchased. *Id.*[17]

Chevron uses this same methodology established in *Pride* to calculate the amount of its claim. Indeed, because DFSC supported the methodology adopted by the court in *Pride* for determining the fair market value, the government is judicially estopped from subsequently challenging this methodology. *Reynolds v. Comm'r of Internal Revenue*, 861 F.2d 469 (6th Cir. 1988).

**B. DFSC's Right To Offset**

In *Barrett Refining Corp. v. United States*, 242 F.3d 1055 (Fed. Cir. 2001), the Federal Circuit held that DFSC could assert an offset *ex aequo et bono*. *Id.* at 1062-64. DFSC's offset is subject to a supplier's claim for fair market value and may not reduce the effective price of a delivery below the initial bid price. *Id.* at 1062, 1064-65.

DFSC's right to offset is intimately related to a supplier's right to recover the fair market value of the fuel it supplied. Thus, in *Barrett*, the Federal Circuit affirmed the Court of Federal Claims' holding that, once DFSC's illegal price adjustment clause is "struck out" of the contract, the "express contract simply incorporates an implied-in-fact promise by the government to pay at least fair market value for the fuel delivered." *Id.* at 1059. It was because payments under the contract were "at least partially unauthorized," that the price term of the contract was replaced by

[17] DFSC transports the overwhelming majority of the fuel it purchases. Accordingly, when DFSC awards contracts each year, it calculates the price of transporting fuel, *inter alia*, from DFSP Houston to the relevant military facilities. DFSC evaluates all available modes of transportation – *e.g.*, truck, tank car, pipeline, or barge – and selects the least-price transportation option. The results of DFSC's evaluation of the least-price transportation option are included in the computer printout of DFSC's bid evaluation model, which is made available to suppliers. These are the transportation rates the court used in *Pride* and that Chevron uses here.

an implied-in-fact contract, which the court affirmed the "parties' inten[ded] to provide for fair market-value consideration of pricing." *Id.* at 1060, 1062.[18]

It was this same invalidity of the contract's pricing term, the Federal Circuit held, that gave rise to DFSC's right to an offset for unauthorized payments: Because "the payments made by the government were based on an illegal price escalation clause and, thus, were unauthorized

---

[18] In *Barrett*, the Federal Circuit stated that it was "unwilling to restrict the trial courts to any single basis for determining fair market value." *Id.* at 1061 (quoting *Seravalli v. United States*, 845 F.2d 1571, 1575 (Fed. Cir. 1988)). Accordingly, while the lower court in *Barrett* measured recovery by adjusting the supplier's initial bid price based on changes in Platts, this methodology is not controlling or appropriate in other cases.

Indeed, the methodology used in *Barrett* is fundamentally flawed. Both parties' expert economists agreed in *Pride* that, because the bid price and price adjustment clause are linked, the illegality in the price adjustment clause affected the level of the initial bid prices. This inextricable link between the bid price and the price adjustment clause was acknowledged by Court of Federal Claims in *Barrett,* which found: "The government's insertion of the Platt's index into the EPA clause of the original contract [in place of the PMM index] would have created a different set of risks for prospective bidders, in turn triggering different bids than those actually submitted by offerors." *Barrett Refining Corporation v. United States*, 45 Fed. Cl. 166, 171 (1999), *aff'd*, 242 F.3d 1055 (Fed. Cir. 2001). Because the bid price and the illegal price adjustment clause are linked, use of the initial bid price in *Barrett* effectively and incorrectly incorporated the effects of DFSC's violation of the law into the fair market value calculation.

Furthermore, the Court of Federal Claims justified its methodology on the grounds that the supplier received special preferences as a small disadvantaged business. *Barrett Refining Corporation v. United States*, 42 Fed. Cl. 128, 134-35 (1998). The court held that the benefits of these special preferences could not be preserved without using the supplier's initial bid price in calculating fair market value. *Id.* The Federal Circuit relied on this justification in affirming the lower court's decision, stating: "Barrett qualified as a small disadvantaged business ("SDB") that, in accordance with an elaborate system of SDB preference factors, affected the base price of these contracts." *Barrett*, 242 F.3d at 1058. This fundamental justification for using the initial bid price, despite the lower court's unchallenged finding that the bid price was linked to the illegal price adjustment clause, has no relevance to Chevron's claim. *Id.* at 1059 (quoting *Seravalli v. United States*, 845 F.2d 1571, 1575 (Fed. Cir. 1988) for the principle that "'trial courts necessarily must have considerable discretion to select the method of valuation that is most appropriate in light of the facts of the particular case'").

. . . the government has a right to seek and recover the unauthorized payments it made." *Id.* at 1064.

The Federal Circuit made clear, however, that DFSC's right to offset the amount of the payments made did not extinguish a supplier's right to recover fair market value under the contract's implied pricing term. The court expressly admonished that DFSC's right to offset is "subject to [the supplier's] claim for fair market value," and held that "no award to the government could be so large that it reduced [the supplier's] recovery below fair market value." *Id.* at 1062, 1064. Moreover, the supplier only could be ordered to "refund payments made in excess of the base [or bid] price," an equitable principle that precludes DFSC's overreaching. *Id* at 1065.[19]

In calculating its claim, Chevron affords DFSC all appropriate offsets as provided in *Barrett*. Chevron calculates the price of each delivery based on fair market value without regard to whether fair market value is greater or lesser than the payments made. Where fair market value falls below the bid price, however, the price of the delivery is deemed to be the initial bid price.[20]

---

[19] This equitable principle, which established the bid price as a floor to a supplier's recovery, must apply without regard to whether the payments made are greater or lesser than fair market value, inasmuch as the impact of DFSC's violation of the law on the payments made cannot control the measure of recovery or the equitable principles applicable thereto.

[20] Chevron does not concede DFSC's right to an offset, or any other claim, nor does Chevron waive any defense to such an offset.

### C. Claim Calculation

The court in *Pride* calculated the fair market value of JP-4 using the following formula:

> .70 (Houston spot price for naphtha) + .30 (Houston spot price for kerojet[21]) + (long-term contract premium) + (DFSC's transportation rate to the point of delivery)

*Pride*, slip op. at 3. Chevron uses this same formula to calculate the fair market value of the JP-4 it delivered to DFSC.

Similar to the Court in *Pride,* Chevron uses for the day of each delivery Platts Los Angeles Spot Price Average for naphtha[22] and Platts Los Angeles Average Pipeline Spot Price for kerojet for El Segundo deliveries.[23] For Pearl City and Richmond deliveries, Chevron uses Platts San Francisco Spot Price Average for naphtha and Platts San Francisco Average Pipeline Spot Price for kerojet. Chevron includes in the formula the cost associated with the contractually required additive FSII at the rate set forth in the contract.[24] DFSC purchased all JP-4 at Chevron's Pearl City, El Segundo, and Richmond refineries, and, following the methodology in

---

[21] This weighted average of the price of naphtha and kerojet reflects the composition of JP-4.

[22] In order to construct Los Angeles and San Francisco naphtha prices, Chevron compared the relationship between U.S. Gulf Coast spot prices for naphtha and unleaded gasoline. Chevron then applied the differential between these two spot prices to the Los Angeles and San Francisco spot prices for unleaded gasoline.

[23] Where Platts did not publish a price on the day of delivery, Chevron uses an average of the first available price for the days immediately before and after the day of delivery.

[24] Although Chevron uses the rate for FSII set forth in the contract, Chevron notes that the fair market value of FSII may be materially higher.

In addition, Modification P00001 amended line item 0501 to include FSII for Pearl City deliveries. Chevron uses the effective date of the modification to determine the inclusion of additive cost and appropriate bid price for Pearl City deliveries. Chevron reserves the right to supplement its claim should additional information become available.

*Pride,* Chevron uses DFSC's own transportation rates from DFSP San Pedro to El Segundo,[25] and DFSP Ozol to Pearl City and Richmond. Chevron applies all appropriate offsets and equitable principles of recovery as established in *Barrett.*

As set forth in Exhibit 2, the fair market value of the JP-4 Chevron delivered to DFSC is $157,822,660.98. As set forth in Exhibit 3, Chevron was paid $152,628,456.12 for these deliveries.[26] Accordingly, the amount of Chevron's claim, represented by the difference between the fair market value of the JP-4 it delivered and what it was paid, is $5,194,204.86.

## V. CONCLUSION

DFSC's price adjustment clause B19.33 violated the FAR and was illegal. Chevron is therefore entitled to recover the fair market value of the fuel it supplied and submits a certified claim for $5,194,204.86, plus interest.[27]

---

[25] DFSC's bid evaluation model did not include a transportation rate from El Segundo to Los Angeles. Chevron uses the rate in DFSC's bid evaluation model for transportation from DFSP San Pedro to El Segundo, which DFSC lists as zero. Chevron reserves the right to supplement its claim with a more appropriate rate if it becomes available.

[26] Calculation of the amount Chevron was paid under the Contract is based on Chevron's electronic invoice data.

[27] Chevron's certification of its claim under the Contract is attached as Exhibit 4.

# APPENDIX

**Exhibit 1**

AWARD/CONTRACT

CONTRACT (Proc. Inst. Ident.) NO.: DLA600-90-D-0531

3. EFFECTIVE DATE: 04 SEP 1990

4. REQUISITION/PURCHASE REQUEST/PROJECT NO.: SCC J-90-0308

5. ISSUED BY CODE SC0600

DEFENSE FUEL SUPPLY CENTER
CAMERON STATION TWX 710-832-0600
ALEXANDRIA, VIRGINIA 22304-6160
BUYER/SYMBOL- Lori Alcorn/DFSC-PZB
PHONE- (202) 274-4291 2.2b

6. ADMINISTERED BY (If other than Item 5) CODE

IN EMERGENCY SITUATIONS AFTER WORKING HOURS CONTACT DFSC-ESOC AT (703)274-8105. QUALITY ADMIN. ONLY: DCMAO EL SEGUNDO, SAN FRANCISCO, AND DFR PACIFIC (SEE CLAUSE E14:02).
PAS- NONE

7. NAME AND ADDRESS OF CONTRACTOR (No., street, city, county, State and ZIP Code)

Chevron USA, Inc.
575 Market Street
San Francisco, CA 94120-7006

Bidder Code: C087 Cage Code: 81230

CODE | FACILITY CODE

8. DELIVERY

[X] FOB ORIGIN [ ] OTHER (See below)

9. DISCOUNT FOR PROMPT PAYMENT

Net 30 Days

10. SUBMIT INVOICES (4 copies unless otherwise specified) TO THE ADDRESS SHOWN IN: ITEM 12

11. SHIP TO/MARK FOR CODE

SEE SCHEDULE

12. PAYMENT WILL BE MADE BY CODE

Defense Fuel Supply Center
Cameron Station, Bldg 8, Attn: DFSC-RFFB
Alexandria, VA 22304-6130

13. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION:

[ ] 10 U.S.C. 2304(c)( ) [ ] 41 U.S.C. 253(c)( )

14. ACCOUNTING AND APPROPRIATION DATA

97X4961.5106 01 26.1 S44203

| 15A. ITEM NO. | 15B. SUPPLIES/SERVICES | 15C. QUANTITY | 15D. UNIT | 15E. UNIT PRICE | 15F. AMOUNT |
|---|---|---|---|---|---|

Chevron USA, Inc.'s offer submitted 15 APR 90 (2), confirmed by SF33 dated 20 APR 90, and amended by correspondence dated 27 APR 90, 10, 17, 23 and 24 MAY 90, 13, 14(4) and 28 JUN 90, and 20 AUG 90; and SubcontractingPlan dated 28 NOV 89 as amended by correspondence dated 6 DEC 89, 31 JAN 90 and 20 AUG 90 is hereby accepted. Solicitation RFP DLA600-90-R-0161 and Amendments 0001 - 0006 are incorporated by reference except that the following clauses shall not apply: I94(F), I97(C), I150, I176(F), I176.01(F), and I176.03(F). A copy of Clause B14.02 ESTIMATED SUPPLIES TO BE FURNISHED (Contract Schedule) and various other clauses agreed to by the parties are attached.

