October 1986 rather than December 1986 as was done during that procurement. This would have had the effect of eliminating margin uncertainty. The process would still have been susceptible to the generally upward market price movement over that period. In this case, however, at least one company was able to agree to a price reduction (when requested by DFSC-P), after the December PMM became available, in part as a result of margin certainty with December pricing. On the previous Inland and West procurement, one company reduced its offered volume when the June PMM became available prior to time of award, and actual June price levels were found to have been higher than this company assumed when it prepared its bid. In this case, the latest PMM at the time of receipt of best and final offers contained April prices. Under a modified bid process, offerors would have made their best and final prices effective in April rather than in June. Several individuals and contractors have suggested that DFSC modify its current system in this manner. The experience with the recent bulk procurements and with an analagous situation several years ago in an overseas procurement suggest that this is a feasible improvement on the current escalation system.

## Decision Options

Option I - Maintain current two-step method of domestic bulk price escalation.

Pro - This system is already in use and contractors are familiar with it. There is no market risk to continuation of its use. DFSC prices are adjusted according to the movement of actual monthly sales price averages.

Con - This system is complex and ~~administratively~~ cumbersome. There are 12 monthly escalations plus 12 monthly corrections. The problems associated with bid preparation probably result in additional expense to the U.S. Government. There will continue to be contractor complaints about the size of final payment adjustments. This system, by escalating on monthly averages, fails to reflect intramonthly price movements.

How much

Option II - Modify the current two-step escalation method so that offerors can establish their bid prices as effective with the month of the most recent PMM.

Pro - This system has the same advantages as Option I, and removes margin uncertainty from the offerors' bid preparation problem.

Con - This system has the same disadvantages as Option I, and forces the offeror to focus on a point two months further into the past when formulating the bid prices, thus possibly making the process even more susceptible to market price movement over the intervening period between the most recent PMM and the date of best and final offers.

8282

Option III - Change to twice-monthly escalation using trade journals escalating with prices effective on the 1st and 15th of the month.

Pro - This system is administratively simpler than the current system (with 24 "final-only" escalations). There is no need for final billing adjustments. There is less need for contractors to build contingency premiums into their offer prices due to margin uncertainty.

Con - There is market risk associated with the move away from escalation on actual sales, particularly with respect to jet kerosene. Twice-monthly price changes do not track actual sales as well as weekly changes, so offerors may still add contingency premiums to their prices. There will likely be several contractor complaints each year about the short-term performance of these escalators.

Option IV - Change to weekly escalation using trade journals.

Pro - This system can be administered as easily as the identical system currently used in ground fuels. There is no need for final billing adjustments. The bid preparation problems would be virtually eliminated. Weekly price changes track actual sales better than monthly or twice-monthly price changes, because they better reflect the continuous nature of price movements in the marketplace. Thus there is even less need for contractors to build in contingency premiums as offer prices can be updated to the time of receipt of best-and-final offers.

Con - There is market risk associated with the move away from escalation on actual sales, particularly with respect to jet kerosene. There would be 52 price escalations per year, more than twice the number in Options I, II, and III. There will likely be several contractor complaints each year concerning the short term performance of these escalators.

Staff Recommendations:

Option II is favored by all of the interested directorates (DFSC-C, -G, -P, and -N). Should the implementation of Option II fail to alleviate the bidding difficulties, the issue can be revisited. In any event, the trade journal options do not appear to be truly viable before mid-1988 at the earliest.

3223

UNITED STATES COURT OF FEDERAL CLAIMS

LA GLORIA OIL AND GAS COMPANY, :

Plaintiff, :

v. : No. 02-465C

THE UNITED STATES, : (Judge Hewitt)

Defendant. :

: Pages 1 - 59

- - - - -

Deposition of Lawrence Ervin

Ft. Belvoir, Virginia

Monday, December 1, 2003

Reported by: Marian E. Cummings, Notary Public

Job No.: 156783

December 1, 2003

12:01 p.m.

Deposition of Lawrence Ervin, held the offices of:

Defense Energy Support Center
8725 John J. Kingman Road
Ft. Belvoir, Virginia 22060-6217

Pursuant to notice, before Marian E. Cummings, a Notary Public of the Commonwealth of Virginia.

APPEARANCES:

Mayer, Brown, Rowe & Maw
For the Plaintiff
1909 K Street, Northwest
Washington, D.C. 20006-1101
(202) 263-3208
BY: J. Keith Burt, Esq.
William L. Olsen, Esq.

United States Department of Justice
For the Defendant
Room 4050
1100 L Street, Northwest
Washington, D.C. 20530
(202) 616-2311
BY: Steve Gillingham, Esq.

Defense Energy Support Center
For the Defendant
Suite 1565
8725 John J. Kingman Road
Ft. Belvoir, Virginia 22060
(703) 767-5009
BY: Howard Kaufer, Esq.

Defense Supply Center
Richmond, Virginia
(804) 279-1423
BY: Donald Tracy, Esq.

CONTENTS


EXAMINATION OF LAWRENCE ERVIN PAGE

MR. BURT 6

-0-


EXHIBITS


ERVIN DEPOSITION EXHIBITS: PAGE:

(None)

-0-

PROCEEDINGS

Thereupon,

LAWRENCE ERVIN

the Witness, called for examination by counsel for the Plaintiff, and, after having been sworn by the notary, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. BURT:

Q Would you state your name for the record.

A Lawrence Calvin Ervin.

Q Mr. Ervin, what is your current position?

A I'm the chief of the market research office at the DECS.

Q And how long approximately have you held that position?

A Eight plus years.

Q And generally what are the responsibilities of that position?

A Well, overseeing an effort to -- we do interscreen, analyses of support of the procurement operations center, do support for price negotiation work in the pricing work done in contracting divisions.

There's a certain amount of affiliate work we do for contingency folks.

We actually manage the strategic petroleum program to the extent we're involved with the -- help the budget folks who work for the comptroller with their out year budget projections, price of oil in the future, forecasting, that sort of stuff. I think that I -- probably everything we do falls within that general description.

