Accordingly, because Chevron and DFSC were mutually mistaken about material elements of the price of the contract, Chevron is entitled to reform the contract to correct the parties' mutual mistake and to reflect their intent to provide for payment of the fair market value of the fuel Chevron delivered. *Beta Systems*, 838 F.2d at 1186; *Craft Machine Works*, 90-3 BCA at 115,696.[9] Alternatively, because of the parties' mutual mistake, Chevron may recover the fair market value of the fuel it delivered by way of rescission and restitution. *Rust Engineering Co.*, B-180071, 74-1 CPD ¶ 101 (mutual mistake concerning applicability of state sales tax supports rescission and restitution); Richard A. Lord, *Williston on Contracts* § 12:6 p. 93 (4th Ed.).

### F. Fifth Amendment Taking

The government may grant statutory or regulatory rights relating to contracts with the United States. *United States Trust Company v. New Jersey*, 431 U.S. 1, 18-19, n.14 & n.17 (1977); *Del-Rio Drilling Program, Inc. v. United States*, 146 F.3d 1358, 1364 (Fed. Cir. 1998) (determination of property interests may turn on federal statutes or regulations). Statutory or regulatory rights relating to contracts vest when the contract is entered, and a taking occurs when the government violates these statutory or regulatory rights. *Perry v. United States*, 294 U.S. 330 (1935); *Lynch v. United States*, 292 U.S. 571 (1934); *see generally United States v. Winstar*, 518 U.S. 839, 876 (1996) ("it is clear that the National Government has some capacity to make agreements binding future Congresses by creating vested rights.").

[9] As *Beta Systems* makes clear, reformation is an available remedy even if the mistake might be characterized as involving a mistake of law. 838 F. 2d 1186; *see also Restatement (Second) of Contracts* § 151 cmt. b; *see generally Blackhawk Hotels Co.*, ASBCA No. 13333, 68-2 BCA ¶ 7265 (contractor would be entitled to an equitable adjustment when the government mistakenly represented that the Service Contract Act did not apply to the procurement), *overruled on other grounds, National Line Co.*, ASBCA No. 18739, 75-2 BCA ¶ 11,400.

In *Perry*, Congress authorized the issuance of bonds redeemable in gold, but later sought to alter those redemption rights. 294 U.S. at 346-47. Because the bondholders' statutory rights to redeem in gold had vested upon purchasing the bonds, Congress' subsequently altering the terms of the bonds was held to have effected a taking. *Id.* at 350-54. Similarly, in *Lynch*, Congress authorized the issuance of war risk insurance policies, but later sought to alter the terms of the policies. 292 U.S. at 575-76. Because the insureds' statutory rights vested upon entering the insurance policies, Congress was held to have effected a taking. *Id.* at 579-89.

Like the rights granted by the government in *Perry* and *Lynch*, the FAR granted Chevron and other contractors a right to contracts with prices that could only be adjusted in certain ways. *See MAPCO*, 27 Fed. Cl. at 412 (FAR regulations governing price adjustment clauses intended to protect contractors). This right vested when Chevron entered the contract. *Perry*, 294 U.S. at 330; *Lynch*, 292 U.S. at 576-77.[10] DFSC abrogated Chevron's rights when it awarded the contract with an illegal price adjustment clause. This effected a taking of Chevron's rights compensible under the Fifth Amendment. *Id.*; *see generally Buse Timber & Sales, Inc. v. United States*, 45 Fed. Cl. 258, 264 (1999) ("takings of contracts have been found where the government . . . repudiates debts to save money").[11]

Furthermore, DFSC had no valid right to possession and use of the fuel Chevron delivered. DFSC could only accede to a right of possession under a lawfully valid contract. As

---

[10] The government may not argue that Chevron's rights under the FAR were disposed of when DFSC awarded the contract. "Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them." *Greenbriar v. United States*, 193 F.3d 1348, 1356 (Fed. Cir. 1999) (quoting *Connolly v. Pension Benefit Guarantee Corp.*, 475 U.S. 211, 223-24 (1986)).

[11] The fact that DFSC violated the law in connection with taking Chevron's rights does not preclude a takings claim. *Del-Rio Drilling*, 146 F.3d at 1361-64.

the Court of Federal Claims held in *Integrated Logistics Support Systems International, Inc. v. United States*, 42 Fed. Cl. 30 (1998), it is "upon the transfer of property to the Government pursuant to a *lawfully executed* bilateral agreement, [that] the Government cannot be compelled to render just compensation for the alleged taking of such property." *Id.* at 33-34 (emphasis added). The court similarly stated in *Scan-Tech Security, L.P. v. United States,* 46 Fed. Cl. 326 (2000), it is only "when the Government asserts its interest in property obtained *pursuant to a valid contract*, [that] no taking occurs." *Id.* at 341 (emphasis added).

Here, the price term of Chevron's contract was not lawfully valid. DFSC's payment of a price term that was not lawfully valid did not confer on DFSC a fully supporting right to possess and use the fuel: for the payment of a lawful price is the *quid pro quo* for receiving title. *Heydt v. United States*, 38 Fed. Cl. 286, 305 (1997) (a taking occurs when the government "controls rights or property which have not been purchased"). Because DFSC took possession of and used the fuel without a fully supporting claim of right, Chevron has a valid takings claim. *Integrated Logistics Support Systems International*, 42 Fed. Cl. at 33-34; *Scan-Tech Security*, 46 Fed. Cl. at 341. Indeed, courts have consistently held that a "taking occurs when the rightful property, *contract*, or regulatory powers of the government are employed to control rights or property which have not been purchased." *Heydt*, 38 Fed. Cl. at 305 (emphasis added).[12]

[12] The mere existence of a contract, of course, cannot preclude a takings claim. As the Court of Federal Claims held in *Integrated Logistics Support*: "That the circumstances confronting plaintiff involve an express contract with the Government is not fatal to plaintiff's Count IV taking claim." 42 Fed. Cl. at 34. Thus, it has long been recognized that, where the government fails to vacate leased property upon termination of a lease, the lessor may assert alternative claims for breach of contract or a Fifth Amendment taking. *Prudential Insurance Co. v. United States*, 801 F.2d 1295, 1300 n.13 (Fed. Cir. 1986); *Allenfield Associates v. United States*, 40 Fed. Cl. 471, 487 (1998).

*(Footnote cont'd on next page)*

Because DFSC effected a taking of Chevron's rights under the Fifth Amendment, Chevron is entitled to compensation based on the fair market value, inclusive of interest, of the fuel it delivered under the contract. *See United States v. Sioux Nation of Indians*, 448 U.S. 371 (1980); *Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299 (1923).[13]

*(Footnote cont'd from previous page.)*

Whether the government's interference with a citizen's property rights gives rise to a takings claim, contractual remedies, or both depends on the circumstances of the interference. *Integrated Logistics Support Systems International, Inc.*, 42 Fed. Cl. at 33-34. However, "[t]aking claims are not presumed to be foreclosed by claims for breach of express contract merely because the claims share the same factual background." *Id.* at 34; *see also Medina Construction v. United States*, 43 Fed. Cl. 537, 559 (1999) (stating that plaintiff "might be able to establish facts sufficient to support a Fifth Amendment taking claim as an alternative to its contract claims against the Government.").

[13] Neither the statute of limitations nor the doctrines of laches or waiver preclude Chevron's claim. The six-year statute of limitations under the CDA was not enacted until October 1995, and does not apply retroactively. *Motorola, Inc. v. West*, 125 F.3d 1470, 1472-73 (Fed. Cir. 1997); FAR § 33.206. Prior to 1995, there was no statute of limitations under the CDA. *Motorola*, 125 F.3d at 1472; *S.E.R., Jobs for Progress, Inc. v. United States*, 759 F.2d 1, 5 (Fed. Cir. 1985); *Dalton v. Sherwood Van Lines, Inc.*, 50 F.3d 1014, 1017 (Fed. Cir. 1995); *Do-Well Machine Shop, Inc. v. United States*, 870 F.2d 637, 639-40 (Fed. Cir. 1989).

In addition, the doctrine of laches does not preclude Chevron's claim because DFSC has not suffered prejudice from any unreasonable delay. *See Jana, Inc. v. United States*, 936 F.2d 1265, 1269-70 (Fed. Cir. 1991); *see also Cupey Bajo Nursing Home, Inc. v. United States*, 36 Fed. Cl. 122, 127 n.8 (1996). All of the data needed to determine what Chevron was paid and the fair market value of the fuel Chevron delivered is readily available. Indeed, DFSC just completed litigating claims from this same period in *Pride* and raised no claim of unreasonable delay or prejudice.

