indicate that Chevron already received fair market value for the fuel it sold the Government. Re-pricing the fuel years after it was delivered and sold to the Government is simply unjustified. Accordingly, I am denying Chevron's claims in their entirety.

## DISCUSSION

### The EPA Clauses Used in the Contracts Were Authorized Because They Accomplished the Objectives of EPA Clauses Required by the FAR

1. Chevron offered, produced, and sold Jet A-1, JP-4, JP-5, and JP-8 jet fuel, DFM, F-76 and DFA diesel fuel, and MUM and MUR gasoline under the 32 contracts that are the subject of these claims. Chevron is a commercial enterprise, which sells the majority of its fuel to private, non-governmental entities. While most of the fuels were made to military specifications and carried military designations, the fuels are similar to commercial fuels. Jet A-1, DFA, MUR and MUM were made to commercial specifications, modified for military use.

2. The EPA clauses in Chevron DESC contracts linked award prices to changes in product markets.[2] The EPA clauses in Contracts DLA600-82-D-0492 and DLA600-82-D-0621 were based on Platts Oilgram Price Report (Platts), an industry publication. The EPA clauses in Contracts DLA600-83-D-0558, DLA600-84-D-0484 and DLA600-84-D-0602 were based on reports in the Bureau of Labor Statistics. The EPA clauses in Contract DLA600-84-D-0498 and the 1986-1994 Bulk Fuels contracts were based on reports in the Petroleum Marketing Monthly (PMM), a publication of the Department of Energy, Energy Information Administration. These PMM reports contained the average sales prices for petroleum products, which refiners are required to report to the Department of Energy. Beginning in 1995 for Bulk Fuels contracts and for Post, Camps and Stations contract DLA600-89-D-1017, DESC used Platts and Oil Price Information Service, industry publications, for EPA purposes. The EPA clauses worked in a direct and simple way. The clauses ensured that the prices Chevron offered and agreed to in its contracts would be adjusted penny for penny according to the identical movements of fuel prices in the market reports. Hence, if the market index went up one cent, the contract price would likewise go up one cent. If the market prices as reflected in the market index went down a penny, the contract price went down a penny. The contract prices were adjusted in this way on a regular basis throughout the terms of the contracts.

[2] The claim for contract DLA600-82-D-0453 did not include a copy of the contract and from the information available, I have not been able to determine the escalation clause(s) used throughout the course of the contract.

3. DESC has compared changes in Chevron's established prices with the price changes in the market-based EPA clauses in Chevron's contracts. The result is a very high correlation between the movements of Chevron's established prices and the product market indices contained in the contracts. This result is not surprising. Price adjustments based on Chevron's established prices alone would be expected to closely track price adjustments based on average established prices of multiple market participants. In dealing with a commodity such as fuel, where the products are standard and the market is competitive, a contractor would be forced to align its prices with the market. Otherwise, the contractor would fail to make sales and would lose market share to its competitors. Given these market realities, Chevron's own established prices would be expected to follow the market.

4. As with Chevron's established prices, there is a high degree of correlation between the movements in crude prices and the actual movement of prices in Chevron's contracts. For purposes of comparison, I used West Texas Intermediate and Alaska North Slope crude oils. The correlation between crude oil prices and product market prices is not surprising because crude oil is the principal material used in making the product Chevron sold to the Government. Because the EPA provisions in Chevron's contracts protected it from the potential harms identified in FAR 16.203-3 the clauses are authorized and valid.

Chevron is not Entitled to a Remedy Because It Already Received Fair Market Value for its Fuel

5. Aside from the validity of the clauses in its contracts, Chevron is not entitled to the remedy it seeks because it already received fair market value for its fuel. Chevron's suggestion that, year after year, contract after contract, it sold fuel to the Government at below fair market value prices, is not credible. Chevron sold fuel to the Government in open, free, and arms length transactions, in response to competitive, widely published solicitations. The contracting officers determined that Chevron's prices were fair and reasonable on the basis of adequate price competition and/or on the basis of market price data. Chevron was at all times knowledgeable of the value of its products in the marketplace. Chevron's continuing decision to sell substantial amounts of fuel to the Government over many years at competitively determined prices confirms that it was receiving fair market value for its fuel.

6. Chevron's suggestion that an EPA clause tied to market prices caused it to receive less than fair market value for its product is illogical. Assuming that the contract base price is a fair market value price, price adjustments tied to changes in the sales price of the relevant product must

result in fair market value prices. There can be no better method of ensuring that prices paid for an item represent fair market value then by adjusting them according to changes in the relevant market prices. Chevron can only ground its claims on the supposition that the contract base prices it bid were below fair market value. There is no evidence to support such an assertion. I reject the claim that Chevron consciously submitted bids below fair market value on the many contracts included in its claim. I find, on the contrary, that Chevron did receive fair market value through the operation of the contract EPA clauses.

7. As indicated above, product market escalators appeared in all of Chevron's contracts. Chevron does not allege that these market indicators failed to accomplish their purpose, namely, to be accurate indicators of actual price movements in the petroleum markets. Chevron never sought to invoke the provision, included in all its contracts, which allowed it to seek a substitute index in the event the contract index failed to track the market. Since Chevron was paid strictly in accordance with actual market movements, recorded in the market publications, Chevron received fair market value for its products throughout the terms of the contracts.

8. The EPA provisions in Chevron's contracts are the types of provisions used in the petroleum industry for term product supply contracts. DESC has been using these price adjustment provisions for more than 20 years for the purchase of more than $60 billion worth of fuel. With the issuance of every solicitation over the years, contractors have had the opportunity to protest the inclusion of these clauses if they thought the clauses would harm them in any way, or deprive them of fair market value for their fuel. Their continuing participation shows the clauses were acceptable to industry and satisfactorily allocated economic risk.

