IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CHEVRON U.S.A. INC., | ) | |
| TEXACO INC., | ) | |
| and TEXACO DOWNSTREAM LLC, | ) | No. 03-288C<br>(Chief Judge Damich) |
| Plaintiffs, | ) | |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(h)(1) of this Court's Rules, defendant, the United States, submits that the following facts pertinent to its motion for summary judgment are undisputed.

**The Parties**

1. Plaintiffs Chevron USA, Inc., Texaco Inc., and Texaco Downstream LLC (collectively, "Chevron"), are part of the ChevronTexaco Corporation family of companies. Second Amended Complaint ("Compl.") ¶ 4. In May, 2005 ChevronTexaco Corporation changed its name to Chevron Corporation. Chevron Corporation is the fifth-largest integrated energy company in the world and conducts business in approximately 180 countries. The company is engaged in every aspect of the oil and natural gas industry, including exploration and production; refining, marketing and transportation; chemicals manufacturing and sales; and power generation. The company traces its earliest roots to 1879 and is the product of the 2001 merger between Chevron and Texaco Inc. Defendant's Appendix ("App.") 128.

2. DESC is a field activity of the Defense Logistics Agency ("DLA"), a component of the Department of Defense. 48 C.F.R. ("DFARS") § 202.1. Among other things, DESC

(formerly called the Defense Fuel Supply Center, or "DFSC") purchases refined fuels for the military worldwide. Compl. ¶ 7.

3. DESC issues annual requests for proposals ("RFPs"), and receives dozens of offers to fill the Government's bulk fuel products requirements. App. 3 (Walker Decl.) ¶ 7. No offer is sufficient to fill the Government's needs. Id. Accordingly, DESC evaluates the proposals and awards contracts to a number of companies each year, based upon the lowest overall cost to the Government. Id.

**The Contracts**

4. Between 1981 and 1999, plaintiff Chevron USA, Inc. ("Chevron USA") or, operating through and under the name of one of its divisions, Chevron Products Company, entered into 32 DESC contracts for the supply of jet fuel, diesel fuel, or gasoline. Chevron supplied Jet A-1, JP-4, JP-5 and JP-8 jet fuel, DFM, F-76 and DFA diesel fuel, and MUM and MUR gasoline under the contracts. Compl. ¶ 1; App. 1 ¶ 2. Most of the contracts were one-year, indefinite quantity contracts in DESC's Bulk Fuels Program. Id.

5. Between 1983 and 1989, plaintiff Texaco Inc., or Texaco Downstream LLC, a successor to a wholly owned subsidiary of Texaco, Inc., entered into 7 DESC contracts for the supply of JP-4 jet fuel ("Texaco"). Texaco's contracts were one-year, indefinite quantity contracts in DESC's Bulk Fuels Program. Compl. ¶ 3; App. 1-2 ¶¶ 2, 4.

6. JP-4 jet fuel is naphtha-based and was used primarily by the Air Force and the Army in aircraft. App. 1-2 ¶ 3. JP-8 jet fuel is kerosene-based and is similar in composition to commercial jet fuel (which is called "kerojet" or "Jet A"). It is used in both aircraft and ground vehicles. Id. JP-5 is a kerosene-based jet fuel used by the Navy. Id. F-76 is a diesel fuel used

in the propulsion of Navy ships. Jet A-1, DFA, MUR and MUM were made to commercial specifications, modified for military use. Id.

7. Chevron's contracts were competitively awarded through negotiated solicitations, pursuant to 48 C.F.R. ("FAR") part 15 ("Contracting by Negotiation"), and FAR part 12 ("Acquisition of Commercial Items"). App. 2-3 ¶ 6. The base prices in Chevron's contracts were determined to be reasonable based on adequate price competition or on established catalog or market prices of commercial items sold in substantial quantities to the general public. App. 3 ¶ 8.

8. Virtually all of DESC's fuel supply contracts are of the "fixed price with economic adjustment" variety (see FAR subpart 16.203), and, therefore, contain an economic price adjustment ("EPA") clause. App. 2-4 ¶¶ 4, 5, 6, 9-11. DESC has used several versions of agency-drafted clause B19.33, "Economic Price Adjustment - Published Market Price." Id.

