IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 03-288C
(Chief Judge Damich)

CHEVRON U.S.A. INC., TEXACO INC., AND TEXACO DOWNSTREAM LLC,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

**PLAINTIFF'S MOTION PURSUANT TO RCFC 56(f) TO REFUSE DEFENDANT'S APPLICATION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR A CONTINUANCE TO PERMIT DISCOVERY**

J. Keith Burt
Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, D.C. 20006
(202) 263-3208

Attorneys for Plaintiffs,
Chevron U.S.A. Inc., Texaco Inc.,
and Texaco Downstream LLC

May 30, 2006

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........ ii

ARGUMENT ........ 2

I. DESC'S PROPOSED FINDINGS OF FACT FOR WHICH CHEVRON REQUIRES DISCOVERY ........ 7

II. WELL-PLEADED ALLEGATIONS IN CHEVRON'S SECOND AMENDED COMPLAINT APPLICABLE TO ALL COUNTS FOR WHICH CHEVRON REQUIRES DISCOVERY ........ 12

III. WELL-PLEADED ALLEGATIONS IN COUNT I OF CHEVRON'S SECOND AMENDED COMPLAINT FOR WHICH CHEVRON REQUIRES DISCOVERY ........ 15

IV. WELL-PLEADED ALLEGATIONS IN COUNT II OF CHEVRON'S SECOND AMENDED COMPLAINT FOR WHICH CHEVRON REQUIRES DISCOVERY ........ 16

V. WELL-PLEADED ALLEGATIONS IN COUNT III OF CHEVRON'S SECOND AMENDED COMPLAINT FOR WHICH CHEVRON REQUIRES DISCOVERY ........ 17

VI. WELL-PLEADED ALLEGATIONS IN COUNT IV OF CHEVRON'S SECOND AMENDED COMPLAINT FOR WHICH CHEVRON REQUIRES DISCOVERY ........ 18

VII. WELL-PLEADED ALLEGATIONS IN COUNT V OF CHEVRON'S SECOND AMENDED COMPLAINT FOR WHICH CHEVRON REQUIRES DISCOVERY ........ 19

VIII. WELL-PLEADED ALLEGATIONS IN COUNT VI OF CHEVRON'S SECOND AMENDED COMPLAINT FOR WHICH CHEVRON REQUIRES DISCOVERY ........ 20

IX. WELL-PLEADED ALLEGATIONS IN COUNT VII OF CHEVRON'S SECOND AMENDED COMPLAINT FOR WHICH CHEVRON REQUIRES DISCOVERY ........ 23

X. FACTS WITH RESPECT TO DESC'S AFFIRMATIVE DEFENSE OF WAIVER FOR WHICH CHEVRON REQUIRES DISCOVERY ........ 23

CONCLUSION ........ 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. United States*, 391 F.3d 1212 (Fed. Cir. 2004) .....1

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986) .....2

*Ashe v. Corley*, 992 F.2d. 540 (5th Cir. 1993) .....4 n.1, 5

*Burnside-Ott Aviation Training Center, Inc. v. United States*, 985 F.2d 1574 (Fed. Cir. 1993) .....3

*Calcasieu Refining Co. v. United States*, No. 02-1219C (Fed. Cl.) (March 2, 2006) .....7 n.5

*Celotex Corp. v Catrett*, 477 U.S. 317 (1986) .....2, 4 n.1, 24

*Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991) .....4 n.1

*Dunkin' Donuts of Am., Inc. v. Metallurgical Exoproducts Corp.*, 840 F.2d 917 (Fed. Cir. 1988) .....2

*Gary-Williams Energy Corp. v. United States*, No. 03-2106C (Fed. Cl.) .....6 n.4

*Gregory Lumber Co. v. United States*, 9 Cl. Ct. 503 (1986) .....2

*Hunt v. Bankers Trust Company*, 689 F. Supp. 666, 671 (D. Tex. 1987) .....2

*Jade Trading, LLC v. United States*, 60 Fed. Cl. 558 (2004) .....2

*Parrish v. Board of Commissioners*, 533 F.2d 942 (5th Cir. 1976) .....3, 4

*Simmons Oil Corp. v. Tesoro Petroleum Co.*, 86 F.3d 1138, 1144 (Fed. Cir. 1996) .....6

*Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560 (Fed. Cir. 1987) .....5 n.2

*Theisen Vending Co. v. United States*, 58 Fed. Cl. 194 (2003) .....6 n.4

*Valero-Refining-Texas, L.P. v. United States*, No. 03-1916C (Fed. Cl.) .....7 n.5

*Ward v. United States*, 471 F.2d 667 (3d Cir. 1973) .....3

**Miscellaneous**

*Wright, Miller & Kane*, 10A FEDERAL PRACTICE AND PROCEDURE § 2741 at 428 (3d ed. 1998) .....2, 4 n.3

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CHEVRON U.S.A. INC.,<br><br>and<br><br>TEXACO INC.,<br><br>and<br><br>TEXACO DOWNSTREAM LLC,<br><br>Plaintiffs,<br>vs.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 03-288C<br>(Chief Judge Damich) |

**PLAINTIFF'S MOTION PURSUANT TO RCFC 56(f) TO REFUSE DEFENDANT'S APPLICATION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR A CONTINUANCE TO PERMIT DISCOVERY**

Pursuant to RCFC 56(f), Plaintiffs, Chevron U.S.A. Inc., Texaco Inc., and Texaco Downstream LLC (collectively "Chevron"), respectfully submit their Motion To Refuse Defendant's Application For Summary Judgment Or, In The Alternative, For A Continuance To Permit Discovery.

The Defense Energy Support Center's ("DESC's") pending Motion to Dismiss states in its first paragraph that, in addition to seeking dismissal under RCFC 12(b)(1) and 12(b)(6), DESC alternatively seeks summary judgment pursuant to RCFC 56(b) on all grounds set forth in the Second Amended Complaint save paragraphs 47 and 48 (relating to DESC's small businesses and minority preference programs). (DESC's Mot. at 1.) While DESC's request for dismissal under RCFC 12(b)(1) and 12(b)(6) must accept the truth of all well-pleaded allegations in Chevron's Second Amended Complaint, *Adams v. United States*, 391 F.3d 1212, 1218 (Fed. Cir. 2004), DESC's request for summary judgment seeks to go beyond the well-pleaded allegations in the Complaint. DESC's request for summary judgment must be denied because Chevron has not had an opportunity for discovery on any of its claims and, therefore, cannot present facts

essential to justify its opposition. *Celotex Corp. v Catrett*, 477 U.S. 317, 326 (1986). Accordingly, pursuant to RCFC 56(f), this Court should refuse DESC's application for summary judgment or, in the alternative, grant a continuance so that Chevron can obtain the discovery it requires.