15G. TOTAL AMOUNT OF CONTRACT $153,907,251.30

16. TABLE OF CONTENTS

| (✓) | SEC. | DESCRIPTION | PAGE(S) | (✓) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | PART I — THE SCHEDULE | | | | PART II — CONTRACT CLAUSES | |
| X | A | SOLICITATION/CONTRACT FORM | 1 | X | I | CONTRACT CLAUSES | 11 |
| X | B | SUPPLIES OR SERVICES AND PRICES/COSTS | 2-7 | | | PART III — LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH. | |
| | C | DESCRIPTION/SPECS./WORK STATEMENT | | | J | LIST OF ATTACHMENTS | |
| | D | PACKAGING AND MARKING | | | | PART IV — REPRESENTATIONS AND INSTRUCTIONS | |
| X | E | INSPECTION AND ACCEPTANCE | 7 | | K | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | |
| X | F | DELIVERIES OR PERFORMANCE | 8 | | | | |
| X | G | CONTRACT ADMINISTRATION DATA | 8-10 | | L | INSTRS., CONDS., AND NOTICES TO OFFER | |
| | H | SPECIAL CONTRACT REQUIREMENTS | | | M | EVALUATION FACTORS FOR AWARD | |

CONTRACTING OFFICER WILL COMPLETE ITEM 17 OR 18 AS APPLICABLE

17. [ ] CONTRACTOR'S NEGOTIATED AGREEMENT (Contractor is required to sign this document and return ______ copies to issuing office.) Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. (Attachments are listed herein.)

18. [X] AWARD (Contractor is not required to sign this document.) Your offer on Solicitation Number DLA600-90-R-0161* including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary.
*and Amendments 0001-0006

19A. NAME AND TITLE OF SIGNER (Type or print)
K. E. Johnson, Manager
Government Accounts

20A. NAME OF CONTRACTING OFFICER
JOHN R. WALKER

19B. NAME OF CONTRACTOR
Chevron U.S.A. Inc.
BY ______ (Signature of person authorized to sign)

19C. DATE SIGNED

20B. UNITED STATES OF AMERICA
BY [signature] (Signature of Contracting Officer)

20C. DATE SIGNED
04 SEP 1990

NSN 7540-01-152-8069
PREVIOUS EDITION UNUSABLE

26-106

STANDARD FORM 26 (REV. 4-85)
Prescribed by GSA
FAR (48 CFR) 53.214(a)

14.04 ESTIMATED SUPPLIES TO BE FURNISHED (DFSC FEB 1990)

(a) Prices indicated hereunder are subject to adjustment pursuant to the terms of this contract.

(b) The refined product to be furnished hereunder, f.o.b. point, method of delivery, and estimated quantity are as follows:

| ITEM | EST QTY/GALS | MOD | BASE PRICE (FEB 90) | INTERIM BASE PRICE (FEB 90) |
|---|---|---|---|---|
| DFSC | | JP-4 | NSN 9130-00-256-8613 | |
| 0101 | 61,320,000 | PL | $.629500 W/O FSII | $.629500 W/O FSII |
| FOB origin delivery of 61,320,000 gallons of JP-4 at El Segundo, CA. | | | | |
| 0201 | 39,973,500 | PL | $.641800 W/O FSII | $.641800 W/O FSII |
| FOB Origin delivery of 39,973,500 gallons of JP-4 at El Segundo, CA. | | | | |
| 0301 | 61,320,000 | PL | $.638800 W/O FSII | $.638800 W/O FSII |
| FOB Origin delivery of 61,320,000 gallons of JP-4 at Richmond, CA. | | | | |
| 0401 | 46,770,000 | PL | $.660300 W/O FSII | $.660300 W/O FSII |
| FOB Origin delivery of 46,770,000 gallons of JP-4 at Richmond, CA. | | | | |
| 0501 | 30,660,000 | PL | $.639200 W/O FSII | $.639200 W/O FSII |
| FOB Origin delivery of 30,600,000 gallons of JP-4 at the junction of the Chevron and military pipelines, Pearl City, HI | | | | |

NOTES:

1. Payment terms are net 30 days.

2. All prices on this contract shall be rounded to the fifth digit in accordance with standard rounding procedures.

3. Unless the parties agree otherwise the minimum/maximum quantities available for individual deliveries shall be as follows:

| ITEM | SHIPPING POINT | MOD | MINIMUM (BBLS) | MAXIMUM (BBLS) |
|---|---|---|---|---|
| | JP-4 | | | |
| 0101-0201 | El Segundo, CA | PL | 30,000 | 120,000 |
| 0301-0401 | Richmond, CA | PL | 40,000 | 90,000 |
| 0501 | Pearl City, HI | PL | 35,000 | 70,000 |

4. The Small and Small Disadvantaged Business concerns Subcontracting Program Clauses Clause I171(F), SMALL BUSINESS AND SMALL DISADVANTAGED BUSINESS SUBCONTRACTING PLAN and I171.03(F), SMALL BUSINESS AND SMALL DISADVANTAGED BUSINESS SUBCONTRACTING PLAN (DOD CONTRACTS)) in this contract will be administered by:

DCMR LA
11099 S. La Cienega Blvd
Los Angeles, CA 90045

5. The Contractor's Small Business and Small Disadvantaged Subcontracting Plan dated 28 NOV 89, as amended by correspondence dated 6 DEC 89 and 31 JAN 90 is incorporated herein by reference and made a material part of this contract.

6. The point of acceptance for quantity of JP-4 from the El Segundo Refinery will be the meter junction of the Chevron and military pipelines at San Pedro, California. In the event the meter at the junction of the Chevron and military pipelines at San Pedro fails, the first backup for quantity determination shall be meter at the El Segundo Refinery. In the unlikely event both meters fail at the same time, determination shall be made by the tank gauges at the San Pedro Terminal. The point of official acceptance for quantity shall remain the junction of the Chevron and U.S. Military pipelines at San Pedro, California.

7. The point of testing and acceptance for quality will be the Chevron Refinery at El Segundo, California. The point of acceptance for workmanship for JP-4 from the El Segundo Refinery shall be the shipping tanks. Deliveries may commence with the product in the shipping tanks having workmanship condition of "bright and dirty," provided the product is filtered prior to entering the pipeline. An examination for workmanship and tests for particulate contamination shall be accomplished on periodic samples taken downstream of the shipping tank filter. If the product does not meet specifications after filtration, the shipping operation will be stopped until corrective action brings the product within specification limits.

8. The following provisions apply for deliveries of JP-4 at Richmond, California:

A. Chevron's Richmond Refinery will report test results for distillation range temperatures in degrees Fahrenheit. ASTM-E-300, Standard for Metric Practice, will be used to convert specification limits from Celsius to degrees Fahrenheit.

B. Chevron's Richmond Refinery is authorized to commence deliveries with product in the shipping tanks having a workmanship condition of "bright and dirty," provided the product is filtered prior to the point of government acceptance. An examination for workmanship and tests for particulate contamination shall be accomplished on periodic samples taken downstream of the line filter. If the product does not meet specifications after filtering, the shipping operation will be stopped until corrective action brings the product to within specification limits.

C. The points at which quality and quantity will be determined for deliveries of JP-4 at Richmond are as follows:

1. Acceptable for quantity will be determined at the Southern Pacific Pipeline meters located in Richmond, California.

2. Acceptance for quality will be at the junction between Chevron's pipeline and Southern Pacific's pipeline located at Chevron's Richmond Refinery..

D. Chevron is not responsible for certification of the Southern Pacific Pipeline meters located at the junction of the Chevron and Southern Pacific Pipelines.

9. This contract was negotiated and awarded pursuant to the Competition in Contracting Act of 1984 (CICA), P.L. 98-369, FAR Subpart 6.1, FULL AND OPEN COMPETITION.

B19.33 ECONOMIC PRICE ADJUSTMENT - PUBLISHED MARKET PRICE (DFSC DEC 1989)

The Contractor represents that the unit prices set forth in this contract do not include any contingency allowance to cover the possibility of increases in the reference price(s) in the Contractor's bid or proposal.

PART A

As used throughout this provision--

(a) The term "listed items" means the items of Section B of the contract that are listed in the Price Tabulations, PART C and PART D of this provision, and are the only items to which price adjustment shall apply, unless otherwise provided in the contract.

(b) The term "base price" means the unit price set forth opposite the item in Section B of the contract schedule.

(c) The term "interim reference price" means the independent published price listing set forth in PART C of this provision which will be used to adjust the base price until such time as the reference price (as set forth in PART D of this provision) becomes available. The interim reference price is the published average of prices listed for specified products and cities in the Oil Price Information Service (OPIS) Petroleum Administration District (PAD) Report, and/or Oil Price Information Service as set forth in PART C of this clause.

(d) The term "reference price" means the independent published price listing set forth in PART D of this provision which will be used to adjust the base price. The reference price is the average or weighted average sales price of the specified product(s) in the specified PAD District or State of the Petroleum Marketing Monthly published by the Energy Information Administration.

(e) The term "base interim reference price" means the weighted average of the specified publication references effective during the month specified by the Contracting Officer in the wire which requests best and final offers. In order to coincide with the base reference price month as described in paragraph f. below, this month will normally (but not always) be the third month prior to the month in which best and final offers are due. For example, if best and final offers are due in June, the "base interim reference price" would normally be the weighted average of the specified publication references effective during the month of March.

(f) The term "base reference price" means the reference price based on Petroleum Marketing Monthly publication effective during the month specified by the Contracting Officer in the wire which requests best and final offers. This month will normally (but not always) be the third month prior to the month in which best and final offers are due. For example, if best and final offers are due in June, the base reference price would normally be based on the March data of the Petroleum Marketing Monthly's specified sales prices of petroleum products tables which would generally be published in early June.

(g) The term "date of delivery" means--

(1) the date and time vessel begins to load where the contract calls for delivery at origin into tanker or barge;

(2) the date and time vessel begins to discharge where the contract calls for delivery at destination by tanker or barge;

(3) the date and time product commences to move past the specified f.o.b. point where the contract calls for delivery by pipeline;

(4) the date product is received for all methods of delivery other than (1), (2) or (3) above.

PART B

(a) Notwithstanding any provision of this clause to the contrary, the prices payable under this contract shall in no event exceed the maximum prices described in the clause entitled UPWARD CEILING ON ECONOMIC PRICE ADJUSTMENT.

(b) The Contractor warrants that the prices to be invoiced hereunder for listed items shall be computed in accordance with this provision.

(c) In the event the reference price or interim reference price is discontinued, or its method of calculation is altered substantially, the parties shall mutually agree upon an appropriate and comparable substitute for determining the price adjustment described herein. This contract shall be amended to reflect such substitute reference price or interim reference price, effective on the date the prior reference price or interim reference price is discontinued or altered. In the event the parties fail to agree on an appropriate substitute, the matter shall be resolved in accordance with the DISPUTES clause of the contract.

(d) The Contracting Officer will issue a modification to this contract to reflect each change in the reference price and the interim billing price pursuant to this provision.

(e) The interim reference price(s), as set forth in PART C, in effect on the first of each month shall be used to calculate the interim billing unit price for all deliveries occurring in that month, subject to final adjustment at such time as the applicable published reference, as set forth in PART D, becomes available.

(f) Final price adjustments under this clause for deliveries previously invoiced will be accomplished (after issuance of the appropriate contract modification) through supplemental payments or credits under the contract on the basis of the Contractor's supplemental invoice statements. The statements will identify (1) the original invoice, (2) items and quantities, unit prices, and amounts originally invoiced, (3) the contract modification pursuant to which the supplemental invoice statement is made, and (4) the amount of increase or decrease from the earlier invoiced price on each item of the invoice.

(g) Notwithstanding any other provision of this clause, no upward adjustment shall apply to supplies which are required to be delivered prior to the effective date of the adjustment but delivered subsequently, unless the Contractor's failure to deliver in accordance with the delivery schedule arises from causes beyond the control and without the fault or negligence of the Contractor within the meaning of the clause of this contract entitled DEFAULT, in which case the contract shall be amended to make an equitable extension of the delivery schedule.

(h) The Contractor shall have the right to appeal under the clause entitled DISPUTES from any determination made by the Contracting Officer under this clause.

PART C -INTERIM BILLING PRICE ADJUSTMENTS

(a) Provision is made for interim billing price adjustments based on interim reference prices subject to final adjustment on a monthly basis in accordance with PART D of this clause.

(b) The last OPIS PAD Report and the last Oil Price Information Service published during the last seven days of the month, shall be used to establish interim billing prices for all deliveries occuring in the following month. The effective date of the interim billing price is the first day of the month regardless of the date of the last publication for the preceding month and the effective date of the prices shown therein.

(c) In the event the OPIS PAD Report or the Oil Price Information Service is not published during the last seven days of the month, the first published OPIS PAD Report or Oil Price Information Service of the following month shall be used.

(d) The interim billing prices payable under this contract for listed items shall be the base price for the listed item increased or decreased by the same number of cents, or fraction thereof, that the interim reference price for the listed item shall have been increased or decreased per like unit of measure from the base interim reference price.