A The responses is often oral. And the document, it gets generated, provided to the person who asked it. We kind of rely heavily on the contract files to be the repository of that since it's, you know, sort of proprietary information.

Q The contract files meaning an office other than yours or is that a contract file in your office?

A No, we don't maintain contract files.

Q So when you provide some market analysis to the bulk fuels group in connection with their procurement and when that analysis is in writing do you keep a copy of what you give to the bulk fuels group?

A Well, I think the short answer to that is no and maybe something momentarily. Again, it would rely heavily on the contract file.

Q All right. Let's turn to page 6 of Plaintiff's Exhibit 2, request number 15 reads, "All documents relating to DESC's decision to use the PMM indexes, Platts, or OPIS as a basis for adjusting prices in its price adjustment clauses."

A Recollection was that '87 study which I believe you've been provided and a prior '84 study.

Q Can you generally describe those studies for me?

A '84, '87 I was involved in producing and we looked at comparing PMM versus Platts and OPIS and the issue of SC escalating on a different time frame and the documents looked at various things which are nice to have in an escalator. They track -- the '87 study wound up recommending making an adjustment to the PMM based status quo at the time.

The '84 study which I did not prepare, my understanding and recollection is that it's mainly, it deals mostly with the move from the ELS to PMM which was prior to 1985.

Q Where did you find those studies?

A Well, I didn't, I don't think I found the first one.

Q Okay.

A The '84 one, and '87 I had basically on my shelf.

Q Mr. Ervin, I believe that in approximately 1995 DESC switched from using Platts to using PMM as an escalator to using Platts; is that correct?

A Sometime back in there, yeah.

Q Do you know whether there was any sort of any studies or analysis of reports prepared by your office in connection with that change from using the PMM to using Platts?

A Well, there wasn't because I was sitting in a room when the decision happened and it was made in response to some pressure from headquarters to do things differently. So the analysis is based on, basically is the analysis in the '87 study. Some people who have read the '87 studies that they would draw different conclusions than what was presented at the end of the study, certainly a close call. Analysis would have supported that as well so it's really the '87 study which is the basis for that move. That and some pressure from headquarters to, you know, be doing things differently and doing things different in a visible fashion to hopefully over the course of time produce substantial cost savings to the taxpayer.

PPR
PP
G
PZ
PD
P Sign

0 6 SEP 1994

DFSC-PPR

SUBJECT: Request for One-Time Deviation to FAR 16.203-1 for Approval of New Method of Economic Price Adjustment (EPA)

TO: AQPLL

1. We request a one-time deviation to FAR 16.203-1 for approval of a proposed EPA clause to cover all domestic bulk fuels solicitations for a period of one year or until a class deviation is approved. Details of the request are contained in the enclosure.

2. We appreciate your prompt attention to this request. The point of contact for this office is Betsy Murray, extension 45500, for any questions you may have.

Original Signed By
L. H. CARPENTER
Captain, SC, USN
Director, Contracting
and Production

Encl

PREPARED BY: BETSY MURRAY/PPR/45500/30 AUG 94/EPA-PZ.DOC
INTERNAL DIST.: DFSC-PP READ DFSC-PPR READ & RECORD

**MEMORANDUM FOR THE EXECUTIVE DIRECTOR (PROCUREMENT), DEFENSE LOGISTICS AGENCY**

**SUBJECT: Request for One-Time Deviation from FAR 16.203-1**

## I. PROBLEM.

The current system of price adjustment for the Defense Fuel Supply Center's (DFSC) domestic bulk fuels programs requires all offerors to accept a method of price adjustment based on actual monthly sales price averages as published by the Department of Energy in the *Petroleum Marketing Monthly (PMM)*. Because the PMM data is not published until the third month following the month for which data is effective, interim adjustments are made based on the movement of an interim escalator. The interim escalator is based on prices published in trade journals at the end of the month prior to delivery. Final adjustments in the billings are made according to differences between the interim and PMM (final) escalators when the PMM is published. When market prices vary greatly from month to month, the final billing adjustments can be substantial. Although this method has proved to be a reliable means of price adjustment, it has several disadvantages. First, it requires double calculations of price adjustments. Second, because of the time lag between interim and final billing, contractors likely build in a price cushion. Finally, the process is overly complicated.

## II. RECOMMENDATION.

Authorize a one-time deviation to FAR 16.203-1 for approval of a proposed EPA clause for domestic bulk fuels, which will replace the current DFSC clause for domestic bulk, Clause B19.33, ECONOMIC PRICE ADJUSTMENT - PUBLISHED MARKET PRICE (DOMESTIC BULK). We request the use of this clause to cover all domestic bulk fuel solicitations for a period of one year or until a class deviation is approved.

## III. DISCUSSION.

A. DFSC began using EPA provisions in its contracts in 1973 as a result of market changes resulting from the oil embargo that year. Prior to that time, our contracts were awarded on a firm fixed price basis. At that time, we determined to use crude oil prices as the EPA reference base because there were Government controls on domestic crude oil prices and because, in the aggregate, crude oil prices tracked accurately with product market prices, despite wide fluctuations in individual contractors' crude costs over short periods of time. When Government crude price controls were discontinued, many major contractors agreed to price adjustment based on refined product posted prices, but most

small refiners insisted on continuing to use an EPA clause based on crude oil costs. In 1980, with DLA's approval, we began allowing contractors to choose between the two methods of price adjustment.

B. DFSC encountered several evaluation-related problems with allowing contractors to choose postings or crude oil. As a result, DFSC, with DLA's approval, abandoned the use of crude oil costs as an adjustment mechanism in 1981. Contractors were only allowed to use product postings for price adjustment purposes. For JP5 only, again with DLA's approval, we changed in 1982 to using a listing from the Bureau of Labor Statistics (BLS) Producer Price Index, because there were no commercially published postings for JP5. Because the BLS figures for a given month were not published until two or three months later, DFSC calculated an interim price adjustment based on company postings, followed by a final adjustment based on BLS statistics. Because BLS proved to be a good basis for price adjustment, we shortly changed the EPA basis for the other bulk products to BLS figures. DLA approved the change. The interim reference was an independent price listing, the Oil Price Information Service (OPIS) PAD report in lieu of company postings, with BLS figures for the final adjustment.