Finally, the doctrine of waiver does not bar Chevron's claim. Chevron was not aware of nor could it as a matter of law have waived DFSC's violation of the FAR. In *Beta Systems*, the Federal Circuit rejected the government's assertion that the contractor waived violation of regulations governing price adjustment clauses when, after objecting to the provisions, the contractor nonetheless accepted the price adjustment. The Federal Circuit held:

> The government's insistence during negotiations on use of Section H-8 in its entirety, and the contractor's acquiescence, does not immunize the government from the consequences of failure of the EPA [economic price adjustment] clause to comply with the law stated in the DAR. . . . The risk of unintentional

*(Footnote cont'd on next page)*

## IV. CHEVRON IS ENTITLED TO RECOVER $5,194,204.86

Chevron is entitled to be paid the fair market value of fuel it supplied to DFSC under each of the legal theories discussed above. The proper methodology for determining the fair market value of fuel Chevron supplied to DFSC under the illegal fuel price adjustment clause was established in *Pride Companies, L.P. v. United States*, No. 95-597C (Fed. Cl. May 10,

---

*(Footnote cont'd from previous page.)*

> failure of a contract term to comply with a legal requirement does not fall solely on the contractor. If the BLS index that was selected does not comply with DAR 3-404.3(c)(3)c.5, even approximately, it is not controlling whether or not *Beta* or the government foresaw, or accepted the risk of failing to foresee, this defect in the index.

*Beta Systems*, 838 F.2d at 1185 (paragraphing omitted).

In *LaBarge*, the Federal Circuit rejected the government's assertion that the contractor waived a violation of the regulations prohibiting auctions. The Federal Circuit held:

> [I]f government officials make a contract they are not authorized to make, in violation of a law enacted for the contractor's protection, the contractor is not bound by estoppel, acquiescence or failure to protest. In cases in which a breach of law is inherent in the writing of the contract, reformation is available despite the contractor's initial adherence to the contract provision later shown to be illegal.

*LaBarge*, 46 F.3d at 1552-53 (citation omitted).

The principles underlying the rule that an illegality in a contract cannot be waived were articulated more than a century ago by the Supreme Court as follows:

> Whenever the illegality appears, whether the evidence comes from one side or the other, the disclosure [of the illegality] is fatal to the case. No consent of the defendant can neutralize its effect. A stipulation in the most solemn form to waive the objection would be tainted with the vice of the original contract, and void for the same reasons.

*McMullen v. Hoffman*, 174 U.S. 639, 658 (1899); *see also Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 81 n.6 (1982) ("and if it be suggested that Kaiser should not have waited so long to assert its defense [of illegality], the Court has held that 'rules of estoppel will not be permitted to thwart the purposes of the laws of the United States.'")

2000). Applying the fair market value methodology established in *Pride*, Chevron is entitled to recover $5,194,204.86, plus interest.

### A. Claim Methodology

The court in *Pride* explained the legal standard for determining fair market value for the fuel delivered under DFSC's illegal price adjustment clause as follows:

> We do not calculate damages as though the contract divided the risk of economic uncertainty properly, or speculate how Pride might have bid the contract with an appropriate EPA [economic price adjustment] provision. We must determine what defendant would have paid for the fuel irrespective of Pride's contract.

*Id.* slip op. at 2-3.

The fair market value, the court held, was "the value of the product to the government." *Id.* at 3. The value to the government was "not based on costs or a reasonable return on investment of the seller, but on the reasonable value in the marketplace of the property sold." *Id.* (quoting *Cities Service Gas Co. v United States*, 500 F.2d 448, 457 (Ct. Cl. 1974)); *see also Urban Data Systems*, 699 F.2d at 1155.[14]

To determine fair market value, the court first determined the value of the fuel on the Gulf Coast, the refining center of the United States. *Pride,* slip op. at 3. More specifically, the court determined the value of fuel at the mouth of the Explorer Pipeline, which is the pricing point for the Gulf Coast spot market and the location where DFSC maintains its largest Defense Fuel Supply Point ("DFSP Houston").

[14] While the court in *Pride* determined fair market value in conjunction with an award of *quantum valebant*, the methodology the court adopted is equally applicable to determination of fair market value under the other legal theories of recovery Chevron advances.

To calculate the dollar value of the fuel on the Gulf Coast, the court used U.S. Gulf Coast Average Spot prices as published in Platts for the analogous commercial fuel or mix of commercial fuels DFSC purchased. *Id.* at 3-5.[15] To reflect the one-year term of DFSC's contracts, as opposed to a one-time spot sale as reflected in Platts, the court added a long-term contract premium.[16] *Id.*

Because DFSC did not purchase the fuel from Pride on the Gulf Coast but rather at specific military facilities, the Court in *Pride* added to the value of the fuel as calculated on the Gulf Coast the transportation rates from the Gulf Coast to each military facility. *Id.* at 5-7. The

---

[15] It may well be appropriate to calculate the value of the fuel on the Gulf Coast by using Platts U.S. Gulf Coast Spot High prices rather than, as the Court did in *Pride*, by using Platts U.S. Gulf Coast Spot Average prices. While Chevron is using Platts Spot Average prices in its claim, Chevron's use of these prices should not be construed as a concession that using Platts Spot Average prices is more appropriate than using Platts Spot High prices.

[16] Chevron uses a total long-term contract premium of $.05, which reflects the $.03 premium for commercial contracts found in *Pride* and an additional $.02 premium for DFSC contracts. *See Pride* slip op. at 3-5. As Mr. Kenneth Riley, former Vice President of ARCO Petroleum Products Company, and Mr. George West, former Business Manager of Distillate and Residual Products for Shell, testified in *Pride*, DFSC's contracts contain an additional $.02 premium above that for commercial contracts because of DFSC's more restrictive contract requirements. While this testimony was presented in *Pride*, the court was not asked nor did it have occasion to address this additional premium for DFSC contracts. This $.05 premium also is supported by the unique refining requirements of DFSC fuels that are not required for commercial fuels.

In addition, while the amount of the long-term premium may have varied during the overall period subject to claim $.05 is an appropriate average. Similarly, while market relationships between suppliers and commercial airlines began to change in the 1990s, in terms both of the backward integration and use of spot formula pricing, the relationship between DFSC and its suppliers has not fundamentally changed, nor has the amount of the appropriate long-term premium for DFSC contracts.

court used DFSC's own transportation rates from DFSP Houston to the military facilities where the fuel was purchased. *Id.*[17]

Chevron uses this same methodology established in *Pride* to calculate the amount of its claim. Indeed, because DFSC supported the methodology adopted by the court in *Pride* for determining the fair market value, the government is judicially estopped from subsequently challenging this methodology. *Reynolds v. Comm'r of Internal Revenue*, 861 F.2d 469 (6th Cir. 1988).

**B. DFSC's Right To Offset**

In *Barrett Refining Corp. v. United States*, 242 F.3d 1055 (Fed. Cir. 2001), the Federal Circuit held that DFSC could assert an offset *ex aequo et bono*. *Id.* at 1062-64. DFSC's offset is subject to a supplier's claim for fair market value and may not reduce the effective price of a delivery below the initial bid price. *Id.* at 1062, 1064-65.

DFSC's right to offset is intimately related to a supplier's right to recover the fair market value of the fuel it supplied. Thus, in *Barrett*, the Federal Circuit affirmed the Court of Federal Claims' holding that, once DFSC's illegal price adjustment clause is "struck out" of the contract, the "express contract simply incorporates an implied-in-fact promise by the government to pay at least fair market value for the fuel delivered." *Id.* at 1059. It was because payments under the contract were "at least partially unauthorized," that the price term of the contract was replaced by

[17] DFSC transports the overwhelming majority of the fuel it purchases. Accordingly, when DFSC awards contracts each year, it calculates the price of transporting fuel, *inter alia*, from DFSP Houston to the relevant military facilities. DFSC evaluates all available modes of transportation – *e.g.*, truck, tank car, pipeline, or barge – and selects the least-price transportation option. The results of DFSC's evaluation of the least-price transportation option are included in the computer printout of DFSC's bid evaluation model, which is made available to suppliers. These are the transportation rates the court used in *Pride* and that Chevron uses here.

an implied-in-fact contract, which the court affirmed the "parties' inten[ded] to provide for fair market-value consideration of pricing." *Id.* at 1060, 1062.[18]

It was this same invalidity of the contract's pricing term, the Federal Circuit held, that gave rise to DFSC's right to an offset for unauthorized payments: Because "the payments made by the government were based on an illegal price escalation clause and, thus, were unauthorized

[18] In *Barrett*, the Federal Circuit stated that it was "unwilling to restrict the trial courts to any single basis for determining fair market value." *Id.* at 1061 (quoting *Seravalli v. United States*, 845 F.2d 1571, 1575 (Fed. Cir. 1988)). Accordingly, while the lower court in *Barrett* measured recovery by adjusting the supplier's initial bid price based on changes in Platts, this methodology is not controlling or appropriate in other cases.