9. In 1995, DESC officially published in the Federal Register a proposed class deviation for the use of a market product escalator in its bulk petroleum solicitations. Chevron did not comment on DESC's use of this kind of EPA clause. Indeed, not a single petroleum firm offered comment or objection to DESC's use of such an EPA clause in its contracts.

10. Chevron continues to bid today under similar market-based price adjustment clauses. In fact, Chevron relies on a market-based index, very similar to the ones the Government has been using for the domestic Bulk Fuels contracts since 1995, to structure its claims. Chevron's conduct is inconsistent with its claims that it is entitled to re-price its contracts using an alternative notion of market value that it never sought during bidding, contract performance, or in the commercial marketplace.

Chevron's Claim Under Nine Contracts Must Fail Because the EPA Clause Was Lawfully Approved by Deviation

11. In December 1992, the MAPCO court decision held that the market-based EPA clause was unenforceable because it was not one of the types specifically listed in the FAR, and because, in that particular case, the clause did not protect the contractor from the risk envisioned by the regulation. Following the MAPCO decision, DESC obtained deviations, individual and class, to ensure the validity of its EPA clauses. Chevron Contracts DLA600-93-D-0507, SP0600-95-D-0462, SP0600-95-D-0521, SP0600-96-D-0520, SP0600-97-D-0514, SP0600-98-D-0507, SP0600-99-D-0534, SP0600-99-D-0535, and SP0600-99-D-0555 contain an EPA clause covered by a FAR deviation. Chevron argues that the Government's deviations are invalid for a variety of reasons. As discussed below, because Chevron's attacks on the deviations are factually and legally erroneous, I find that Contracts DLA600-93-D-0507, SP0600-95-D-0462, SP0600-95-D-0521, SP0600-96-D-0520, SP0600-97-D-0514, SP0600-98-D-0507, SP0600-99-D-0534, SP0600-99-D-0535, and SP0600-99-D-0555 contained an EPA clause covered by a FAR deviation. Thus, Chevron has no basis for its claim on those contracts.[3]

12. Chevron argues that the individual deviations covering Contracts DLA600-93-D-0507, SP0600-95-D-0462, and SP0600-95-D-0521 are void because under FAR 1.404, individual deviations may only be used for a single contract and DESC awarded multiple contracts under the deviations. However, FAR 1.404 provides for individual deviations that "affect only one contracting action." If the drafters of the FAR intended the result Chevron seeks, they could have limited individual deviations to one "contract" rather than employ the broader "one contracting action" terminology. In Pride Companies L. P. v. United States, 2000 U.S. Claims LEXIS 213 (2000), the court rejected the argument Chevron makes and ruled that an individual deviation applied to all of the contracts awarded under a particular

[3] Contracts beginning in 1996 were awarded pursuant to FAR Part 12, Acquisition of Commercial Items. Because the EPA clauses in Chevron's contracts are in accordance with commercial practice, six contracts awarded using Part 12 procedures contain EPA clauses authorized under Part 12 as well. The six contracts are SP0600-96-D-0520, SP0600-97-D-0514, SP0600-98-D-0507, SP0600-99-D-0534, SP0600-99-D-0535, and SP0600-99-D-0555.

solicitation. Thus, Contracts DLA600-93-D-0507, SP0600-95-D-0462, and SP0600-95-D-0521 contain an EPA clause covered by a proper FAR deviation.

13. Next, Chevron alleges that DESC failed to comply with the Federal Register publication requirements. This is not the case. The Government published the proposed class deviation in the Federal Register on February 28, 1995. Chevron did not comment on the EPA clause.

14. Chevron also argues that the Government failed to comply with 5 USC § 801 because it did not notify Congress of the final rule. This is not the case. In any event, 5 USC § 805 provides that omissions under § 801 are not subject to judicial review. Chevron challenges the deviation because the Government did not conduct a Regulatory Flexibility Act (RFA) analysis as required by 5 USC § 601 et seq. However, the Federal Register notice contained the agency's certification, as authorized by 5 USC § 605(b), that the proposed EPA clause coverage would not have a significant economic impact on a substantial number of small entities. By making this certification, the agency waived the requirement to do an analysis. The decision not to conduct an analysis is not subject to judicial review and provides no basis for invalidating the deviation.

15. Lastly, Chevron incorrectly argues that the class deviation is invalid because the FAR required that the Government seek "an appropriate revision to the FAR" because DESC knew it would need the deviation on a permanent basis. DESC met with the DAR Council to discuss a FAR change. The DAR Council concluded that since only one agency required the change, it did not need to amend the FAR under those circumstances. In any event, Chevron's argument would improperly read class deviations out of the FAR, a result the drafters certainly did not contemplate.

The Government's Procurement Process Complied with the Law

16. Based on the Government's EPA clauses, Chevron claims it is entitled to recover "fair market value" for its fuel under the following additional theories: misrepresentation, breach of contract, mutual mistake of fact, failure of consideration, and a 5th Amendment taking. Since the additional theories rest on the erroneous premise that the EPA clause harmed Chevron, none of these other theories is viable, either factually or legally.

17. Chevron contends that the Government's match price method of conducting small business set-aside negotiations violates Section 27 of the Federal Procurement Policy Act, 41 USC § 423, and that the procedure

constitutes an auction. Chevron does not explain how the set-aside procedure harmed it. In any event, the procedure complies with the law.