**The EPA Clauses**

9. DESC began using EPA clauses based upon crude oil costs in 1973, in response to increases in crude oil costs experienced by suppliers as a result of the Arab oil embargo. At that time, the Government had imposed controls upon the price of crude oil. After the price restraints were lifted, DESC gave suppliers the option of selecting an EPA clause based either upon actual crude oil costs, or upon market prices for similar products. In 1981, having concluded that allowing that choice presented too many administrative problems, including difficulties in evaluating and comparing bids that used different EPA indexes, DESC began using market-based indexes exclusively. DESC chose a refined product market index because

that index was believed to closely mirror changes in refiners' costs, over time, although a given price index might not track costs over shorter periods. See App. 24.

10. DESC's EPA clauses listed prices for various refined products and regions, taken from commercially available market price publications. See, e.g., App. 87-89 (parts A and D). For example, part D of EPA clause B19.33 provided a unique "reference price" (sometimes called a "base reference price") for each refined petroleum product sought in the RFP. App. 87-88. DESC's principal EPA clause (B19.33) listed prices for various refined products and regions, taken from a commercially available market publication. An offeror would propose a "base price" for each product offered. That price was subject to adjustment, based upon changes in the reference price. Specifically, B.19.33 provided that "[t]he prices payable under this contract for listed items shall be the base [proposal] price for the listed item increased or decreased by the same number of cents, or fraction thereof, that the reference price increases or decreases per like unit of measure from the base reference price." App. 88 (part D ¶(c)). The base price was primarily for evaluation purposes, and as the baseline from which price adjustments were made. Because the base price would be adjusted during performance, it was not the price the contractor received for fuel. App. 2 ¶ 5.

11. DLA600-82-D-0492 and DLA600-82-D-0621 were based upon Platts Oilgram Price Report ("Platts"), a commercial petroleum-industry price report. App. 3 ¶ 9. According to its web site, "Platts' industry-standard price assessments are critical elements of short-and-long term contracts worldwide." App. 122.

12. Chevron contracts DLA600-83-D-0558, DLA600-84-D-0484, and DLA600-84-D-0602 contained EPA clauses based upon prices published by the United States Department of

Labor's Bureau of Labor Statistics ("BLS"). App. 3 ¶ 9.

13. The EPA clauses in contract DLA6600-84-D-0498 and in Chevron's 1986 to 1994 Bulk Fuels contracts were based upon prices published in the Petroleum Marketing Monthly ("PMM"), a petroleum pricing publication issued by the Department of Energy. Compl. ¶ 12; App. 3-4 ¶ 9. The EPA clauses in Texaco's 1984-1989 contracts also were based upon prices published in PMM. App. 3-4 ¶ 9.

14. Beginning in 1995, Chevron's Bulk Fuels Program contracts, and contract DLA600-89-D-1017 (a Posts, Camps and Stations Program contract) included an EPA clause based upon regional average prices reported in either Platts or the Oil Price Information Service ("OPIS"). App. 4 ¶ 11. "OPIS is the world's most comprehensive source for petroleum pricing . . . ." Its client list " . . . includes the top 200 oil companies." App. 127.

**<u>The PMM</u>**

15. The PMM is a compilation of domestic petroleum transaction prices, published by the Department of Energy's Energy Information Administration. App. 4 ¶ 10. All refiners, including Chevron, are required by law to submit sales data to DOE monthly. <u>Id.</u>; 15 U.S.C. § 772. DOE compiles the data and reports monthly average sales prices for various petroleum products, by product and by region, in the PMM. App. 4 ¶ 10. Prices were adjusted monthly under the PMM EPA clause. <u>Id.</u>

16. Because DOE requires time to obtain the sales data for any particular month, any given month's edition of the PMM reports prices paid three months earlier. Thus, for example, sales data for January are published in April, and data for February are published in May. <u>Id.</u> To

accommodate the PMM's three-month reporting lag, DESC made monthly adjustments on an interim basis, and then reconciled them when PMM data for that month were published. Id.