## **ARGUMENT**

RCFC 56(f) provides:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Consistent with RCFC 56(f) and its companion provision in the Federal Rules of Civil Procedure, the Supreme Court has made clear that summary judgment should not be granted until the non-movant has "had an opportunity to make full discovery." *Celotex*, 477 U.S. at 326; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986) (Rule 56(f) requires that "summary judgment be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition"); *Dunkin' Donuts of Am., Inc. v. Metallurgical Exoproducts Corp.*, 840 F.2d 917, 919 (Fed. Cir. 1988) (summary judgment is "inappropriate unless a tribunal permits the parties adequate time for discovery"). Accordingly, requests to refuse judgment or for a continuance under RCFC 56(f) are "generally favored and should be liberally granted." *Jade Trading, LLC v. United States*, 60 Fed. Cl. 558, 565 (2004) (internal citations omitted); *Gregory Lumber Co. v. United States*, 9 Cl. Ct. 503, 532 (1986) ("[W]e embrace with approval the requirement of a liberal construction of Rule 56(f). . . ."). Indeed, "[t]he sheer complexity, size, or significance of a case may be a sufficient ground for deferring decision of a motion for summary judgment to permit further discovery." *Hunt v. Bankers Trust Company*, 689 F. Supp. 666, 671 (N.D. Tex. 1987); *see also* Wright, Miller & Kane, 10A FEDERAL PRACTICE AND PROCEDURE § 2741 at 428 (3d ed. 1998) (same).

In *Burnside-Ott Aviation Training Center, Inc. v. United States*, 985 F.2d 1574 (Fed. Cir. 1993), the Federal Circuit applied a relevancy standard in holding that the failure to permit discovery before granting summary judgment was improper. In *Burnside Ott*, the Court of Federal Claims dismissed claims of estoppel and mistake after only two months of discovery and despite the plaintiff's objection that discovery was inadequate. *Id*. at 1582. On appeal, the Federal Circuit reversed, holding: "Because intent is *relevant* [to the plaintiff's claims of estoppel and mistake] the Claims Court erred in granting summary judgment on the issue without allowing adequate discovery." *Id*. (emphasis added). Admonishing that "summary judgment is inappropriate unless a tribunal permits the parties adequate time for discovery" the court held that "the case demands adequate discovery" and directed the trial court "to permit full discovery of facts necessary to resolve this case." *Id*.; *see also Parrish v. Board of Commissioners*, 533 F.2d 942, 947 (5th Cir. 1976) (grant of summary judgment before discovery improper where discovery was "relevant and necessary to fair litigation.").

Chevron has received no discovery in this case, including no discovery of DESC's contract files with respect to the fuel contracts at issue. The discovery Chevron seeks is clearly "relevant" to its claims. *Burnside-Ott*, 985 F.2d at 1582. While Chevron has obtained a substantial number of documents from DESC in a similarly situated case, Chevron has not had an opportunity to obtain all of the documents it requires, take depositions of key DESC witnesses or obtain any discovery from key third parties. Discovery is required either because information is uniquely held by DESC or because Chevron is required to depose any number of former employees that are now third-party witnesses. *See, e.g., Ward v. United States*, 471 F.2d 667, 670 (3d Cir. 1973) (holding that when the crucial facts are solely in the possession of the moving party, "a motion for a continuance of a motion for summary judgment for purposes of discovery should, we think, ordinarily be granted almost as a matter of course").

Discovery is particularly appropriate to the extent that DESC seeks (erroneously here Chevron believes[1]) to support its motion without offering evidence and by simply arguing that the record does not support Chevron's case. *See, e.g.*, DESC's Mot. to Dismiss at 10-11. Denying discovery in this context would permit the government to respond to every complaint by moving for summary judgment based on the assertion that there is no evidence to support the plaintiff's case and to obtain dismissal of the complaint when the government itself holds the evidence of its own liability. Such efforts, in essence to thwart the discovery processes upon which litigation in federal courts has long been premised, are properly rejected. *Parrish v. Board of Commissioners*, 533 F.2d 942, 947 (5th Cir. 1976) (stating with respect to Rule 56(f), "[i]n effect, the argument of appellees amounts to a contention that a mere denial of improper conduct by the party against whom discovery is sought is adequate to support refusal to compel discovery, unless the opposing party is able to counter such denial by specific affidavit. Such a rule would frustrate the discovery process and tend to erect an unreasonably protective shield around parties possessing material relevant and necessary to fair litigation.").

What is perhaps most conspicuous is that DESC is apparently unable to offer affidavits from any contracting officer or other DESC personnel denying Chevron's allegations, *inter alia*, of misrepresentation, mistake, and breach of contract. Instead, DESC seeks to force Chevron to proffer evidence unilaterally while DESC conceals its own employees and documents behind a dark curtain. Chevron will fully support its claims, following full discovery, when either DESC

[1] *Celotex*, 477 U.S. at 328 ("[T]he movant may rely on depositions, answers to interrogatories, and the like, to demonstrate that the plaintiff has no evidence to prove his case and hence that there can be no factual dispute. But the movant must discharge the burden the Rules place upon him: It is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case.") (White, J., concurring); *Ashe v. Corley*, 992 F.2d 540, 543 (5th Cir. 1993) ("It is not enough for the moving party to merely make a conclusory statement that the other party has no evidence to prove his case."); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) ("Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial.").

presents evidence challenging them or at trial. Chevron does not consent to defend its claims, and has no obligation to do so, on this vastly incomplete record while DESC withholds evidence and is unwilling to submit sworn testimony even denying Chevron's claims. As the United States Court of Appeals for the Fifth Circuit stated in *Ashe v. Corley*, 992 F.2d 540 (5th Cir. 1993): "[S]imply filing a summary judgment motion does not immediately compel the party opposing the motion to come forward with evidence demonstrating material issues of fact as to every element of the case. It is not enough for the moving party to merely make a conclusory statement that the other party has no evidence to prove his case." *Id*. at 543 (internal citations and quotations omitted).

Accordingly, Chevron sets forth below and in the Rule 56(f) declaration accompanying this motion (*see* Exhibit A) the discovery it requires to respond to DESC's request for summary judgment, without access to which Chevron is unable to present by affidavit or other sworn testimony facts essential to its opposition. Chevron first sets forth each of DESC's proposed findings of fact for which it requires discovery to respond. Next, Chevron sets forth for each count in its Second Amended Complaint the well-pleaded allegations with respect to which, if DESC is deemed to meet its burden in challenging the allegation,[2] Chevron requires discovery to establish. Chevron requires complete discovery with respect to each of the enumerated proposed findings of fact and with respect to each of the enumerated allegations in the Second Amended Complaint.[3]

---

[2] *See Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1562 (Fed. Cir. 1987) (moving party must provide "affidavits or other evidence which, unopposed, would establish its right to judgment").