INTERIM REFERENCE PRICE TABULATION

| I | II | III | IV | V |
|---|---|---|---|---|
| Economic Price Adjustment Region and Item No. (Listed Items) | Name of Publication | Name of Product | Location where Price is Applicable | Interim Reference Price as of FEB 90 (date) (Excludes All Taxes) |
| WEST COAST/JP-4<br>0101-0501 | OIL PRICE INFORMATION SERVICE PADD 5 REPORT | UNLEADED | LOS ANGELES SAN FRANCISCO SEATTLE | $.656284 |
| | OIL PRICE INFORMATION SERVICE | COMMERCIAL AIRLINE JET FUEL RANGE (AVERAGE) | LOS ANGELES | |

The price computation for the above locations shall be the arithmetic average of the published product averages shown at those locations. The Interim Reference Price shall be determined as follows:

Jet Fuel Price

$$\frac{\text{Los Angeles+San Francisco+Seattle}}{3} \times .7 + \text{Los Angeles(Average)} \times .3$$

PART D - PETROLEUM MARKETING MONTHLY SALES PRICES OF PETROLEUM PRODUCTS TABLES

(a) Contract prices for each month's deliveries will be based on the specified references listed by the Petroleum Marketing Monthly under the Sales Prices of Petroleum Products Tables for the month dated during the month of delivery. In accordance with the Petroleum Marketing Monthly practice, the Petroleum Marketing Monthly publication for a given month represents actual sales prices during that month. For example, the contract price for April deliveries will be based on the April data of the Petroleum Marketing Monthly which would usually be published sometime in mid-July. In the event the Petroleum Marketing Monthly Sales Prices of Petroleum Products Tables are adjusted after publication for that month and the adjustment results in an adjustment to the contract price of more than $.002 per gallon, retroactive adjustments to the contract price shall be made. In this case, final contract prices for that month will be based on the revised version of the applicable Petroleum Marketing Monthly Sales Prices of Petroleum Products Tables.

(b) The Contractor, upon receipt of each modification incorporating the final adjusted price for a month, shall submit a proper supplemental invoice statement. Payment tendered to the Contractor by the Government as a result of submission of a proper supplemental invoice statement shall be in accordance with the clause entitled NET PAYMENT.

(c) The prices payable under this contract for listed items shall be the base price for the listed item increased or decreased by the same number of cents, or fraction thereof, that the reference price increases or decreases per like unit of measure from the base reference price.

(d) The reference price with which the base price for the listed item is to fluctuate is as set forth in the Reference Price Tabulation:

## REFERENCE PRICE TABULATION

NOTE: For ease of reference, the appropriate petroleum sales price tables shall be identified as follows:

Jet Fuel = Refiner Prices of Aviation Fuels and Propane.

Unleaded Regular = Refiner/Reseller Unleaded Regular Gasoline Prices by Seller Type.

Distillate = Refiner Prices of Kerosene and Distillates.

| I | II | III | IV |
|---|---|---|---|
| Economic Price Adjustment Region and Item No. Listed (Items) | Name of Publication | Heading under which reference price is published and name of product | Reference Price As Of FEB 90 (date) (Excludes all taxes) |
| WEST COAST/JP-4<br>0101-0501 | PETROLEUM MARKETING MONTHLY (PMM) | KEROSENE-TYPE JET FUEL SALES TO END-USERS PAD DISTRICT V AVERAGE | $.660300 |
| | | REFINER/RESELLER UNLEADED REGULAR GASOLINE PRICES BY SELLER TYPE ALL REFINERS SALES FOR RESALE PAD DISTRICT V AVERAGE | |

The reference price shall be determined as follows:

.30(PADD V KERO-JET) + .70(PADD V UNL GAS)

B20.02 UPWARD CEILINGS ON ECONOMIC PRICE ADJUSTMENT (DFSC APR 1984)

Contractor agrees that the total increase in any unit price pursuant to the Economic Price Adjustment provision of this contract shall not exceed 80 percent of the original base price for individual contract items, except in the situations provided hereafter.

(a) If at any time the Contractor has reason to believe that within the near future a price adjustment will be required under the Economic Price Adjustment provision of this contract and that the resultant adjustment when added to the latest contract price for the item(s) in question will exceed the current contract ceiling price for the item(s), the Contractor shall notify the Contracting Officer of the expected increase. At the same time, the Contractor shall propose a revised ceiling which he believes to be sufficient to permit completion of remaining contract performance. Contractor's proposal shall be supported by appropriate explanations and documentation as required by the Contracting Officer. The parties agree to promptly undertake negotiations regarding the proposed new ceiling.

(b) If, in the absence of an agreement on a new ceiling, notice is given by the Contractor of an actual price change which results in a unit price for contract item(s) which exceeds the current ceiling, the Contractor will have no further obligation under this contract to fill pending or future orders for the specific line item(s) in question as of the effective date of the increase, as long as the unit price exceeds the ceiling. If, however, notwithstanding the lack of agreement on a new ceiling the Contracting Officer indicates in writing that the Government is prepared to purchase the line item(s) for the price as adjusted under the Economic Price Adjustment provisions beyond the current ceiling, the Contractor will be obligated to continue to honor orders placed for the specific line item in question.

E14.02 INSPECTION AND ACCEPTANCE (DFSC NOV 1979)

On deliveries f.o.b. origin, acceptance of the supplies furnished hereunder will take place at origin notwithstanding that inspection by the Government may take place elsewhere prior to acceptance. On deliveries f.o.b. destination, acceptance of the supplies furnished hereunder will take place at a destination notwithstanding that inspection by the Government may take place elsewhere prior to acceptance. The office responsible for inspection, in behalf of the Government, shall be as follows:

| ITEM(S) | SOURCE OF PRODUCT AND/OR SHIPPING POINT | INSPECTOR(S) |
|---|---|---|
| 0101-0201 | El Segundo Refinery<br>324 W. El Segundo Blvd.<br>El Segundo, CA 90245 | DCMAO El Segundo<br>222 N. Sepulveda Blvd.<br>El Segundo, CA 90245-4320 |
| 0301-0401 | Richmond Refinery<br>Standard Avenue<br>Richmond, CA 94802 | DCMAO San Francisco<br>Attn: DCRL-GFOF<br>P.O. Box 996<br>Concord, CA 94502-0996 |
| 0501 | Hawaii Refinery<br>Barbers Point - Oahu<br>Honolulu, HI 96707 | Commander, DFR Pacific<br>Camp H. M. Smith<br>Honolulu, HI 96861-5000 |

F1.08 DELIVERIES AND CONTRACT PERIOD (DFSC APR 1968)

(a) The period of this contract during which the Ordering Officer may order pursuant to the clause entitled INDEFINITE QUANTITY; SCOPE OF CONTRACT is from date of award through 30 SEP 91.

(b) Notwithstanding paragraph (a) above, except at its option, Contractor shall not be required to make delivery hereunder prior to: 01 OCT 90.

(c) In so far as practicable, the Government will attempt to lift in approximately equal monthly quantities. Except at its option, a supplier which offered product over the period 01 OCT 90 through 30 SEP 91 shall not be required (i) to make deliveries of any grade of product at a daily rate which is in excess of the contract quantity of such grade of product for delivery at or shipment from each designated refiners or bulk plant location divided by 365 days or (ii) to accumulate any such product at any such location and to subsequently make deliveries in excess of 8.33% in any one month of the contract quantity of the applicable grade of products, provided, however, that where the maximum quantity available for individual deliveries as specified in the contract is greater than 8.33% per month, the supplier will accumulate any such product at any such location and subsequently make deliveries equal to the specified maximum quantity available for individual deliveries and provided further, that the supplier will be required to make delivery in excess of 8.33% per month if the delivery is to be made f.o.b. tanker at origin and no other quantities have been ordered for delivery during the applicable month and the 30,000 bbls minimum, under paragraph (d) below is greater than such 8.33% quantity

(d) Except at its option, the Contractor shall not be required to deliver f.o.b. tanker at origin in any one delivery a quantity of product(s) which is less than 30,000 bbls except, when the minimum quantity available for individual deliveries as specified in the contract is less than 30,000 barrels or, when on the last delivery, the quantity available pursuant to the clause entitled INDEFINITE QUANTITY - SCOPE OF CONTRACT, is less than 30,000 barrels.

G9.07 ELECTRONIC TRANSFER OF FUNDS PAYMENTS - CORPORATE TRADE PAYMENTS (CTP) (DFSC MAY 1990)

(a) By submission of the following data, the Contractor elects to receive payments under this contract by electronic transfer of funds through Corporate Trade Payments (CTP):

NAME OF RECEIVING BANK |C |I |T |Y | |B |A |N |K | |D |E |L |A |W |A |R |E | | | | | | | | | | | | |
(DO NOT EXCEED 29 CHARACTERS)

CITY AND STATE OF RECEIVING BANK |W |I |L |M |I |N |G |T |O |N | |D |E | | | | | | | |
(DO NOT EXCEED 20 CHARACTERS)

AMERICAN BANKERS ASSOCIATION NINE DIGIT IDENTIFIER OF RECEIVING BANK |0 |3 |1 |1 |0 |0 |2 |0 |9 |

ACCOUNT TYPE CODE: (Contractor to designate one)5

[X] CHECKING TYPE 22

[ ] SAVINGS TYPE 32

RECIPIENT'S ACCOUNT NUMBER ENCLOSED IN PARENTHESES: |( |3 |8 |1 |5 |- |1 |2 |8 |5 |) | | | | |
(DO NOT EXCEED 15 CHARACTERS)

RECIPIENT'S NAME: |C |H |E |V |R |O |N | |U |S |A | |I |N |C | | | | | | | | | | |
(DO NOT EXCEED 25 CHARACTERS)

NOTE: Additional information may be entered in EITHER paragraph (b) OR paragraph (c) below. Total space available for information entered in (b) OR (c) is 153 characters.

(b) Special Instructions/Other Identifying Data:

| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

(DO NOT EXCEED 153 CHARACTERS)
OR

(c) THIRD PARTY INFORMATION: Where payment is to be forwarded from the receiving bank to another financial institution for deposit into Contractor's account, the following information must be supplied by the Contractor: Second Bank Name, City/State and/or Country, Account Number, Account Name, and City/State and/or Country.

| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

(DO NOT EXCEED 153 CHARACTERS)

(d) Any change by the Contractor in designation of the bank account to receive electronic transfer of funds in accordance with this clause must be received by the Contracting Officer no later than 15 days prior to the date the change is to become effective.

(e) The electronic transfer of funds does not constitute an assignment of such funds in any form or fashion.

(f) In the event CTP payments cannot be processed, the Government retains the option to make payments under this contract by check.

(g) NOTICE TO FOREIGN SUPPLIERS:

(1) The bank designated as the receiving bank must be located in the United States. The appropriate American Bankers Association nine-digit identifier must be supplied in order for payments to be processed through CTP.

(2) If your account is with a foreign bank which has an account with a bank located within the United States, the U.S. bank may be designated as the receiving bank. The recipient's name and account number shall identify the foreign bank, and transfer instructions to supplier's account must be specified in paragraph (c) above.

Information regarding payments made by the Government through CTP will be identified by the following codes in the payment transmission message:

SPECIAL CODES FOR PROCESSING CTP PAYMENTS

| CODE | CODE EXPLANATION |
|---|---|
| 01 | Credit Memorandum |
| 02 | Freight Bill/Bill of Lading |
| 03 | Government Bill |
| 04 | Insurance |
| 05 | Invoice |

| | |
|---|---|
| 06 | Lease |
| 07 | Loan |
| 08 | Purchase Order |
| 09 | Rent |
| 10 | Taxes |
| 11 | Vendor Order |
| 12 | Voucher |
| 13 | Your Letter |
| 14 | Deduction, enter total dollar amount of deductions for each invoice affected |
| 15 | Deduction previously paid on earlier invoice (enter invoice number) |
| 16 | Modification |
| 17 | Gallons deducted IAW support document (e.g. DD-250) |
| 18 | Credit taken IAW a modification |
| 19 | Deduction of Federal Excise Tax not due Contractor |
| 20 | Deduction of State Tax not due Contractor |
| 21 | Deduction of other Tax not due Contractor |
| 22 | Credit taken for expired contract |
| 23 | Deduction due to extension error |
| 24 | Duplicate payment deduction (DOV # will be entered when available) |
| 25 | Deduction tank trucks not authorized |
| 26 | Reimbursement |
| 27 | Reimbursement for deduction (DOV # will be entered when available) |
| 28 | Detention fee |
| 29 | Detention fee adjustment |
| 30 | Discount |
| 31 | Reimbursement for discount not due Government |
| 32 | Multiple invoices processed, contact DFSC-CFE, Examination Section, if additional information is required. |
| 33 | Order, use ORD to precede order number |
| 34 | Multiple orders involved, contact DFSC-CFE, Examination Section, if additional information is required |
| 35 | Miscellaneous |

I150.11 SUBMISSION OF INVOICES BY TELEFACSIMILE (DFSC APR 1990)

NOTE: INVOICES WILL REFLECT QUANTITIES IN WHOLE NUMBERS.