C. In 1984, we began to use monthly sales price averages published in the *Petroleum Marketing Monthly (PMM)*, published by the Department of Energy. We switched to the PMM because it was superior to BLS and because BLS changed to recording pricing patterns in a manner that rendered it unacceptable for our purposes as an EPA basis. In 1987, a minor change was made in that the basic reference was kept but the effective dates of offer prices was changed to allow offerors to know the base reference price prior to submission of best and final offers.

D. The current system of price adjustment has been used since 1987. All offerors of product to DFSC are required to accept a method of price adjustment based on actual monthly sales price averages as published by the Department of Energy in the PMM. Because the PMM data is not published until the third month following the month for which data is effective, interim billings are paid based on the movement of an interim escalator. The interim escalator is based on prices published in trade journals at the end of the month prior to delivery. Final adjustments in the billings are made according to differences between the interim and PMM (final) escalators when the PMM is published. When market prices vary greatly from month to month, the final billing adjustments can be substantial. In 1992, the Defense Management Review, as part of a review of all agency clauses, approved the use of the PMM-based EPA clauses. Our authority to use the PMM was reconfirmed by the Director of Defense Procurement in 1993.

E. We propose to substitute industry publications, a more current EPA basis, for the existing PMM methodology. This will provide a number of advantages. First, it will

eliminate the current method, which requires double calculation of price adjustments. Second, because of the time lag between interim and final billing, contractors likely build in a price cushion. It is probable that the Government would save money with contractors no longer having to include a cushion to cover them for price adjustments. Third, the new EPA method is more similar to the way adjustments are done commercially in that commercial publications are widely accepted by industry. Finally, the new method will be much simpler for all parties to use. The DFSC Office of Market Research and Analysis has studied the proposed EPA provisions and found them to be reliable bases for price adjustments. These publications are already used for EPA purposes in other DFSC programs.

F. We are requesting this one-time deviation to cover all bulk requirements for CONUS for a one-year period or until a class deviation is approved. A permanent change will be subsequently requested under separate cover. At this time, the reference price will be based on the spot assessment quotation from Platt's Oilgram Price Report, or, for the Rocky Mountain area, on the OPIS publication. It will be firm for weekly periods. It will be defined as the weekly average of the high and low of the price Monday through Friday (excluding holidays) and shall be effective the following Tuesday through Monday. We also request flexibility to (1) change the frequency of price escalation (e.g., from weekly changes to daily) should that become appropriate in the future, and (2) if recommended by DFSC's Office of Market Research and Analysis, to change publications as circumstances warrant. A copy of the new clause is enclosed.

G. We intend to use B19.34-1 in all domestic bulk solicitations. In those instances where we have additional publications to be used for other line items in a solicitation, we will designate those clauses as B19.34-2, B19.34-3, and so on, as appropriate, for purposes of that solicitation..

H. This is the first request for this deviation.

TOTAL P.06

DEFENSE LOGISTICS AGENCY
DEFENSE FUEL SUPPLY CENTER
CAMERON STATION
ALEXANDRIA, VIRGINIA 22304-6160

IN REPLY REFER TO DFSC-PPR

12 MAY 1995

SUBJECT: Request for Class Deviation and Permanent Coverage in DLAR

TO: AQPLL

1. As you requested, enclosed is a revised Memorandum for the Director of the DAR Council which addresses the one public comment received in response to the Economic Price Adjustment coverage published in the 28 February 1995 edition of the Federal Register.

2. We appreciate your prompt attention to this request. The point of contact for this office is Kerry Pilz, extension 45500, for any questions you may have.

Original Signed By

L. H. CARPENTER
Captain, SC, USN
Director, Contracting
and Production

Encl

MEMORANDUM FOR THE DIRECTOR OF THE DAR COUNCIL

I. PROBLEM:

By letters dated 8 January 1992 and 1 May 1992, the Director of Defense Procurement approved the Defense Fuel Supply Center's (DFSC) economic price adjustment (EPA) clauses as part of the regulatory relief task force review. These clauses, or variations, are in effect today. DFSC wishes to revise the clause used in its domestic bulk fuels programs. None of the three economic price adjustment types currently encompassed by the FAR are appropriate for many of the competitive procurements of commercial products undertaken by DFSC and other DLA contracting offices. The use of an EPA reference based on an individual contractor's established price or cost of materials is impractical for procurements under which indefinite quantity contracts will be issued. Unique EPA references for each offeror engender relative price variations during the delivery period, making it impossible to determine the most favorable offer at time of award. This creates a significant price risk for the Government and undermines the competitive process. Given the need for a common EPA reference, a reference that more closely follows market prices for the end item reduces price risk for both the Government and the contractor. Such references are also more in conformance with commercial practice.

II. RECOMMENDATION:

A class deviation, lasting longer than three years, should be incorporated into the DLAR. This deviation expands the use of EPAs based on established prices to encompass industry-wide and geographically based market price references and expands the use of EPAs based on indexes to encompass indexes for commercial products or services which are identical to or similar to the end products to be provided under the contract. The appropriate coverage in DLAR at 16.203 should read:

*16.203-1 Description*

*(a)(90) Adjustment based on established prices. Established prices may reflect industry-wide and/or geographically based market price fluctuations for commodity groups, specific supplies or services, or contract end items.*

*(c)(90) Adjustments based on cost indexes of labor or material. These price adjustments may also be based on increases or decreases in indexes for commodity groups, specific supplies or services, or contract end items.*

*16.203-3 Limitations*

*(90) A fixed price contract with economic price adjustment may also be used to provide for price adjustments authorized in this section.*