Indeed, the methodology used in *Barrett* is fundamentally flawed. Both parties' expert economists agreed in *Pride* that, because the bid price and price adjustment clause are linked, the illegality in the price adjustment clause affected the level of the initial bid prices. This inextricable link between the bid price and the price adjustment clause was acknowledged by Court of Federal Claims in *Barrett,* which found: "The government's insertion of the Platt's index into the EPA clause of the original contract [in place of the PMM index] would have created a different set of risks for prospective bidders, in turn triggering different bids than those actually submitted by offerors." *Barrett Refining Corporation v. United States*, 45 Fed. Cl. 166, 171 (1999), *aff'd*, 242 F.3d 1055 (Fed. Cir. 2001). Because the bid price and the illegal price adjustment clause are linked, use of the initial bid price in *Barrett* effectively and incorrectly incorporated the effects of DFSC's violation of the law into the fair market value calculation.

Furthermore, the Court of Federal Claims justified its methodology on the grounds that the supplier received special preferences as a small disadvantaged business. *Barrett Refining Corporation v. United States*, 42 Fed. Cl. 128, 134-35 (1998). The court held that the benefits of these special preferences could not be preserved without using the supplier's initial bid price in calculating fair market value. *Id.* The Federal Circuit relied on this justification in affirming the lower court's decision, stating: "Barrett qualified as a small disadvantaged business ("SDB") that, in accordance with an elaborate system of SDB preference factors, affected the base price of these contracts." *Barrett*, 242 F.3d at 1058. This fundamental justification for using the initial bid price, despite the lower court's unchallenged finding that the bid price was linked to the illegal price adjustment clause, has no relevance to Chevron's claim. *Id.* at 1059 (quoting *Seravalli v. United States*, 845 F.2d 1571, 1575 (Fed. Cir. 1988) for the principle that "'trial courts necessarily must have considerable discretion to select the method of valuation that is most appropriate in light of the facts of the particular case'").

. . . the government has a right to seek and recover the unauthorized payments it made." *Id.* at 1064.

The Federal Circuit made clear, however, that DFSC's right to offset the amount of the payments made did not extinguish a supplier's right to recover fair market value under the contract's implied pricing term. The court expressly admonished that DFSC's right to offset is "subject to [the supplier's] claim for fair market value," and held that "no award to the government could be so large that it reduced [the supplier's] recovery below fair market value." *Id.* at 1062, 1064. Moreover, the supplier only could be ordered to "refund payments made in excess of the base [or bid] price," an equitable principle that precludes DFSC's overreaching. *Id* at 1065.[19]

In calculating its claim, Chevron affords DFSC all appropriate offsets as provided in *Barrett*. Chevron calculates the price of each delivery based on fair market value without regard to whether fair market value is greater or lesser than the payments made. Where fair market value falls below the bid price, however, the price of the delivery is deemed to be the initial bid price.[20]

---

[19] This equitable principle, which established the bid price as a floor to a supplier's recovery, must apply without regard to whether the payments made are greater or lesser than fair market value, inasmuch as the impact of DFSC's violation of the law on the payments made cannot control the measure of recovery or the equitable principles applicable thereto.

[20] Chevron does not concede DFSC's right to an offset, or any other claim, nor does Chevron waive any defense to such an offset.

### C. Claim Calculation

The court in *Pride* calculated the fair market value of JP-4 using the following formula:

> .70 (Houston spot price for naphtha) + .30 (Houston spot price for kerojet[21]) + (long-term contract premium) + (DFSC's transportation rate to the point of delivery)

*Pride*, slip op. at 3. Chevron uses this same formula to calculate the fair market value of the JP-4 it delivered to DFSC.

Similar to the Court in *Pride,* Chevron uses for the day of each delivery Platts Los Angeles Spot Price Average for naphtha[22] and Platts Los Angeles Average Pipeline Spot Price for kerojet for El Segundo deliveries.[23] For Pearl City and Richmond deliveries, Chevron uses Platts San Francisco Spot Price Average for naphtha and Platts San Francisco Average Pipeline Spot Price for kerojet. Chevron includes in the formula the cost associated with the contractually required additive FSII at the rate set forth in the contract.[24] DFSC purchased all JP-4 at Chevron's Pearl City, El Segundo, and Richmond refineries, and, following the methodology in

---

[21] This weighted average of the price of naphtha and kerojet reflects the composition of JP-4.

[22] In order to construct Los Angeles and San Francisco naphtha prices, Chevron compared the relationship between U.S. Gulf Coast spot prices for naphtha and unleaded gasoline. Chevron then applied the differential between these two spot prices to the Los Angeles and San Francisco spot prices for unleaded gasoline.

[23] Where Platts did not publish a price on the day of delivery, Chevron uses an average of the first available price for the days immediately before and after the day of delivery.

[24] Although Chevron uses the rate for FSII set forth in the contract, Chevron notes that the fair market value of FSII may be materially higher.

In addition, Modification P00001 amended line item 0501 to include FSII for Pearl City deliveries. Chevron uses the effective date of the modification to determine the inclusion of additive cost and appropriate bid price for Pearl City deliveries. Chevron reserves the right to supplement its claim should additional information become available.

*Pride,* Chevron uses DFSC's own transportation rates from DFSP San Pedro to El Segundo,[25] and DFSP Ozol to Pearl City and Richmond. Chevron applies all appropriate offsets and equitable principles of recovery as established in *Barrett.*

As set forth in Exhibit 2, the fair market value of the JP-4 Chevron delivered to DFSC is $157,822,660.98. As set forth in Exhibit 3, Chevron was paid $152,628,456.12 for these deliveries.[26] Accordingly, the amount of Chevron's claim, represented by the difference between the fair market value of the JP-4 it delivered and what it was paid, is $5,194,204.86.

## V. CONCLUSION

DFSC's price adjustment clause B19.33 violated the FAR and was illegal. Chevron is therefore entitled to recover the fair market value of the fuel it supplied and submits a certified claim for $5,194,204.86, plus interest.[27]

---

[25] DFSC's bid evaluation model did not include a transportation rate from El Segundo to Los Angeles. Chevron uses the rate in DFSC's bid evaluation model for transportation from DFSP San Pedro to El Segundo, which DFSC lists as zero. Chevron reserves the right to supplement its claim with a more appropriate rate if it becomes available.

[26] Calculation of the amount Chevron was paid under the Contract is based on Chevron's electronic invoice data.

[27] Chevron's certification of its claim under the Contract is attached as Exhibit 4.

# APPENDIX

**Exhibit 1**

AWARD/CONTRACT

| | | |
|---|---|---|
| CONTRACT (Proc. Inst. Ident.) NO. DLA600-90-D-0531 | EFFECTIVE DATE 04 SEP 1990 | REQUISITION/PURCHASE REQUEST/PROJECT NO. SCC J-90-0308 |

**5. ISSUED BY** CODE SC0600

DEFENSE FUEL SUPPLY CENTER
CAMERON STATION TWX 710-832-0600
ALEXANDRIA, VIRGINIA 22304-6160
BUYER/SYMBOL- Lori Alcorn/DFSC-PZB
PHONE- (202) 274-4291 2.2b

**6. ADMINISTERED BY (If other than Item 5)** CODE

IN EMERGENCY SITUATIONS AFTER WORKING HOURS CONTACT DFSC-ESOC AT (703)274-8105. QUALITY ADMIN. ONLY: DCMAO EL SEGUNDO, SAN FRANCISCO, AND DFR PACIFIC (SEE CLAUSE E14:02).
PAS- NONE

**7. NAME AND ADDRESS OF CONTRACTOR (No., street, city, county, State and ZIP Code)**

Chevron USA, Inc.
575 Market Street
San Francisco, CA 94120-7006

Bidder Code: C087 Cage Code: 81230

CODE | FACILITY CODE

**8. DELIVERY**

[X] FOB ORIGIN [ ] OTHER (See below)

**9. DISCOUNT FOR PROMPT PAYMENT**

Net 30 Days

**10. SUBMIT INVOICES** (4 copies unless otherwise specified) TO THE ADDRESS SHOWN IN: ITEM 12

**11. SHIP TO/MARK FOR** CODE

SEE SCHEDULE

**12. PAYMENT WILL BE MADE BY** CODE

Defense Fuel Supply Center
Cameron Station, Bldg 8, Attn: DFSC-RFFB
Alexandria, VA 22304-6130

**13. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION:**

[ ] 10 U.S.C. 2304(c)( ) [ ] 41 U.S.C. 253(c)( )

**14. ACCOUNTING AND APPROPRIATION DATA**

97X4961.5106 01 26.1 S44203

| 15A. ITEM NO. | 15B. SUPPLIES/SERVICES | 15C. QUANTITY | 15D. UNIT | 15E. UNIT PRICE | 15F. AMOUNT |
|---|---|---|---|---|---|

Chevron USA, Inc.'s offer submitted 15 APR 90 (2), confirmed by SF33 dated 20 APR 90, and amended by correspondence dated 27 APR 90, 10, 17, 23 and 24 MAY 90, 13, 14(4) and 28 JUN 90, and 20 AUG 90; and SubcontractingPlan dated 28 NOV 89 as amended by correspondence dated 6 DEC 89, 31 JAN 90 and 20 AUG 90 is hereby accepted. Solicitation RFP DLA600-90-R-0161 and Amendments 0001 - 0006 are incorporated by reference except that the following clauses shall not apply: I94(F), I97(C), I150, I176(F), I176.01(F), and I176.03(F). A copy of Clause B14.02 ESTIMATED SUPPLIES TO BE FURNISHED (Contract Schedule) and various other clauses agreed to by the parties are attached.