18. Section 27 does not apply to the 15 Chevron contracts that were either awarded or solicited before the July 16, 1989, effective date of the Act. In any event, Section 27 permits the release of proprietary or source selection information during the conduct of a procurement when agency procedures or the contracting officer permit. Because small business concerns were authorized to receive match price information under approved procedures dating to the 1960s, the statute was not violated.

19. Chevron erroneously contends that the set-aside procedures constitute an impermissible auction. FAR 19.502-3(c), which discusses partial small business set-asides, and FAR 52.219-7, the partial small business set-aside clause, set forth the very negotiation procedures that DESC uses and Chevron asserts are an auction. The Comptroller General has reported that DESC's small business procedures are consistent with applicable procurement and small business laws and regulations. See B-230556, March 23, 1989. Thus, set-aside negotiations, authorized by the FAR for many years, are not an impermissible auction.

20. Chevron claims that the Government's use of the 10 per cent evaluation preference for SDB concerns was unlawful, citing Adarand Constructors, Inc. v. Pena, 515 U.S. 200 (1995) (bidding preferences are subject to strict judicial scrutiny). Chevron suggests that the preference "affected the contract price" but provides no explanation. Since it cannot say how it was harmed, it is not entitled to any remedy.

Chevron's Market Value Formula Overstates the Value of Chevron's Fuel

21. Chevron uses the Pride Companies formula to determine the market value of its fuel. I disagree with this approach because it ignores the base bid price to which the parties agreed. In any event, contemporaneous documents do not support the $.05 per gallon premium above the market index that Chevron claims, or anything close to that amount. Chevron's own documents and bidding practices refute such a figure. I note that Chevron relies on a market-based index, the one the Government has been using since 1995, as the basis for its market value assessment, although Chevron simultaneously challenges the legality of such an index as an escalator. The index is an accurate reflection of market value, but Chevron's claimed premium is not.

## APPEAL RIGHTS

22. This is the final decision of the Contracting Officer. You may appeal this decision to the Armed Services Board of Contract Appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the Board and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals to the Board, you may, solely at your election, proceed under the Board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the Board, you may bring an action directly in the United States Court of Federal Claims within 12 months of the date you receive this decision.

23. In addition to these appeal rights, you may request that this dispute be resolved using Alternative Dispute Resolution (ADR) procedures. The use of ADR typically results in relatively expeditious and inexpensive dispute resolution. DESC is committed to using ADR whenever it is appropriate. Please keep in mind that choosing ADR does not suspend the respective 90-day and 12-month time periods for appealing this final decision. If you want to request ADR, or want more information about the various ADR options that are available, please contact me.

Sincerely,

JOHN R. WALKER
Contracting Officer
Bulk Fuels

cc: J. Keith Burt, Esq.
John Wyma, Esq.

Attachment 1

DLA600-82-D-0453
DLA600-82-D-0492
DLA600-82-D-0621
DLA600-83-D-0558
DLA600-84-D-0484
DLA600-84-D-0498
DLA600-84-D-0602
DLA600-86-D-0500
DLA600-86-D-0630
DLA600-86-D-0891
DLA600-87-D-0469
DLA600-88-D-0552
DLA600-89-D-0480
DLA600-89-D-0588
DLA600-89-D-1017
DLA600-90-D-0531
DLA600-91-D-0581
DLA600-92-D-0460
DLA600-92-D-0513
DLA600-92-D-0539
DLA600-93-D-0507
DLA600-93-D-0568
DLA600-93-D-0570
DLA600-94-D-0535
SP0600-95-D-0462
SP0600-95-D-0521
SP0600-96-D-0520
SP0600-97-D-0514
SP0600-98-D-0507
SP0600-99-D-0534
SP0600-99-D-0535
SP0600-99-D-0555

**MAYER, BROWN, ROWE & MAW**

1909 K STREET, N.W.

WASHINGTON, D.C. 20006-1101

**J. KEITH BURT**
DIRECT DIAL (202) 263-3208
kburt@mayerbrownrowe.com

MAIN TELEPHONE
(202) 263-3000
MAIN FAX
(202) 263-3300

February 12, 2003

Mr. John R. Walker
Contracting Officer
Defense Energy Support Center
8725 John J. Kingman Road
Suite 2941
Fort Belvoir, VA 22060-6222

Dear Mr. Walker:

We are writing on behalf of our client Chevron USA, Inc. Enclosed are two certified claims under contracts with DESC for the delivery of JP-4 and F-76.

If you are not the current contracting officer for these contracts, we request that you forward the respective claim to the appropriate contracting officer.

If you have any questions concerning the claims, you should contact us directly.

Sincerely,

J. Keith Burt

Enclosures

cc: Howard M. Kaufer, Esq. (w/o enc.)

Brussels Charlotte Chicago Cologne Frankfurt Houston London Los Angeles Manchester New York Palo Alto Paris Washington, D.C.
Independent Mexico City Correspondent: Jauregui, Navarrete, Nader y Rojas, S.C.

Mayer, Brown, Rowe & Maw is a U.S. General Partnership. We operate in combination with our associated English partnership in the offices listed above.

**DEFENSE LOGISTICS AGENCY**
DEFENSE ENERGY SUPPORT CENTER
8725 JOHN J. KINGMAN ROAD, SUITE 4950
FORT BELVOIR, VIRGINIA 22060-6222

IN REPLY REFER TO DESC-BZ

February 24, 2003

Mr. Todd P. Grubin
Chevron USA, Inc.
575 Market Street
San Francisco, CA 94105

Dear Mr. Grubin:

This is in reference to your two, February 12, 2003, claims for approximately $18.8 million on deliveries under unidentified contracts.

I have not been able to verify that any of the deliveries listed in these claims took place. Therefore, I request you provide copies of the information from which you derived the claimed deliveries and payments, including any additional data that you did not include in your exhibits. In addition, I request you provide an explanation of your invoice numbering scheme. I would like to have this information by March 7, 2003.