17. In January, 1986, DESC's Office of Market Research and Analysis prepared a recommendation to change the procedure by which offers were submitted in DESC's solicitations for bulk fuels. App. 28. Due to the PMM's three-month reporting lag, offerors were required to submit offers tied to a reference price that had not yet been published. App. 28 ¶¶ 1, 2. That is, the clause provided that the base reference price was the PMM price published for the month before the submission of best and final offers. Id. As the recommendation noted, "[s]ince the Best and Final offers are submitted before the base reference is known, offerors must guess at the relationship between the offered price and the reference." Id. at ¶ 2. The recommendation noted that "the movement of PMM compared to other references as used for interim price adjustments may have moves as much as one or two cents per gallon out of step with such interim references." Id. at ¶ 3. The recommendation noted that offerors might increase their price to compensate for the unknown factor of what the PMM reference price would be when it was eventually published and, therefore, recommended that the best and final price be tied to an already published final and interim reference price. "For example, if the best and final date were November 15th, the final base EPA reference price would be PMM for August and the interim base reference would be the publication(s) . . . for the month of July." App. 28-29.

18. In 1987, DESC's Office of Market Research and Analysis prepared a decision paper concerning the ". . . means of price escalation used in the domestic programs." App. 30 ¶ 1. The purpose of the decision paper was to decide whether to modify DESC's EPA clauses.

App. 31 ¶ 1 (Issue). The paper considered four options in this regard: 1) keeping the price adjustment system then in use by DESC, 2) modifying the system then in use to " . . . reduce offer price uncertainties," 3) adjusting prices twice monthly using "trade journal" prices, and 4) adjusting prices weekly using "trade journal" prices. App. 30 at ¶ 2; App. 35-36, Decision Options.

19. The paper set forth nine criteria by which to judge proposed escalation systems, " . . . 1) product; 2) geography; 3) timing; 4) timeliness; 5) commonality; 6) independence from contractor influence; 7) basis in actual sales; 8) market risk; and 9) simplicity." App. at Discussion. The paper then compared PMM prices to "trade journal" prices for using those nine criteria. App. 31-35.

20. The paper concluded that:

> [t]he current PMM based system is preferable by three criteria: independence from contractor influence, sales basis, and market risk. Three other criteria, simplicity, timing, and timeliness, favor the switch to trade journals. By the criteria of product, geography, and commonality there is no clear alternate between the alternate systems.

App. 31 at Discussion.

21. The paper included a detailed analysis of each of the nine criteria and whether each favored the PMM, the trade journal prices, or neither. The paper found that the product criterion favored neither, because "[b]oth the PMM and trade publications publish prices of similar commercial products . . . ." App. 31. Regarding geography, the paper found that both PMM and trade publications prices were published in ". . . the geographical area where the requirements are located." App. 32. Regarding commonality, the paper found that either PMM or trade publications were acceptable to both DESC and contractors, based upon the fact that

DESC had used PMM prices successfully in bulk fuels for three years and had used trade publication prices successfully in contracts for ground fuels and overseas bulk programs. Id.

22. The paper concluded that the contractor influence, contractor sales, and market risk factors favored PMM. App. 32-33. The paper noted that, although both PMM and trade publications were independent of DESC contractors, trade publications might be influenced by the moves of large "market players" "given their informal method of conducting market surveys," whereas the PMM was a survey of actual sale prices. App. 32. Regarding market risk, the paper found that DESC ". . . contract prices are susceptible to market risk if they escalate on indices which do not correlate well with actual sales prices. PMM prices are actual sales price averages." App. 33. Trade publication prices were considered more ". . . variable in quality . . . ." Id. The study also found that trade publication prices were more susceptible to "price stickiness," and increased the market risk of higher prices during time periods of declining prices because sellers might be slow to lower posted prices. Id.

23. The paper concluded that the timing and timeliness criteria favored trade publication prices. The PMM published prices three months after they were paid. PFF 16. To accommodate that fact, DESC adjusted prices on an interim basis, using trade publications, subject to later reconciliation. App. 32. By contrast, trade publications, such as Platts and OPIS are published daily, which permitted closer to real-time pricing and eliminated the need for interim adjustments. App. 4 ¶ 11. As the paper also explained, the timing of those prices would reduce the ". . . possibility that contractors will build a contingency premium into their prices." App. 32.