[3] Nor may DESC assert that Chevron must propose a full-scale discovery plan in order to invoke its right to discovery under RCFC 56(f). Chevron has not been afforded the opportunity to engage in discovery. It has not, for example, had the opportunity to obtain DESC's contract files or propound interrogatories to identify who at DESC undertook what actions or were involved in making which decisions. DESC may not use the fact that it has thus far avoided discovery to argue that Chevron is required to set forth a full-scale discovery plan as if discovery has in fact been completed. Thus, DESC may not use RCFC 56(f) to force Chevron to speculate as to

*(Footnote cont'd on next page)*

DESC elsewhere has criticized other refiners in similarly situated military fuel cases for setting forth at length the specific factual allegations in their complaints for which they require discovery. However, this is exactly what the authorities DESC has cited in those cases require. For instance, DESC has quoted *Simmons Oil Corp. v. Tesoro Petroleum Co.*, 86 F.3d 1138, 1144 (Fed. Cir. 1996), for the proposition that the plaintiff "may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts." By tying its requests for discovery to the specific allegations in DESC's proposed findings of fact and to the specific allegations in its own Amended Complaint, Chevron demonstrates the nexus between its demand for discovery and the material allegations of fact it must establish to defeat DESC's motion.[4]

Of course, to the extent that the Court were to find that any of DESC's proposed findings of fact enumerated below are not material to resolving DESC's motion, discovery with respect to those findings of fact would not be required to resolve the motion. Similarly, to the extent that the Court were to find that DESC does not challenge any of Chevron's well-pleaded allegations enumerated below and that those allegations may be deemed admitted for purposes of the motion, discovery with respect to those allegations would not be required to resolve the motion. By way of illustration, if the Court were to agree with Chevron that DESC does not challenge Chevron's factual allegations concerning misrepresentation or mistake (see Chevron's Opp'n at

---

*(Footnote cont'd from previous page.)*

whom at DESC has relevant knowledge and may need to be deposed and then later try to hold Chevron to those discovery limitations because Chevron's speculations were incorrect.

[4] This Court, although not DESC, elsewhere has invoked the factors set forth in *Theisen Vending Co. v. United States*, 58 Fed. Cl. 194 (2003), for applying Rule 56(f). *See* Order of April 20, 2006 (*Gary-Williams Energy Corp. v. United States*, No. 03-2106C (Fed. Cl.). However, *Theisen* itself notes that "neither this Court nor the Federal Circuit appears to have settled on particular criteria for the sufficiency of an affidavit under RCFC 56(f)." *Id.* at 197. Chevron submits that *Theisen* is inapplicable to a complex case such as this where there has been only initial document discovery and the government, holding much if not most of the relevant evidence, asserts that there is no evidence supporting the plaintiff's case. In any event, by identifying DESC's proposed findings of fact and Chevron's own allegations in the Second Amended Complaint for which full discovery is required, Chevron materially satisfies the factors set forth in *Theisen* as applicable within the context of this case.

pp. 33-34, 44) and that those allegations should be deemed true for purposes of resolving DESC's motion, discovery would not be required concerning those allegations.[5] Conversely, were the Court to find that DESC's motion in fact challenges Chevron's allegations of misrepresentation and mistake, then discovery would be required.

## I. DESC'S PROPOSED FINDINGS OF FACT FOR WHICH CHEVRON REQUIRES DISCOVERY

Chevron sets forth below DESC's proposed findings of fact for which Chevron requires discovery in order to present by affidavit or other sworn testimony facts essential to its opposition:

> A. Def.'s PFF No. 7: Chevron's contracts were competitively awarded through negotiated solicitations, pursuant to 48 C.F.R. ("FAR") part 15 ("Contracting by Negotiation"), and FAR part 12 ("Acquisition of Commercial Items"). App. 2-3 ¶ 6. The base prices in Chevron's contracts were determined to be reasonable based on adequate price competition or on established catalog or market prices of commercial items sold in substantial quantities to the general public. App. 3 ¶ 8.

> B. Def.'s PFF No. 9: DESC began using EPA clauses based upon crude oil costs in 1973, in response to increases in crude oil costs experienced by suppliers as a result of the Arab oil embargo. At that time, the Government had imposed controls upon the price of crude oil. After the price restraints were lifted, DESC gave suppliers the option of selecting an EPA clause based either upon actual crude oil costs, or upon market prices for similar products. In 1981, having concluded that allowing that choice presented too many administrative problems, including difficulties in evaluating and comparing bids that used different EPA indexes, DESC began using market-based indexes exclusively. DESC chose a refined product market index because that index was believed to closely mirror changes in refiners' costs, over time, although a given price index might not track costs over shorter periods. See App. 24.

---

[5] In its replies to plaintiffs' Rule 56(f) motions in other fuel contract cases, DESC has in fact conceded the truth of the facts alleged in the complaints in those cases and has essentially withdrawn its request for summary judgment under Rule 56 in favor of its request for dismissal under Rules 12(b)(1) and (6). In recognition of this fact, the Court in *Calcasieu Refining Co. v. United States*, No. 02-1219C (Fed. Cl.) (March 2, 2006), has ruled that DESC's "motion is amenable to a ruling without discovery." Similarly, in *Valero-Refining-Texas, L.P. v. United States*, No. 03-1916C (May 3, 2006), the Court stayed consideration of DESC's motion under RCFC 56 in favor of DESC's motion under RCFC 12(b)(1) and (6) and concomitantly stayed the Plaintiffs' RCFC 56(f) motion for discovery.

C. Def.'s PFF No. 10: For example, part D of EPA clause B19.33 provided a unique "reference price" (sometimes called a "base reference price") for each refined petroleum product sought in the REP. App. 87-88. DESC's principal EPA clause (B19.33) listed prices for various refined products and regions, taken from a commercially available market publication. An offeror would propose a "base price" for each product offered. That price was subject to adjustment, based upon changes in the reference price. Specifically, B.19.33 provided that "[t]he prices payable under this contract for listed items shall be the base [proposal] price for the listed item increased or decreased by the same number of cents, or fraction thereof, that the reference price increases or decreases per like unit of measure from the base reference price. " App. 88 (part D ¶(c)). The base price was primarily for evaluation purposes, and as the baseline from which price adjustments were made.

D. Def's PFF No. 11: DLA600-82-D-0492 and DLA600-82-D-0621 were based upon Platts Oilgram Price Report ("Platts"), a commercial petroleum-industry price report. App. 3 ¶ 9.

E. Def's PFF No. 12: Chevron contracts DLA600-83-D-0558, DLA600-84-D-0484, and DLA600-84-D-0602 contained EPA clauses based upon prices published by the United States Department of Labor's Bureau of Labor Statistics ("BLS"). App. 3 ¶ 9.

F. Def.'s PFF No. 13: The EPA clauses in contract DLA6600-84-D-0498 and in Chevron's 1986 to 1994 Bulk Fuels contracts were based upon prices published in the Petroleum Marketing Monthly ("PMM"), a petroleum pricing publication issued by the Department of Energy. Compl. ¶ 12; App. 3-4 ¶ 9. The EPA clauses in Texaco's 1984-1989 contracts also were based upon prices published in PMM. App. 3-4 ¶ 9.