(a) The following guidance is applicable to Army, Navy (including Marines), and other DoD activity requirements (except Air Force) unless the requirements are for standby, Alaska, or Hawaii.

(1) When the Contractor has elected to transmit invoices by telefacsimile, it is responsible for validating receipt of its telefaxed invoice. Because DFSC-CDX cannot be held accountable for transmissions not received, the Contractor must verify receipt of its telefax by telephoning DFSC-CDX at (202) 274-7055.

(2) Utilization of the telefacsimile invoicing method is contingent upon the Contractor's submission of invoices by this method <u>at all times</u>.

(3) The receiving numbers for invoices telefaxed to the DFSC-CDX mailroom are (202) 274-8888 (primary) and (202) 274-9210 (alternate).

(4) The Contractor shall include his telefacsimile (FAX) number on each document transmitted.

(5) After transmitting the original invoice, the Contractor shall mark that invoice "Original Invoice - Telefaxed" and retain it. The hard copy is <u>not</u> required for payment and shall <u>not</u> be mailed to the payment office (DFSC-CDX) unless DFSC-C specifically requests it for audit purposes.

(6) When telefaxing an invoice for f.o.b. origin deliveries, the Contractor shall also transmit the applicable original Material Inspection and Receiving Report, DD Form 250, or Tanker/Barge Material Inspection and Receiving Report, DD Form 250-1, signed by the Quality Assurance Representative (QAR). The signed copy, which certifies acceptance by the QAR of the product prior to submission of the invoice, will have the following information stamped, printed, or typed on it: <u>ORIGINAL RECEIVING REPORT FOR PAYMENT INVOICE</u>. <u>However, in order to receive payment</u>, the Contractor <u>must mail</u> four copies (one of which will contain an original signature) of the DD Form 250 or DD Form 250-1 to the payment office as follows:

Defense Fuel Supply Center
ATTN: DFSC-CDX
Cameron Station, Bldg. 8
Alexandria, Virginia 22304-6130

(7) Failure to comply with these requirements will revoke the Contractor's right to submit invoices by the telefacsimile method.

(b) <u>ORDERS BY OTHER FEDERAL AGENCIES</u>. On orders placed by activities of Federal Departments other than the Army and Navy (including Marines), invoices shall be submitted as instructed by those activities. Such activities placing orders under this contract will furnish the Contractor with the name and proper address of the activity to whom invoices shall be rendered. Such activities will also indicate the procedure for processing tax exemption certificates.

(c) <u>CLASSIFIED CONTRACTS</u>. To prevent disclosure of classified information, invoices submitted under classified contracts shall be so prepared that the supplies or services covered thereby can be identified only by reference to the contract. For example, the invoices may state "Contract DLA600-_____________, Item 0101, 5,000 at $0.15 = $750.00". The security classification shown on the contract shall not appear on the invoices.

(d) <u>DETENTION COSTS</u>. Detention costs, if allowed in accordance with the contract, will be the sole responsibility of the activity incurring them. Invoices for detention costs, if any, will be forwarded directly to the activity receiving the product.

I193 SCHEDULE OF CONTRACTOR'S REFINERY SHUTDOWN FOR TURNAROUNDS (DFSC FEB 1989)

(a) Within 30 days from the date of contract award, the Contractor shall furnish to the Contracting Officer a tentative refinery shutdown schedule for the contract period in order that the placement of orders and the delivery of supplies as set forth under the clause entitled "DELIVERIES AND CONTRACT PERIOD" may be adjusted to provide for delivery of the entire contract quantity. Any revisions to this schedule will necessitate prior notice of at least 60 days in order to coordinate the placement of orders for the delivery of the entire contract volume.

(b) If the Contractor can not provide the 60 days advance notice, then, at no additional cost to the Government, the Contractor shall maintain sufficient inventory to make deliveries in support of the ordering activities' requirements or the Contractor shall provide for an alternate source for product during the shutdown period(s).

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE

PAGE 1 OF PAGES 2

2. AMENDMENT/MODIFICATION NO. P000 0 1

3. EFFECTIVE DATE 90 NOV 08

4. REQUISITION/PURCHASE REQ. NO. SC0600-90-0308

5. PROJECT NO. (If applicable)

6. ISSUED BY CODE SC0600

DEFENSE FUEL SUPPLY CENTER
CAMERON STATION TWX 710-832-0600
ALEXANDRIA, VIRGINIA 22304-6160
BUYER/SYMBOL - L. Alcorn/DFSC-PZB
PHONE - (703) 274-7909 2.2b

7. ADMINISTERED BY (If other than Item 6) CODE

8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code)

Chevron U.S.A., Inc.
575 Market St.
San Francisco, CA 94120-7006

Bidder Code: C087 Cage Code: 81230

CODE | FACILITY CODE

9A. AMENDMENT OF SOLICITATION NO.

9B. DATED (SEE ITEM 11)

10A. MODIFICATION OF CONTRACT/ORDER NO. DLA600-90-D-0531

10B. DATED (SEE ITEM 13) 90 Sep 04

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning ______ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| (✓) | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| X | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| | D. OTHER (Specify type of modification and authority) |

E. IMPORTANT: Contractor [X] is not, ☐ is required to sign this document and return ______ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

A. Per Chevron's correspondence dated 90 Oct 30, contract DLA600-90-D-0531 is modified as follows:

1) Clause B14.04, ESTIMATED SUPPLIES TO BE FURNISHED, is changed as follows:

| Item | Est. Qty. Gals. | Mod | Award Price (FEB 90) |
|---|---|---|---|
| 0501 | 30,660,000 | PL | $.643200 w/ FSII |

(FOB Origin delivery of 30,600,000 gallons of JP-4 at the junction of the Chevron and militry pipelines, Pearl City, HI)

FSII factor included in Line Item 0501 above is $.004 per gallon.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER (Type or print)

16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) JOHN R. WALKER

15B. CONTRACTOR/OFFEROR (Signature of person authorized to sign)

15C. DATE SIGNED

16B. UNITED STATES OF AMERICA BY (Signature of Contracting Officer)

16C. DATE SIGNED

NSN 7540-01-152-8070
PREVIOUS EDITION UNUSABLE

30-105

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

2) The total dollar value of contract DLA600-90-D-0531 is hereby increased by $122,640.00 from $153,907,251.30 to $154,029,891.30.

3) Deliveries made under CLIN 0501 prior to the effective date of this modification provided product inclusive of FSII. Additional cost of $.004 per gallon shall be included in final adjusted prices for October and November 90.

B. All other terms and conditions of the subject contract remain as previously stated.

**Exhibit 4**

**CERTIFICATION UNDER CONTRACT NO. DLA600-90-D-0531**

I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor.

Todd P. [signature]
Chevron USA, Inc.

Dated: 11/13/01

**DEFENSE LOGISTICS AGENCY**
DEFENSE ENERGY SUPPORT CENTER
8725 JOHN J. KINGMAN ROAD, SUITE 4950
FORT BELVOIR, VIRGINIA 22060-6222

Certified Mail
Return Receipt Requested

IN REPLY REFER TO DESC-BZ

February 11, 2002

Mr. Robert D. Topping, Esq.
Texaco, Inc.
1111 Bagby
Houston, Texas 77002

Dear Mr. Topping:

This is the contracting officer's final decision on Texaco, Inc.'s (Texaco) September 7, 2001, September 25, 2001, and October 5, 2001, claims for approximately $45 million under 7 contracts awarded to Texaco between 1983 and 1989.[1] According to Texaco, the economic price adjustment (EPA) clauses in its contracts were unauthorized and therefore unenforceable. Texaco seeks to have all of these contracts re-priced at a substantial premium. It claims this is necessary so that it will receive fair market value for the petroleum products it supplied. The implication in Texaco's claims is that it was harmed because the Government's EPA clauses did not protect Texaco from price risk.

I disagree that the EPA clauses in Texaco's contracts were unauthorized. First, the FAR permits agencies to modify EPA clauses so long as they accomplish the objectives set out in FAR 16.203-3. Those objectives are to protect the contractor and the Government against significant fluctuations in material costs <u>or</u> to provide for contract price adjustments in the event of changes in the contractor's established prices. The evidence shows that the clauses used in Texaco's contracts achieved the objectives of the FAR. Texaco was in fact protected against significant fluctuations in the costs of crude oil as measured by appropriate indices, <u>and</u> the changes in the contract prices caused by the EPA clauses closely tracked the changes in Texaco's own established prices. Texaco has provided no information to the contrary.[2]

Additionally, there is no basis for granting Texaco the relief it seeks. All the circumstances surrounding Texaco's dealings with the Government indicate that Texaco already received fair market value for the fuel it sold the Government. Re-pricing the fuel years after it was delivered and sold to the

---

[1] The contracts that are the subject of Texaco's claim and this final decision are listed in Attachment 1.
[2] By letter dated November 13, 2001, I requested information from Texaco substantiating how the EPA clause harmed it, but Texaco did not respond.

Government is simply unjustified. Accordingly, I am denying Texaco's claims in their entirety.

## DISCUSSION

The EPA Clauses Used in the Contracts Were Authorized Because They Accomplished the Objectives of EPA Clauses Required by the FAR

1. Texaco offered, produced, and sold JP-4 jet fuel under the 7 contracts that are the subject of this claim. Texaco is a commercial enterprise, which sells the majority of its fuel to private, non-governmental entities. While the jet fuel was made to a military specification and carried a military designation, the fuel is similar to commercial fuel.

2. EPA clauses linking changes in Texaco DESC contract prices to changes in product markets appeared in all of Texaco's contracts. The 1983 contract contained a Bureau of Labor Statistics index. From 1984-1989, the EPA clauses were based on reports in the Petroleum Marketing Monthly, a publication of the Department of Energy, Energy Information Administration. These PMM reports contained the average sales prices for petroleum products, which refiners are required to report to the Department of Energy. The EPA clauses worked in a direct and simple way. The clauses ensured that the prices Texaco offered and agreed to in its contracts would be adjusted penny for penny according to the identical movements of fuel prices in the indices. Hence, if the market index went up one cent, the contract price would likewise go up one cent. If the market prices as reflected in the market index went down a penny, the contract price went down a penny. The contract prices were adjusted in this way on a regular basis throughout the terms of the contracts.

3. DESC has compared changes in Texaco's established prices with the price changes in the market-based EPA clauses in Texaco's contracts. The result is a very high correlation between the movements of Texaco's established prices and the product market indices contained in the contracts. This result is not surprising. Price adjustments based on Texaco's established prices alone would be expected to closely track price adjustments based on average established prices of multiple market participants. In dealing with a commodity such as fuel, where the products are standard and the market is competitive, a contractor would be forced to align its prices with the market. Otherwise, the contractor would fail to make sales and would lose market share to its competitors. Given these market realities, Texaco's own established prices would be expected to follow the market.

4. As with Texaco's established prices, there is a high degree of correlation between the movements in crude prices and the actual movement of prices in Texaco's contracts. For purposes of comparison, I used West Texas Intermediate (WTI) crude oil, a benchmark crude oil in the United States. The correlation between crude oil prices and product market prices is not surprising because crude oil is the principal material used in making the product Texaco sold to the Government. Because the EPA provisions in Texaco's contracts protected it from the potential harms identified in FAR 16.203-3 the clauses are authorized and valid.

Texaco is not Entitled to a Remedy Because It Already Received Fair Market Value for its Fuel

5. Aside from the validity of the clauses in its contracts, Texaco is not entitled to the remedy it seeks because it already received fair market value for its fuel. Texaco's suggestion that, year after year, contract after contract, it sold fuel to the Government at below fair market value prices, is not credible. Texaco sold fuel to the Government in open, free, and arms length transactions, in response to competitive, widely published solicitations. The contracting officers determined that Texaco's prices were fair and reasonable on the basis of adequate price competition and/or on the basis of market price data. Texaco was at all times knowledgeable of the value of its products in the marketplace. Texaco's continuing decision to sell substantial amounts of fuel to the Government over many years at competitively determined prices confirms that it was receiving fair market value for its fuel.