*16.204-4 Contract clauses.*

*(90) When the contracting officer determines that an existing EPA clause is not appropriate, the contracting officer may develop and use another EPA clause in accordance with 16.203-1(a)(90) or (c)(90). Established prices in such clauses need not be verifiable using the criteria in 48 CFR (FAR) 15.804-3. Established prices and cost indexes need not reflect changes in the costs or established prices of a specific contractor. The established price or cost index may be derived from sales prices in the marketplace, quotes, or assessments as reported or made available in a consistent manner in a publication, electronic database, or other form, by an independent trade association, Governmental body, or other third party independent of the contractor. More than one established price or cost index may be combined in a formula for economic price adjustment purposes in the absence of an appropriate single price or cost index.*

III. DISCUSSION:

A. Prior to FARS DEV 94-24, DFSC's current system of price adjustment for bulk petroleum had been used since 1987. All offerors of product to DFSC were required to accept a method of price adjustment based on actual monthly sales price averages as published by the Department of Energy in the *Petroleum Marketing Monthly* (PMM). Because the PMM data is not published until the third month following the month for which data is effective, interim billings are paid based on the movement of an interim escalator. The interim escalator is based on prices published in trade journals at the end of the month prior to delivery. Final adjustments in the billings are made according to differences between the interim and PMM (final) escalators when the PMM is published. When market prices vary greatly from month to month, the final billing adjustments can be substantial. In 1992, the Defense Management Review, as part of a review of all agency clauses, approved the use of the PMM-based EPA clauses. Our authority to use the PMM was reconfirmed by the Director of Defense Procurement in 1993.

B. The revised bulk fuels clause substitutes industry publications, a more current EPA basis, for the prior PMM methodology. This provides a number of advantages. First, it eliminates the need for double calculations of price adjustments, a significant savings to the government. Second, because of the time lag between interim and final billing, contractors likely build in a price cushion. It is probable that the Government would save money with contractors no longer having to include a cushion to cover them for price adjustments. Third, the new EPA method is more similar to the way adjustments are done commercially in that commercial publications are widely accepted by industry. Finally, the new method will be much simpler for all parties to use. The DFSC Office of Market Research and Analysis has studied the proposed EPA provisions and found them to be reliable bases for price adjustments. The publications are already used for EPA purposes in other DFSC programs.

C. DFSC has used the industry market price concept since the early 1980's and has found it to be a reliable method of price adjustment. It is unnecessary to review the deviation every three years as with most class deviations. Therefore, we request that the deviation be made permanent and be included in the DLAR.

D. Additional DFARS 201.402(3) Requirements.

1. This class deviation request has been reviewed and approved by the DFSC Office of Counsel.

2. This class deviation corresponds most closely with the deviation definition of FAR 1.401(c).

3. This is the first request for this class deviation to be published in the DLAR.

4. This class deviation was published in the Federal Register on 28 February 1995. It offered the public 60 days in which to comment on the proposed DLAR language. One public comment was received on 2 May 1995, after the expiration of the public comment period. DFSC, however, addresses the letter received from The National Security Industrial Association as follows.

The National Security Industrial Association is concerned that the EPA references chosen by the contracting officer might not reflect actual market prices and therefore, the price available to the contractor. They stated, "Such a situation could unfairly shift the risk of price uncertainty to the contractor."

DFSC responds that the commentor seems concerned about implementing the market price concept, not the concept itself. Because DFSC sucessfully used the market price EPA concept since the early 1980's, we do not believe that any concern is warranted. None of DFSC's contractors have filed comments regarding the proposal. In any event, DFSC's EPA clauses contain provisions for revising market price indicators, if the contracting officer finds a reference has been discontinued, or if it substantially and consistently fails to reflect market conditions. If these conditions occur, the parties may agree upon an appropriate substitute for the inadequate indicator. If the parties fail to reach agreement, the supplier can utilize the provisions contained in the DISPUTES clause of the contract. DFSC makes every effort to utilize market price indicators that consistently reflect actual market conditions. The National Security Industrial Association recognizes the benefit of such behavior by agreeing in its letter with the Government's statement in the Federal Register: "a reference that more closely follows market prices for the end item reduces price risk for both the Government and the contractor." Accordingly, the comment does not warrant revising the proposed DLAR coverage.

## IV. COLLATERALS:

A. The proposed class deviation and DLAR coverage do not impose any paperwork burdens or informal collection requirements. Thus the Paperwork Reduction Act does not apply.

B. The proposed class deviation and DLAR coverage is not expected to have a significant impact on a substantial number of small entities within the meaning of the Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.* since the elimination of interim billing will greatly simplify

**administrative procedures required of contractors. A regulatory flexibility analysis, therefore, is not required.**

**CERTIFIED CLAIM OF**

**CHEVRON USA, INC.**

**SUBMITTED PURSUANT TO**

**THE CONTRACT DISPUTES ACT OF 1978**

**CONTRACT NO. DLA600-90-D-0531**

Chevron USA, Inc.
575 Market Street
San Francisco, California

# TABLE OF CONTENTS


| | | Page No. |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | DFSC'S PRICE ADJUSTMENT CLAUSE WAS ILLEGAL | 2 |
| III. | CHEVRON IS ENTITLED TO BE PAID THE FAIR MARKET VALUE OF THE FUEL IT SUPPLIED | 5 |
| | A. Illegality | 5 |
| | B. Misrepresentation | 7 |
| | C. Breach of Contract | 9 |
| | D. Failure of Consideration | 9 |
| | E. Mutual Mistake | 11 |
| | F. Fifth Amendment Taking | 13 |
| IV. | CHEVRON IS ENTITLED TO RECOVER $5,194,204.86 | 17 |
| | A. Claim Methodology | 18 |
| | B. DFSC's Right To Offset | 20 |
| | C. Claim Calculation | 23 |
| V. | CONCLUSION | 24 |

APPENDIX

| | |
|---|---|
| Contract No. DLA600-90-D-0531 | Exhibit 1 |
| Fair Market Value of JP-4 | Exhibit 2 |
| Total Payments For JP-4 | Exhibit 3 |
| Certification | Exhibit 4 |

# CERTIFIED CLAIM OF CHEVRON USA, INC.

Pursuant to the Contract Disputes Act ("CDA"), Chevron USA, Inc. ("Chevron") hereby submits its certified claim in the amount of $5,194,204.86 under Contract No. DLA600-90-D-0531 between Chevron and the Defense Fuel Supply Center ("DFSC"). Chevron requests a final decision on its claim within sixty days.