**15G. TOTAL AMOUNT OF CONTRACT** $153,907,251.30

**16. TABLE OF CONTENTS**


| (✓) | SEC. | DESCRIPTION | PAGE(S) | (✓) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | PART I — THE SCHEDULE | | | | PART II — CONTRACT CLAUSES | |
| X | A | SOLICITATION/CONTRACT FORM | 1 | X | I | CONTRACT CLAUSES | 11 |
| X | B | SUPPLIES OR SERVICES AND PRICES/COSTS | 2-7 | | | PART III — LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH. | |
| | C | DESCRIPTION/SPECS./WORK STATEMENT | | | J | LIST OF ATTACHMENTS | |
| | D | PACKAGING AND MARKING | | | | PART IV — REPRESENTATIONS AND INSTRUCTIONS | |
| X | E | INSPECTION AND ACCEPTANCE | 7 | | K | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | |
| X | F | DELIVERIES OR PERFORMANCE | 8 | | | | |
| X | G | CONTRACT ADMINISTRATION DATA | 8-10 | | L | INSTRS., CONDS., AND NOTICES TO OFFERORS | |
| | H | SPECIAL CONTRACT REQUIREMENTS | | | M | EVALUATION FACTORS FOR AWARD | |


*CONTRACTING OFFICER WILL COMPLETE ITEM 17 OR 18 AS APPLICABLE*

17. [ ] **CONTRACTOR'S NEGOTIATED AGREEMENT** *(Contractor is required to sign this document and return ______ copies to issuing office.)* Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. *(Attachments are listed herein.)*

18. [X] **AWARD** *(Contractor is not required to sign this document.)* Your offer on Solicitation Number DLA600-90-R-0161* including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary.
*and Amendments 0001-0006

**19A. NAME AND TITLE OF SIGNER (Type or print)**
K. E. Johnson, Manager
Government Accounts

**20A. NAME OF CONTRACTING OFFICER**
JOHN R. WALKER

**19B. NAME OF CONTRACTOR**
Chevron U.S.A. Inc.
BY ______ (Signature of person authorized to sign)

**19C. DATE SIGNED**

**20B. UNITED STATES OF AMERICA**
BY [signature] (Signature of Contracting Officer)

**20C. DATE SIGNED**
04 SEP 1990

NSN 7540-01-152-8069
PREVIOUS EDITION UNUSABLE

26-106

STANDARD FORM 26 (REV. 4-85)
Prescribed by GSA
FAR (48 CFR) 53.214(a)

14.04 ESTIMATED SUPPLIES TO BE FURNISHED (DFSC FEB 1990)

(a) Prices indicated hereunder are subject to adjustment pursuant to the terms of this contract.

(b) The refined product to be furnished hereunder, f.o.b. point, method of delivery, and estimated quantity are as follows:

| ITEM | EST QTY/GALS | MOD | BASE PRICE (FEB 90) | INTERIM BASE PRICE (FEB 90) |
|---|---|---|---|---|
| DFSC | | JP-4 | NSN 9130-00-256-8613 | |
| 0101 | 61,320,000 | PL | $.629500 W/O FSII | $.629500 W/O FSII |
| FOB origin delivery of 61,320,000 gallons of JP-4 at El Segundo, CA. | | | | |
| 0201 | 39,973,500 | PL | $.641800 W/O FSII | $.641800 W/O FSII |
| FOB Origin delivery of 39,973,500 gallons of JP-4 at El Segundo, CA. | | | | |
| 0301 | 61,320,000 | PL | $.638800 W/O FSII | $.638800 W/O FSII |
| FOB Origin delivery of 61,320,000 gallons of JP-4 at Richmond, CA. | | | | |
| 0401 | 46,770,000 | PL | $.660300 W/O FSII | $.660300 W/O FSII |
| FOB Origin delivery of 46,770,000 gallons of JP-4 at Richmond, CA. | | | | |
| 0501 | 30,660,000 | PL | $.639200 W/O FSII | $.639200 W/O FSII |
| FOB Origin delivery of 30,600,000 gallons of JP-4 at the junction of the Chevron and military pipelines, Pearl City, HI | | | | |

NOTES:

1. Payment terms are net 30 days.

2. All prices on this contract shall be rounded to the fifth digit in accordance with standard rounding procedures.

3. Unless the parties agree otherwise the minimum/maximum quantities available for individual deliveries shall be as follows:

| ITEM | SHIPPING POINT | MOD | MINIMUM (BBLS) | MAXIMUM (BBLS) |
|---|---|---|---|---|
| | JP-4 | | | |
| 0101-0201 | El Segundo, CA | PL | 30,000 | 120,000 |
| 0301-0401 | Richmond, CA | PL | 40,000 | 90,000 |
| 0501 | Pearl City, HI | PL | 35,000 | 70,000 |

4. The Small and Small Disadvantaged Business concerns Subcontracting Program Clauses Clause I171(F), SMALL BUSINESS AND SMALL DISADVANTAGED BUSINESS SUBCONTRACTING PLAN and I171.03(F), SMALL BUSINESS AND SMALL DISADVANTAGED BUSINESS SUBCONTRACTING PLAN (DOD CONTRACTS)) in this contract will be administered by:

DCMR LA
11099 S. La Cienega Blvd
Los Angeles, CA 90045

5. The Contractor's Small Business and Small Disadvantaged Subcontracting Plan dated 28 NOV 89, as amended by correspondence dated 6 DEC 89 and 31 JAN 90 is incorporated herein by reference and made a material part of this contract.

6. The point of acceptance for quantity of JP-4 from the El Segundo Refinery will be the meter junction of the Chevron and military pipelines at San Pedro, California. In the event the meter at the junction of the Chevron and military pipelines at San Pedro fails, the first backup for quantity determination shall be meter at the El Segundo Refinery. In the unlikely event both meters fail at the same time, determination shall be made by the tank gauges at the San Pedro Terminal. The point of official acceptance for quantity shall remain the junction of the Chevron and U.S. Military pipelines at San Pedro, California.

7. The point of testing and acceptance for quality will be the Chevron Refinery at El Segundo, California. The point of acceptance for workmanship for JP-4 from the El Segundo Refinery shall be the shipping tanks. Deliveries may commence with the product in the shipping tanks having workmanship condition of "bright and dirty," provided the product is filtered prior to entering the pipeline. An examination for workmanship and tests for particulate contamination shall be accomplished on periodic samples taken downstream of the shipping tank filter. If the product does not meet specifications after filtration, the shipping operation will be stopped until corrective action brings the product within specification limits.

8. The following provisions apply for deliveries of JP-4 at Richmond, California:

A. Chevron's Richmond Refinery will report test results for distillation range temperatures in degrees Fahrenheit. ASTM-E-300, Standard for Metric Practice, will be used to convert specification limits from Celsius to degrees Fahrenheit.

B. Chevron's Richmond Refinery is authorized to commence deliveries with product in the shipping tanks having a workmanship condition of "bright and dirty," provided the product is filtered prior to the point of government acceptance. An examination for workmanship and tests for particulate contamination shall be accomplished on periodic samples taken downstream of the line filter. If the product does not meet specifications after filtering, the shipping operation will be stopped until corrective action brings the product to within specification limits.

C. The points at which quality and quantity will be determined for deliveries of JP-4 at Richmond are as follows:

1. Acceptable for quantity will be determined at the Southern Pacific Pipeline meters located in Richmond, California.

2. Acceptance for quality will be at the junction between Chevron's pipeline and Southern Pacific's pipeline located at Chevron's Richmond Refinery..

D. Chevron is not responsible for certification of the Southern Pacific Pipeline meters located at the junction of the Chevron and Southern Pacific Pipelines.

9. This contract was negotiated and awarded pursuant to the Competition in Contracting Act of 1984 (CICA), P.L. 98-369, FAR Subpart 6.1, FULL AND OPEN COMPETITION.

B19.33 ECONOMIC PRICE ADJUSTMENT - PUBLISHED MARKET PRICE (DFSC DEC 1989)

The Contractor represents that the unit prices set forth in this contract do not include any contingency allowance to cover the possibility of increases in the reference price(s) in the Contractor's bid or proposal.

PART A

As used throughout this provision--

(a) The term "listed items" means the items of Section B of the contract that are listed in the Price Tabulations, PART C and PART D of this provision, and are the only items to which price adjustment shall apply, unless otherwise provided in the contract.

(b) The term "base price" means the unit price set forth opposite the item in Section B of the contract schedule.

(c) The term "interim reference price" means the independent published price listing set forth in PART C of this provision which will be used to adjust the base price until such time as the reference price (as set forth in PART D of this provision) becomes available. The interim reference price is the published average of prices listed for specified products and cities in the Oil Price Information Service (OPIS) Petroleum Administration District (PAD) Report, and/or Oil Price Information Service as set forth in PART C of this clause.