If you have any questions, please contact me at (703) 767-9267.

Sincerely,

JOHN R. WALKER
Contracting Officer
Bulk Fuels

cc: Mr. J. Keith Burt, Esq.

MAYER, BROWN, ROWE & MAW

1909 K STREET, N.W.

WASHINGTON, D.C. 20006-1101

J. KEITH BURT
DIRECT DIAL (202) 263-3208
kburt@mayerbrownrowe.com

MAIN TELEPHONE
(202) 263-3000
MAIN FAX
(202) 263-3300

March 3, 2003

**By Facsimile and First Class Mail**

Mr. John R. Walker
Contracting Officer
Defense Energy Support Center
8725 John J. Kingman Road
Suite 2941
Fort Belvoir, VA 22060-6222

Dear Mr. Walker:

We are writing on behalf of our client, Chevron USA, Inc., in response to your February 24, 2003 letter to Mr. Todd Grubin. In your letter, you request additional information concerning the deliveries and payments that are the subject of Chevron's two February 12, 2003 claims.

As Chevron states in each of the two claims, the schedule of deliveries and payments reflects Chevron's electronic invoice records. The invoice numbering scheme is the same that Chevron used in its prior claims.

If you have any further questions regarding these claims, you should contact us directly.

Sincerely,

J. Keith Burt

cc: Howard Kaufer, Esq.

Brussels Charlotte Chicago Cologne Frankfurt Houston London Los Angeles Manchester New York Palo Alto Paris Washington, D.C.
Independent Mexico City Correspondent: Jauregui, Navarrete, Nader y Rojas, S.C.

Mayer, Brown, Rowe & Maw is a U.S. General Partnership. We operate in combination with our associated English partnership in the offices listed above.

**DEFENSE LOGISTICS AGENCY**
DEFENSE ENERGY SUPPORT CENTER
8725 JOHN J. KINGMAN ROAD, SUITE 4950
FORT BELVOIR, VA 22060-6222

IN REPLY REFER TO DESC-BZ

March 4, 2003

Mr. Todd Grubin
Chevron USA, Inc.
575 Market Street
San Francisco, California 94105

Dear Mr. Grubin:

This responds Chevron USA, Inc.'s (Chevron) two February 12, 2003 (certified May 9, 2002), requests for payment totaling $18.8 million for alleged deliveries of JP-4 jet fuel and F-76 diesel fuel to the Defense Energy Support Center from 1982 to 1984. According to Chevron, the economic price adjustment (EPA) clauses in its contracts were unauthorized and therefore unenforceable. Chevron seeks to have the deliveries re-priced at a substantial premium.

As explained below, the information in Chevron's February 12, 2003, submissions is so inadequate that it fails to qualify as a claim for purposes of the Contract Disputes Act. Therefore, I will not issue a final decision on these requests for payment.

Chevron fails to provide any of the basic facts that would allow me to render a final decision. Specifically, Chevron fails to identify the contract(s) pursuant to which it made the purported deliveries, fails to identify the specific EPA clause(s) alleged to be unauthorized, and fails to provide any evidence that it actually made the deliveries.

Instead of providing these basic facts, Chevron states in its submission that other contracts during the 1982-84 period contained EPA clauses based on various "price indexes." Chevron states that the deliveries were listed in its electronic records; it has no paper copies evidencing the deliveries.

My search has failed to turn up any evidence of these deliveries or the contracts to which they might apply. Chevron's March 3, 2003, letter provided no new information.

For the foregoing reasons, I am unable to issue a final decision on Chevron's February 12, 2003, requests for payment.

Sincerely,

JOHN R. WALKER
Contracting Officer
Bulk Fuels

cc: J. Keith Burt, Esq.

Westlaw.

1988 WL 227932 (Comp.Gen.), B- 230,556

**(Cite as: 1988 WL 227932 (Comp.Gen.))**

COMPTROLLER GENERAL

*1 Subject: Defense Fuel Supply Center's Small Business Set-Aside Procurements (B-230556; Code 396917)
September 6, 1988

To: Group Director, NSIAD--John Rinko
Thru: Senior Attorney, OGC--A.R. Kasdan

DIGEST

The Defense Fuel Supply Center's (DFSC) small business partial set-aside procedures for the acquisition of its fuel supplies, comply and are consistent with the Small Business Act, 15 U.S.C. 631 et.seq., as well as other applicable Federal procurement laws and regulations. The DFSC procedures have been approved as deviations from applicable procurement regulations for over 20 years, and we previously considered these procedures as a reasonable exercise of DFSC's discretion. See B-168576(2), April 28, 1971 and B-171289, April 28, 1971.

This responds to your request for our views on the legality of the Defense Fuel Supply Center's (DFSC) small business set-aside practices (procedures) for the acquisition of its fuel supplies. In his letter of January 11, 1988, to GAO requesting this review, Senator Max Baucus questioned whether DFSC's small business set-aside procedures afford small business a fair opportunity to compete for these fuel acquisitions. He has asked GAO to determine whether DFSC's procurement procedures are consistent with the Small Business Act, as well as other applicable Federal procurement laws and regulations. For the reasons given below, we believe that DFSC's small business set-aside procurement procedures comply and are consistent with those laws and regulations.

Background

The DFSC purchases its bulk fuel supplies for the Department of Defense's (DOD) domestic requirements in a non-traditional way. It makes two major buys of bulk fuels with multiple contract awards based on a geographical division of the country: Inland/West and East/Gulf. It uses a bid evaluation model developed in the 1960's and 70's which allows it to select the particular combination of contract awards for a specific buy which will fulfill the government's requirement at the overall lowest cost (product plus transportation cost). Under this model, multiple awards are needed at many locations so that each individual requirement or location can be completely supplied. Usual procedures of awarding contracts to the lowest sources do not provide the least total cost pattern of awards.