24. Finally, the paper set forth a summary of the "pros and cons" of the four alternatives. The paper concluded that the preferred option was to modify the existing use of PMM prices by using the latest published PMM price as the base reference price. That, the study reasoned, would eliminate "margin uncertainty" and allow bidders to base their offered prices on a known reference price. The paper pointed out that "[s]everal individuals and contractors have suggested that [DESC] modify its current system in this manner." App. 35. Starting in 1987, DESC began using this modified PMM-based adjustment, and continued to do so until 1995, when the use of trade publication prices began. See PFF 14. An example of the PMM adjustment clause in use between 1987 and 1993 is contained at App. 87-89.

25. In September, 1994, DESC requested a one-time FAR deviation to authorize the use of price adjustment based on market prices published in Platts and Oil Price Information Service ("OPIS") for that year's annual bulk fuels contract, in lieu of PMM prices. App. 6 ¶ 17; App. 47. In the request for a FAR deviation, DESC set forth reasons for switching from PMM prices to Platts and OPIS prices. DESC stated that the PMM prices had been reliable, but that using Platts and OPIS would provide several advantages. In addition to eliminating the need for two price adjustments, DESC stated, "commercial publications [such as Platts are] widely accepted by industry" and would be simpler to use. App. 49-50. DESC further noted that its Office of Market Research and Analysis had studied the proposed Platts-based clauses and found them to provide reliable bases for price adjustments. App. 50; see also App. 6 ¶ 17.

26. In May, 1995, DESC sought a Class Deviation and change to the Defense Logistics Agency Acquisition Regulation ("DLAR") that would explicitly authorize DESC to base its EPA clauses upon "industry publications" (including Platts and OPIS). App. 52. The

bases for DESC's request for such permanent authorization were the same as set forth in its request for an individual deviation the previous fall. App. 53, ¶ III. B. DESC noted that "industry publications" were published more often and would eliminate the "need for double calculations or price adjustments, a significant savings to the government." Id. The deviation request noted that, due to the lag time between interim and final billing under PMM, "contractors likely build in a price cushion." The deviation also noted that the use of an "industry publication" was similar to the "way adjustments are done commercially in that commercial publications are widely accepted by industry." Id.

27. The DESC request also noted that "industry publications" had been used for DESC programs other than bulk fuels for years. Id. As it did in its earlier request, DESC stated that its "Office of Market Research and Analysis has studied the proposed EPA provisions and found them to be reliable for price adjustments." Id. The Office of Market Research and Analysis study to which both deviation requests referred was the 1987 study described in PFF 18-24. App. 45-46.

28. Thus, beginning in 1995, the "base reference" price for Chevron's Bulk Fuels Program contracts were regional average prices reported in Platts or OPIS. App. 4 ¶ 11. Because Platts prices were published daily, and OPIS prices weekly, DESC was able to adjust prices weekly, and, therefore, was able to discontinue the burdensome interim payment and reconciliation process required by the PMM-based EPA clause. Id.

**DESC's Small and Small Disadvantaged Business Program**

29. In accordance with 15 U.S.C. § 644 and FAR Part 19, many of DESC's bulk fuels program solicitations included partial small business set-asides. App. 7 ¶ 19. Beginning in

1988, pursuant to 10 U.S.C. § 2323, DESC solicitations also included an evaluation preference of up to 10 per cent for small disadvantaged business concerns. Id. DESC solicitation clauses I237.05, Notice of Evaluation Preference for Small Disadvantaged Business Concerns, and I237.06, Notice of Partial Small Business Set-Aside with Preferential Consideration for Small Disadvantaged Business Concerns, set forth the operation of these programs. App. 10-11.

30. The clauses provided that the set-aside price would be the highest price the Government would pay for the non-set-aside portion of the fuel required for a location, and allowed negotiation with small business offerors to obtain that price. DESC did not provide small business concerns with either the identity or the prices of other offerors. App. 7-8 ¶ 20. The negotiated price DESC allowed small business concerns to match was comprised of the fuel price the Government would pay plus a figure for transportation costs to the destination. Id.