G. Def.'s PFF No. 14: Beginning in 1995, Chevron's Bulk Fuels Program contracts, and contract DLA600-89-D-1017 (a Posts, Camps and Stations Program contract) included an EPA clause based upon regional average prices reported in either Platts or the Oil Price Information Service ("OPIS"). App. 4 ¶¶ 11.

H. Def.'s PFF No. 16: Because DOE requires time to obtain the sales data for any particular month, any given month's edition of the PMM reports prices paid three months earlier. Thus, for example, sales data for January are published in April, and data for February are published in May. Id. To accommodate the PMM's three-month reporting lag, DESC made monthly adjustments on an interim basis, and then reconciled them when PMM data for that month were published. Id.

I. Def.'s PFF No. 17: In January, 1986, DESC's Office of Market Research and Analysis prepared a recommendation to change the procedure by which offers were submitted in DESC's solicitations for bulk fuels. App. 28. Due to the PMM's three-month reporting lag, offerors were required to submit offers tied to a reference price that had not yet been published. App. 28 ¶¶ 1, 2. That is, the clause provided that the base reference price was the PMM price published for the month before the submission of best and final offers. Id. As the recommendation noted, "[s]ince the Best and Final offers are submitted before the base reference is known, offerors must guess at the relationship

between the offered price and the reference." Id. at 2. The recommendation noted that "the movement of PMM compared to other references as used for interim price adjustments may have moves as much as one or two cents per gallon out of step with such interim references." Id. at ¶ 3. The recommendation noted that offerors might increase their price to compensate for the unknown factor of what the PMM reference price would be when it was eventually published and, therefore, recommended that the best and final price be tied to an already published final and interim reference price. "For example, if the best and final date were November 15th, the final base EPA reference price would be PMM for August and the interim base reference would be the publication(s) . . . for the month of July." App. 28-29.

J. Def.'s PFF No. 18: In 1987, DESC's Office of Market Research and Analysis prepared a decision paper concerning the ". . . means of price escalation used in the domestic programs." App. 30 ¶ 1. The purpose of the decision paper was to decide whether to modify DESC's EPA clauses. App. 31 ¶ 1 (Issue). The paper considered four options in this regard: 1) keeping the price adjustment system then in use by DESC, 2) modifying the system then in use to " ... reduce offer price uncertainties," 3) adjusting prices twice monthly using "trade journal" prices, and 4) adjusting prices weekly using "trade journal" prices. App. 30 at ¶ 2; App. 35-36, Decision Options.

K. Def.'s PFF No. 19: The paper set forth nine criteria by which to judge proposed escalation systems, "...1) product; 2) geography; 3) timing; 4) timeliness; 5) commonality; 6) independence from contractor influence; 7) basis in actual sales; 8) market risk; and 9) simplicity." App. at Discussion. The paper then compared PMM prices to "trade journal" prices for using those nine criteria. App. 31-35.

L. Def.'s PFF No. 20: The paper concluded that:

> [t]he current PMM based system is preferable by three criteria: independence from contractor influence, sales basis, and market risk. Three other criteria, simplicity, timing, and timeliness, favor the switch to trade journals. By the criteria of product, geography, and commonality there is no clear alternate between the alternate systems.

App. 31 at Discussion.

M. Def.'s PFF No. 21: The paper included a detailed analysis of each of the nine criteria and whether each favored the PMM, the trade journal prices, or neither. The paper found that the product criterion favored neither, because "[b]oth the PMM and trade publications publish prices of similar commercial products . . . ." App. 31. Regarding geography, the paper found that both PMM and trade publications prices were published in ". . . the geographical area where the requirements are located." App. 32. Regarding commonality, the paper found that either PMM or trade publications were acceptable to both DESC and contractors, based upon the fact that DESC had used PMM prices successfully in bulk fuels for three years and had used trade publication prices successfully in contracts for ground fuels and overseas bulk programs. Id.

N. Def.'s PFF No. 22: The paper concluded that the contractor influence, contractor sales, and market risk factors favored PMM. App. 32-33. The paper noted that, although both PMM and trade publications were independent of DESC contractors, trade publications might be influenced by the moves of large "market players" "given their informal method of conducting market surveys," whereas the PMM was a survey of actual sale prices. App. 32. Regarding market risk, the paper found that DESC "... contract prices are susceptible to market risk if they escalate on indices which do not correlate well with actual sales prices. PMM prices are actual sales price averages." App. 33. Trade publication prices were considered more " . . . variable in quality . . . ." Id. The study also found that trade publication prices were more susceptible to "price stickiness," and increased the market risk of higher prices during time periods of declining prices because sellers might be slow to lower posted prices. Id.

O. Def.'s PFF No. 23: The paper concluded that the timing and timeliness criteria favored trade publication prices. The PMM published prices three months after they were paid. PFF 16. To accommodate that fact, DESC adjusted prices on an interim basis, using trade publications, subject to later reconciliation. App. 32. By contrast, trade publications, such as Platts and OPIS are published daily, which permitted closer to real-time pricing and eliminated the need for interim adjustments. App. 4 ¶ 11. As the paper also explained, the timing of those prices would reduce the ". . . possibility that contractors will build a contingency premium into their prices." App. 32.

P. Def.'s PFF No. 24: Finally, the paper set forth a summary of the "pros and cons" of the four alternatives. The paper concluded that the preferred option was to modify the existing use of PMM prices by using the latest published PMM price as the base reference price. That, the study reasoned, would eliminate "margin uncertainty" and allow bidders to base their offered prices on a known reference price. The paper pointed out that "[s]everal individuals and contractors have suggested that [DESC] modify its current system in this manner." App. 35. Starting in 1987, DESC began using this modified PMM-based adjustment, and continued to do so until 1995, when the use of trade publication prices began. See PFF 14. An example of the PMM adjustment clause in use between 1987 and 1993 is contained at App. 87-89.

Q. Def.'s PFF No. 25: In September, 1994, DESC requested a one-time FAR deviation to authorize the use of price adjustment based on market prices published in Platts and Oil Price Information Service ("OPIS") for that year's annual bulk fuels contract, in lieu of PMM prices. App. 6 ¶ 17; App. 47. In the request for a FAR deviation, DESC set forth reasons for switching from PMM prices to Platts and OPIS prices. DESC stated that the PMM prices had been reliable, but that using Platts and OPIS would provide several advantages. In addition to eliminating the need for two price adjustments, DESC stated, "commercial publications [such as Platts are] widely accepted by industry" and would be simpler to use. App. 49-50. DESC further noted that its Office of Market Research and Analysis had studied the proposed Platts-based clauses and found them to provide reliable bases for price adjustments. App. 50; see also App. 6 ¶ 17.