6. Texaco's suggestion that an EPA clause tied to market prices caused it to receive less than fair market value for its product is illogical. Assuming that the contract base price is a fair market value price, price adjustments tied to changes in the sales price of the relevant product must result in fair market value prices. There can be no better method of ensuring that prices paid for an item represent fair market value then by adjusting them according to changes in the relevant market prices. Texaco can only ground its claims on the supposition that the contract base prices it bid were below fair market value. There is no evidence to support such an assertion. I reject the claim that Texaco consciously submitted bids below fair market value on the many contracts included in its claim. I find, on the contrary, that Texaco did receive fair market value through the operation of the contract EPA clauses.

7. As indicated above, product market escalators appeared in all of Texaco's contracts. Texaco does not allege that these market indicators failed to accomplish their purpose, namely, to be accurate indicators of actual price movements in the petroleum markets. There is no evidence that Texaco ever

sought to substitute or change an EPA provision before filing these claims. Texaco never sought to invoke the provision, included in all its contracts, which allowed it to seek a substitute index in the event the contract index failed to track the market. Since Texaco was paid strictly in accordance with actual market movements, recorded in the PMM, Texaco received fair market value for its products throughout the terms of the contracts.

8. The EPA provisions in Texaco's contracts are the types of provisions used in the petroleum industry for term product supply contracts. DESC has been using these price adjustment provisions for more than 20 years for the purchase of more than $60 billion worth of fuel. With the issuance of every solicitation over the years, contractors have had the opportunity to protest the inclusion of these clauses if they thought the clauses would harm them in any way, or deprive them of fair market value for their fuel. Their continuing participation shows the clauses were acceptable to industry and satisfactorily allocated economic risk.

9. In 1995, DESC officially published in the Federal Register a proposed class deviation for the use of a market product escalator in its bulk petroleum solicitations. Not a single petroleum firm offered comment or objection to DESC's use of such an EPA clause in its contracts.

10. Texaco relies on a market-based index, similar to the one the Government has been using since 1995, to structure its claims. Texaco's conduct is inconsistent with its claims that it is entitled to re-price its contracts using an alternative notion of market value that it never sought during bidding, contract performance, or in the commercial marketplace.

Texaco's Market Value Formula Overstates the Value of Texaco's Fuel

11. Texaco uses the Pride Companies formula to determine the market value of its fuel. I disagree with this approach because it ignores the base bid price to which the parties agreed. In any event, contemporaneous documents do not support the $.03 per gallon premium above the market index that Texaco claims, or anything close to that amount. Texaco's own documents and bidding practices refute such a figure. I note that Texaco relies on a market-based index, the one the Government has been using since 1995, as the basis for its market value assessment, although Texaco simultaneously challenges the legality of such an index as an escalator. The index is an accurate reflection of market value, but Texaco's claimed premium is not. In addition, Texaco erroneously fails to credit the Government with overpayments calculated under Texaco's claim formula.

## APPEAL RIGHTS

12. This is the final decision of the Contracting Officer. You may appeal this decision to the Armed Services Board of Contract Appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the Board and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals to the Board, you may, solely at your election, proceed under the Board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the Board, you may bring an action directly in the United States Court of Federal Claims within 12 months of the date you receive this decision.

13. In addition to these appeal rights, you may request that this dispute be resolved using Alternative Dispute Resolution (ADR) procedures. The use of ADR typically results in relatively expeditious and inexpensive dispute resolution. DESC is committed to using ADR whenever it is appropriate. Please keep in mind that choosing ADR does not suspend the respective 90-day and 12-month time periods for appealing this final decision. If you want to request ADR, or want more information about the various ADR options that are available, please contact me.

Sincerely,

JOHN R. WALKER
Contracting Officer
Bulk Fuels

Cc: Mr. John K. Wyma, Esq.
Mr. J. Keith Burt, Esq.

Attachment 1

DLA600-83-D-0620
DLA600-84-D-0510
DLA600-84-D-0561
DLA600-86-D-0575
DLA600-87-D-0494
DLA600-88-D-0476
DLA600-89-D-0457

**DEFENSE LOGISTICS AGENCY**
DEFENSE ENERGY SUPPORT CENTER
8725 JOHN J. KINGMAN ROAD, SUITE 4950
FORT BELVOIR, VIRGINIA 22060-6222

IN REPLY REFER TO DESC-BZ

Certified Mail
Return Receipt Requested

July 2, 2002

Mr. Todd Grubin
Chevron USA, Inc.
575 Market Street
San Francisco, California 94105

Dear Mr. Grubin:

This is the contracting officer's final decision on Chevron USA, Inc.'s and Chevron Products Company's (Chevron) December 6, 2001, and January 31, 2002, claims for nearly $386 million under 32 contracts awarded to Chevron between 1981 and 1999.[1] According to Chevron, the economic price adjustment (EPA) clauses in its contracts were unauthorized and therefore unenforceable. Chevron seeks to have all of these contracts re-priced at a substantial premium. It claims this is necessary so that it will receive fair market value for the petroleum products it supplied. The implication in Chevron's claims is that it was harmed because the Government's EPA clauses did not protect Chevron from price risk.

I disagree that the EPA clauses in Chevron's contracts were unauthorized for two reasons. First, the FAR permits agencies to modify EPA clauses so long as they accomplish the objectives set out in FAR 16.203-3. Those objectives are to protect the contractor and the Government against significant fluctuations in material costs <u>or</u> to provide for contract price adjustments in the event of changes in the contractor's established prices. The evidence shows that the clauses used in Chevron's contracts achieved the objectives of the FAR. Chevron was in fact protected against significant fluctuations in the costs of crude oil as measured by appropriate indices, <u>and</u> the changes in the contract prices caused by the EPA clauses closely tracked the changes in Chevron's own established prices. Chevron has provided no information to the contrary. Second, as detailed below, DESC obtained deviations approving market-based price adjustment clauses in nine of the contracts.

Additionally, there is no basis for granting Chevron the relief it seeks. All the circumstances surrounding Chevron's dealings with the Government

[1] Chevron submitted 32 separate claims. This decision covers all 32 claims. The contracts that are the subject of Chevron's claims and this final decision are listed in Attachment 1. Most of the contracts were awarded to Chevron USA, Inc. For purposes of this decision, I refer to the firms collectively as "Chevron."

indicate that Chevron already received fair market value for the fuel it sold the Government. Re-pricing the fuel years after it was delivered and sold to the Government is simply unjustified. Accordingly, I am denying Chevron's claims in their entirety.

## DISCUSSION

### The EPA Clauses Used in the Contracts Were Authorized Because They Accomplished the Objectives of EPA Clauses Required by the FAR

1. Chevron offered, produced, and sold Jet A-1, JP-4, JP-5, and JP-8 jet fuel, DFM, F-76 and DFA diesel fuel, and MUM and MUR gasoline under the 32 contracts that are the subject of these claims. Chevron is a commercial enterprise, which sells the majority of its fuel to private, non-governmental entities. While most of the fuels were made to military specifications and carried military designations, the fuels are similar to commercial fuels. Jet A-1, DFA, MUR and MUM were made to commercial specifications, modified for military use.

2. The EPA clauses in Chevron DESC contracts linked award prices to changes in product markets.[2] The EPA clauses in Contracts DLA600-82-D-0492 and DLA600-82-D-0621 were based on Platts Oilgram Price Report (Platts), an industry publication. The EPA clauses in Contracts DLA600-83-D-0558, DLA600-84-D-0484 and DLA600-84-D-0602 were based on reports in the Bureau of Labor Statistics. The EPA clauses in Contract DLA600-84-D-0498 and the 1986-1994 Bulk Fuels contracts were based on reports in the Petroleum Marketing Monthly (PMM), a publication of the Department of Energy, Energy Information Administration. These PMM reports contained the average sales prices for petroleum products, which refiners are required to report to the Department of Energy. Beginning in 1995 for Bulk Fuels contracts and for Post, Camps and Stations contract DLA600-89-D-1017, DESC used Platts and Oil Price Information Service, industry publications, for EPA purposes. The EPA clauses worked in a direct and simple way. The clauses ensured that the prices Chevron offered and agreed to in its contracts would be adjusted penny for penny according to the identical movements of fuel prices in the market reports. Hence, if the market index went up one cent, the contract price would likewise go up one cent. If the market prices as reflected in the market index went down a penny, the contract price went down a penny. The contract prices were adjusted in this way on a regular basis throughout the terms of the contracts.

[2] The claim for contract DLA600-82-D-0453 did not include a copy of the contract and from the information available, I have not been able to determine the escalation clause(s) used throughout the course of the contract.

3. DESC has compared changes in Chevron's established prices with the price changes in the market-based EPA clauses in Chevron's contracts. The result is a very high correlation between the movements of Chevron's established prices and the product market indices contained in the contracts. This result is not surprising. Price adjustments based on Chevron's established prices alone would be expected to closely track price adjustments based on average established prices of multiple market participants. In dealing with a commodity such as fuel, where the products are standard and the market is competitive, a contractor would be forced to align its prices with the market. Otherwise, the contractor would fail to make sales and would lose market share to its competitors. Given these market realities, Chevron's own established prices would be expected to follow the market.

4. As with Chevron's established prices, there is a high degree of correlation between the movements in crude prices and the actual movement of prices in Chevron's contracts. For purposes of comparison, I used West Texas Intermediate and Alaska North Slope crude oils. The correlation between crude oil prices and product market prices is not surprising because crude oil is the principal material used in making the product Chevron sold to the Government. Because the EPA provisions in Chevron's contracts protected it from the potential harms identified in FAR 16.203-3 the clauses are authorized and valid.

Chevron is not Entitled to a Remedy Because It Already Received Fair Market Value for its Fuel

5. Aside from the validity of the clauses in its contracts, Chevron is not entitled to the remedy it seeks because it already received fair market value for its fuel. Chevron's suggestion that, year after year, contract after contract, it sold fuel to the Government at below fair market value prices, is not credible. Chevron sold fuel to the Government in open, free, and arms length transactions, in response to competitive, widely published solicitations. The contracting officers determined that Chevron's prices were fair and reasonable on the basis of adequate price competition and/or on the basis of market price data. Chevron was at all times knowledgeable of the value of its products in the marketplace. Chevron's continuing decision to sell substantial amounts of fuel to the Government over many years at competitively determined prices confirms that it was receiving fair market value for its fuel.

6. Chevron's suggestion that an EPA clause tied to market prices caused it to receive less than fair market value for its product is illogical. Assuming that the contract base price is a fair market value price, price adjustments tied to changes in the sales price of the relevant product must

result in fair market value prices. There can be no better method of ensuring that prices paid for an item represent fair market value then by adjusting them according to changes in the relevant market prices. Chevron can only ground its claims on the supposition that the contract base prices it bid were below fair market value. There is no evidence to support such an assertion. I reject the claim that Chevron consciously submitted bids below fair market value on the many contracts included in its claim. I find, on the contrary, that Chevron did receive fair market value through the operation of the contract EPA clauses.

7. As indicated above, product market escalators appeared in all of Chevron's contracts. Chevron does not allege that these market indicators failed to accomplish their purpose, namely, to be accurate indicators of actual price movements in the petroleum markets. Chevron never sought to invoke the provision, included in all its contracts, which allowed it to seek a substitute index in the event the contract index failed to track the market. Since Chevron was paid strictly in accordance with actual market movements, recorded in the market publications, Chevron received fair market value for its products throughout the terms of the contracts.

8. The EPA provisions in Chevron's contracts are the types of provisions used in the petroleum industry for term product supply contracts. DESC has been using these price adjustment provisions for more than 20 years for the purchase of more than $60 billion worth of fuel. With the issuance of every solicitation over the years, contractors have had the opportunity to protest the inclusion of these clauses if they thought the clauses would harm them in any way, or deprive them of fair market value for their fuel. Their continuing participation shows the clauses were acceptable to industry and satisfactorily allocated economic risk.

9. In 1995, DESC officially published in the Federal Register a proposed class deviation for the use of a market product escalator in its bulk petroleum solicitations. Chevron did not comment on DESC's use of this kind of EPA clause. Indeed, not a single petroleum firm offered comment or objection to DESC's use of such an EPA clause in its contracts.

10. Chevron continues to bid today under similar market-based price adjustment clauses. In fact, Chevron relies on a market-based index, very similar to the ones the Government has been using for the domestic Bulk Fuels contracts since 1995, to structure its claims. Chevron's conduct is inconsistent with its claims that it is entitled to re-price its contracts using an alternative notion of market value that it never sought during bidding, contract performance, or in the commercial marketplace.