## I. INTRODUCTION

Chevron and DFSC[1] entered into Contract No. DLA600-90-D-0531 ("the Contract") in 1990. (Ex. 1.) The Contract provided for Chevron to deliver JP-4 at its refineries in Pearl City, Hawaii, El Segundo, and Richmond, California. (Ex. 1, at 2.) The Contract established initial prices for delivering JP-4 and provided that these prices could be adjusted during the contract period under DFSC's standard economic price adjustment clause. (Ex. 1, at 4-6.)

DFSC's price adjustment clause, designated "Clause B19.33," permitted the prices Chevron received for fuel to be adjusted by as much as eighty percent of the original contract price. (Ex. 1, at 6.) Price adjustments were made monthly based on changes in indexes of sales of petroleum products published by the Department of Energy in the *Petroleum Marketing Monthly* (hereafter "PMM indexes"). (Ex. 1, at 5-6.)

DFSC used the PMM indexes to make price adjustments even though the Department of Energy did not design or intend for the PMM indexes to be used to set or adjust prices,[2] and despite that the PMM indexes were not appropriate for this purpose. Indeed, in awarding fuel contracts, DFSC maintained that use of its price adjustment clause and the PMM indexes was nonnegotiable.

---

[1] DFSC subsequently was renamed the Defense Energy Support Center ("DESC"). For simplicity, the designation "DFSC" is used throughout.

[2] Testimony of Dr. John Cook, Director of the Petroleum Marketing Division of the Department of Energy's Energy Information Administration.

## II. DFSC'S PRICE ADJUSTMENT CLAUSE WAS ILLEGAL

In *Barrett Refining Corp. v. United States*, 242 F.3d 1055 (Fed. Cir. 2001), the United States Court of Appeals for the Federal Circuit found that DFSC's "standard price adjustment clause . . . was unenforceable because it failed to comply with the Federal Acquisition Regulations." *Id.* at 1058. In holding DFSC's price adjustment clause to be "unauthorized and unenforceable," the Federal Circuit adopted the rationale in *MAPCO Alaska Petroleum, Inc. v. United States*, 27 Fed. Cl. 405 (1992), where the United States Court of Federal Claims first held DFSC's price adjustment clause to be illegal. *Id.* at 1058, 1060 & n.2.

In *MAPCO*, the supplier had a one-year contract with DFSC to deliver JP-4, DFA, and MUR. 27 Fed. Cl. at 406. The contract contained DFSC's price adjustment clause B19.33, the same clause used in Chevron's contract, which provided for fuel prices to be adjusted based on changes in specified PMM indexes. *Id.* During the contract, the price adjustment clause reduced fuel prices by thirty-five percent, while crude oil prices rose by ninety-five percent. *Id.* at 407. The supplier sustained a $10 million loss under the contract.

The court in *MAPCO* found that the supplier sustained this loss because DFSC's price adjustment clause "did not divide the risk of economic uncertainty between the parties" as the Federal Acquisition Regulation ("FAR") required. *Id.* at 408, 412. The court held that the FAR, in order to protect contractors, authorizes prices to be adjusted in only one of three ways. *Id.* at 408, 414. The PMM indexes, the court held, did not adjust prices in an authorized way. *Id.* at 408-11.

As the court explained, FAR § 16.203-1 provides:

> Description.
>
> A fixed-price contract with economic price adjustment provides for upward and downward revision of the stated contract price upon the occurrence of specified contingencies. Economic price adjustments are of three general types:
>
> (a) *Adjustments based on established prices.* These price adjustments are based on increases or decreases from an

> agreed upon level in published or otherwise established prices of specific items or the contract end items.
>
> (b) *Adjustments based on actual costs of labor or material.* These price adjustments are based on increases or decreases in specified costs of labor or material that the contractor actually experiences during contract performance.
>
> (c) *Adjustments based on cost indexes of labor or material.* These price adjustments are based on increases or decreases in labor or material cost standards or indexes that are specifically identified in the contract.

27 Fed. Cl. at 408.

In considering whether DFSC's price adjustment clause complied with these provisions, the court initially held that DFSC's use of the PMM indexes did not provide for price adjustments based on established prices, as set forth in FAR § 16.203-1(a), because price adjustments were based on an average of market prices and not on the contractor's own established prices. 27 Fed. Cl. at 408-11. The court then held that DFSC's use of the PMM indexes did not provide for price adjustments based on actual costs, as set forth in FAR § 16.203-1(b), because price adjustments were not based on costs. *Id.* Finally, the court held that DFSC's use of the PMM indexes did not provide for price adjustments based on cost indexes, as set forth in FAR § 16.203-1(c), because adjustments were based on an index of prices, not costs. *Id.*

Because DFSC's use of the PMM indexes did not adjust prices in one of the three ways authorized by the FAR, the court held that DFSC's price adjustment clause was illegal. *Id.* at 408. The Court admonished DFSC that, where the government violates the law in pricing a contract, "the government cannot, by law, benefit from it." *Id.* at 408 (quoting *Beta Systems, Inc. v. United States*, 838 F.2d 1179, 1185 (Fed. Cir. 1988)); *see generally LaBarge Products, Inc. v. West*, 46 F.3d 1547, 1552-53 (Fed. Cir. 1995) (a contractor may "seek reformation of its price

term, even after performance, if that term was allegedly diminished by unlawful government acts").