(d) The term "reference price" means the independent published price listing set forth in PART D of this provision which will be used to adjust the base price. The reference price is the average or weighted average sales price of the specified product(s) in the specified PAD District or State of the Petroleum Marketing Monthly published by the Energy Information Administration.

(e) The term "base interim reference price" means the weighted average of the specified publication references effective during the month specified by the Contracting Officer in the wire which requests best and final offers. In order to coincide with the base reference price month as described in paragraph f. below, this month will normally (but not always) be the third month prior to the month in which best and final offers are due. For example, if best and final offers are due in June, the "base interim reference price" would normally be the weighted average of the specified publication references effective during the month of March.

(f) The term "base reference price" means the reference price based on Petroleum Marketing Monthly publication effective during the month specified by the Contracting Officer in the wire which requests best and final offers. This month will normally (but not always) be the third month prior to the month in which best and final offers are due. For example, if best and final offers are due in June, the base reference price would normally be based on the March data of the Petroleum Marketing Monthly's specified sales prices of petroleum products tables which would generally be published in early June.

(g) The term "date of delivery" means--

(1) the date and time vessel begins to load where the contract calls for delivery at origin into tanker or barge;

(2) the date and time vessel begins to discharge where the contract calls for delivery at destination by tanker or barge;

(3) the date and time product commences to move past the specified f.o.b. point where the contract calls for delivery by pipeline;

(4) the date product is received for all methods of delivery other than (1), (2) or (3) above.

PART B

(a) Notwithstanding any provision of this clause to the contrary, the prices payable under this contract shall in no event exceed the maximum prices described in the clause entitled UPWARD CEILING ON ECONOMIC PRICE ADJUSTMENT.

(b) The Contractor warrants that the prices to be invoiced hereunder for listed items shall be computed in accordance with this provision.

(c) In the event the reference price or interim reference price is discontinued, or its method of calculation is altered substantially, the parties shall mutually agree upon an appropriate and comparable substitute for determining the price adjustment described herein. This contract shall be amended to reflect such substitute reference price or interim reference price, effective on the date the prior reference price or interim reference price is discontinued or altered. In the event the parties fail to agree on an appropriate substitute, the matter shall be resolved in accordance with the DISPUTES clause of the contract.

(d) The Contracting Officer will issue a modification to this contract to reflect each change in the reference price and the interim billing price pursuant to this provision.

(e) The interim reference price(s), as set forth in PART C, in effect on the first of each month shall be used to calculate the interim billing unit price for all deliveries occurring in that month, subject to final adjustment at such time as the applicable published reference, as set forth in PART D, becomes available.

(f) Final price adjustments under this clause for deliveries previously invoiced will be accomplished (after issuance of the appropriate contract modification) through supplemental payments or credits under the contract on the basis of the Contractor's supplemental invoice statements. The statements will identify (1) the original invoice, (2) items and quantities, unit prices, and amounts originally invoiced, (3) the contract modification pursuant to which the supplemental invoice statement is made, and (4) the amount of increase or decrease from the earlier invoiced price on each item of the invoice.

(g) Notwithstanding any other provision of this clause, no upward adjustment shall apply to supplies which are required to be delivered prior to the effective date of the adjustment but delivered subsequently, unless the Contractor's failure to deliver in accordance with the delivery schedule arises from causes beyond the control and without the fault or negligence of the Contractor within the meaning of the clause of this contract entitled DEFAULT, in which case the contract shall be amended to make an equitable extension of the delivery schedule.

(h) The Contractor shall have the right to appeal under the clause entitled DISPUTES from any determination made by the Contracting Officer under this clause.

PART C -INTERIM BILLING PRICE ADJUSTMENTS

(a) Provision is made for interim billing price adjustments based on interim reference prices subject to final adjustment on a monthly basis in accordance with PART D of this clause.

(b) The last OPIS PAD Report and the last Oil Price Information Service published during the last seven days of the month, shall be used to establish interim billing prices for all deliveries occuring in the following month. The effective date of the interim billing price is the first day of the month regardless of the date of the last publication for the preceding month and the effective date of the prices shown therein.

(c) In the event the OPIS PAD Report or the Oil Price Information Service is not published during the last seven days of the month, the first published OPIS PAD Report or Oil Price Information Service of the following month shall be used.

(d) The interim billing prices payable under this contract for listed items shall be the base price for the listed item increased or decreased by the same number of cents, or fraction thereof, that the interim reference price for the listed item shall have been increased or decreased per like unit of measure from the base interim reference price.

INTERIM REFERENCE PRICE TABULATION

| I | II | III | IV | V |
|---|---|---|---|---|
| Economic Price Adjustment Region and Item No. (Listed Items) | Name of Publication | Name of Product | Location where Price is Applicable | Interim Reference Price as of FEB 90 (date) (Excludes All Taxes) |
| WEST COAST/JP-4<br>0101-0501 | OIL PRICE INFORMATION SERVICE PADD 5 REPORT | UNLEADED | LOS ANGELES<br>SAN FRANCISCO<br>SEATTLE | $.656284 |
| | OIL PRICE INFORMATION SERVICE | COMMERCIAL AIRLINE JET FUEL RANGE (AVERAGE) | LOS ANGELES | |

The price computation for the above locations shall be the arithmetic average of the published product averages shown at those locations. The Interim Reference Price shall be determined as follows:

Jet Fuel Price

$$\frac{\text{Los Angeles+San Francisco+Seattle}}{3} \times .7 + \text{Los Angeles(Average)} \times .3$$

PART D - PETROLEUM MARKETING MONTHLY SALES PRICES OF PETROLEUM PRODUCTS TABLES

(a) Contract prices for each month's deliveries will be based on the specified references listed by the Petroleum Marketing Monthly under the Sales Prices of Petroleum Products Tables for the month dated during the month of delivery. In accordance with the Petroleum Marketing Monthly practice, the Petroleum Marketing Monthly publication for a given month represents actual sales prices during that month. For example, the contract price for April deliveries will be based on the April data of the Petroleum Marketing Monthly which would usually be published sometime in mid-July. In the event the Petroleum Marketing Monthly Sales Prices of Petroleum Products Tables are adjusted after publication for that month and the adjustment results in an adjustment to the contract price of more than $.002 per gallon, retroactive adjustments to the contract price shall be made. In this case, final contract prices for that month will be based on the revised version of the applicable Petroleum Marketing Monthly Sales Prices of Petroleum Products Tables.

(b) The Contractor, upon receipt of each modification incorporating the final adjusted price for a month, shall submit a proper supplemental invoice statement. Payment tendered to the Contractor by the Government as a result of submission of a proper supplemental invoice statement shall be in accordance with the clause entitled NET PAYMENT.

(c) The prices payable under this contract for listed items shall be the base price for the listed item increased or decreased by the same number of cents, or fraction thereof, that the reference price increases or decreases per like unit of measure from the base reference price.

(d) The reference price with which the base price for the listed item is to fluctuate is as set forth in the Reference Price Tabulation:

REFERENCE PRICE TABULATION

NOTE: For ease of reference, the appropriate petroleum sales price tables shall be identified as follows:

Jet Fuel = Refiner Prices of Aviation Fuels and Propane.

Unleaded Regular = Refiner/Reseller Unleaded Regular Gasoline Prices by Seller Type.

Distillate = Refiner Prices of Kerosene and Distillates.

| I | II | III | IV |
|---|---|---|---|
| Economic Price Adjustment Region and Item No. Listed (Items) | Name of Publication | Heading under which reference price is published and name of product | Reference Price As Of FEB 90 (date) (Excludes all taxes) |
| WEST COAST/JP-4<br>0101-0501 | PETROLEUM MARKETING MONTHLY (PMM) | KEROSENE-TYPE JET FUEL SALES TO END-USERS PAD DISTRICT V AVERAGE | $.660300 |
| | | REFINER/RESELLER UNLEADED REGULAR GASOLINE PRICES BY SELLER TYPE ALL REFINERS SALES FOR RESALE PAD DISTRICT V AVERAGE | |

The reference price shall be determined as follows:

.30(PADD V KERO-JET) + .70(PADD V UNL GAS)

B20.02 UPWARD CEILINGS ON ECONOMIC PRICE ADJUSTMENT (DFSC APR 1984)

Contractor agrees that the total increase in any unit price pursuant to the Economic Price Adjustment provision of this contract shall not exceed 80 percent of the original base price for individual contract items, except in the situations provided hereafter.

(a) If at any time the Contractor has reason to believe that within the near future a price adjustment will be required under the Economic Price Adjustment provision of this contract and that the resultant adjustment when added to the latest contract price for the item(s) in question will exceed the current contract ceiling price for the item(s), the Contractor shall notify the Contracting Officer of the expected increase. At the same time, the Contractor shall propose a revised ceiling which he believes to be sufficient to permit completion of remaining contract performance. Contractor's proposal shall be supported by appropriate explanations and documentation as required by the Contracting Officer. The parties agree to promptly undertake negotiations regarding the proposed new ceiling.