DFSC solicitations request offers from all suppliers, including both large and small business firms, for needs of all DOD locations in the particular geographic

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

area. Using the model developed and taking into account quantities reserved for qualified minority small business firms and small business set-asides, prices for bulk fuels at the various locations in the region are established. DFSC must assure that the small business firms eligible for set-asides are offered an opportunity to receive contracts at a particular location at prices which are not higher than the maximum unit price DFSC would otherwise have to pay. It uses one of three methods--the balanced price, the step price and the matched price--depending on the pattern of bids received to determine the set-aside price. This price is then offered to small business and they have an opportunity to accept or reject it. If it is rejected, the amount set-aside is offered to other sellers at that location to avoid any resolicitation.

*2 Since 1960 DFSC procedures have been approved as a deviation or exception from procurement regulations applicable to small business partial set-asides. The most recent extension of this exception occurred in May 1987 when the DFSC procedures were approved as a deviation from the applicable provisions of the Federal Acquisition Regulation (FAR 19.507, and 19.508(d) ) and of the Defense Supplement to the FAR (DFAR 19.508(d) and 19.508(70) ). DFSC believes that these procedures are necessary to assure awards to small business concerns at prices that are fair and reasonable to the government and to the concerns. DFSC also argues that its procedure results in small business receiving an equal to or higher price for their fuel than they would have received if the standard FAR small business partial set-aside procedures were used. Under the FAR, the price for a partial set-aside is "... the highest unit price(s) in the contract(s) for the non-set-aside portion...." FAR 52.219.7

In his January 11 letter, Senator Baucus expressed concern that the DFSC's partial set-aside procedure may not be consistent with the spirit of the Small Business Set-Aside Program. He stated that in DFSC procurements small businesses do not engage in price competition with other small businesses. Since the "match price" for the fuel is largely set by the prices submitted by large fuel suppliers, small businesses are forced to compete with the cost of production of large suppliers. He therefore contends that DFSC's procedure does not offer small businesses the "maximum practical opportunity to participate in the performance of contracts let by any Federal agency," referring to the Small Business Act, 15 U.S.C. 637. [FN1]

Question: Does the DFSC small business partial set-aside procedure comply with the Small Business Act and other federal procurement laws and regulations?

Answer: Yes. Although the DFSC small business set-aside procedure is an approved deviation from FAR and DFAR provisions, it reserves for small business a portion of a particular acquisition as long as the price does not exceed the market price. The deviation from FAR and DFAR set aside procedures is required because of the nature of DFSC's acquisition of bulk fuel supplies. No provision of the Small Business Act or the FAR or DFAR require that small business compete only against each other in setting the price for the small business set-asides. GAO has previously found substantially similar DFSC procedures to be reasonable.

Explanation: The Small Business Act, 15 U.S.C. 631 et. seq., is designed to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

protect the economic interests of small business concerns, and "... to insure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the government be placed with small business enterprises ..." 15 U.S.C. 631(a). (Emphasis added.) Identical policy objectives are stated in the Armed Services Procurement Act (ASPA), 10 U.S.C. 2301(b), and the Federal Property and Administrative Services Act (FPASA), 41 U.S.C. 252(b), which respectively govern military and civilian acquisitions. Part 19 of the FAR implements the small business acquisition-related provisions of the Small Business Act and the applicable provisions of the ASPA and FPASA. Also, provisions of the DFAR apply to small business set-aside in DOD acquisitions.

*3 To achieve the Small Business Act's "fair proportion policy", both the Act and the FAR give federal agencies broad authority to award contracts to small business, including on a total or partial set-aside basis. 15 U.S.C. 644(a) and FAR 19.5. An agency may not award a contract to a small business firm if the agency's cost would exceed a fair market price, 15 U.S.C. 644(a). [FN2] Relatedly, the FAR set-aside procedures provide that in both total and partial procurement set-asides, the contracts awarded must be made only at reasonable prices. FAR 19.502-2 and 19.502-3. The FAR also requires that specific clauses be inserted for set-aside contracts, i.e., FAR 52.219-6 (total set-asides) and 52.219-7 (partial set-asides). [FN3]

For partial set-asides, FAR 19.502(3)(c) requires that the contracting officer must first award the non-set-aside portion using normal contracting procedures. Both large firms and businesses eligible for the set-aside submit offers on the non-set-aside portion. After the non-set-aside portion is awarded, the contracting officer negotiates with small business firms who have submitted responsive (acceptable) offers on the non-set-aside portion. The set aside portion will be awarded at the highest unit price(s) in the non-set-aside portion. FAR 52.219-7, part (b)(3) of the required contract clause. If a set-aside acquisition is not awarded, the supplies or services for which no award was made is recompeted. FAR 19.507(a).

The DFSC procedures differ from the FAR procedures in two substantial respects which are said by DFSC to be required to effectuate bulk fuel acquisitions. First, the award of set-aside quantities is made at prices which would have been paid without the set-aside. This can differ from the "highest unit price(s)" paid under the FAR. This variance is the result of the nature of the petroleum refining business. In most businesses, prices will often drop as more product is produced. In the petroleum refinery business, the contrary is the case. Since the refining process can produce many products, e.g., jet fuel, gasoline, diesel fuel, etc., increased quantities of one product are produced at the expense of others and the price of additional production rises.