31. DESC's method of awarding partial set asides in its bulk fuels acquisitions differs from the standard FAR and DFARS procedures, in that DESC makes offers for the set aside quantities before award of the basic quantities. App. 8 ¶ 21; App. 10-13. The standard FAR and DFARS procedure is to offer set aside quantities after award of the basic quantities. App. 16-23. Under the DESC clauses, where there is a set aside failure, the quantities are awarded to the low offeror for the basic quantity rather than being re-solicited as a new requirement. App. 8 ¶ 21; App. 10-13. This procedure avoids the delay that would take place in re-soliciting set aside failure quantities under the standard FAR and DFARS procedures. Id. DESC has used this method since the 1960's pursuant to authorized deviations. Id.; App. 117. The DESC procedure has been approved by the Government Accountability Office ("GAO"), formerly the General Accounting Office, on several occasions. App. 117.

32. Based on a review of the contract files that are still available, four contracts that DESC awarded to Chevron (DLA-600-86-D-0891, DLA-600-92-D-0460, DLA-600-92-D-0512, SPO-600-99-D-0555), were awarded pursuant to solicitations that did not include small business set asides, and did not include either DESC's or the standard FAR or DFARS set aside clauses. App. 7 ¶ 19.

**Chevron's Claims**

33. During performance of the contracts at issue, neither Chevron nor Texaco raised any question regarding the legality of the EPA clauses, and they never complained that they were not being paid fairly. App. 5 ¶ 13. Neither company objected to any of the hundreds of monthly and weekly price adjustments made under the contracts' BLS based, PMM-based, Platts-based, or OPIS-based EPA clauses. Id.

34. Chevron USA submitted claims concerning this matter to the contracting officer between December 6, 2001, and January 31, 2002. Compl. ¶ 34; App. 5 ¶ 14. Texaco submitted claims between September 10, 2001 and October 10, 2001. Compl. ¶ 36; App. 5 ¶ 14. Their principal contention was that the EPA clauses in the contracts were illegal, citing the MAPCO decision. App. 5 ¶ 14; e.g., App. 56-83. The claims did not assert that the clauses were ambiguous, had failed to operate as expected, or that they had failed to protect from significant fluctuations in costs or prices. Id.

35. To price the claims, Chevron began with the Platts Spot Price averages for a similar product, and added a long-term contract premium, transportation costs, and, when appropriate, prices for additives. E.g., App. 80-81.

36. The contracting officer denied Texaco's claims in a final decision dated February

11, 2002. Compl. ¶ 37; App. 98. The contracting officer denied Chevron USA's claims in a final decision dated July 2, 2002. Compl. ¶ 38; App. 104. The contracting officer concluded, among other things, that the EPA clauses are authorized and enforceable, and that the prices calculated in Chevron' claims do not reflect fair market value. App. 5 ¶ 15; App. 98-112.

37. On February 12, 2003, Chevron USA submitted additional claims in the amount of $18.8 million. App. 113. Chevron did not identify the contracts under which it submitted the claims. On February 24, 2003, the contracting officer requested that Chevron provide additional information regarding the basis for the claims. App. 114. Chevron replied that the claims were based on " . . . Chevron's electronic invoice records." App. 115. On March 4, 2003, the contracting officer notified Chevron that its submission failed to qualify as a claim for purposes of the Contract Disputes Act, and that DESC would not issue a final decision on the claim. App. 116. The contracting officer stated that Chevron had failed to identify either the contracts or EPA clauses under which it had purportedly made deliveries to DESC in 1982-1984. Id.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Steven J. Gillingham
STEVEN J. GILLINGHAM
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Tele: (202) 616-2311
Fax: (202) 353-7988

Attorneys for Defendant

OF COUNSEL:

HOWARD M. KAUFER
Assistant Counsel
Office of Counsel
Defense Energy Support Center
Ft. Belvoir, VA

DONALD S. TRACY
Trial Attorney
Defense Supply Center Richmond
Richmond, VA

April 13, 2006

CERTIFICATE OF FILING

I hereby certify that on April 13, 2006, a copy of the foregoing document was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Steven J. Gillingham