R. Def.'s PFF No. 26: In May, 1995, DESC sought a Class Deviation and change to the Defense Logistics Agency Acquisition Regulation ("DLAR") that would explicitly authorize DESC to base its EPA clauses upon "industry publications" (including Platts and OPIS). App. 52. The bases for DESC's request for such permanent authorization were the same as set forth in its request for an individual deviation the previous fall. App. 53, ¶ III. B. DESC noted that "industry publications" were published more often and would eliminate the "need for double calculations or price adjustments, a significant savings to the government." Id. The deviation request noted that, due to the lag time between interim and final billing under PMM, "contractors likely build in a price cushion." The deviation also noted that the use of an "industry publication" was similar to the "way adjustments are done commercially in that commercial publications are widely accepted by industry." Id.

S. Def.'s PFF No. 27: The DESC request also noted that "industry publications" had been used for DESC programs other than bulk fuels for years. Id. As it did in its earlier request, DESC stated that its "Office of Market Research and Analysis has studied the proposed EPA provisions and found them to be reliable for price adjustments." Id. The Office of Market Research and Analysis study to which both deviation requests referred was the 1987 study described in PFF 18-24. App. 45-46.

T. Def.'s PFF No. 28: Thus, beginning in 1995, the "base reference" price for Chevron's Bulk Fuels Program contracts were regional average prices reported in Platts or OPIS. App. 4 ¶ 11. Because Plaits prices were published daily, and OPIS prices weekly, DESC was able to adjust prices weekly, and, therefore, was able to discontinue the burdensome interim payment and reconciliation process required by the PMM-based EPA clause. Id.

U. Def.'s PFF No. 29: … many of DESC's bulk fuels program solicitations included partial small business set-asides. App. 7 ¶ 19. Beginning in 1988 … DESC solicitations also included an evaluation preference of up to 10 per cent for small disadvantaged business concerns. Id. DESC solicitation clauses I237.05, Notice of Evaluation Preference for Small Disadvantaged Business Concerns, and I237.06, Notice of Partial Small Business Set-Aside with Preferential Consideration for Small Disadvantaged Business Concerns, set forth the operation of these programs. App. 10-1l.

V. Def.'s PFF No. 30: The clauses provided that the set-aside price would be the highest price the Government would pay for the non-set-aside portion of the fuel required for a location, and allowed negotiation with small business offerors to obtain that price. DESC did not provide small business concerns with either the identity or the prices of other offerors. App. 7-8 ¶ 20. The negotiated price DESC allowed small business concerns to match was comprised of the fuel price the Government would pay plus a figure for transportation costs to the destination. Id.

W. Def.'s PFF No. 31: DESC's method of awarding partial set asides in its bulk fuels acquisitions differs from the standard FAR and DFARS procedures, in that DESC makes offers for the set aside quantities before award of the basic quantities. App. 8 ¶ 21; App. 10-13. The standard FAR and DFARS procedure is to offer set aside

quantities after award of the basic quantities. App. 16-23. Under the DESC clauses, where there is a set aside failure, the quantities are awarded to the low offeror for the basic quantity rather than being re-solicited as a new requirement. App. 8 ¶ 21; App. 10-13. This procedure avoids the delay that would take place in re-soliciting set aside failure quantities under the standard FAR and DFARS procedures. Id.

X. Def.'s PFF No. 32: Based on a review of the contract files that are still available, four contracts that DESC awarded to Chevron (DLA-600-86-D-0891, DLA-600-92-D-0460, DLA-600-92-D-0512, SPO-600-99-D-0555), were awarded pursuant to solicitations that did not include small business set asides, and did not include either DESC's or the standard FAR or DFARS set aside clauses. App. 7 ¶19.

Y. Def.'s PFF No. 33: During performance of the contracts at issue, neither Chevron nor Texaco raised any question regarding the legality of the EPA clauses, and they never complained that they were not being paid fairly. App. 5 ¶ 13. Neither company objected to any of the hundreds of monthly and weekly price adjustments made under the contracts' BLS based, PMM-based, Platts-based, or OPIS-based EPA clauses. Id.

## II. WELL-PLEADED ALLEGATIONS IN CHEVRON'S SECOND AMENDED COMPLAINT APPLICABLE TO ALL COUNTS FOR WHICH CHEVRON REQUIRES DISCOVERY

Chevron sets forth below the well-pleaded allegations, contained in paragraphs 10 to 32 of its Second Amended Complaint, that are applicable to all counts and for which Chevron requires discovery in order to present by affidavit or other sworn testimony facts essential to its opposition:

A. DESC has acknowledged at least two authorized purposes for its price adjustment clause: First, to protect DESC and Plaintiffs against market fluctuations, and, second, to ensure that the prices DESC paid Plaintiffs for military fuel under the long-term contracts reflected at least fair market value.

B. A January 5, 1993 memorandum from DLA's Deputy Director, Directorate Contracting and Production, states that DESC's standard price adjustment clause was intended both to "ensure[] that the contract price will be awarded and remain at the market price," and to "ensure[] that the sale will be at the market price, which is fair and reasonable."

C. DESC's price adjustment clause permitted DESC to adjust the prices it paid Plaintiffs for fuel based on changes in indexes published by the Department of Energy ("DOE") in the *Petroleum Marketing Monthly* (hereafter "PMM").

D. DESC was one of the principal users of PMM and worked with DOE in determining how PMM was published. A March 23, 1989 internal memorandum from

DESC's Director, Office of Market Research and Analysis, states: "DOE normally will work with us to see that our needs are satisfied as we are one of the primary users of PMM." DESC never disclosed to its suppliers such as Plaintiffs its role in publication of PMM.

E. In basing price adjustments on PMM, DESC represented and warranted that PMM was adequate to accomplish its purposes of protecting against market fluctuations and ensuring that the prices DESC paid for military fuel reflected at least fair market value.

F. In basing price adjustments on PMM, DESC represented and warranted that PMM accurately reflected at least the fair market value for fuel and that prices for military fuel were fair and reasonable.

G. DESC's Pre-Negotiation Briefing Memoranda, which established pricing policies for DESC's military fuel contracts, expressly provided that DESC's price adjustment clause was "non-negotiable." Accordingly, suppliers of military fuel such as Plaintiffs were required to accept DESC's use of PMM to set military fuel prices or exit the market for military fuel.

H. Contrary to the acknowledged purposes of DESC's price adjustment clause, DOE did not design or intend for PMM to be used to set or adjust prices in response to market fluctuations, and PMM did not reflect at least the fair market value for military fuel.

I. Among the many inadequacies of PMM for use in setting military fuel prices, PMM suffered from a statistical flaw known as an "index number problem," whereby different categories or classes of fuel were used to calculate the value of the index in different months. Such an index number problem renders use of PMM essentially meaningless for measuring changes in price levels from month to month as DESC did. After this case was filed, DOE publicly conceded that PMM suffered from an index number problem.

J. As early as January 1986, DESC concluded in an internal assessment that "the movement of PMM as compared to other [market] references . . . indicates that PMM may have moves as much as one or two cents per gallon out of step with such . . . references." In contrast, DESC typically required suppliers such as Plaintiffs to submit bids to sell military fuel to the one-ten-thousandth of a cent ($.000001).