Chevron's Claim Under Nine Contracts Must Fail Because the EPA Clause Was Lawfully Approved by Deviation

11. In December 1992, the MAPCO court decision held that the market-based EPA clause was unenforceable because it was not one of the types specifically listed in the FAR, and because, in that particular case, the clause did not protect the contractor from the risk envisioned by the regulation. Following the MAPCO decision, DESC obtained deviations, individual and class, to ensure the validity of its EPA clauses. Chevron Contracts DLA600-93-D-0507, SP0600-95-D-0462, SP0600-95-D-0521, SP0600-96-D-0520, SP0600-97-D-0514, SP0600-98-D-0507, SP0600-99-D-0534, SP0600-99-D-0535, and SP0600-99-D-0555 contain an EPA clause covered by a FAR deviation. Chevron argues that the Government's deviations are invalid for a variety of reasons. As discussed below, because Chevron's attacks on the deviations are factually and legally erroneous, I find that Contracts DLA600-93-D-0507, SP0600-95-D-0462, SP0600-95-D-0521, SP0600-96-D-0520, SP0600-97-D-0514, SP0600-98-D-0507, SP0600-99-D-0534, SP0600-99-D-0535, and SP0600-99-D-0555 contained an EPA clause covered by a FAR deviation. Thus, Chevron has no basis for its claim on those contracts.[3]

12. Chevron argues that the individual deviations covering Contracts DLA600-93-D-0507, SP0600-95-D-0462, and SP0600-95-D-0521 are void because under FAR 1.404, individual deviations may only be used for a single contract and DESC awarded multiple contracts under the deviations. However, FAR 1.404 provides for individual deviations that "affect only one contracting action." If the drafters of the FAR intended the result Chevron seeks, they could have limited individual deviations to one "contract" rather than employ the broader "one contracting action" terminology. In Pride Companies L. P. v. United States, 2000 U.S. Claims LEXIS 213 (2000), the court rejected the argument Chevron makes and ruled that an individual deviation applied to all of the contracts awarded under a particular

[3] Contracts beginning in 1996 were awarded pursuant to FAR Part 12, Acquisition of Commercial Items. Because the EPA clauses in Chevron's contracts are in accordance with commercial practice, six contracts awarded using Part 12 procedures contain EPA clauses authorized under Part 12 as well. The six contracts are SP0600-96-D-0520, SP0600-97-D-0514, SP0600-98-D-0507, SP0600-99-D-0534, SP0600-99-D-0535, and SP0600-99-D-0555.

solicitation. Thus, Contracts DLA600-93-D-0507, SP0600-95-D-0462, and SP0600-95-D-0521 contain an EPA clause covered by a proper FAR deviation.

13. Next, Chevron alleges that DESC failed to comply with the Federal Register publication requirements. This is not the case. The Government published the proposed class deviation in the Federal Register on February 28, 1995. Chevron did not comment on the EPA clause.

14. Chevron also argues that the Government failed to comply with 5 USC § 801 because it did not notify Congress of the final rule. This is not the case. In any event, 5 USC § 805 provides that omissions under § 801 are not subject to judicial review. Chevron challenges the deviation because the Government did not conduct a Regulatory Flexibility Act (RFA) analysis as required by 5 USC § 601 et seq. However, the Federal Register notice contained the agency's certification, as authorized by 5 USC § 605(b), that the proposed EPA clause coverage would not have a significant economic impact on a substantial number of small entities. By making this certification, the agency waived the requirement to do an analysis. The decision not to conduct an analysis is not subject to judicial review and provides no basis for invalidating the deviation.

15. Lastly, Chevron incorrectly argues that the class deviation is invalid because the FAR required that the Government seek "an appropriate revision to the FAR" because DESC knew it would need the deviation on a permanent basis. DESC met with the DAR Council to discuss a FAR change. The DAR Council concluded that since only one agency required the change, it did not need to amend the FAR under those circumstances. In any event, Chevron's argument would improperly read class deviations out of the FAR, a result the drafters certainly did not contemplate.

<u>The Government's Procurement Process Complied with the Law</u>

16. Based on the Government's EPA clauses, Chevron claims it is entitled to recover "fair market value" for its fuel under the following additional theories: misrepresentation, breach of contract, mutual mistake of fact, failure of consideration, and a 5th Amendment taking. Since the additional theories rest on the erroneous premise that the EPA clause harmed Chevron, none of these other theories is viable, either factually or legally.

17. Chevron contends that the Government's match price method of conducting small business set-aside negotiations violates Section 27 of the Federal Procurement Policy Act, 41 USC § 423, and that the procedure

constitutes an auction. Chevron does not explain how the set-aside procedure harmed it. In any event, the procedure complies with the law.

18. Section 27 does not apply to the 15 Chevron contracts that were either awarded or solicited before the July 16, 1989, effective date of the Act. In any event, Section 27 permits the release of proprietary or source selection information during the conduct of a procurement when agency procedures or the contracting officer permit. Because small business concerns were authorized to receive match price information under approved procedures dating to the 1960s, the statute was not violated.

19. Chevron erroneously contends that the set-aside procedures constitute an impermissible auction. FAR 19.502-3(c), which discusses partial small business set-asides, and FAR 52.219-7, the partial small business set-aside clause, set forth the very negotiation procedures that DESC uses and Chevron asserts are an auction. The Comptroller General has reported that DESC's small business procedures are consistent with applicable procurement and small business laws and regulations. See B-230556, March 23, 1989. Thus, set-aside negotiations, authorized by the FAR for many years, are not an impermissible auction.

20. Chevron claims that the Government's use of the 10 per cent evaluation preference for SDB concerns was unlawful, citing Adarand Constructors, Inc. v. Pena, 515 U.S. 200 (1995) (bidding preferences are subject to strict judicial scrutiny). Chevron suggests that the preference "affected the contract price" but provides no explanation. Since it cannot say how it was harmed, it is not entitled to any remedy.

Chevron's Market Value Formula Overstates the Value of Chevron's Fuel

21. Chevron uses the Pride Companies formula to determine the market value of its fuel. I disagree with this approach because it ignores the base bid price to which the parties agreed. In any event, contemporaneous documents do not support the $.05 per gallon premium above the market index that Chevron claims, or anything close to that amount. Chevron's own documents and bidding practices refute such a figure. I note that Chevron relies on a market-based index, the one the Government has been using since 1995, as the basis for its market value assessment, although Chevron simultaneously challenges the legality of such an index as an escalator. The index is an accurate reflection of market value, but Chevron's claimed premium is not.

## APPEAL RIGHTS

22. This is the final decision of the Contracting Officer. You may appeal this decision to the Armed Services Board of Contract Appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the Board and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals to the Board, you may, solely at your election, proceed under the Board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the Board, you may bring an action directly in the United States Court of Federal Claims within 12 months of the date you receive this decision.

23. In addition to these appeal rights, you may request that this dispute be resolved using Alternative Dispute Resolution (ADR) procedures. The use of ADR typically results in relatively expeditious and inexpensive dispute resolution. DESC is committed to using ADR whenever it is appropriate. Please keep in mind that choosing ADR does not suspend the respective 90-day and 12-month time periods for appealing this final decision. If you want to request ADR, or want more information about the various ADR options that are available, please contact me.

Sincerely,

JOHN R. WALKER
Contracting Officer
Bulk Fuels

cc: J. Keith Burt, Esq.
John Wyma, Esq.

Attachment 1

DLA600-82-D-0453
DLA600-82-D-0492
DLA600-82-D-0621
DLA600-83-D-0558
DLA600-84-D-0484
DLA600-84-D-0498
DLA600-84-D-0602
DLA600-86-D-0500
DLA600-86-D-0630
DLA600-86-D-0891
DLA600-87-D-0469
DLA600-88-D-0552
DLA600-89-D-0480
DLA600-89-D-0588
DLA600-89-D-1017
DLA600-90-D-0531
DLA600-91-D-0581
DLA600-92-D-0460
DLA600-92-D-0513
DLA600-92-D-0539
DLA600-93-D-0507
DLA600-93-D-0568
DLA600-93-D-0570
DLA600-94-D-0535
SP0600-95-D-0462
SP0600-95-D-0521
SP0600-96-D-0520
SP0600-97-D-0514
SP0600-98-D-0507
SP0600-99-D-0534
SP0600-99-D-0535
SP0600-99-D-0555

**MAYER, BROWN, ROWE & MAW**

1909 K STREET, N.W.

WASHINGTON, D.C. 20006-1101

**J. KEITH BURT**
DIRECT DIAL (202) 263-3208
kburt@mayerbrownrowe.com

MAIN TELEPHONE
(202) 263-3000
MAIN FAX
(202) 263-3300

February 12, 2003

Mr. John R. Walker
Contracting Officer
Defense Energy Support Center
8725 John J. Kingman Road
Suite 2941
Fort Belvoir, VA 22060-6222

Dear Mr. Walker:

We are writing on behalf of our client Chevron USA, Inc. Enclosed are two certified claims under contracts with DESC for the delivery of JP-4 and F-76.

If you are not the current contracting officer for these contracts, we request that you forward the respective claim to the appropriate contracting officer.

If you have any questions concerning the claims, you should contact us directly.

Sincerely,

J. Keith Burt

Enclosures

cc: Howard M. Kaufer, Esq. (w/o enc.)

**DEFENSE LOGISTICS AGENCY**
DEFENSE ENERGY SUPPORT CENTER
8725 JOHN J. KINGMAN ROAD, SUITE 4950
FORT BELVOIR, VIRGINIA 22060-6222

IN REPLY REFER TO DESC-BZ

February 24, 2003

Mr. Todd P. Grubin
Chevron USA, Inc.
575 Market Street
San Francisco, CA 94105

Dear Mr. Grubin:

This is in reference to your two, February 12, 2003, claims for approximately $18.8 million on deliveries under unidentified contracts.

I have not been able to verify that any of the deliveries listed in these claims took place. Therefore, I request you provide copies of the information from which you derived the claimed deliveries and payments, including any additional data that you did not include in your exhibits. In addition, I request you provide an explanation of your invoice numbering scheme. I would like to have this information by March 7, 2003.

If you have any questions, please contact me at (703) 767-9267.

Sincerely,

JOHN R. WALKER
Contracting Officer
Bulk Fuels

cc: Mr. J. Keith Burt, Esq.

**MAYER, BROWN, ROWE & MAW**

1909 K STREET, N.W.

WASHINGTON, D.C. 20006-1101

**J. KEITH BURT**
DIRECT DIAL (202) 263-3208
kburt@mayerbrownrowe.com

MAIN TELEPHONE
(202) 263-3000
MAIN FAX
(202) 263-3300

March 3, 2003

**By Facsimile and First Class Mail**

Mr. John R. Walker
Contracting Officer
Defense Energy Support Center
8725 John J. Kingman Road
Suite 2941
Fort Belvoir, VA 22060-6222

Dear Mr. Walker:

We are writing on behalf of our client, Chevron USA, Inc., in response to your February 24, 2003 letter to Mr. Todd Grubin. In your letter, you request additional information concerning the deliveries and payments that are the subject of Chevron's two February 12, 2003 claims.

As Chevron states in each of the two claims, the schedule of deliveries and payments reflects Chevron's electronic invoice records. The invoice numbering scheme is the same that Chevron used in its prior claims.

If you have any further questions regarding these claims, you should contact us directly.

Sincerely,

J. Keith Burt

cc: Howard Kaufer, Esq.

**DEFENSE LOGISTICS AGENCY**
DEFENSE ENERGY SUPPORT CENTER
8725 JOHN J. KINGMAN ROAD, SUITE 4950
FORT BELVOIR, VA 22060-6222

IN REPLY REFER TO DESC-BZ

March 4, 2003

Mr. Todd Grubin
Chevron USA, Inc.
575 Market Street
San Francisco, California 94105

Dear Mr. Grubin:

This responds Chevron USA, Inc.'s (Chevron) two February 12, 2003 (certified May 9, 2002), requests for payment totaling $18.8 million for alleged deliveries of JP-4 jet fuel and F-76 diesel fuel to the Defense Energy Support Center from 1982 to 1984. According to Chevron, the economic price adjustment (EPA) clauses in its contracts were unauthorized and therefore unenforceable. Chevron seeks to have the deliveries re-priced at a substantial premium.

As explained below, the information in Chevron's February 12, 2003, submissions is so inadequate that it fails to qualify as a claim for purposes of the Contract Disputes Act. Therefore, I will not issue a final decision on these requests for payment.