As a result of the decision in *MAPCO*, DFSC has been forced to concede the illegality of its price adjustment clause in the Federal Circuit, the United States Court of Federal Claims, and the *Federal Register*. *Barrett Refining Corp. v. United States*, 242 F.3d 1055, 1060 (Fed. Cir. 2001) (reflecting DFSC's contention that it made payments under the illegal price adjustment clause by mistake); *Phoenix Petroleum v. United States*, No. 98-5124, 1999 U.S. App. LEXIS 16939 at * 5 (Fed. Cir. July 23, 1999); *Pride Companies, L.P. v. United States*, No. 95-597C (Fed. Cl. May 10, 2000); *Gold Line v. United States*, 43 Fed. Cl. 291, 292 (1999); 64 Fed. Reg. 41,834 (Aug. 2, 1999).[3]

---

[3] In addition to violating the FAR's restrictions on price adjustments, DFSC violated the law in several other respects in awarding Chevron's contract. Most notably, DFSC awarded the contract pursuant to an illegal auction. Under DFSC contract clauses providing for preferential evaluation and consideration of bids submitted by small and small disadvantaged businesses, DFSC disclosed to small and small disadvantaged businesses the amount of the lowest bids submitted. Small and small disadvantaged businesses were then permitted to match these bids (sometimes within ten percent). Such an auction violated the Office of Federal Procurement Policy Act, 41 U.S.C. § 423 (1990), and FAR 15.610(e). In *LaBarge Products, Inc. v. West*, 46 F.3d 1547 (Fed. Cir. 1995), the Federal Circuit held that an auction violating these provisions rendered a contract illegal. *Id.* at 1552-53.

In addition, DFSC did not award the contract in compliance with DFAR § 252.219-7001. Contrary to the requirements of this provision, DFSC did not award the portions of the procurement for large businesses before awarding the portion of the procurement set aside for small and small disadvantaged businesses. Nor did DFSC re-solicit to large businesses the portions of the procurement set aside for, but not ultimately awarded to, small and small disadvantaged businesses.

Finally, contrary to the Supreme Court's decision in *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995), DFSC's extension of preferences to small disadvantaged businesses violated the equal protection component of the Fifth Amendment's due process clause, because they were not narrowly tailored measures that furthered compelling government interests through remedying prior harms or otherwise. *See also Adarand Constructors, Inc. v. Mineta*, 121 S. Ct.

*(Footnote cont'd on next page)*

## III. CHEVRON IS ENTITLED TO BE PAID THE FAIR MARKET VALUE OF THE FUEL IT SUPPLIED

The Federal Circuit has held that suppliers of fuel to DFSC are entitled to be paid the fair market value of the fuel they delivered under contracts containing DFSC's illegal price adjustment clause. *Barrett Refining Corp. v. United States,* 242 F.3d 1055 (Fed. Cir. 2001); *see also Pride Companies, L.P. v. United States,* No. 95-597C, (Fed. Cl. May 10, 2000). A number of different legal theories support Chevron's right to be paid the fair market value of the fuel it supplied to DFSC. Each of these legal theories is discussed separately below.

### A. Illegality

Where the government violates the law in pricing a contract, a contractor is entitled to "equitable relief." *Gould, Inc. v United States*, 935 F.2d 1271, 1275 (1991). The government's violation of the law gives rise to three different equitable remedies: *quantum valebant*, reformation, and rescission and restitution.

*Quantum valebant* permits recovery of the fair market value of goods delivered under an illegal contract. *Urban Data Systems v. United States,* 699 F.2d 1147, 1155 (Fed. Cir. 1983). In *Barrett*, the Federal Circuit affirmed an award of *quantum valebant* to a DFSC supplier for fuel delivered under DFSC's illegal price adjustment clause. 242 F.3d at 1059-61. The Federal Circuit expressly upheld the lower court's finding that "'once the unauthorized [price escalation]

*(Footnote cont'd from previous page.)*

1401 (2001) (granting *cert.* to review the lower court's implementation of the Supreme Court's original *Adarand* decision).

All of these illegalities affected the contract price Chevron received and entitle Chevron to be paid the fair market value of the fuel it delivered to DFSC under the same legal theories and in the same amounts applicable to Chevron's recovery for DFSC's illegal price adjustment clause.

clause is struck out, . . . [the] express contract simply incorporates an implied-in-fact promise by the government to pay at least fair market value for the fuel delivered.'" *Id.* at 1059 (brackets and ellipses original).

Consistent with the holding in *Barrett*, in *Pride*, a DFSC supplier recovered $45 million in *quantum valebant* because of DFSC's illegal price adjustment clause. *Pride*, slip op. at 8. Similarly, in *Gold Line*, the court upheld the supplier's right to recover *quantum valebant*, although the amount of recovery was left for further proceedings. *Gold Line*, 43 Fed. Cl. at 296. Like the suppliers in *Barrett*, *Pride* and *Gold Line*, Chevron is entitled to recover under *quantum valebant* the fair market value of the fuel it supplied to DFSC. *See generally Phoenix Petroleum*, No. 98-5124, 1999 U.S. App. LEXIS 16939, at *5 (noting that "other parties have since prevailed before the Court of Federal Claims in recovering government underpayments stemming from illegal application of B19.33 [DFSC's illegal price adjustment clause]").[4]

Alternatively, where the government violates the law in pricing a contract, a contractor may seek to reform the contract price. In *Beta Systems, Inc. v. United States*, 838 F.2d 1179 (Fed. Cir. 1988), the government used an illegal price adjustment clause and the Federal Circuit held that "reformation was appropriate." *Id.* at 1186. In *LaBarge Products, Inc. v. West*, 46 F.3d 1547 (Fed. Cir. 1995), the government allegedly established the price of a contract through an illegal auction. *Id.* at 1552. The Federal Circuit held that the contractor could "seek reformation

[4] The holding in *Northrop Grumman Corp. v. United States*, 47 Fed. Cl. 20, 40-41 (Fed. Cl. 2000), that the Court of Federal Claims lacks jurisdiction to award recovery under *quantum valebant* was overruled in *Barrett Refining Corp. v. United States*, 242 F.3d at 1059-61. *See also AT&T v. United States*, 177 F.3d 1368, 1374 (Fed. Cir. 1999); *Clark v. United States*, 95 U.S. 539, 542 (1877); *Crocker v. United States*, 240 U.S. 74, 81 (1916); *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 566 n.22 (1961). Indeed, the government was compelled to stipulate to recovery under *quantum valebant* in *Pride*.

of its price term, even after performance, if that term was allegedly diminished by unlawful government acts." *Id.* at 1552-53. In *Gold Line*, the court expressly held that reformation was an available remedy for DFSC's illegal price adjustment clause. *Gold Line*, 43 Fed. Cl. at 298. As in *LaBarge*, *Beta Systems*, and *Gold Line*, Chevron is entitled to reform the price of its contract to reflect the fair market value of the fuel it supplied.