(b) If, in the absence of an agreement on a new ceiling, notice is given by the Contractor of an actual price change which results in a unit price for contract item(s) which exceeds the current ceiling, the Contractor will have no further obligation under this contract to fill pending or future orders for the specific line item(s) in question as of the effective date of the increase, as long as the unit price exceeds the ceiling. If, however, notwithstanding the lack of agreement on a new ceiling the Contracting Officer indicates in writing that the Government is prepared to purchase the line item(s) for the price as adjusted under the Economic Price Adjustment provisions beyond the current ceiling, the Contractor will be obligated to continue to honor orders placed for the specific line item in question.

E14.02 INSPECTION AND ACCEPTANCE (DFSC NOV 1979)

On deliveries f.o.b. origin, acceptance of the supplies furnished hereunder will take place at origin notwithstanding that inspection by the Government may take place elsewhere prior to acceptance. On deliveries f.o.b. destination, acceptance of the supplies furnished hereunder will take place at a destination notwithstanding that inspection by the Government may take place elsewhere prior to acceptance. The office responsible for inspection, in behalf of the Government, shall be as follows:

| ITEM(S) | SOURCE OF PRODUCT AND/OR SHIPPING POINT | INSPECTOR(S) |
|---|---|---|
| 0101-0201 | El Segundo Refinery<br>324 W. El Segundo Blvd.<br>El Segundo, CA 90245 | DCMAO El Segundo<br>222 N. Sepulveda Blvd.<br>El Segundo, CA 90245-4320 |
| 0301-0401 | Richmond Refinery<br>Standard Avenue<br>Richmond, CA 94802 | DCMAO San Francisco<br>Attn: DCRL-GFOF<br>P.O. Box 996<br>Concord, CA 94502-0996 |
| 0501 | Hawaii Refinery<br>Barbers Point - Oahu<br>Honolulu, HI 96707 | Commander, DFR Pacific<br>Camp H. M. Smith<br>Honolulu, HI 96861-5000 |

F1.08 DELIVERIES AND CONTRACT PERIOD (DFSC APR 1968)

(a) The period of this contract during which the Ordering Officer may order pursuant to the clause entitled INDEFINITE QUANTITY; SCOPE OF CONTRACT is from date of award through 30 SEP 91.

(b) Notwithstanding paragraph (a) above, except at its option, Contractor shall not be required to make delivery hereunder prior to: 01 OCT 90.

(c) In so far as practicable, the Government will attempt to lift in approximately equal monthly quantities. Except at its option, a supplier which offered product over the period 01 OCT 90 through 30 SEP 91 shall not be required (i) to make deliveries of any grade of product at a daily rate which is in excess of the contract quantity of such grade of product for delivery at or shipment from each designated refiners or bulk plant location divided by 365 days or (ii) to accumulate any such product at any such location and to subsequently make deliveries in excess of 8.33% in any one month of the contract quantity of the applicable grade of products, provided, however, that where the maximum quantity available for individual deliveries as specified in the contract is greater than 8.33% per month, the supplier will accumulate any such product at any such location and subsequently make deliveries equal to the specified maximum quantity available for individual deliveries and provided further, that the supplier will be required to make delivery in excess of 8.33% per month if the delivery is to be made f.o.b. tanker at origin and no other quantities have been ordered for delivery during the applicable month and the 30,000 bbls minimum, under paragraph (d) below is greater than such 8.33% quantity

(d) Except at its option, the Contractor shall not be required to deliver f.o.b. tanker at origin in any one delivery a quantity of product(s) which is less than 30,000 bbls except, when the minimum quantity available for individual deliveries as specified in the contract is less than 30,000 barrels or, when on the last delivery, the quantity available pursuant to the clause entitled INDEFINITE QUANTITY - SCOPE OF CONTRACT, is less than 30,000 barrels.

G9.07 ELECTRONIC TRANSFER OF FUNDS PAYMENTS - CORPORATE TRADE PAYMENTS (CTP) (DFSC MAY 1990)

(a) By submission of the following data, the Contractor elects to receive payments under this contract by electronic transfer of funds through Corporate Trade Payments (CTP):

NAME OF RECEIVING BANK |C |I |T |Y | |B |A |N |K | |D |E |L |A |W |A |R |E | | | | | | | | | | | |
(DO NOT EXCEED 29 CHARACTERS)

CITY AND STATE OF RECEIVING BANK |W |I |L |M |I |N |G |T |O |N | |D |E | | | | | | | |
(DO NOT EXCEED 20 CHARACTERS)

AMERICAN BANKERS ASSOCIATION NINE DIGIT IDENTIFIER OF RECEIVING BANK |0 |3 |1 |1 |0 |0 |2 |0 |9 |

ACCOUNT TYPE CODE: (Contractor to designate one)5

[X] CHECKING TYPE 22

[ ] SAVINGS TYPE 32

RECIPIENT'S ACCOUNT NUMBER ENCLOSED IN PARENTHESES: |( |3 |8 |1 |5 |- |1 |2 |8 |5 |) | | | | |
(DO NOT EXCEED 15 CHARACTERS)

RECIPIENT'S NAME: |C |H |E |V |R |O |N | |U |S |A | |I |N |C | | | | | | | | | | |
(DO NOT EXCEED 25 CHARACTERS)

**NOTE**: Additional information may be entered in EITHER paragraph (b) OR paragraph (c) below. Total space available for information entered in (b) OR (c) is 153 characters.

(b) Special Instructions/Other Identifying Data:

(DO NOT EXCEED 153 CHARACTERS)
OR

(c) THIRD PARTY INFORMATION: Where payment is to be forwarded from the receiving bank to another financial institution for deposit into Contractor's account, the following information must be supplied by the Contractor: Second Bank Name, City/State and/or Country, Account Number, Account Name, and City/State and/or Country.

(DO NOT EXCEED 153 CHARACTERS)

(d) Any change by the Contractor in designation of the bank account to receive electronic transfer of funds in accordance with this clause must be received by the Contracting Officer no later than 15 days prior to the date the change is to become effective.

(e) The electronic transfer of funds does not constitute an assignment of such funds in any form or fashion.

(f) In the event CTP payments cannot be processed, the Government retains the option to make payments under this contract by check.

(g) NOTICE TO FOREIGN SUPPLIERS:

(1) The bank designated as the receiving bank must be located in the United States. The appropriate American Bankers Association nine-digit identifier must be supplied in order for payments to be processed through CTP.

(2) If your account is with a foreign bank which has an account with a bank located within the United States, the U.S. bank may be designated as the receiving bank. The recipient's name and account number shall identify the foreign bank, and transfer instructions to supplier's account must be specified in paragraph (c) above.

Information regarding payments made by the Government through CTP will be identified by the following codes in the payment transmission message:

SPECIAL CODES FOR PROCESSING CTP PAYMENTS

| CODE | CODE EXPLANATION |
|---|---|
| 01 | Credit Memorandum |
| 02 | Freight Bill/Bill of Lading |
| 03 | Government Bill |
| 04 | Insurance |
| 05 | Invoice |

| | |
|---|---|
| 06 | Lease |
| 07 | Loan |
| 08 | Purchase Order |
| 09 | Rent |
| 10 | Taxes |
| 11 | Vendor Order |
| 12 | Voucher |
| 13 | Your Letter |
| 14 | Deduction, enter total dollar amount of deductions for each invoice affected |
| 15 | Deduction previously paid on earlier invoice (enter invoice number) |
| 16 | Modification |
| 17 | Gallons deducted IAW support document (e.g. DD-250) |
| 18 | Credit taken IAW a modification |
| 19 | Deduction of Federal Excise Tax not due Contractor |
| 20 | Deduction of State Tax not due Contractor |
| 21 | Deduction of other Tax not due Contractor |
| 22 | Credit taken for expired contract |
| 23 | Deduction due to extension error |
| 24 | Duplicate payment deduction (DOV # will be entered when available) |
| 25 | Deduction tank trucks not authorized |
| 26 | Reimbursement |
| 27 | Reimbursement for deduction (DOV # will be entered when available) |
| 28 | Detention fee |
| 29 | Detention fee adjustment |
| 30 | Discount |
| 31 | Reimbursement for discount not due Government |
| 32 | Multiple invoices processed, contact DFSC-CFE, Examination Section, if additional information is required. |
| 33 | Order, use ORD to precede order number |
| 34 | Multiple orders involved, contact DFSC-CFE, Examination Section, if additional information is required |
| 35 | Miscellaneous |

I150.11 SUBMISSION OF INVOICES BY TELEFACSIMILE (DFSC APR 1990)

NOTE: INVOICES WILL REFLECT QUANTITIES IN WHOLE NUMBERS.

(a) The following guidance is applicable to Army, Navy (including Marines), and other DoD activity requirements (except Air Force) unless the requirements are for standby, Alaska, or Hawaii.