The second difference is that in the event of set-aside failures, the set-aside portion is not recompeted. Under the DFSC procedures both large and small firms are required to submit offers on total quantities just as if there was no set-aside. In this way, in the event a set-aside acquisition cannot be filled, other offers can be considered.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Under both the FAR partial set-aside regulation and the DFSC deviation large and small business compete against each other. Under the former, the large and small firms submit offers on the non-set-aside portion which is awarded first. The set-aside portion is negotiated with qualified small business who have submitted responsive offers under the non-aside portion. Under the DFSC procedure, both large and small firms compete by submitting offers on total quantities.

*4 We have found no court cases or GAO decisions or opinions which have specifically addressed the issue whether the FAR partial set-aside procedures are a reasonable implementation of the requirements of the Small Business Act. However, GAO has considered DFSC procedures substantially similar to those in effect today as a reasonable exercise of an agency's discretion. In B-168576(2), April 28, 1971, a small business protested the reduction of the small business set-aside and proposed certain changes in DFSC's set-aside procedures. At that time, DFSC's procedures were a deviation from applicable ASPA regulations. The protestor proposed that the formula DFSC uses to calculate the prices paid for the quantities accepted be modified. Under this proposal, the price for the set-aside would be set on the basis of the prices and quantities remaining on each offeror's bid after subtracting the amount awarded on the non-set-aside portion.

DFSC pointed out that the proposed procedure would not only cost the government more money, but might actually result in lower prices for set-asides as the percentage of the total procurement which is set-aside increases. GAO stated that it would not substitute its judgment for that of DFSC "unless it [DFSC] has acted in an arbitrary or capricious manner." We concluded that based on the record, there was "substantial evidence to support DFSC decision not to revise its small business set-aside procedures," as suggested by the protestor. In B-171289 , also decided on April 28, 1971, GAO concluded that it failed to see how evaluation procedures--substantially similar to DFSC present procedures--would be contrary to the "congressional purpose and intent in establishing the small business set-aside procedure, 15 U.S.C. 631."

In conclusion, we find no reason to question our previous positions that DFSC procedures are in compliance with the Small Business Act and are a reasonable exercise of agency discretion to implement the policy of the act.

Substantially similar DFSC procedures have been approved as deviations from applicable procurement regulations for partial set-asides for over 20 years. Our view is reenforced by information DFSC has provided that shows that the DFSC set-aside procedure results in small businesses receiving an equal to or a higher price for their fuel than under the FAR set-aside procedure.

Finally, we note that Senator Baucus letter referenced the Small Business Act's requirement that small businesses "... shall have the maximum practical opportunity to participate in the performance of contracts let by any federal agency ..." 15 U.S.C. 637(a). However, this section is not applicable to the award of a federal contract, but to insure that small business receive subcontracts under prime contracts the government has already awarded.

Raymond J. Wyrsch

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Senior Attorney, OCG

FN1 Senator Baucus' request stemmed from a specific DFSC fuel acquisition in which one small business firm, the Wolf Point Refining Company, could not meet the offered "match price" for the delivery of JP-4 fuel to the Minot Air Force Base, because to do so would have resulted in a $900,000 loss to the company. The attorney representing the company believes that DFSC's small business set-aside procedure offers little opportunity for small businesses to compete against large firms. In view of the Senator's request for a general assessment of DFSC's procedure, and that Wolf Point did not file a bid protest concerning the Minot fuel acquisition, we will not address this case.

FN2 The Small Business Act also requires that the head of each agency shall establish goals for the participation by small business concerns in the award of its procurement contracts having a value of $25,000 or more, 15 U.S.C. 644(g).

FN3 The DFAR also requires that similar clauses be inserted in DOD contracts, i.e., DFAR 52.219-7003.

1988 WL 227932 (Comp.Gen.), B- 230,556

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

platts

## Market Prices

Platts' industry-standard price assessments are critical elements of short- and long-term contracts worldwide. Our pricing products range from real-time alert services to traditional newsletters and historical pricing and are delivered though a variety of medium to suit your individual needs. Our real-time market services help industry specialists understand price trends and emerging consensus as they're being formed – putting them in a better position to make faster, more profitable decisions. Platts' independent derivative assessments are one of the only sources of unbiased mark-to-market data for valuing positions.

### Oil

Asia-Pacific / Arab Gulf Marketscan (APAG)
Bunkerwire
China Fuel Oil Report
**Please note this publication is only available in Chinese.**
China Fuel Oil Report (English)
China Wire
Clean Tankerwire Monthly
Crude Oil Marketwire
Dirty Tankerwire
Dirty Tankerwire Monthly
Dispatch - Oil
European Marketscan
Forward Curve - Oil
Global Alert
Historical Price Data
Inside Energy
Latin American Wire
LPGaswire
Marine Alert
North American Crude Wire
North Sea Letter
Oilgram Price Report
Refiner
US Oil Data 1935 and Beyond
US Marketscan

Copyright © 2006 - Platts, All Rights Reserved
The McGraw-Hill Companies

platts

Get more out of your business.
ey.com/us/energycenter
Ernst & Young
Quality In Everything We Do





# Glossary

Other glossaries: Derivatives Glossary - Technicals Glossary - Glossary of International Glossary of Terms: EIA - US Power Glossary: EIA

A-B-C-D-E-F-G-H-I-J-K-L-M-N-O-P-Q-R-S-T-U-V-W-Z

15-Day Brent

## A

A/F
abandon
accumulation
AG
AGO
alkylate
alternating current (AC)
alternating current distribution
American style option
ampere (amp)
ancillary services
Andrew's Pitchfork
Aniline point
anode
ANS
anthracite
API
API gravity
APT
ARA
Arab Gulf
Aramco
arbitrage
aromatics
asph
asphalt
assay
assessment
associated gas
at-the-money
AUD

### spinning reserve

Unused capacity available from units connected to and synchronized with the grid to serve additional demand. The spinning reserve must be under automatic control to instantly respond to system requirements.