K. DESC did not disclose to its suppliers such as Plaintiffs its 1986 assessment and, notwithstanding the assessment, continued to use PMM in its price adjustment clause.

L. In 1987, DESC conducted a second study of PMM which found that PMM did not protect against market fluctuations and did not ensure that the prices DESC paid for military fuel under the long-term contracts reflected at least fair market value.

M. DESC did not disclose this 1987 study to its suppliers such as Plaintiffs and, despite the study, continued to use PMM in its price adjustment clause.

N. Seven years later, in 1994, senior officials at DLA learned of DESC's 1987 study, and, upon review of the study, directed DESC to stop using PMM to set military fuel prices.

O. In implementing DLA's directive, DESC admitted that its use of PMM had distorted military fuel prices materially, stating in internal documents that "direct contract price comparisons are not possible" between DESC's military fuel prices and fair market value.

P. Consistent with DESC's internal admissions, a DOE report admits that PMM differed by as much as nineteen percent from comparable prices published by the Bureau of Labor Statistics.

Q. Thus, DESC, as the sole purchaser and user of military fuel, used PMM on a "non-negotiable" basis to set military fuel prices despite knowing that PMM was not designed to be used to set or adjust prices, and despite knowing that PMM did not reflect at least fair market value and did not result in fair and reasonable prices.

R. As a result of DESC's use of PMM in its price adjustment clause, DESC paid Plaintiffs prices for military fuel that were materially below fair market value and were not fair and reasonable.

S. DESC also used other indexes in its price adjustment clause to make price adjustments. On information and belief, DESC also knew that some of the other indexes it used to set or adjust prices were not appropriate for these purposes.

T. Beyond DESC's use of PMM and other price indexes to set military fuel prices below fair market value, DESC distorted the market value of military fuel in other ways.

U. DESC conducted an auction for fuel contracts, whereby DESC offered fuel contracts to bidders that agreed to match the price, or adjusted price, of other bidders. More than fifty percent of the fuel offered (as a percentage of that purchased) commonly was subject to DESC's auction. In furtherance of DESC's auction, DESC procured purchases of fuel set aside for small business together with purchases from large businesses rather than conducting the two procurements separately.

V. DESC also provided a ten percent price preference to minority-owned suppliers. In some years, more than twenty percent of the fuel offered (as a percentage of that purchased) was subject to DESC's minority price preference.

W. As a result of DESC's auction of fuel contracts and its ten percent price preference for minority-owned suppliers, DESC paid Plaintiffs prices for military fuel that were materially below fair market value and were not fair and reasonable.

## III. WELL-PLEADED ALLEGATIONS IN COUNT I OF CHEVRON'S SECOND AMENDED COMPLAINT FOR WHICH CHEVRON REQUIRES DISCOVERY

Chevron sets forth below the well-pleaded allegations in Count I, contained in paragraphs 43 to 50 of its Second Amended Complaint, for which Chevron requires discovery in order to present by affidavit or other sworn testimony facts essential to its opposition:

A. DESC knowingly awarded and administered Plaintiffs' contracts in violation, inter alia, of FAR § 16.203 by basing price adjustments on indexes rather than on Plaintiffs' own established fuel prices.

B. Even if FAR § 16.203 permitted DESC to base price adjustments on indexes rather than on Plaintiffs' own established fuel prices, DESC knowingly awarded and administered Plaintiffs' contracts in violation, inter alia, of FAR § 16.203 by basing price adjustments on indexes that were not market-based, were not designed or intended to be used to set or adjust prices, and did not reflect at least the fair market value of military fuel.

C. DESC knowingly awarded and administered Plaintiffs' contracts in violation, inter alia, of FAR § 15.802(b) [currently codified at FAR § 15.402(a)] by using PMM and other indexes to establish prices for military fuel that were not fair and reasonable.

D. DESC knowingly awarded and administered each of Plaintiffs' contracts in violation, inter alia, of the Office of Federal Procurement Policy Act and its implementing regulations (and, prior to its enactment, FAR § 15.610) by using prohibited auction techniques, whereby DESC awarded contracts to bidders that agreed to match other bidders' prices.

E. DESC knowingly awarded and administered Plaintiffs' contracts in violation, inter alia, of DOD Federal Acquisition Regulation ("DFAR") pt. 219 by improperly soliciting and awarding portions of the procurements set aside for small businesses together with those for large businesses.

F. DESC knowingly awarded and administered Plaintiffs' contracts in violation, inter alia, of the equal protection component of the fifth amendment's due process clause by extending to minority-owned businesses bidding preferences that were not narrowly tailored to further a compelling governmental interest.

G. DESC thus combined its substantial market power and substantial ability to affect the price of military fuel with a knowing violation of law and regulation to reduce the price it paid for military fuel below fair market value.

H. DESC's violation of law and regulation in awarding and administering Plaintiffs' contracts damaged Plaintiffs.

## IV. WELL-PLEADED ALLEGATIONS IN COUNT II OF CHEVRON'S SECOND AMENDED COMPLAINT FOR WHICH CHEVRON REQUIRES DISCOVERY

Chevron sets forth below the well-pleaded allegations in Count II, contained in paragraphs 53 to 64 of its Second Amended Complaint, for which Chevron requires discovery in order to present by affidavit or other sworn testimony facts essential to its opposition:

A. DESC knowingly awarded and administered Plaintiffs' contracts in violation of law and regulation.

B. In awarding and administering Plaintiffs' contracts, DESC knowingly based price adjustments on PMM and other indexes that were not adequate to accomplish the stated purposes of DESC's price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value.

C. In awarding and administering Plaintiffs' contracts, DESC knowingly based price adjustments on PMM and other indexes that were not designed or intended to be used to set or adjust prices and which did not reflect at least the fair market value of military fuel.

D. In awarding and administering Plaintiffs' contracts, DESC knew that the contracts did not provide for payment of at least the fair market value of military fuel and knew that the contracts did not provide for fair and reasonable prices.

E. In awarding and administering Plaintiffs' contracts, DESC worked with DOE to determine how PMM was published and to "see that our needs are satisfied as . . . one of the primary users of PMM."

F. In awarding and administering the contracts, DESC, through the contracting officer and others, misrepresented and otherwise failed to disclose its violation of law and regulation.

G. In awarding and administering the contracts, DESC, through the contracting officer and others, misrepresented and otherwise failed to disclose that it based price adjustments on PMM and other indexes that were not adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value.

H. In awarding and administering the contracts, DESC, through the contracting officer and others, misrepresented and otherwise failed to disclose that PMM and other indexes were not designed or intended to be used to set or adjust prices and did not reflect at least fair market value.

I. In awarding and administering the contracts, DESC, through the contracting officer and others, misrepresented and otherwise failed to disclose that the contracts did not provide for payment of at least fair market value for military fuel and did not provide for fair and reasonable prices.