Chevron fails to provide any of the basic facts that would allow me to render a final decision. Specifically, Chevron fails to identify the contract(s) pursuant to which it made the purported deliveries, fails to identify the specific EPA clause(s) alleged to be unauthorized, and fails to provide any evidence that it actually made the deliveries.

Instead of providing these basic facts, Chevron states in its submission that other contracts during the 1982-84 period contained EPA clauses based on various "price indexes." Chevron states that the deliveries were listed in its electronic records; it has no paper copies evidencing the deliveries.

My search has failed to turn up any evidence of these deliveries or the contracts to which they might apply. Chevron's March 3, 2003, letter provided no new information.

For the foregoing reasons, I am unable to issue a final decision on Chevron's February 12, 2003, requests for payment.

Sincerely,

JOHN R. WALKER
Contracting Officer
Bulk Fuels

cc: J. Keith Burt, Esq.

COMPTROLLER GENERAL

*1 Subject: Defense Fuel Supply Center's Small Business Set-Aside Procurements (B-230556; Code 396917)
September 6, 1988

To: Group Director, NSIAD--John Rinko
Thru: Senior Attorney, OGC--A.R. Kasdan

DIGEST

The Defense Fuel Supply Center's (DFSC) small business partial set-aside procedures for the acquisition of its fuel supplies, comply and are consistent with the Small Business Act, 15 U.S.C. 631 et.seq., as well as other applicable Federal procurement laws and regulations. The DFSC procedures have been approved as deviations from applicable procurement regulations for over 20 years, and we previously considered these procedures as a reasonable exercise of DFSC's discretion. See B-168576(2), April 28, 1971 and B-171289, April 28, 1971.

This responds to your request for our views on the legality of the Defense Fuel Supply Center's (DFSC) small business set-aside practices (procedures) for the acquisition of its fuel supplies. In his letter of January 11, 1988, to GAO requesting this review, Senator Max Baucus questioned whether DFSC's small business set-aside procedures afford small business a fair opportunity to compete for these fuel acquisitions. He has asked GAO to determine whether DFSC's procurement procedures are consistent with the Small Business Act, as well as other applicable Federal procurement laws and regulations. For the reasons given below, we believe that DFSC's small business set-aside procurement procedures comply and are consistent with those laws and regulations.

Background

The DFSC purchases its bulk fuel supplies for the Department of Defense's (DOD) domestic requirements in a non-traditional way. It makes two major buys of bulk fuels with multiple contract awards based on a geographical division of the country: Inland/West and East/Gulf. It uses a bid evaluation model developed in the 1960's and 70's which allows it to select the particular combination of contract awards for a specific buy which will fulfill the government's requirement at the overall lowest cost (product plus transportation cost). Under this model, multiple awards are needed at many locations so that each individual requirement or location can be completely supplied. Usual procedures of awarding contracts to the lowest sources do not provide the least total cost pattern of awards.

DFSC solicitations request offers from all suppliers, including both large and small business firms, for needs of all DOD locations in the particular geographic

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

area. Using the model developed and taking into account quantities reserved for qualified minority small business firms and small business set-asides, prices for bulk fuels at the various locations in the region are established. DFSC must assure that the small business firms eligible for set-asides are offered an opportunity to receive contracts at a particular location at prices which are not higher than the maximum unit price DFSC would otherwise have to pay. It uses one of three methods--the balanced price, the step price and the matched price--depending on the pattern of bids received to determine the set-aside price. This price is then offered to small business and they have an opportunity to accept or reject it. If it is rejected, the amount set-aside is offered to other sellers at that location to avoid any resolicitation.

*2 Since 1960 DFSC procedures have been approved as a deviation or exception from procurement regulations applicable to small business partial set-asides. The most recent extension of this exception occurred in May 1987 when the DFSC procedures were approved as a deviation from the applicable provisions of the Federal Acquisition Regulation (FAR 19.507, and 19.508(d) ) and of the Defense Supplement to the FAR (DFAR 19.508(d) and 19.508(70) ). DFSC believes that these procedures are necessary to assure awards to small business concerns at prices that are fair and reasonable to the government and to the concerns. DFSC also argues that its procedure results in small business receiving an equal to or higher price for their fuel than they would have received if the standard FAR small business partial set-aside procedures were used. Under the FAR, the price for a partial set-aside is "... the highest unit price(s) in the contract(s) for the non-set-aside portion...." FAR 52.219.7

In his January 11 letter, Senator Baucus expressed concern that the DFSC's partial set-aside procedure may not be consistent with the spirit of the Small Business Set-Aside Program. He stated that in DFSC procurements small businesses do not engage in price competition with other small businesses. Since the "match price" for the fuel is largely set by the prices submitted by large fuel suppliers, small businesses are forced to compete with the cost of production of large suppliers. He therefore contends that DFSC's procedure does not offer small businesses the "maximum practical opportunity to participate in the performance of contracts let by any Federal agency," referring to the Small Business Act, 15 U.S.C. 637. [FN1]

Question: Does the DFSC small business partial set-aside procedure comply with the Small Business Act and other federal procurement laws and regulations?

Answer: Yes. Although the DFSC small business set-aside procedure is an approved deviation from FAR and DFAR provisions, it reserves for small business a portion of a particular acquisition as long as the price does not exceed the market price. The deviation from FAR and DFAR set aside procedures is required because of the nature of DFSC's acquisition of bulk fuel supplies. No provision of the Small Business Act or the FAR or DFAR require that small business compete only against each other in setting the price for the small business set-asides. GAO has previously found substantially similar DFSC procedures to be reasonable.

Explanation: The Small Business Act, 15 U.S.C. 631 et. seq., is designed to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

protect the economic interests of small business concerns, and "... to insure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the government be placed with small business enterprises ..." 15 U.S.C. 631(a). (Emphasis added.) Identical policy objectives are stated in the Armed Services Procurement Act (ASPA), 10 U.S.C. 2301(b), and the Federal Property and Administrative Services Act (FPASA), 41 U.S.C. 252(b), which respectively govern military and civilian acquisitions. Part 19 of the FAR implements the small business acquisition-related provisions of the Small Business Act and the applicable provisions of the ASPA and FPASA. Also, provisions of the DFAR apply to small business set-aside in DOD acquisitions.

*3 To achieve the Small Business Act's "fair proportion policy", both the Act and the FAR give federal agencies broad authority to award contracts to small business, including on a total or partial set-aside basis. 15 U.S.C. 644(a) and FAR 19.5. An agency may not award a contract to a small business firm if the agency's cost would exceed a fair market price, 15 U.S.C. 644(a). [FN2] Relatedly, the FAR set-aside procedures provide that in both total and partial procurement set-asides, the contracts awarded must be made only at reasonable prices. FAR 19.502-2 and 19.502-3. The FAR also requires that specific clauses be inserted for set-aside contracts, i.e., FAR 52.219-6 (total set-asides) and 52.219-7 (partial set-asides). [FN3]

For partial set-asides, FAR 19.502(3)(c) requires that the contracting officer must first award the non-set-aside portion using normal contracting procedures. Both large firms and businesses eligible for the set-aside submit offers on the non-set-aside portion. After the non-set-aside portion is awarded, the contracting officer negotiates with small business firms who have submitted responsive (acceptable) offers on the non-set-aside portion. The set aside portion will be awarded at the highest unit price(s) in the non-set-aside portion. FAR 52.219-7, part (b)(3) of the required contract clause. If a set-aside acquisition is not awarded, the supplies or services for which no award was made is recompeted. FAR 19.507(a).

The DFSC procedures differ from the FAR procedures in two substantial respects which are said by DFSC to be required to effectuate bulk fuel acquisitions. First, the award of set-aside quantities is made at prices which would have been paid without the set-aside. This can differ from the "highest unit price(s)" paid under the FAR. This variance is the result of the nature of the petroleum refining business. In most businesses, prices will often drop as more product is produced. In the petroleum refinery business, the contrary is the case. Since the refining process can produce many products, e.g., jet fuel, gasoline, diesel fuel, etc., increased quantities of one product are produced at the expense of others and the price of additional production rises.

The second difference is that in the event of set-aside failures, the set-aside portion is not recompeted. Under the DFSC procedures both large and small firms are required to submit offers on total quantities just as if there was no set-aside. In this way, in the event a set-aside acquisition cannot be filled, other offers can be considered.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Under both the FAR partial set-aside regulation and the DFSC deviation large and small business compete against each other. Under the former, the large and small firms submit offers on the non-set-aside portion which is awarded first. The set-aside portion is negotiated with qualified small business who have submitted responsive offers under the non-aside portion. Under the DFSC procedure, both large and small firms compete by submitting offers on total quantities.

*4 We have found no court cases or GAO decisions or opinions which have specifically addressed the issue whether the FAR partial set-aside procedures are a reasonable implementation of the requirements of the Small Business Act. However, GAO has considered DFSC procedures substantially similar to those in effect today as a reasonable exercise of an agency's discretion. In B-168576(2), April 28, 1971, a small business protested the reduction of the small business set-aside and proposed certain changes in DFSC's set-aside procedures. At that time, DFSC's procedures were a deviation from applicable ASPA regulations. The protestor proposed that the formula DFSC uses to calculate the prices paid for the quantities accepted be modified. Under this proposal, the price for the set-aside would be set on the basis of the prices and quantities remaining on each offeror's bid after subtracting the amount awarded on the non-set-aside portion.

DFSC pointed out that the proposed procedure would not only cost the government more money, but might actually result in lower prices for set-asides as the percentage of the total procurement which is set-aside increases. GAO stated that it would not substitute its judgment for that of DFSC "unless it [DFSC] has acted in an arbitrary or capricious manner." We concluded that based on the record, there was "substantial evidence to support DFSC decision not to revise its small business set-aside procedures," as suggested by the protestor. In B-171289, also decided on April 28, 1971, GAO concluded that it failed to see how evaluation procedures--substantially similar to DFSC present procedures--would be contrary to the "congressional purpose and intent in establishing the small business set-aside procedure, 15 U.S.C. 631."

In conclusion, we find no reason to question our previous positions that DFSC procedures are in compliance with the Small Business Act and are a reasonable exercise of agency discretion to implement the policy of the act.

Substantially similar DFSC procedures have been approved as deviations from applicable procurement regulations for partial set-asides for over 20 years. Our view is reenforced by information DFSC has provided that shows that the DFSC set-aside procedure results in small businesses receiving an equal to or a higher price for their fuel than under the FAR set-aside procedure.

Finally, we note that Senator Baucus letter referenced the Small Business Act's requirement that small businesses "... shall have the maximum practical opportunity to participate in the performance of contracts let by any federal agency ..." 15 U.S.C. 637(a). However, this section is not applicable to the award of a federal contract, but to insure that small business receive subcontracts under prime contracts the government has already awarded.

Raymond J. Wyrsch

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1988 WL 227932 (Comp.Gen.), B- 230,556

**(Cite as: 1988 WL 227932 (Comp.Gen.))**

Senior Attorney, OCG

FN1 Senator Baucus' request stemmed from a specific DFSC fuel acquisition in which one small business firm, the Wolf Point Refining Company, could not meet the offered "match price" for the delivery of JP-4 fuel to the Minot Air Force Base, because to do so would have resulted in a $900,000 loss to the company. The attorney representing the company believes that DFSC's small business set-aside procedure offers little opportunity for small businesses to compete against large firms. In view of the Senator's request for a general assessment of DFSC's procedure, and that Wolf Point did not file a bid protest concerning the Minot fuel acquisition, we will not address this case.

FN2 The Small Business Act also requires that the head of each agency shall establish goals for the participation by small business concerns in the award of its procurement contracts having a value of $25,000 or more, 15 U.S.C. 644(g).

FN3 The DFAR also requires that similar clauses be inserted in DOD contracts, i.e., DFAR 52.219-7003.

1988 WL 227932 (Comp.Gen.), B- 230,556

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

platts

## Market Prices

Platts' industry-standard price assessments are critical elements of short- and long-term contracts worldwide. Our pricing products range from real-time alert services to traditional newsletters and historical pricing and are delivered though a variety of medium to suit your individual needs. Our real-time market services help industry specialists understand price trends and emerging consensus as they're being formed – putting them in a better position to make faster, more profitable decisions. Platts' independent derivative assessments are one of the only sources of unbiased mark-to-market data for valuing positions.