Finally, where the government violates the law in pricing a contract, the contractor may rescind the contract and recover restitution. *See* 6A Arthur Linton Corbin, *Corbin on Contracts*, § 1540 (1962). The measure of Chevron's restitution is the fair market value of the fuel it delivered to DFSC. *Id.*[5]

### B. Misrepresentation

A misrepresentation is an assertion not in accordance with the facts. *Morris v. United States*, 33 Fed. Cl. 733 (1995) (citing *Restatement (Second) of Contracts* § 159). It may be expressed through words or conduct or may occur where a party failed to disclose facts that related to a basic contract assumption. *Restatement (Second) of Contracts* §§ 159, 161.

A misrepresentation is actionable if it is either "material" or "fraudulent." *Badgley v. United States*, 31 Fed. Cl. 508, 514 (1994) (citing *Restatement (Second) of Contracts* § 164); *CTA Incorporated v. United States*, 44 Fed. Cl. 684, 698 (1999) (same). A material misrepresentation is one that is reasonably likely to induce assent, whereas a fraudulent

[5] The remedy of rescission and restitution is equally available before and after completion of performance. *Aluminum Company of America v. Essex Group, Inc.*, 499 F. Supp. 53, 78 (W.D. Pa. 1980) ("where one or both parties have performed under the supposed contract, the courts award appropriate restitution in light of the benefits the parties have conferred on each other"); G. Palmer, II *Law of Restitution* § 8.6 at 206 (1979) ("If both parties were mistaken as to the facts making the transaction illegal, restitution should be granted . . . no policy justifies denial of relief to the faultless party when the other party has been unjustly enriched.").

misrepresentation is a knowing or recklessly made misrepresentation. *Restatement (Second) of Contracts* § 162. A fraudulent misrepresentation is actionable even if not material. *Restatement (Second) of Contracts* § 164 cmt. b.

DFSC's award of the contract was an affirmative misrepresentation that the contract complied with the law. *See Northrop Grumman Corp. v. United States*, No. 97-276C, slip op. at 11-13 (Fed. Cl., Dec. 20, 1999) (rejecting the government's assertion that the award of an allegedly illegal contract constituted "no affirmation of fact or promise" sufficient to create a warranty that the Navy complied with the FAR in awarding the contract). In addition to this affirmative misrepresentation, DFSC's failure to disclose its violation of the law was a misrepresentation because the legality of the contract was a basic contract assumption. *See Restatement (Second) of Contracts* §§ 159 cmt. a, 160-161 (1981). Furthermore, through awarding the contract, DFSC affirmatively misrepresented and otherwise failed to disclose that the Department of Energy had not designed or intended for the PMM indexes to be used to set or adjust prices.

These material and/or fraudulent misrepresentations by DFSC (including by the contracting officer) were relied upon by Chevron and induced Chevron to enter the contract. DFSC's misrepresentations entitle Chevron to be paid the fair market value of the fuel it delivered to DFSC, whether by way of rescission and restitution, damages, or reformation. *See T. Brown Constructors, Inc. v. Pena*, 132 F.3d 724, 728 (Fed. Cir. 1997) (damages); *Rosenberg Lumber Co. v. Madigan*, 978 F.2d 660, 665-67 (Fed. Cir. 1992) (rescission and restitution and reformation).

**C. Breach of Contract**

When DFSC entered the contract, it had a contractual obligation to comply with the law. *Slagan v. John Whitman & Assoc.*, No. 97-3961, 1997 U.S. Dist. LEXIS 14146, *10-11 (E.D. Pa. Sept. 10, 1997); *Hartzell v. Burdick*, 398 N.Y.S.2d 649, 650 (1997). When DFSC violated the FAR by using an illegal price adjustment clause, DFSC breached the contract. *Id.*

In *Northrop Grumman Corp. v. United States*, No. 97-276C (Fed. Cl., Dec. 20, 1999), the contractor alleged that the Navy's award of a fixed-price development contract in violation of the FAR was a breach of contract. *Id.* slip op. at 11. The court held that the contractor's breach of contract claim could proceed to trial, rejecting the government's assertion that the Navy's award of the contract constituted "no affirmation of fact or promise necessary" to support a breach of contract claim. *Id.* slip op. at 11-13.

Like the Navy's alleged breach in *Northrop Grumman*, DFSC breached the contract by violating the FAR. *Id.*; *see also Slagan*, 1997 U.S. Dist. LEXIS 14146, *10-11; *Hartzell*, 398 N.Y.S.2d at 650. Because DFSC breached the contract, Chevron is entitled to be paid the fair market value of the fuel it delivered to DFSC, whether by way of rescission and restitution or damages. *See Estate of Berg v. United States*, 687 F.2d 377, 379 (Ct. Cl. 1982) (damages); *Resolution Trust Corp. v. Federal Savings and Loan Ins. Corp.*, 25 F.3d 1493, 1504-06 (10th Cir. 1994) (rescission and restitution).