(1) When the Contractor has elected to transmit invoices by telefacsimile, it is responsible for validating receipt of its telefaxed invoice. Because DFSC-CDX cannot be held accountable for transmissions not received, the Contractor must verify receipt of its telefax by telephoning DFSC-CDX at (202) 274-7055.

(2) Utilization of the telefacsimile invoicing method is contingent upon the Contractor's submission of invoices by this method at all times.

(3) The receiving numbers for invoices telefaxed to the DFSC-CDX mailroom are (202) 274-8888 (primary) and (202) 274-9210 (alternate).

(4) The Contractor shall include his telefacsimile (FAX) number on each document transmitted.

(5) After transmitting the original invoice, the Contractor shall mark that invoice "Original Invoice - Telefaxed" and retain it. The hard copy is not required for payment and shall not be mailed to the payment office (DFSC-CDX) unless DFSC-C specifically requests it for audit purposes.

(6) When telefaxing an invoice for f.o.b. origin deliveries, the Contractor shall also transmit the applicable original Material Inspection and Receiving Report, DD Form 250, or Tanker/Barge Material Inspection and Receiving Report, DD Form 250-1, signed by the Quality Assurance Representative (QAR). The signed copy, which certifies acceptance by the QAR of the product prior to submission of the invoice, will have the following information stamped, printed, or typed on it: ORIGINAL RECEIVING REPORT FOR PAYMENT INVOICE. However, in order to receive payment, the Contractor must mail four copies (one of which will contain an original signature) of the DD Form 250 or DD Form 250-1 to the payment office as follows:

Defense Fuel Supply Center
ATTN: DFSC-CDX
Cameron Station, Bldg. 8
Alexandria, Virginia 22304-6130

(7) Failure to comply with these requirements will revoke the Contractor's right to submit invoices by the telefacsimile method.

(b) ORDERS BY OTHER FEDERAL AGENCIES. On orders placed by activities of Federal Departments other than the Army and Navy (including Marines), invoices shall be submitted as instructed by those activities. Such activities placing orders under this contract will furnish the Contractor with the name and proper address of the activity to whom invoices shall be rendered. Such activities will also indicate the procedure for processing tax exemption certificates.

(c) CLASSIFIED CONTRACTS. To prevent disclosure of classified information, invoices submitted under classified contracts shall be so prepared that the supplies or services covered thereby can be identified only by reference to the contract. For example, the invoices may state "Contract DLA600-____________, Item 0101, 5,000 at $0.15 = $750.00". The security classification shown on the contract shall not appear on the invoices.

(d) DETENTION COSTS. Detention costs, if allowed in accordance with the contract, will be the sole responsibility of the activity incurring them. Invoices for detention costs, if any, will be forwarded directly to the activity receiving the product.

I193 SCHEDULE OF CONTRACTOR'S REFINERY SHUTDOWN FOR TURNAROUNDS (DFSC FEB 1989)

(a) Within 30 days from the date of contract award, the Contractor shall furnish to the Contracting Officer a tentative refinery shutdown schedule for the contract period in order that the placement of orders and the delivery of supplies as set forth under the clause entitled "DELIVERIES AND CONTRACT PERIOD" may be adjusted to provide for delivery of the entire contract quantity. Any revisions to this schedule will necessitate prior notice of at least 60 days in order to coordinate the placement of orders for the delivery of the entire contract volume.

(b) If the Contractor can not provide the 60 days advance notice, then, at no additional cost to the Government, the Contractor shall maintain sufficient inventory to make deliveries in support of the ordering activities' requirements or the Contractor shall provide for an alternate source for product during the shutdown period(s).

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE | PAGE 1 OF PAGES 2

2. AMENDMENT/MODIFICATION NO.: P00001
3. EFFECTIVE DATE: 90 NOV 08
4. REQUISITION/PURCHASE REQ. NO.: SC0600-90-0308
5. PROJECT NO. (If applicable)

6. ISSUED BY CODE SC0600
DEFENSE FUEL SUPPLY CENTER
CAMERON STATION TWX 710-832-0600
ALEXANDRIA, VIRGINIA 22304-6160
BUYER/SYMBOL - L. Alcorn/DFSC-PZB
PHONE - (703) 274-7909 2.2b

7. ADMINISTERED BY (If other than Item 6) CODE

8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code)
Chevron U.S.A., Inc.
575 Market St.
San Francisco, CA 94120-7006

Bidder Code: C087 Cage Code: 81230

CODE | FACILITY CODE

9A. AMENDMENT OF SOLICITATION NO.
9B. DATED (SEE ITEM 11)
10A. MODIFICATION OF CONTRACT/ORDER NO.: DLA600-90-D-0531
10B. DATED (SEE ITEM 13): 90 Sep 04

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning ______ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| (✓) | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| X | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| | D. OTHER (Specify type of modification and authority) |

E. IMPORTANT: Contractor [X] is not, ☐ is required to sign this document and return ______ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

A. Per Chevron's correspondence dated 90 Oct 30, contract DLA600-90-D-0531 is modified as follows:

1) Clause B14.04, ESTIMATED SUPPLIES TO BE FURNISHED, is changed as follows:

| Item | Est. Qty. Gals. | Mod | Award Price (FEB 90) |
|---|---|---|---|
| 0501 | 30,660,000 | PL | $.643200 w/ FSII |

(FOB Origin delivery of 30,600,000 gallons of JP-4 at the junction of the Chevron and militry pipelines, Pearl City, HI)
FSII factor included in Line Item 0501 above is $.004 per gallon.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER (Type or print)
16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print): JOHN R. WALKER

15B. CONTRACTOR/OFFEROR ______ (Signature of person authorized to sign)
15C. DATE SIGNED
16B. UNITED STATES OF AMERICA BY [signature] (Signature of Contracting Officer)
16C. DATE SIGNED

NSN 7540-01-152-8070
PREVIOUS EDITION UNUSABLE
30-105
STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

2) The total dollar value of contract DLA600-90-D-0531 is hereby increased by $122,640.00 from $153,907,251.30 to $154,029,891.30.

3) Deliveries made under CLIN 0501 prior to the effective date of this modification provided product inclusive of FSII. Additional cost of $.004 per gallon shall be included in final adjusted prices for October and November 90.

B. All other terms and conditions of the subject contract remain as previously stated.

**Exhibit 4**

**CERTIFICATION UNDER CONTRACT NO. DLA600-90-D-0531**

I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor.

Todd P. [signature]
Chevron USA, Inc.

Dated: 11/13/01

**DEFENSE LOGISTICS AGENCY**
DEFENSE ENERGY SUPPORT CENTER
8725 JOHN J. KINGMAN ROAD, SUITE 4950
FORT BELVOIR, VIRGINIA 22060-6222

Certified
Return

IN REPLY REFER TO DESC-BZ

February 11, 2002

Mr. Robert D. Topping, Esq.
Texaco, Inc.
1111 Bagby
Houston, Texas 77002

Dear Mr. Topping:

This is the contracting officer's final decision on Texaco, Inc.'s (Texaco) September 7, 2001, September 25, 2001, and October 5, 2001, claims for approximately $45 million under 7 contracts awarded to Texaco between 1983 and 1989.[1] According to Texaco, the economic price adjustment (EPA) clauses in its contracts were unauthorized and therefore unenforceable. Texaco seeks to have all of these contracts re-priced at a substantial premium. It claims this is necessary so that it will receive fair market value for the petroleum products it supplied. The implication in Texaco's claims is that it was harmed because the Government's EPA clauses did not protect Texaco from price risk.

I disagree that the EPA clauses in Texaco's contracts were unauthorized. First, the FAR permits agencies to modify EPA clauses so long as they accomplish the objectives set out in FAR 16.203-3. Those objectives are to protect the contractor and the Government against significant fluctuations in material costs <u>or</u> to provide for contract price adjustments in the event of changes in the contractor's established prices. The evidence shows that the clauses used in Texaco's contracts achieved the objectives of the FAR. Texaco was in fact protected against significant fluctuations in the costs of crude oil as measured by appropriate indices, <u>and</u> the changes in the contract prices caused by the EPA clauses closely tracked the changes in Texaco's own established prices. Texaco has provided no information to the contrary.[2]

Additionally, there is no basis for granting Texaco the relief it seeks. All the circumstances surrounding Texaco's dealings with the Government indicate that Texaco already received fair market value for the fuel it sold the Government. Re-pricing the fuel years after it was delivered and sold to the

---

[1] The contracts that are the subject of Texaco's claim and this final decision are listed in Attachment 1.
[2] By letter dated November 13, 2001, I requested information from Texaco substantiating how the EPA clause harmed it, but Texaco did not respond.

Government is simply unjustified. Accordingly, I am denying Texaco's claims in their entirety.

## DISCUSSION

### The EPA Clauses Used in the Contracts Were Authorized Because They Accomplished the Objectives of EPA Clauses Required by the FAR

1. Texaco offered, produced, and sold JP-4 jet fuel under the 7 contracts that are the subject of this claim. Texaco is a commercial enterprise, which sells the majority of its fuel to private, non-governmental entities. While the jet fuel was made to a military specification and carried a military designation, the fuel is similar to commercial fuel.