### spot market

A market where goods are traded for immediate delivery.

### SPR

Strategic Petroleum Reserve in the US.

### spread

The difference between two prices, either across time or between commodities or instruments.

### spread (options)

An option trade in which two or more open positions are established in order to trade the differentials and offset risk. Option spreads may use different strike prices and/or expiry dates.

### Spread-trading

Buying one instrument/commodity and selling another, with a view to profiting from the change in the gap between the two markets.

### steam cracker

Ethylene plant. A petrochemical plant which produces olefins, particularly ethylene, and, in some cases, aromatics.

### steam generation plant

A thermal electricity generating plant which creates steam to drive a turbine.

### stochastics

The theory of stochastics is based on the premise that prices close nearer the high in an uptrend, and nearer the low in a downtrend. %D Slow %D %K %R are all just names for different ways of smoothing the stochastic measures derived from the uptrend/downtrend theory.

NYMEX
NEW YORK MERCANTILE EXCHANGE

Home About the Exchange News Markets Education
Visitors Resources Shareholder Relations

>> NYMEX and Complete $160 Investment in N

Contact Us | Glo

Search

# Light Sweet Crude Oil

**Market Data**
Current Session Overview
Current Expanded Table
Previous Session Overview
Previous Expanded Table
Squawk Box
**Contract Detail**
Description
Specifications
Margins
Termination Schedule
Request for Information

Crude oil is the world's most actively traded commodity, and the NYMEX Division light, sweet crude oil futures contract is the world's most liquid forum for crude oil trading, as well as the world's largest-volume futures contract trading on a physical commodity. Because of its excellent liquidity and price transparency, the contract is used as a principal international pricing benchmark. Additional risk management and trading opportunities are offered through options on the futures contract; calendar spread options; crack spread options on the pricing differential of heating oil futures and crude oil futures and gasoline futures and crude oil futures; and average price options.

The contract trades in units of 1,000 barrels, and the delivery point is Cushing, Oklahoma, which is also accessible to the international spot markets via pipelines. The contract provides for delivery of several grades of domestic and internationally traded foreign crudes, and serves the diverse needs of the physical market.

Light, sweet crudes are preferred by refiners because of more...

**Daily Chart -**

CL(I

C=Last



**Margins** view

**Non-Member Customer Initia**

**Member Custo Initial**

**Clearing Memb Customer Maintenance**

©2006 New York Mercantile Exchange,Inc. All Rights Reserved.
Disclaimer Privacy Policy Report abuse

**Sour or Sweet Crude**
Industry terms which denote the relative degree of a given crude oil's sulfur content. Sour crude refers to those crudes with a comparatively high sulfur content, 0.5% by weight and above; sweet refers to those crudes with sulfur content of less than 0.5%.

**Sour Gas**
Natural gas found with a sufficiently high quantity of sulfur to require purifying prior to shipment or use.

**Spark Spread**
The spark spread reflects the costs or anticipated costs of producing power from a specific facility. It can be used as a method of converting millions of Btus to megawatt hours and vice versa, and thus relates well to the electricity and natural gas futures contracts. The spread is simply the heat rate (a proxy for efficiency) of a specific generating unit or power system (the number of Btus needed to make one kilowatt hour of electricity), multiplied by the cost of energy expressed as dollars per British thermal units (Btus). For example, if it takes 10,000 Btus to make one kilowatt hour of electricity, the formula can be simplified by multiplying the price per million Btus (MMBtu) by 10 to equate one MMBtu of natural gas to one megawatt hour (Mwh) of electricity. The usefulness of the spread evaluation is dependent on the market price for power which reflects the relationship of the supply and demand for power, not the efficiencies of the generating units. Other costs affecting the price of power using the spark spread evaluation include those of gas transportation, power transmission, plant operations and maintenance, and fixed costs. Because the electricity futures contract is specified in lots of 736 megawatt hours, and the natural gas futures contracts are specified in units of 10,000 million Btus, one power contract equates to 0.736 natural gas contracts.

**Specifications**
1) Contract terms specified by the Exchange. 2) Term referring to the properties of a given crude oil or refined petroleum product, which are "specified" since they often vary widely even within the same grade of product. In the normal process of negotiation, seller will guarantee buyer that the product or crude to be sold will meet certain specified limits. Generally, the major properties of oil that are guaranteed are API gravity, sulfur, pour point, viscosity, and BS&W.

**Specific Gravity**
The ratio of the density of a substance at 60 degrees Farenheit to the density of water at the same temperature.

**Speculative Position Limit**
The maximum position, either net long or net short, in one commodity futures or options, or in all futures or options of one commodity combined, which may be held or controlled by an entity without a hedge exemption as prescribed by an exchange or the Commodity Futures Trading Commission.

**Speculator**
A trader who hopes to profit from the specific directional price move of a futures or options contract, or commodity.

**Spot**
Term which describes one-time open market case (CHANGE TO CASH) transaction, where a commodity is purchased "on the spot" at current market rates. Spot transactions are in contrast to term sales, which specify a steady supply of product over a period of time.

**Spot Month**
The futures contract closest to maturity. The nearby delivery month.

**Spread (Futures)**
The simultaneous purchase and sale of futures contracts for different months, different commodities, or different grades of the same commodity.

**Spread (Options)**
The purchase and sale of options which vary in terms of type (call or put), strike prices, expiration dates, or both. May also refer to an options contract purchase (sale) and the simultaneous sale (purchase) of a futures contract for the same underlying commodity.