J. In awarding and administering the contracts, DESC, through the contracting officer and others, misrepresented and otherwise failed to disclose that DESC worked with DOE to determine how PMM was published and to "see that our needs are satisfied as . . . one of the primary users of PMM."

K. Plaintiffs reasonably relied upon DESC's material and/or fraudulent misrepresentations as an inducement to enter the contracts.

L. DESC's material and/or fraudulent misrepresentations damaged Plaintiffs.

## V. WELL-PLEADED ALLEGATIONS IN COUNT III OF CHEVRON'S SECOND AMENDED COMPLAINT FOR WHICH CHEVRON REQUIRES DISCOVERY

Chevron sets forth below the well-pleaded allegations in Count III, contained in paragraphs 67 to 78 of its Second Amended Complaint, for which Chevron requires discovery in order to present by affidavit or other sworn testimony facts essential to its opposition:

A. DESC's compliance with law and regulation in awarding and administering the contracts was a material condition of the contracts upon which Plaintiffs reasonably relied in entering the contracts.

B. DESC's basing price adjustments on PMM and other indexes that were adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value was a material condition of the contracts upon which Plaintiffs reasonably relied in entering the contracts.

C. DESC's basing price adjustments on standards that were designed or intended to be used to set or adjust prices and which reflected at least the fair market value of fuel was a material condition of the contracts upon which Plaintiffs reasonably relied in entering the contracts.

D. DESC's paying at least fair market value for military fuel and DESC's paying fair and reasonable prices were material conditions of the contracts upon which Plaintiffs reasonably relied in entering the contracts.

E. DESC's negotiating and administering the contracts in good faith was a material condition of the contracts upon which Plaintiffs reasonably relied in entering the contracts.

F. In contravention of DESC's contractual obligations, DESC violated law and regulation in awarding and administering the contracts.

G. In contravention of DESC's contractual obligations, DESC based price adjustments on PMM and other indexes that were not adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value.

H. In contravention of DESC's contractual obligations, DESC based price adjustments on standards such as PMM and other indexes that were not designed or intended to be used to set or adjust prices and which did not reflect at least the fair market value of fuel.

I. In contravention of DESC's contractual obligations, DESC did not pay at least fair market value for military fuel and did not pay fair and reasonable prices for fuel.

J. In contravention of DESC's contractual obligations, DESC did not negotiate and administer the contracts in good faith. Instead, DESC used a non-negotiable illegal price adjustment clause that based price adjustments on PMM and other indexes, and worked with DOE to determine how PMM was published and to "see that our needs are satisfied as . . . one of the primary users of PMM."

K. DESC's contravention of its contractual obligation constituted breach of contract.

L. DESC's breach of contract damaged Plaintiffs.

## VI. WELL-PLEADED ALLEGATIONS IN COUNT IV OF CHEVRON'S SECOND AMENDED COMPLAINT FOR WHICH CHEVRON REQUIRES DISCOVERY

Chevron sets forth below the well-pleaded allegations in Count IV, contained in paragraphs 81 to 84 of its Second Amended Complaint, for which Chevron requires discovery in order to present by affidavit or other sworn testimony facts essential to its opposition:

A. DESC knowingly awarded and administered Plaintiffs' contracts in violation of law and regulation.

B. DESC's violation of law and regulation in awarding and administering Plaintiffs' contracts rendered at least the price terms of Plaintiffs' contracts invalid and unenforceable.

C. DESC's violation of law and regulation in awarding and administering Plaintiffs' contracts damaged Plaintiffs.

D. At least the pricing terms of Plaintiffs' contracts are replaced by an implied-in-fact contract to pay the fair market value of the fuel Plaintiffs delivered to DESC.

## VII. WELL-PLEADED ALLEGATIONS IN COUNT V OF CHEVRON'S SECOND AMENDED COMPLAINT FOR WHICH CHEVRON REQUIRES DISCOVERY

Chevron sets forth below the well-pleaded allegations in Count V, contained in paragraphs 87 to 102 of its Second Amended Complaint, for which Chevron requires discovery in order to present by affidavit or other sworn testimony facts essential to its opposition:

A. DESC's compliance with law and regulation in awarding and administering the contracts was a material part of the consideration upon which Plaintiffs reasonably relied in entering the contracts and a material purpose of the contracts.

B. DESC's basing price adjustments on PMM and other indexes that were adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value was a material part of the consideration upon which Plaintiffs reasonably relied in entering the contracts and a material purpose of the contracts.

C. DESC's basing price adjustments on standards that were designed or intended to be used to set or adjust prices and that reflected at least the fair market value of fuel was a material part of the consideration upon which Plaintiffs reasonably relied in entering the contracts and a material purpose of the contracts.

D. DESC's paying at least fair market value for the military fuel it purchased and DESC's paying fair and reasonable prices were a material part of the consideration upon which Plaintiffs reasonably relied in entering the contracts and a material purpose of the contracts.

E. DESC's negotiating the contracts in good faith was a material part of the consideration upon which Plaintiffs reasonably relied in entering the contracts and a material purpose of the contracts.

F. DESC violated law and regulation in awarding and administering the contracts.

G. DESC based price adjustments on PMM and other indexes that were not adequate to accomplish the stated purposes of its price adjustment clause to protecting against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value.

H. DESC based price adjustments on PMM and other indexes that were not designed or intended to be used to set or adjust prices and that did not reflect at least fair market value.

I. DESC did not pay at least fair market value for military fuel or pay fair and reasonable prices.

J. DESC did not negotiate the contracts in good faith.

K. DESC's violation of law and regulation in awarding and administering the contracts constituted a failure of consideration and frustrated the purpose of the contracts.

L. DESC's failure to base price adjustments on PMM and other indexes that were not adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value constituted a failure of consideration and frustrated the purpose of the contracts.

M. DESC's use of PMM and other indexes that were not designed or intended to be used to set or adjust prices and that did not reflect at least fair market value constituted a failure of consideration and frustrated the purpose of the contracts.

N. DESC's failure to pay at least fair market value for military fuel and its failure to pay fair and reasonable prices constituted a failure of consideration and frustrated the purpose of the contracts.

O. DESC's failure to negotiate the contracts in good faith constituted a failure of consideration and frustrated the purpose of the contracts.

P. This failure of consideration and frustration of the purpose of the contracts damaged Plaintiffs.

## VIII. WELL-PLEADED ALLEGATIONS IN COUNT VI OF CHEVRON'S SECOND AMENDED COMPLAINT FOR WHICH CHEVRON REQUIRES DISCOVERY

Chevron sets forth below the well-pleaded allegations in Count VI, contained in paragraphs 105 to 129 of its Second Amended Complaint, for which Chevron requires discovery in order to present by affidavit or other sworn testimony facts essential to its opposition:

A. Plaintiffs entered and performed the contracts with the intent that they comply with law and regulation. This was a material condition upon which Plaintiffs reasonably relied in entering the contracts.