### Oil

Asia-Pacific / Arab Gulf Marketscan (APAG)
Bunkerwire
China Fuel Oil Report
**Please note this publication is only available in Chinese.**
China Fuel Oil Report (English)
China Wire
Clean Tankerwire Monthly
Crude Oil Marketwire
Dirty Tankerwire
Dirty Tankerwire Monthly
Dispatch - Oil
European Marketscan
Forward Curve - Oil
Global Alert
Historical Price Data
Inside Energy
Latin American Wire
LPGaswire
Marine Alert
North American Crude Wire
North Sea Letter
Oilgram Price Report
Refiner
US Oil Data 1935 and Beyond
US Marketscan

Copyright © 2006 - Platts, All Rights Reserved
The McGraw-Hill Companies

The McGraw-Hill Companies
platts
Get more out of your business.
ey.com/us/energycenter
Ernst & Young
Quality In Everything We Do

Home | Oil | Electric Power | Natural Gas | Coal | Nuclear | Petrochemic

Search
Go
Advanced/Saved Search

Shop at Platts
Events
Market Prices
Newsletters & Reports
Real-Time Information
Resources
Blog: Renewable Energy
Contact Editorial
Crude Converter
Energy Careers Center
Glossaries
Market Issues
Methodology & Specifications
News Features
Oil Market Podcasts
Presentations
Quote of the Day
Risk Management
Symbol & Page Directories
Top 250 Company Rankings
Useful Links
What's Moving the Market?

# Glossary

Other glossaries: Derivatives Glossary - Technicals Glossary - Glossary of International Glossary of Terms: EIA - US Power Glossary: EIA

A-B-C-D-E-F-G-H-I-J-K-L-M-N-O-P-Q-R-S-T-U-V-W-Z

15-Day Brent

## A

A/F
abandon
accumulation
AG
AGO
alkylate
alternating current (AC)
alternating current distribution
American style option
ampere (amp)
ancillary services
Andrew's Pitchfork
Aniline point
anode
ANS
anthracite
API
API gravity
APT
ARA
Arab Gulf
Aramco
arbitrage
aromatics
asph
asphalt
assay
assessment
associated gas
at-the-money
AUD

### spinning reserve

Unused capacity available from units connected to and synchronized with the grid to serve additional demand. The spinning reserve must be under automatic control to instantly respond to system requirements.

### spot market

A market where goods are traded for immediate delivery.

### SPR

Strategic Petroleum Reserve in the US.

### spread

The difference between two prices, either across time or between commodities or instruments.

### spread (options)

An option trade in which two or more open positions are established in order to trade the differentials and offset risk. Option spreads may use different strike prices and/or expiry dates.

### Spread-trading

Buying one instrument/commodity and selling another, with a view to profiting from the change in the gap between the two markets.

### steam cracker

Ethylene plant. A petrochemical plant which produces olefins, particularly ethylene, and, in some cases, aromatics.

### steam generation plant

A thermal electricity generating plant which creates steam to drive a turbine.

### stochastics

The theory of stochastics is based on the premise that prices close nearer the high in an uptrend, and nearer the low in a downtrend. %D Slow %D %K %R are all just names for different ways of smoothing the stochastic measures derived from the uptrend/downtrend theory.

NYMEX
NEW YORK MERCANTILE EXCHANGE

Home About the Exchange News Markets Education
Visitors Resources Shareholder Relations

>> NYMEX and Complete $160

Contact Us | Glo

Search

# Light Sweet Crude Oil

**Market Data**
Current Session Overview
Current Expanded Table
Previous Session Overview
Previous Expanded Table
Squawk Box
**Contract Detail**
Description
Specifications
Margins
Termination Schedule
Request for Information

Crude oil is the world's most actively traded commodity, and the NYMEX Division light, sweet crude oil futures contract is the world's most liquid forum for crude oil trading, as well as the world's largest-volume futures contract trading on a physical commodity. Because of its excellent liquidity and price transparency, the contract is used as a principal international pricing benchmark. Additional risk management and trading opportunities are offered through options on the futures contract; calendar spread options; crack spread options on the pricing differential of heating oil futures and crude oil futures and gasoline futures and crude oil futures; and average price options.

The contract trades in units of 1,000 barrels, and the delivery point is Cushing, Oklahoma, which is also accessible to the international spot markets via pipelines. The contract provides for delivery of several grades of domestic and internationally traded foreign crudes, and serves the diverse needs of the physical market.

Light, sweet crudes are preferred by refiners because of more...

**Daily Chart -**

CL(I

C=Last



**Margins** view

**Non-Member Customer Initia**

**Member Custo Initial**

**Clearing Memb Customer Maintenance**

©2006 New York Mercantile Exchange,Inc. All Rights Reserved.
Disclaimer Privacy Policy Report abuse

**Sour or Sweet Crude**
Industry terms which denote the relative degree of a given crude oil's sulfur content. Sour crude refers to those crudes with a comparatively high sulfur content, 0.5% by weight and above; sweet refers to those crudes with sulfur content of less than 0.5%.

**Sour Gas**
Natural gas found with a sufficiently high quantity of sulfur to require purifying prior to shipment or use.

**Spark Spread**
The spark spread reflects the costs or anticipated costs of producing power from a specific facility. It can be used as a method of converting millions of Btus to megawatt hours and vice versa, and thus relates well to the electricity and natural gas futures contracts. The spread is simply the heat rate (a proxy for efficiency) of a specific generating unit or power system (the number of Btus needed to make one kilowatt hour of electricity), multiplied by the cost of energy expressed as dollars per British thermal units (Btus). For example, if it takes 10,000 Btus to make one kilowatt hour of electricity, the formula can be simplified by multiplying the price per million Btus (MMBtu) by 10 to equate one MMBtu of natural gas to one megawatt hour (Mwh) of electricity. The usefulness of the spread evaluation is dependent on the market price for power which reflects the relationship of the supply and demand for power, not the efficiencies of the generating units. Other costs affecting the price of power using the spark spread evaluation include those of gas transportation, power transmission, plant operations and maintenance, and fixed costs. Because the electricity futures contract is specified in lots of 736 megawatt hours, and the natural gas futures contracts are specified in units of 10,000 million Btus, one power contract equates to 0.736 natural gas contracts.

**Specifications**
1) Contract terms specified by the Exchange. 2) Term referring to the properties of a given crude oil or refined petroleum product, which are "specified" since they often vary widely even within the same grade of product. In the normal process of negotiation, seller will guarantee buyer that the product or crude to be sold will meet certain specified limits. Generally, the major properties of oil that are guaranteed are API gravity, sulfur, pour point, viscosity, and BS&W.

**Specific Gravity**
The ratio of the density of a substance at 60 degrees Farenheit to the density of water at the same temperature.

**Speculative Position Limit**
The maximum position, either net long or net short, in one commodity futures or options, or in all futures or options of one commodity combined, which may be held or controlled by an entity without a hedge exemption as prescribed by an exchange or the Commodity Futures Trading Commission.

**Speculator**
A trader who hopes to profit from the specific directional price move of a futures or options contract, or commodity.

**Spot**
Term which describes one-time open market case (CHANGE TO CASH) transaction, where a commodity is purchased "on the spot" at current market rates. Spot transactions are in contrast to term sales, which specify a steady supply of product over a period of time.

**Spot Month**
The futures contract closest to maturity. The nearby delivery month.

**Spread (Futures)**
The simultaneous purchase and sale of futures contracts for different months, different commodities, or different grades of the same commodity.

**Spread (Options)**
The purchase and sale of options which vary in terms of type (call or put), strike prices, expiration dates, or both. May also refer to an options contract purchase (sale) and the simultaneous sale (purchase) of a futures contract for the same underlying commodity.

**Stock-Type Settlement**
A settlement procedure in which the purchase of a contract requires immediate and full payment by the buyer to the seller. In stock-type settlement, the actual cash profit or loss from a trade is not realized until the position is liquidated. NYMEX Division energy and platinum options have this type of settlement procedure, which differs from that in the futures market where gains and losses are realized on a daily basis.

OPIS NET
Downstream Petroleum News & Pricing | Crude | Refined Spot | Wholesale Racks | LPGas | Feedstocks | Diesel | Retail Gasoline | Ethanol

Tuesday, March 28, 2006 12:07:02 PM

# About Us

Oil Price Information Service (OPIS) is the world's most comprehensive source for petroleum pricing and news information. Products and prices began in 1977 with the award-winning Oil Express Newsletter, quickly expanded in 1980 into the only source, and the world's most comprehensive database of U.S. wholesale petroleum prices. We now distribute the most accurate, reliable and referenced petroleum prices via e-mail, web, fax, newsletter, and 3rd party vendors.

OPIS is comprised of more than 50 information specialists, including the most experienced editors in the business, combining over 150 years of industry experience. Pricing experts track more than 70,000 rack prices for heating oil, gasoline, diesel and kerosene, and thousands of contract prices for jet fuel, LP-gas, residual fuel, ethanol, biodiesel and MTBE. More than 125,000 retail gasoline prices are also tracked daily.

Our editors not only cover the market, and report breaking stories -- but also provide inside analysis on what the trends mean and how they could affect prices and purchasing decisions.

Our client list is strictly confidential, and includes the top 200 oil companies, thousands of distributors, traders, government and commercial buyers of petroleum products.

**Recent Press Releases**
OPIS Acquires AXXIS Petroleum

| | |
|---|---|
| **About Us** | OPIS Benchmark \| OPIS Methodology \| OPIS West Coast Methodology FAQ<br>Privacy Policy \| Conferences & Education \| Advertising & Sponsorships |
| **News & Pricing Services** | OPIS Spot Ticker \| OPIS News Alerts \| LP-Gas Report \| International Feedstocks<br>Jet Fuel Report \| Gasoline/Diesel Rack Prices \| West Coast Refined Spots Report<br>Canadian Rack Prices \| Biodiesel Rack Prices \| Crude Postings \| Retail Truckstop Prices<br>Full-Day Refined Spot Report \| Metro Margin Report \| Metro Pump Report \| Fleet Fuel Mgmt<br>Truckstop Spread Report \| Propane Contract Prices \| Custom Price History/Time Series |
| **Newsletters** | OPIS Newsletter \| Oil Express \| OPIS Retail Fuel Watch<br>OPIS Fuel Ethanol & Biodiesel Report |
| **Directories** | Petroleum Supply Americas \| Petroleum Supply Europe<br>Petroleum Terminal Encyclopedia \| Who's Who in Natural Gas & Power |

Chevron





# Company Profile

Chevron is the fifth-largest integrated energy company in the world. Headquartered in San Ramon, California, and conducting business in approximately 180 countries, the company is engaged in every aspect of the oil and natural gas industry, including exploration and production; refining, marketing and transportation; chemicals manufacturing and sales; and power generation.

## Company Roots

The company traces its earliest roots to an 1879 oil discovery at Pico Canyon, north of Los Angeles, a find that led to the formation of the Pacific Coast Oil Co., which later evolved into the Standard Oil Co. of California and, later, Chevron Corp. Another major root in the genealogical chart is the 1901 formation of The Texas Fuel Co. in Beaumont, Texas. It later became known as The Texas Co. and, eventually, Texaco Inc. In 2001, these entities merged to form ChevronTexaco. The name was changed to Chevron in 2005 to present a more unified presence in the global marketplace. The merger with Unocal in 2005 strengthened Chevron's position as a global energy leader, enhancing assets in key basins around the world.

## Global Scope

With the addition of former Unocal employees, the company's diverse and highly skilled global work force stands at approximately 53,000 employees. Chevron and its people continue to take great pride in a commitment to community partnerships, social responsibility and environmental excellence.

In 2004, ChevronTexaco produced more than 2.5 million barrels of oil equivalent per day, with two-thirds of the volume occurring outside the United States and in more than 20 different countries.

The acquisition of Unocal, including its share of equity affiliates, has added daily net production of approximately 459,000 BOE. As of December 31, 2004, Unocal, including its share of equity affiliates, reported it had net proved reserves approximately of 1.75 billion BOE.

With a global refining capacity of more than 2 million barrels of oil per day at year-end 2004, Chevron also has a marketing network that supports approximately 25,700 retail outlets - including those of affiliate companies - in nearly 90 countries. The company has interests in 16 power-generating assets located in the United States and Asia, three of which were added with the Unocal merger.

## Energy Technologies

Chevron develops and commercializes advanced energy technologies, including core hydrocarbon technologies, a global digital infrastructure and information technology. The current business development portfolio includes hydrogen infrastructure, advanced battery systems, nano-materials and renewable energy applications.

**Corporate G**

We seek the all our stake only for the g achieve but achieve ther

**Map of Oper**



We are activ approximate countries.
View more a operations

**Corporate F**

View Fa: 45Kb)

PDF downlo