**D. Failure of Consideration**

A claim of "failure of consideration exists wherever one who has promised to give some performance fails, without his fault, to receive in some material respect the agreed exchange for that performance." *Williston on Contracts* § 814 (3d Ed.) (1962); *see also City of New York v. United States*, 106 Ct. Cl. 141, 151 (1946). The doctrine of failure of consideration supports

contractual relief even in the absence of a breach of contract and without regard to the fault of the non-performing party. *Aerojet-General Corp. v. Askew*, 453 F.2d 819, 831 (5th Cir. 1971) (quoting *Corbin on Contracts*). A failure of consideration may occur "with reference to the formation of the contract or with reference to its performance." Walter H.E. Jaeger, *Williston on Contracts* § 814, p. 16.[6]

In *Davis Airfoils, Inc. v. United States*, 124 F. Supp. 350 (Ct. Cl. 1954), a patent was declared invalid during the term of a license agreement. *Id.* at 353. The Court of Claims found a failure of consideration because the subject matter of the contract never lawfully existed. *Id.* Similarly, in *Louisiana v. Wood*, 102 U.S. 294 (1880), the Supreme Court upheld a claim of failure of consideration by a purchaser of illegally-issued bonds. The Court held that "[t]he consideration on which the payment was made has failed, because the bonds were not, in fact, valid obligations of the city." *Id.* at 298.

Here, as in *Davis Airfoils* and *Wood*, compliance with the law was a material part of the consideration for entering the contract. Like the illegalities in *Davis Airfoils* and *Wood*, the illegality in Chevron's contract caused consideration to fail. *Davis Airfoils*, 124 F. Supp. at 353; *Wood*, 102 U.S. at 298. In addition, a material part of the consideration for the contract was that the PMM indexes were designed and intended to be used to set or adjust prices. The fact that the

---

[6] While the Federal Rules of Civil Procedure recognize that failure of consideration may be raised as an affirmative defense, Fed. R. Civ. P. 8(c), failure of consideration also may be raised as an affirmative claim for relief. *District of Columbia v. Thompson*, 281 U.S. 25, 32-22 ( 1930); *Louisiana v. Wood*, 102 U.S. 294, 298 (1880); *Woodbury v. District of Columbia*, 92 F.2d 202, 203 (Ct. App. D.C. 1937); *see generally Far West Federal Bank v. Office of Thrift Supervision*, 930 F. 2d 883, 886 (Fed. Cir. 1991) (plaintiff advancing claim with regard to bank conversion agreement on the grounds of failure of consideration).

PMM indexes were not designed and intended to be used to set or adjust prices also caused consideration to fail.[7]

Because there was a material failure of consideration for the contract, Chevron is entitled to rescind the contract and to recover restitution reflecting the fair market value of the fuel it delivered to DFSC. *FDIC v. Air Florida System, Inc.*, 822 F.2d 833, 839 (9th Cir. 1987).

### E. Mutual Mistake

In *Beta Systems, Inc. v. United States*, 838 F.2d 1179 (Fed. Cir. 1988), a contract contained an economic price adjustment clause that violated the DAR, the predecessor regulations to the FAR, because the price adjustment clause did not approximate the changes in the contractor's costs. *Id.* at 1186. Despite this violation of the DAR, the court found that the parties had intended that the contract comply with the law. The court stated:

> The government does not challenge that Beta did not intend to use an index that would effectively eliminate its principal construction material from fair weight in the inflation adjustment. And there is a legal presumption that the government did not intend to use an index that would violate the law as embodied in the DAR.

*Id.* at 1186.

Because both parties intended to comply with the law, the court held the contract could be reformed, stating: "If the contract is in violation of the DAR, and does not meet the

---

[7] In addition, a material purpose and condition of the price adjustment clause and of the contract itself was that the price adjustment clause and the contract comply with the law and result in prices that reflected fair market value. Because the price adjustment clause and the contract did not comply with the law or result in prices that reflected fair market value, the purpose of the contract was frustrated and a condition of the contract failed. Accordingly, Chevron may recover the fair market value of the fuel it delivered to DFSC by way of rescission and restitution. *Office of the Comptroller General of the Republic of Bolivia v. International Promotions and Ventures, LTD*, 618 F. Supp. 202 (S.D.N.Y. 1985); *Unihealth v. U.S. Healthcare, Inc.*, 14 F. Supp. 2d 623 (D.N.J. 1998); *Restatement (Second) of Contracts* § 377 (1979).

requirement that an index be selected that approximately tracks the economic changes affecting this contract, then reformation is appropriate." *Id.*; *see also Gold Line*, 43 Fed. Cl. at 297 (relying on *Beta Systems* to uphold reformation of DFSC's illegal price adjustment clause); *Craft Machine Works*, 90-3 BCA ¶ 23,095, at 115,696 (relying on *Beta Systems* to reform an EPA clause that violated the FAR and replace it with "an alternate interpretation consistent with the parties' intentions and the law").

Here, Chevron intended to enter a contract that complied with the FAR and which resulted in prices that reflected fair market value. If DFSC did not misrepresent or is not otherwise held to know these facts as previously alleged,[8] then DFSC may be presumed as a matter of law to have intended to comply with the FAR when it entered the contract and to have intended to use a price adjustment clause which resulted in prices that reflected fair market value. *Id.*; *see also Barrett Refining*, 242 F.3d at 1062 (DFSC alleged that it made payments under its illegal price adjustment clause "because of a mistake of law.") Had Chevron and DFSC been aware of their mistake, they would not have used DFSC's illegal price adjustment clause.

In addition, when Chevron entered the contract, it was not aware that the Department of Energy had not designed or intended for the PMM indexes to be used to set or adjust prices. If DFSC did not misrepresent or is not otherwise held to know these facts concerning the PMM indexes, then DFSC may be presumed to have been mistaken concerning them. *Id.* Had both Chevron and DFSC been aware of their mistake, they would not have used DFSC's illegal price adjustment clause.

[8] Of course, if DFSC were aware, actually or constructively, of Chevron's mistake concerning DFSC's compliance with the FAR or the design and intent behind the PMM indexes, Chevron may recover on the grounds of a unilateral mistake. *Buesing v. United States*, 42 Fed. Cl. 679, 695 (1999).