2. EPA clauses linking changes in Texaco DESC contract prices to changes in product markets appeared in all of Texaco's contracts. The 1983 contract contained a Bureau of Labor Statistics index. From 1984-1989, the EPA clauses were based on reports in the Petroleum Marketing Monthly, a publication of the Department of Energy, Energy Information Administration. These PMM reports contained the average sales prices for petroleum products, which refiners are required to report to the Department of Energy. The EPA clauses worked in a direct and simple way. The clauses ensured that the prices Texaco offered and agreed to in its contracts would be adjusted penny for penny according to the identical movements of fuel prices in the indices. Hence, if the market index went up one cent, the contract price would likewise go up one cent. If the market prices as reflected in the market index went down a penny, the contract price went down a penny. The contract prices were adjusted in this way on a regular basis throughout the terms of the contracts.

3. DESC has compared changes in Texaco's established prices with the price changes in the market-based EPA clauses in Texaco's contracts. The result is a very high correlation between the movements of Texaco's established prices and the product market indices contained in the contracts. This result is not surprising. Price adjustments based on Texaco's established prices alone would be expected to closely track price adjustments based on average established prices of multiple market participants. In dealing with a commodity such as fuel, where the products are standard and the market is competitive, a contractor would be forced to align its prices with the market. Otherwise, the contractor would fail to make sales and would lose market share to its competitors. Given these market realities, Texaco's own established prices would be expected to follow the market.

4. As with Texaco's established prices, there is a high degree of correlation between the movements in crude prices and the actual movement of prices in Texaco's contracts. For purposes of comparison, I used West Texas Intermediate (WTI) crude oil, a benchmark crude oil in the United States. The correlation between crude oil prices and product market prices is not surprising because crude oil is the principal material used in making the product Texaco sold to the Government. Because the EPA provisions in Texaco's contracts protected it from the potential harms identified in FAR 16.203-3 the clauses are authorized and valid.

Texaco is not Entitled to a Remedy Because It Already Received Fair Market Value for its Fuel

5. Aside from the validity of the clauses in its contracts, Texaco is not entitled to the remedy it seeks because it already received fair market value for its fuel. Texaco's suggestion that, year after year, contract after contract, it sold fuel to the Government at below fair market value prices, is not credible. Texaco sold fuel to the Government in open, free, and arms length transactions, in response to competitive, widely published solicitations. The contracting officers determined that Texaco's prices were fair and reasonable on the basis of adequate price competition and/or on the basis of market price data. Texaco was at all times knowledgeable of the value of its products in the marketplace. Texaco's continuing decision to sell substantial amounts of fuel to the Government over many years at competitively determined prices confirms that it was receiving fair market value for its fuel.

6. Texaco's suggestion that an EPA clause tied to market prices caused it to receive less than fair market value for its product is illogical. Assuming that the contract base price is a fair market value price, price adjustments tied to changes in the sales price of the relevant product must result in fair market value prices. There can be no better method of ensuring that prices paid for an item represent fair market value then by adjusting them according to changes in the relevant market prices. Texaco can only ground its claims on the supposition that the contract base prices it bid were below fair market value. There is no evidence to support such an assertion. I reject the claim that Texaco consciously submitted bids below fair market value on the many contracts included in its claim. I find, on the contrary, that Texaco did receive fair market value through the operation of the contract EPA clauses.

7. As indicated above, product market escalators appeared in all of Texaco's contracts. Texaco does not allege that these market indicators failed to accomplish their purpose, namely, to be accurate indicators of actual price movements in the petroleum markets. There is no evidence that Texaco ever

sought to substitute or change an EPA provision before filing these claims. Texaco never sought to invoke the provision, included in all its contracts, which allowed it to seek a substitute index in the event the contract index failed to track the market. Since Texaco was paid strictly in accordance with actual market movements, recorded in the PMM, Texaco received fair market value for its products throughout the terms of the contracts.

8. The EPA provisions in Texaco's contracts are the types of provisions used in the petroleum industry for term product supply contracts. DESC has been using these price adjustment provisions for more than 20 years for the purchase of more than $60 billion worth of fuel. With the issuance of every solicitation over the years, contractors have had the opportunity to protest the inclusion of these clauses if they thought the clauses would harm them in any way, or deprive them of fair market value for their fuel. Their continuing participation shows the clauses were acceptable to industry and satisfactorily allocated economic risk.

9. In 1995, DESC officially published in the Federal Register a proposed class deviation for the use of a market product escalator in its bulk petroleum solicitations. Not a single petroleum firm offered comment or objection to DESC's use of such an EPA clause in its contracts.

10. Texaco relies on a market-based index, similar to the one the Government has been using since 1995, to structure its claims. Texaco's conduct is inconsistent with its claims that it is entitled to re-price its contracts using an alternative notion of market value that it never sought during bidding, contract performance, or in the commercial marketplace.

Texaco's Market Value Formula Overstates the Value of Texaco's Fuel

11. Texaco uses the Pride Companies formula to determine the market value of its fuel. I disagree with this approach because it ignores the base bid price to which the parties agreed. In any event, contemporaneous documents do not support the $.03 per gallon premium above the market index that Texaco claims, or anything close to that amount. Texaco's own documents and bidding practices refute such a figure. I note that Texaco relies on a market-based index, the one the Government has been using since 1995, as the basis for its market value assessment, although Texaco simultaneously challenges the legality of such an index as an escalator. The index is an accurate reflection of market value, but Texaco's claimed premium is not. In addition, Texaco erroneously fails to credit the Government with overpayments calculated under Texaco's claim formula.

## APPEAL RIGHTS

12. This is the final decision of the Contracting Officer. You may appeal this decision to the Armed Services Board of Contract Appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the Board and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals to the Board, you may, solely at your election, proceed under the Board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the Board, you may bring an action directly in the United States Court of Federal Claims within 12 months of the date you receive this decision.

13. In addition to these appeal rights, you may request that this dispute be resolved using Alternative Dispute Resolution (ADR) procedures. The use of ADR typically results in relatively expeditious and inexpensive dispute resolution. DESC is committed to using ADR whenever it is appropriate. Please keep in mind that choosing ADR does not suspend the respective 90-day and 12-month time periods for appealing this final decision. If you want to request ADR, or want more information about the various ADR options that are available, please contact me.

Sincerely,

JOHN R. WALKER
Contracting Officer
Bulk Fuels

Cc: Mr. John K. Wyma, Esq.
Mr. J. Keith Burt, Esq.

Attachment 1

DLA600-83-D-0620
DLA600-84-D-0510
DLA600-84-D-0561
DLA600-86-D-0575
DLA600-87-D-0494
DLA600-88-D-0476
DLA600-89-D-0457

**DEFENSE LOGISTICS AGENCY**
DEFENSE ENERGY SUPPORT CENTER
8725 JOHN J. KINGMAN ROAD, SUITE 4950
FORT BELVOIR, VIRGINIA 22060-6222

IN REPLY REFER TO DESC-BZ

Certified Mail
Return Receipt Requested

July 2, 2002

Mr. Todd Grubin
Chevron USA, Inc.
575 Market Street
San Francisco, California 94105

Dear Mr. Grubin:

This is the contracting officer's final decision on Chevron USA, Inc.'s and Chevron Products Company's (Chevron) December 6, 2001, and January 31, 2002, claims for nearly $386 million under 32 contracts awarded to Chevron between 1981 and 1999.[1] According to Chevron, the economic price adjustment (EPA) clauses in its contracts were unauthorized and therefore unenforceable. Chevron seeks to have all of these contracts re-priced at a substantial premium. It claims this is necessary so that it will receive fair market value for the petroleum products it supplied. The implication in Chevron's claims is that it was harmed because the Government's EPA clauses did not protect Chevron from price risk.

I disagree that the EPA clauses in Chevron's contracts were unauthorized for two reasons. First, the FAR permits agencies to modify EPA clauses so long as they accomplish the objectives set out in FAR 16.203-3. Those objectives are to protect the contractor and the Government against significant fluctuations in material costs <u>or</u> to provide for contract price adjustments in the event of changes in the contractor's established prices. The evidence shows that the clauses used in Chevron's contracts achieved the objectives of the FAR. Chevron was in fact protected against significant fluctuations in the costs of crude oil as measured by appropriate indices, <u>and</u> the changes in the contract prices caused by the EPA clauses closely tracked the changes in Chevron's own established prices. Chevron has provided no information to the contrary. Second, as detailed below, DESC obtained deviations approving market-based price adjustment clauses in nine of the contracts.

Additionally, there is no basis for granting Chevron the relief it seeks. All the circumstances surrounding Chevron's dealings with the Government

[1] Chevron submitted 32 separate claims. This decision covers all 32 claims. The contracts that are the subject of Chevron's claims and this final decision are listed in Attachment 1. Most of the contracts were awarded to Chevron USA, Inc. For purposes of this decision, I refer to the firms collectively as "Chevron."