**Stock-Type Settlement**
A settlement procedure in which the purchase of a contract requires immediate and full payment by the buyer to the seller. In stock-type settlement, the actual cash profit or loss from a trade is not realized until the position is liquidated. NYMEX Division energy and platinum options have this type of settlement procedure, which differs from that in the futures market where gains and losses are realized on a daily basis.

OPIS NET
Downstream Petroleum News & Pricing | Crude | Refined Spot | Wholesale Racks | LPGas Feedstocks | Diesel | Retail Gasoline | Ethanol

Tuesday, March 28, 2006 12:07:02 PM

# About Us

Oil Price Information Service (OPIS) is the world's most comprehensive source for petroleum pricing and news information. Products and prices began in 1977 with the award-winning Oil Express Newsletter, quickly expanded in 1980 into the only source, and the world's most comprehensive database of U.S. wholesale petroleum prices. We now distribute the most accurate, reliable and referenced petroleum prices via e-mail, web, fax, newsletter, and 3rd party vendors.

OPIS is comprised of more than 50 information specialists, including the most experienced editors in the business, combining over 150 years of industry experience. Pricing experts track more than 70,000 rack prices for heating oil, gasoline, diesel and kerosene, and thousands of contract prices for jet fuel, LP-gas, residual fuel, ethanol, biodiesel and MTBE. More than 125,000 retail gasoline prices are also tracked daily.

Our editors not only cover the market, and report breaking stories -- but also provide inside analysis on what the trends mean and how they could affect prices and purchasing decisions.

Our client list is strictly confidential, and includes the top 200 oil companies, thousands of distributors, traders, government and commercial buyers of petroleum products.

**Recent Press Releases**
OPIS Acquires AXXIS Petroleum

| | |
|---|---|
| **About Us** | OPIS Benchmark \| OPIS Methodology \| OPIS West Coast Methodology FAQ<br>Privacy Policy \| Conferences & Education \| Advertising & Sponsorships |
| **News & Pricing Services** | OPIS Spot Ticker \| OPIS News Alerts \| LP-Gas Report \| International Feedstocks<br>Jet Fuel Report \| Gasoline/Diesel Rack Prices \| West Coast Refined Spots Report<br>Canadian Rack Prices \| Biodiesel Rack Prices \| Crude Postings \| Retail Truckstop Prices<br>Full-Day Refined Spot Report \| Metro Margin Report \| Metro Pump Report \| Fleet Fuel Mgmt<br>Truckstop Spread Report \| Propane Contract Prices \| Custom Price History/Time Series |
| **Newsletters** | OPIS Newsletter \| Oil Express \| OPIS Retail Fuel Watch<br>OPIS Fuel Ethanol & Biodiesel Report |
| **Directories** | Petroleum Supply Americas \| Petroleum Supply Europe<br>Petroleum Terminal Encyclopedia \| Who's Who in Natural Gas & Power |

Chevron

Home Q&A Contact Us Site In

About Chevron Investors News Room Worldwide Operations Social Responsibility Technology Brand

- The Chevron Way
- Operational Excellence
- Company Profile
  - Board of Directors
  - Executive Committee
  - Organization Chart
  - Company History
- Our Businesses
- Real Issues
- Real Issues Advertising
- Supplier Diversity
- Careers

# Company Profile

Chevron is the fifth-largest integrated energy company in the world. Headquartered in San Ramon, California, and conducting business in approximately 180 countries, the company is engaged in every aspect of the oil and natural gas industry, including exploration and production; refining, marketing and transportation; chemicals manufacturing and sales; and power generation.

## Company Roots

The company traces its earliest roots to an 1879 oil discovery at Pico Canyon, north of Los Angeles, a find that led to the formation of the Pacific Coast Oil Co., which later evolved into the Standard Oil Co. of California and, later, Chevron Corp. Another major root in the genealogical chart is the 1901 formation of The Texas Fuel Co. in Beaumont, Texas. It later became known as The Texas Co. and, eventually, Texaco Inc. In 2001, these entities merged to form ChevronTexaco. The name was changed to Chevron in 2005 to present a more unified presence in the global marketplace. The merger with Unocal in 2005 strengthened Chevron's position as a global energy leader, enhancing assets in key basins around the world.

## Global Scope

With the addition of former Unocal employees, the company's diverse and highly skilled global work force stands at approximately 53,000 employees. Chevron and its people continue to take great pride in a commitment to community partnerships, social responsibility and environmental excellence.

In 2004, ChevronTexaco produced more than 2.5 million barrels of oil equivalent per day, with two-thirds of the volume occurring outside the United States and in more than 20 different countries.

The acquisition of Unocal, including its share of equity affiliates, has added daily net production of approximately 459,000 BOE. As of December 31, 2004, Unocal, including its share of equity affiliates, reported it had net proved reserves approximately of 1.75 billion BOE.

With a global refining capacity of more than 2 million barrels of oil per day at year-end 2004, Chevron also has a marketing network that supports approximately 25,700 retail outlets - including those of affiliate companies - in nearly 90 countries. The company has interests in 16 power-generating assets located in the United States and Asia, three of which were added with the Unocal merger.

## Energy Technologies

Chevron develops and commercializes advanced energy technologies, including core hydrocarbon technologies, a global digital infrastructure and information technology. The current business development portfolio includes hydrogen infrastructure, advanced battery systems, nano-materials and renewable energy applications.

**Corporate G**

We seek the
all our stake
only for the g
achieve but
achieve ther

**Map of Oper**



We are activ
approximate
countries.
View more a
operations

**Corporate F**

View Fa
45Kb)

PDF downlo