B. Plaintiffs entered and performed the contracts with the intent that PMM and other indexes were adequate to accomplish the stated purposes of DESC's price adjustment clause to protect against market fluctuations and to ensure that the prices

DESC paid for military fuel reflected at least fair market value. This was a material condition upon which Plaintiffs reasonably relied in entering the contracts.

C. Plaintiffs entered and performed the contracts with the intent that the standards used to make price adjustments were designed or intended to be used to set or adjust prices and reflected at least fair market value. This was a material condition upon which Plaintiffs reasonably relied in entering the contracts.

D. Plaintiffs entered and performed the contracts with the intent that DESC pay at least fair market value for military fuel and pay fair and reasonable prices. This was a material condition upon which Plaintiffs reasonably relied in entering the contracts.

E. DESC did not comply with law and regulation in awarding and administering the contracts.

F. DESC did not use PMM and other indexes that were adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value.

G. DESC based price adjustments on PMM and other indexes that were not designed or intended to be used to set or adjust prices and that did not reflect at least fair market value.

H. DESC did not pay fair market value for military fuel or pay fair and reasonable prices.

I. If DESC did not knowingly award and administer the contracts in violation of law and regulation, as alleged above, then DESC must be presumed to have intended to award and administer the contracts in accordance with law and regulation.

J. If DESC did not know that the PMM and other indexes were not adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value, as alleged above, then DESC must be presumed to have used the PMM and other indexes with the intent that they were adequate to accomplish the stated purposes of its price adjustment clause.

K. If DESC did not know that PMM and other indexes were not designed or intended to be used to set or adjust prices and did not reflect at least fair market value, as alleged above, then DESC must be presumed to have used PMM and other indexes with the intent that they were designed or intended to be used to set or adjust prices and reflected at least fair market value.

L. If DESC did not knowingly fail to pay at least fair market value for military fuel and did not knowingly fail to pay prices that were fair and reasonable, as alleged above, then DESC must be presumed to have intended to pay at least fair market value for military fuel and to have intended to pay fair and reasonable prices.

M. As a result of a mistake, DESC and Plaintiffs entered and performed the contracts in violation of law and regulation.

N. As a result of a mistake, DESC and Plaintiffs entered and performed the contracts using the PMM and other indexes that were not adequate to accomplish the stated purposes of DESC's price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value.

O. As a result of a mistake, DESC and Plaintiffs entered and performed the contracts using PMM and other indexes that were not designed or intended to be used to set or adjust prices and did not reflect at least fair market value.

P. As a result of a mistake, DESC and Plaintiffs entered and performed the contracts that did not provide for the payment of at least fair market value for military fuel and did not provide for payment of fair and reasonable prices.

Q. If DESC and Plaintiffs had not been mistaken, DESC and Plaintiffs would not have entered and performed the contracts in violation of law and regulation.

R. If DESC and Plaintiffs had not been mistaken, DESC and Plaintiffs would not have entered and performed the contracts using the PMM and other indexes that were not adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value

S. If DESC and Plaintiffs had not been mistaken, DESC and Plaintiffs would not have entered and performed the contracts using PMM and other indexes to set or adjust prices.

T. If DESC and Plaintiffs had not been mistaken, DESC and Plaintiffs would not have entered and performed the contracts that did not provide for the payment of at least fair market value for military fuel and did not provide for payment of fair and reasonable prices.

U. Alternatively, if DESC was not mistaken in awarding and administering contracts in violation of law and regulation, then DESC knew or should have known of Plaintiffs' mistake and failed to meet its duty timely to disclose this mistake to Plaintiffs.

V. Alternatively, if DESC was not mistaken in awarding and performing the contracts using the PMM and other indexes that were not adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value, then DESC knew or should have known of Plaintiffs' mistake and failed to meet its duty timely to disclose this mistake to Plaintiffs.

W. Alternatively, if DESC was not mistaken in awarding and performing contracts using PMM and other indexes to set or adjust prices, then DESC knew or

should have known of Plaintiffs' mistake and failed to meet its duty timely to disclose this mistake to Plaintiffs.

X. Alternatively, if DESC was not mistaken in entering and performing contracts that did not provide for payment of at least fair market value for military fuel and that did not provide for payment of fair and reasonable prices, then DESC knew or should have known of Plaintiffs' mistake and failed to meet its duty timely to disclose this mistake to Plaintiffs.

Y. The parties' mutual mistake and/or DESC's failure to disclose Plaintiffs' unilateral mistake damaged Plaintiffs.

## IX. WELL-PLEADED ALLEGATIONS IN COUNT VII OF CHEVRON'S SECOND AMENDED COMPLAINT FOR WHICH CHEVRON REQUIRES DISCOVERY

Chevron sets forth below the well-pleaded allegations in Count VII, contained in paragraphs 133 to 138 of its Second Amended Complaint, for which Chevron requires discovery in order to present by affidavit or other sworn testimony facts essential to its opposition:

A. With no fully supporting claim of right, DESC took possession of and infringed upon Plaintiffs' property rights in and in relation to the fuel it delivered.

B. DESC's taking of Plaintiffs' property was for a public purpose.

C. To the extent that DESC's taking of Plaintiffs' property was effected in conjunction with a violation of law and regulation, DESC acted within the general scope of its authority to procure the fuel.

D. DESC effected a taking of Plaintiffs' property within the meaning of the Fifth Amendment of the United States Constitution.

E. DESC has not paid Plaintiffs just compensation for the taking of Plaintiffs' property.

F. DESC's failure to pay Plaintiffs just compensation for the taking of its property violated the Fifth Amendment of the United States Constitution and thereby damaged Plaintiffs.

## X. FACTS WITH RESPECT TO DESC'S AFFIRMATIVE DEFENSE OF WAIVER FOR WHICH CHEVRON REQUIRES DISCOVERY

With respect to DESC's affirmative defense of waiver, Chevron requires full discovery concerning negotiation, award and performance of the fuel contracts, and concerning DESC's

prices and indexes in the fuel contracts, in order to present by affidavit or other sworn testimony facts essential to its opposition concerning DESC's allegation that:

A. Chevron intentionally relinquished any known rights with respect to the fuel contracts it entered with DESC.

**CONCLUSION**

Pursuant to RCFC 56(f), this Court should not adopt any of the proposed findings of fact enumerated above, disregard any of the well-pleaded allegations enumerated above, or grant DESC's request for summary judgment without affording Chevron "an opportunity to make full discovery" and to present the resulting evidence. *Celotex*, 477 U.S. at 326. Accordingly, as set forth in RCFC 56(f), this Court should refuse DESC's application for summary judgment or, in the alternative, grant a continuance so that Chevron can obtain the discovery it requires to present evidence essential to its Opposition.

Respectfully submitted,

s/J. Keith Burt
J. Keith Burt
Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, D.C. 20006
(202) 263-3208 (phone)
(202) 263-5208 (fax)

Counsel for Plaintiffs,
Chevron U.S.A. Inc., Texaco Inc.,
and Texaco Downstream LLC

May 30, 2006