No. 03-288C
(Chief Judge Damich)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

CHEVRON, U.S.A., INC, TEXACO, INC, and TEXACO DOWNSTREAM LLC,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT AND SUPPLEMENTAL APPENDIX

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

STEVEN J. GILLINGHAM
Assistant Director
Commercial Litigation Branch
Civil Division
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Department of Justice
Washington, D.C. 20530
Tele: (202) 616-2311
Fax: (202) 353-7988

Attorneys for Defendant

OF COUNSEL:

DONALD S. TRACY
Trial Attorney
Defense Supply Center Richmond
Richmond, VA 23297

HOWARD M. KAUFER
Assistant Counsel
Office of Counsel
Defense Energy Support Center
Ft. Belvoir, VA

June 19, 2006

**TABLE OF CONTENTS**


FACTS . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . 11

I. DESC's EPA Clauses Are Authorized by FAR 16.203-1 . . . . . . . . . . 11

A. EPA Clauses Need Not Be Based Upon Plaintiffs' Own Prices . . . . . . . 11

B. DESC's PMM-Based EPA Clause Is Legal . . . . . . . . . . 12

C. Chevron's FAR 15.802(b) Allegation Does Not State A Cause of Action 16

II. Chevron's Alternative Illegality Theories In Counts II-VI Must Be Dismissed . . . . . . . . . . 18

A. Count II (Misrepresentation) . . . . . . . . . . 18

B. Count III ("Breach of Contract") and Count IV ("Implied-In-Fact Contract") . . . . . . . . . . 19

C. Count V ("Failure of Consideration and Frustration of Purpose") . . . . . 20

D. Count VI (Mistake) . . . . . . . . . . 20

III. Chevron's Takings Claim Should Be Dismissed . . . . . . . . . . 21

IV. Chevron's Small Business Program Complaints Must Be Dismissed . . . . . . . . . 23

A. The Court Lacks Jurisdiction To Entertain The Fifth Amendment Complaint . . . . . . . . . . 23

B. DESC's Small Business Program Is Not Improper . . . . . . . . . . 25

V. Waiver and Estoppel Bar Chevron's Claims . . . . . . . . . . 28

A. Introduction . . . . . . . . . . 28

B. Chevron Has Waived Its Claims As A Matter Of Fact . . . . . . . . . . 31

C. Chevron Has Waived Its Claims As A Matter Of Law . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . 45

## SUPPLEMENTAL APPENDIX


Barrett trial testimony of John Cook, dated July 29, 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Excerpt from deposition of Jacob Bournazian, dated December 3, 2003 . . . . . . . . . . . . . . . . . . . 7

Form EIA-782A ("Refiners'/Gas Plant Operators' Monthly Petroleum Product Sales Report . . 9

A Comparison of Selected EIA-782 Data with Data From Other Sources,
by Jacob Bournazian . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Declaration of John Walker with attachments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Contract DLA-600-81-D-0354 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Contract DLA-600-81-D-0445 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Contract DLA-600-81-D-3037 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Letter from ConocoPhillips to DESC, Re: Method Used to Determine Bid Award for JP-4,
dated December 18, 1986 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70


## TABLE OF AUTHORITIES

### CASES


American Telephone and Telegraph Co. v. United States,
307 F.3d 1374 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

American Telephone & Telegraph Co. v. United States,
177 F.3d 1368 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 43

Armstrong v. United States, 364 U.S. 40 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Barrett Refining v. United States,
242 F.3d. 1055 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Barrett v. United States,
50 Fed. Cl. 567 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Barrett Ref. Corp. v. United States,
45 Fed. Cl. 166, 169-70 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Barrett Ref. Corp. v. United States,
42 Fed. Cl. 128, 129 (1998) . . . . . . . . . . 7

Beta Systems, Inc. v. United States,
838 F. 2d 1179 (Fed. Cir. 1988) . . . . . . . . . . passim

Brooklyn Sav. Bank v. O'Neill,
324 U.S. 697 (1945) . . . . . . . . . . 36

Cessna Aircraft v. Dalton,
126 F.3d 1442 (Fed. Cir. 1997) . . . . . . . . . . passim

Chris Berg, Inc. v. United States,
426 F. 2d 314 (Ct. Cl. 1970) . . . . . . . . . . passim

Clark v. United States,
95 U.S. 539 (1877) . . . . . . . . . . 36

Coflexip & Servs., Inc. v. United States, 961 F. 2d 951, 952-953 (Fed. Cir. 1992) . . . . . . . . . . 24

Costanza Coal Min. Co. v. Weirton Steel Co.,
150 F.2d 929 (4th Cir. 1945) . . . . . . . . . . 44

Dairyland Power Cooperative v. United States,
16 F.3d 1197 (Fed. Cir. 1994) . . . . . . . . . . 20

DGS Contract Services, Inc. v. United States, 43 Fed. Cl. 227, 239 (1999) . . . . . . . . . . 25, 27

E. Walters & Co., Inc. v. United States,
217 Ct. Cl. 576 F.2d 362 (1978) . . . . . . . . . . passim

Federal Crop Ins. v. Merrill,
332 U.S. 380 (1947) . . . . . . . . . . 43

Federal Elec. Corp. v. United States,
486 F.2d 1377 (Ct. Cl. 1973) . . . . . . . . . . 38

General Eng'g. & Mach. Works v. O'Keefe,
991 F. 2d 775 (Fed. Cir. 1993) . . . . . . . . . . 45

Gold Line Refining v. United States, 54 Fed. Cl. 285 (2002) . . . . . . . . . . 29

Gould v. United States, 67 F.3d 925 (Fed. Cir. 930 (Fed. Cir. 1995) . . . . . . . . . . 23

Hartford Accident & Indem. Co. v. United States,
127 F. Supp. 565 (Ct. Cl. 1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Hermes v. United States,
58 Fed. Cl. 409 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Integrated Logistics Support Systems, Int'l v. United States, 42 Fed. Cl. 30 (1998) . . . . . . . . . 22

La Gloria v. United States, 56 Fed. Cl. 211 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 29

La Van v. United States, 382 F.3d 1340, 1352 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 21

LaBarge Prods., Inc. v. West,
46 F.3d 1547 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Ling-Temco-Vought, Inc. v. United States,
201 Ct. Cl. 135, 475 F.2d 630 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Louisville and Nashville R.R. Co. v. Cent. Iron and Coal Co.,
265 U.S. 59 (1924) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 44

MAPCO Alaska Petroleum, Inc. v. United States,
27 Fed. Cl. 405 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Millmaster Intl. Inc. v. United States,
427 F. 2d 811 (Cust. Ct. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Mitsubishi Motors Corporation v. Soler Chrysler-Plymouth, Inc.,
473 U.S. 614 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Nautilus Shipping Corp. v. United States,
141 Ct. Cl. 391 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Navajo v. United States, 58 Fed. Cl. 200, 213 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Northern Helex Co. v. United States,
197 Ct. Cl. 118, 125-26 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Osprey Pacific Corp. V. United States, 41 Fed. Cl. 250 (1998) . . . . . . . . . . . . . . . . . . . . . . . . 22

PCL Construction Services, Inc. v. United States,
41 Fed. Cl. 242, 252 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Pi Electronics Corp. V. United States, 55 Fed. Cl. 279 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . 22

Pittsburgh C.C. & St. L. Ry. Co. v. Fink,
250 U.S. 577 (1919) . . . . . . . . . . 35, 44

Rough Diamond Co. v. United States,
351 F.2d 636 (Ct. Cl. 1965) . . . . . . . . . . passim

Safeco Credit v. United States,
44 Fed. Cl. 406 (1999) . . . . . . . . . . 32

Shearson/American Express, Inc. v. McMahon,
482 U.S. 220 (1987) . . . . . . . . . . 36

Short Bros., PLC v. United States,
65 Fed. Cl. 695 (2005) . . . . . . . . . . 16

Shutte v. Thompson,
82 U.S. 151 (1872) . . . . . . . . . . 36

Sola Electric Co. v. Jefferson Electric Co.,
317 U.S. 173 (1942) . . . . . . . . . . 44

Sprague Steamship Co. v. United States,
172 F. Supp 674 (Ct. Cl. 1959) . . . . . . . . . . 35

Tesoro et al. v. United States,
405 F. 3d 1339 (Fed. Cir. 2005) . . . . . . . . . . passim

Tesoro v. United States, 58 Fed. Cl. 65 (2003) . . . . . . . . . . 29

Thomas v. United States,
125 Ct .Cl. 76, 80 (1953) . . . . . . . . . . 35

Trauma Service Group v. United States,
104 F.3d 1321 (Fed. Cir. 1997) . . . . . . . . . . passim

Union Pacific Railroad Co. v. United States,
847 F.2d 1567 (Fed. Cir. 1988) . . . . . . . . . . 40

United States v. Mezzanatto,
513 U.S. 196 (1995) . . . . . . . . . . 36

United States v. Wurts, 303 U.S. 414, 415 (1937) . . . . . . . . . . 21

Urban Data Sys., Inc. v. United States,
699 F.2d 1147 (Fed. Cir. 1983) . . . . . . . . . . passim

Whittaker Electronic Systems v. Dalton,
124 F.3d 1443 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

**STATUTES AND REGULATIONS**

15 U.S.C. § 772 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

41 U.S.C. § 423 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

DAR § 1-1502(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

FAR § 15.402(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

FAR 15.404-1(b)(2)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

FAR § 15.802(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

FAR § 15.804-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

FAR § 16.203-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

FAR § 16.203-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

FAR § 16.203-4(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

FAR 52.219-7(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**MISCELLANEOUS**

Restatement (Second) of Contracts § 178 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Nash and Cibinic, Formation of Government Contracts (3rd Ed. 1998) . . . . . . . . . . . . . . . . . . . 18

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CHEVRON, U.S.A., INC, | ) | |
| TEXACO, INC, and | ) | |
| TEXACO DOWNSTREAM LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 03-288C |
| v. | ) | (Chief Judge Damich) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

REPLY TO PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS THE COMPLAINT

In our moving brief, we demonstrated that Plaintiffs' ("Chevron") Second Amended Complaint ("Compl.") attempted to clone the cause of action at issue in MAPCO Alaska Petroleum, Inc. v. United States, 27 Fed. Cl. 405 (1992), which held that DESC's jet-fuel contract price escalation Clause B19.33 was inconsistent with the Federal Acquisition Regulation ("FAR"). In Tesoro et al. v. United States, 405 F. 3d 1339 (Fed. Cir. 2005), reh'g en banc denied, No. 04-5064 (Fed. Cir. Aug. 22, 2005) ("Tesoro"), the court of appeals abrogated MAPCO, holding that B19.33 had been legal all along. The court explicitly rejected the contractors' contention, repeated here, that B19.33 was illegal because it was based upon "indexes rather than on Plaintiffs' own established fuel prices;" and because it used the Department of Energy's Petroleum Marketing Monthly ("PMM") as a price reference. As our moving brief explains, the standard Tesoro established for economic price adjustment ("EPA") clauses also effectively disposes of Chevron's miscellaneous complaints concerning the legality of its contracts' EPA clauses, because it makes clear that the various tests Chevron would have these clauses pass simply do not exist. In fact, the court held, in order to pass muster under FAR 16.203-1, EPA clauses need only rely upon "industry-based prices," which "may be established

by reference to either a catalog or market sources independent of the manufacturer or vendor." Id. at 1347.

In response, Chevron amended its complaint to assert that the contracting officer had an obligation to assure Chevron was paid "fair and reasonable prices, pursuant to FAR 15.802(b) (currently codified at FAR § 15.402(a))" (see Compl. ¶ 45); yet, still clung to allegations squarely rejected by Tesoro (that the escalation clause must be based upon Chevron's own prices) or those that invoke requirements found nowhere in the law (that EPA clauses must be "designed or intended" to set prices and "reflect at least the fair market value of military fuel"). As our motion explains, these allegations do not invoke a proper legal test for EPA clauses and, therefore, fail to state a claim upon which relief can be granted.

Chevron also clung to its common-law allegations which, although allegedly grounded in the parties' understandings and commitments, lack a factual basis -- one that might establish the essential unrequited promise or understanding that typically undergirds such allegations. Their deficiency is unsurprising, because, as our motion explains, they are but thinly-disguised restatements of the Count I complaints, which, in turn depend upon MAPCO for their vitality. Accordingly, with regard to these allegations as well, there simply is no relevant fact that Chevron possessed or envisioned that can transform these counts into authentic common law claims.

We also explained that, regardless of the above, Chevron abandoned any rights the FAR might have conferred upon it, and Chevron forfeited any right it might have had to test those rights in litigation when it waited as many years as it did to file the necessary claims. In doing so, we relied upon this Court's decision in Hermes v. United States, 58 Fed. Cl. 409 (2003) ("Hermes II"), which held that the contractor that brought a suit identical to this one no longer

could pursue its illegality-based claims. As we demonstrated, Chevron's rights with respect to its derivative claims are indistinguishable and also should be dismissed.

Chevron responds with a broadside attack upon the PMM itself, based upon incomplete quotations, innuendo, and a report from its consultants quibbling with the use of the escalation clause that the parties agreed to use. Absent from the report's theoretical discussion is a report of actual harm to Chevron and an acknowledgment that the court of appeals has determined that the clause is legal, even if not to the liking of Chevron's pricing advisors. Chevron's efforts to resuscitate the complaint via common law complaints of mistake, misrepresentation, breach, frustration of purpose -- premised on the very same lack of "fair market value" argument -- and absent traditional allegations of agreement-based, unrequited expectations – fare no better. That is so, because a cause of action that has, at its root, the existence of a right that does not exist (the right to an EPA clause based upon a contractor's own prices, or one based upon "fair market value") does not become stronger by adding further elements of proof. The other basis of Chevron's response is that it requires discovery (Pl. Br. 19). However, the items Chevron intends to discover concern its own case and other matters that are untethered to legal causes of action and, as we have explained in our RCFC 56(f) response, are not properly supported. Accordingly, Chevron is not entitled to discovery and cannot plead lack of discovery to prevent the termination of this litigation.

## FACTS

Chevron continues to rely upon the same partial quotations and quaint charges of Government scheming pedaled in its Second Amended Complaint. To this, Chevron adds a consultants' opinion concerning the performance of the PMM, also built-upon unfounded premises, and a conclusory statement from two of Chevron's officials declaring that Chevron

intended to receive legal prices and fair market value.[1] See Compl. ¶¶ 17-22; Pl. Br. 4-8. In addition to being untrue, these allegations concern the relative merits of various price references -- a discussion best left to economists and fuel-industry analysts -- not the parties to a contract years after their contracts have been fully performed. In general, Chevron's logic-bending story is that: DESC knew that its use of the PMM was corrupt; DESC had concluded that the price of fuel would, in the future, move in one direction; the PMM and all of the references DESC used would report movement in the opposite direction; that movement always would favor DESC; and, somehow, the fuel industry never would detect this or, upon learning it, would bid eagerly nonetheless.

Chevron's story begins with the Energy Information Administration ("EIA"), the author of the PMM. Among Chevron's favorite allegations and a pillar of its complaint is that the EIA has acknowledged that the PMM was not "intended to be an index that is used for setting prices." Pl. PFF 16. The implication is that the PMM is unsuitable or illegal for use as a price reference. What Chevron avoids quoting is the testimony of the EIA's Dr. Cook on that point, which was:

> We're not opposed to [the PMM] being used for that purpose. We don't, per se, collect the data and justify its collection with OMB

[1] Notably, Chevron declines to address contracts containing other than PMM price references. Pl. Br. 3, n. 5. It also declines to address our PFFs concerning those references, citing RCFC 56(f). Chevron cannot seriously assert that the other references are not market-based price sources or that it requires discovery to learn that fact. In fact, while disagreeing that a DESC study supported the use of PMM, Chevron's brief acknowledges that the study "supported using the commercial price references Platts and OPIS to make price adjustments." Pl. Br. 6. Indeed, Chevron's consultants use Platts to assess the market. Pl. App. 624 ¶ 53. Platts' description of its publication (not to mention Chevron's failure ever to protest its use) also suggests that there can be no disagreement over this matter. See Defendant's Supplemental Appendix ("SA") 122, which is attached to this brief. Indeed, Chevron used Platts to value the fuel in pricing its claims. Defendants' Appendix ("App." ) 80 (filed with our moving brief). Accordingly, there is no basis for further proceedings concerning paragraph 28 of the Second Amended Complaint, which alleges that "[o]n information and belief, DESC also knew that some of the other indexes it used to set or adjust prices were not appropriate for these purposes."

> for that specific use. We justify its collection on the basis of its general value in measuring actual average prices, wholesale and retail, for everything from crude oil from the wellhead to the pump for state energy offices or various federal agencies, and most especially for Congressional committees for analysis purposes, forecasting, market tracking, all those uses. It's, it's, it happens to be useful, according to oil companies and DFSC for indexing, as well, but we didn't specifically design it for that.

SA 5-6 (Tr. 632, l. 14).[2]

Chevron also suggests that EIA and DESC cooperated surreptitiously to tilt the PMM in DESC's favor, and that DESC breached an obligation to disclose that it worked with EIA "to see that our needs are satisfied." Pl. Br. at 40, n.46; see also Pl. Br. at 5, n.8. However, the document upon which the assertion relies, Pl. App. 100, is taken out of context. As Chevron's next document explains, DESC asked that EIA employ a "phased-in" approach to a new PMM format EIA was developing. DESC suggested that this could take the form of a dual reporting scheme in which EIA proceeded with its new method, but also included the old method until existing DESC contracts relying on the old method expired. Pl. App. 101-02. This hardly affected the contracts at issue or implicated a legal duty owed to Government fuel suppliers.

Lacking EIA's condemnation, Chevron relies upon a litigation consultants' generalized assessment of the PMM, to argue that the PMM is illegal because it does not "reflect fair market value" (Pl. Br. 9), suffers from an "index number problem" (Pl. Br. 13), and does not measure "military jet fuel." Id. at 14. As we explain in our response to Chevron's proposed findings, the difficulty with the fair market value allegation (in addition to its lack of relevance to the parties' actual price agreement) is the fact that it depends upon the assumption that the "market" is represented only by data published in Platts. Platts publishes spot market price assessments.

[2] "SA" refers to the Supplemental Appendix filed with this brief.

App. 80. The PMM reports all sales. SA 12 (item III) and 19 (item 23). A "spot" market is "a market where goods are traded for immediate delivery." App. 124 (Platts Glossary); see also App. 126 (NYMEX Glossary (spot is a "[t]erm which describes a one-time open market cash transaction, where a commodity is purchased 'on the spot' at current market rates. Spot transactions are in contrast to term sales, which specify a steady supply of product over a period of time")).

Chevron's "index number problem" allegation also is untethered from the parties' contracts, and is not supported by the evidence. The index number problem refers to an "index" that contains two or more products whose relative prices or quantities are changing. The basis for this argument is Chevron's consultants' assertion that the PMM "uses current-period volume weights; that is, the reported sales prices are weighted by the actual sales volumes of different products and in different locations in each period." Pl. App. 615. The consultants also assert that "the price data reported in the PMM often represent an aggregate of multiple different fuels sold across many locations." Id. at 616. (Apparently, the consultants mean the product mix changes). However, as EIA's Mr. Bournazian explained to Chevron's counsel, during a deposition in La Gloria v. United States, No. 02-465 (Fed. Cl.), the price data at issue is not an index, which is "a ratio of two numbers." SA 8.

Moreover, the PMM does not mix fuel products. As the contracting officer has explained, "PMM price averages are based on petroleum product sales information reported to DOE and grouped by product, type of sale, states, and by geographic regions." App. 4 (Walker Decl. ¶ 10). The EIA Form 782A, which collects that information, confirms as much. SA 9-20. It provides strict requirements that require the segregation of product sales reports. Thus, kerosene-based jet fuel is reported on one line of the form, while different types of gasoline and

diesel fuels are reported on others.[3] Even the article relied upon by Chevron's consultants does not indicate fuel products were mixed. In fact, it studies the different types of fuel separately, including "U.S. Kerosene-Type Jet Fuel." SA 22-7.

Chevron's quarrel with the type of fuel references goes well beyond the test of a "market based" EPA clause announced in Tesoro, and also is unwarranted. The contracts at issue were for the sale of a variety of fuels, including JP-4, JP-5, JP-8, Jet A-1 jet fuels, MUM and MUR gasolines, and DFM, F-76 and DFA diesel fuels. Def. Exh. 1 ¶ 2. The PMM explicitly requires the report of JP-5 and JP-8 sales on line 15 of the PMM report form (SA 10 (Line 15) and 19 (Item 13)), and that is the item to which the JP-5 and JP-8 contracts referred. See, e.g., Pl. App. 733, 952 ("Reference Price Tabulation"). The PMM did not report the sale of JP-4, which is a blend of naphtha and kerosene. Barrett Ref. Corp. v. United States, 42 Fed. Cl. 128, 129 (1998); Barrett Ref. Corp. v. United States, 45 Fed. Cl. 166, 169-70 (1999). Accordingly, Chevron's contracts designated the reference price as a combination of PMM-reported prices relating to naphtha and kerosene. E.g., Pl. App. 745. Naphtha sales are not reported in PMM. However, naphtha is an intermediate product in the manufacture of gasoline and, therefore, changes in its value are related to changes in the price of gasoline. App. 31; Pl. App. 620, ¶ 35. Accordingly, Chevron's contracts used the report of wholesale gasoline to reflect changes in the value of the naphtha component of JP-4. E.g., Pl. App. 745.

Chevron's consultants argue the use of this kerosene/gasoline blend was "simplistic" and

---

[3] Thus, this reporting is different than that which might be encountered with a true "index," such as the Consumer Price Index, which is based upon a "market basket" of different items. See, generally, http://www.bls.gov/lpc/lprdho95.pdf (Bureau of Labor Statistics paper on the index number problem); http://www.imf.org/external/np/sta/tegppi/ch15.pdf (International Monetary Fund paper addressing the question of "How exactly should the microeconomic information involving possibly millions of prices and quantities be aggregated into a smaller number of price and quantity variables? This is the basic index number problem").

"inappropriate." Pl. App 620 ¶ 38. However, in 1986, before the onset of this litigation, at least one of the plaintiffs in this litigation admitted otherwise. Writing to DESC about its JP-4 contracts, Conoco stated that it "has no complaint with the way the PMM is calculated and used but with the timing of its availability." SA 70. Prior to DESC's decision to use a common economic price adjustment (EPA) clause, DESC allowed suppliers to propose their own EPA clause. In many cases, suppliers of JP-4 proposed an EPA clause based, in part, on gasoline prices. Our supplemental appendix contains three examples of suppliers proposing to use gasoline prices as a component of an EPA clause. SA 35-36. For example, Ashland Petroleum Company, Contract DLA600-81-D-0354, proposed the use of its own sales prices for gasoline and kerosene in a 60 percent - 40 percent ratio. In another example, Gulf Oil Co., Contract DLA600-81-D-0445, proposed the use of its own sales prices for gasoline and jet fuel in a 50 percent - 50 percent ratio. In a third example, Phillips Petroleum proposed the use of its posted price for house brand gasoline, unleaded gasoline, and dual-purpose fuel oil in equal proportions to adjust JP-4 prices. SA 36.

Lacking any proof of the PMM's inherent illegality, Chevron asserts it was misled, because DESC knew that the PMM moved as much as two cents per gallon out of step with other market references, would not protect suppliers, and failed to disclose that. Compl. ¶¶ 19-20; Pl. Br. 5-7. For example, the complaint alleges that a 1987 DESC study concluded that "PMM did not protect against market fluctuations and did not ensure that the prices DESC paid for military fuel under the long-term contracts reflected at least fair market value." Compl. ¶ 21. See also Pl. Br. 6 (the "study supported using the commercial price references Platts and OPIS to make price adjustments -- not the PMM"). In fact, although the study found features to recommend both the PMM and trade publications (Def. PFF 18-24), it concluded that DESC should continue

using PMM prices, but change the reference month, in order to use a reference price that had been published and was available at the time bidders were submitting their offers. PFF 24.[4]

Avoiding the 1987 study's actual conclusions, Chevron relies upon out of context quotations taken from the study. For example, Chevron cites a supplier's statement that "we never know if we have made or lost money when you (D[E]SC) lift a cargo." Pl. Br. 7. Chevron fails to explain that the comment concerned the interim-final price adjustment issue, not the use of PMM *per se*. See App. 31, Background. But, the disparity between interim payments and final payments was well known by both parties, i.e., that various interim references (those used to provide a price adjustment while final PMM numbers for the month were being compiled by EIA) yielded different figures than the PMM and could over or under-predict the final price adjustment due. For that very reason, the contracts with PMM EPA clauses provided for final price adjustments, to be made when the applicable PMM prices were published. Such a two-step payment procedure would have been unnecessary if the references were identical. Thus, Chevron knew from its many interim and final payments that reference prices differed.[5] See PFF

[4] Chevron's allegation that "DESC did not disclose this study to its suppliers" is undercut by the very evidence it offers on that point. See Pl. App. 596 (handwritten note on cover memorandum to "proposed final draft" shows that some suppliers were canvassed on the proposal to continue using PMM prices with an earlier base reference price. ("Option II industry survey-Barrett, Pride, Chevron, Dia. Sh.-great idea! Calcasieu-indifferent Sun, West. Pet, Gladieux, Peerless, AIRI-won't hurt-might help")).

[5] Chevron attempts to infuse some significance to the difference between the PMM and other price references by asserting that DESC required its suppliers to submit bids to the one ten-thousandth of a cent. DESC did not "require" that offerors ". . . submit bids to sell military fuel to the one-ten-thousandth of a cent ($.000001)." Compl. ¶ 19; Pl. Br. 5. DESC only evaluated offers to that decimal place. Bidders were free to, and often did, submit bids to fewer decimal places. See, e.g., Pl. App. 950 (one place), 903, 936, 962 (two places), 678, 688, 694, 709, 729, 739, 796, 808, 891, 978, 1002 (three places), 760, 770, 782, 831, 834, 876, 910, 924, 935 (four places).

16.[6]

Chevron also cites a DESC statement that the use of trade journals "would cost DESC money" and that there would be "market risk" if adjustments were based on trade journal prices for "jet kerosene." Pl. Br. 6. But, the quotations were based upon potential flaws with the trade journals, not advantageous flaws in the PMM. The "market risk" stemmed from DESC's analysis that trade journals reported unrealistically high prices ("price stickiness") during periods of declining prices. PFF 22; App. 33. Another "market risk" noted was the fact that only a single trade journal reported "jet kerosene" prices, and that it might discontinue publication. App. 33.

To round out its conspiracy tale, Chevron alleges that "seven years later, in 1994, senior officials at DLA learned of DESC's 1987 study, and, upon review of the study, directed DESC to stop using PMM to set military fuel prices." Compl. ¶ 23. However, as we explained in our response to Chevron's PFF 10, it was DESC, not DLA, which, in 1994, first sought a FAR deviation to begin using trade publication prices for price adjustments. PFF 25, 26. DESC did so, not because it had concluded that refiners were not receiving "fair market value," but for some of the same reasons that had been set out in the 1987 study, including the elimination of the need for interim price adjustments, the wide acceptance of trade publication prices by industry, and the relative simplicity of the use of trade publication prices. PFF 26. The apparent basis for Chevron's theory is the deposition testimony of Lawrence Ervin that the change from PMM prices to trade journal prices "was made in response to some pressure from headquarters

---

[6] Chevron's "Response to Defendant's Proposed Findings of Uncontroverted Fact" denies PFF 26, "pursuant to Rule 56(f)." Chevron cannot seriously claim a need for discovery regarding whether its contracts contained interim and final price adjustments. In fact, its own Appendix contains contracts specifying them, precisely as set forth in PFF 16. See, e.g., Pl. App. 761-62.

to do things differently." App. 46. However, as he explained, the "pressure" was to "produce substantial savings to the taxpayer." Id; see also Def. Response to PFF 11. Chevron cannot explain how DLA would expect to produce "substantial savings to the taxpayer" while at the same time eliminating the use of PMM, which, according to Chevron, underpaid suppliers.

## ARGUMENT

### I. DESC's EPA Clauses Are Authorized by FAR 16.203-1

In Count I, Chevron asserts: (1) that the clauses were illegal because they were not based upon "Plaintiffs' own established fuel prices" (Compl. ¶ 43); (2) that the clauses were illegal because they were "not market-based, were not designed or intended to be used to set or adjust prices, and did not reflect at least the fair market value of military fuel" (Compl. ¶ 44); and (3) that the contracts were awarded in violation of FAR § 15.802(b) (now codified at FAR 15.402(a)) (contracting officer's duty to review price reasonableness) (Compl. ¶ 45).

#### A. EPA Clauses Need Not Be Based Upon Chevron's Own Prices

As explained in our moving brief, Tesoro explicitly rejected Chevron's first argument, holding that the theory that "FAR 16.203-3 requires that adjustments be based only on changes in the prices charged by individual contractors eviscerates the regulatory meaning of the term 'established prices' and the policy reasons for using it." Id. Summarizing, the court explained that: "According to the interplay of all four sections of FAR § 16.203, a 'contractor's established price' may be established by reference to either a catalog or market sources independent of the manufacturer or vendor." Id. at 1347 (emphasis added).

Chevron's only rebuttal to this point is its assertion that Tesoro was wrongly decided, and that Barrett Refining v. United States, 242 F.3d. 1055, 1060 (2001), provides the proper rule of decision. Pl. Br. 21, n. 27. However, that argument was examined in Tesoro and rejected.

Tesoro, 405 F. 3d 1345 (noting that the Barrett court was not presented with the issue of legality). Accordingly, that argument appears to have reached an end – at least in this Court.

B. DESC's PMM-Based EPA Clause Is Legal

In Tesoro, the court did not stop with the question of whether, in general, an EPA clause not based upon the contractor's own price would be illegal, because the argument presented to it (especially given reliance upon MAPCO) concerned the nature of the PMM. Accordingly, the court of appeals explicitly considered whether DESC's PMM-based EPA clause was an "established prices" clause and held that it was. Our moving brief quoted at length from Tesoro. It demonstrated that the court stated that it was considering the legality of the PMM (e.g., the certified question for interlocutory review was "Did DESC establish the price of fuel in violation of law by employing economic price adjustment clauses indexed to PMM?" (id. at 1342 (emphasis added)), and considered various of the factors cited by MAPCO, as the basis for *its* holding the PMM was not an "established prices" clause (e.g., that the PMM was an "amalgamation of the previous month's sales data" and, as such, did not comport with the dictionary definition of "established").

Summarizing the sweep of its review, the court of appeals concluded:

> Because we conclude that DESC's use of a market-based EPA clause tied to the PMM was authorized under the FAR, we do not reach the other issues raised in the certified questions . . . . Our holding that the use of the PMM-based EPA clause was authorized under the statute moots the issue [of waiver]. . . . .
>
> For the foregoing reasons, we hold that the Court of Federal Claims erred in holding that DESC's use of a PMM-based EPA clause was not authorized under the FAR.

Id. at 1348-9 (emphasis added).[7]

In the trial-level decisions that led to Tesoro, the plaintiffs disagreed concerning whether the PMM could be considered an "established prices" clause, arguing that the PMM was only an amalgamation of prices, was not based upon actual sales of jet fuel, and so forth. See, e.g., MAPCO, 27 Fed. Cl. 405. Neither the various trial courts nor the court of appeals found a genuine issue that might have precluded a judgment in our favor. Nor did these courts posit that there was a further test of what it means to be "market-based." The plaintiffs in Tesoro certainly never suggested that the PMM or any of the various references were not market-based. Nor does the purpose of the EPA clauses themselves suggest that conclusion.

As we have explained in earlier briefings, the FAR's bias is for competition. Nothing provides a less-assailable ground for competition than firm-fixed prices. To permit an exception – one that allows the winning bidder of a single, price-based competition to escape that price for subsequent sales, yet be the sole supplier for those subsequent lots – potentially eviscerates a competition-based system. Accordingly, to assure that prices remain tethered to the competition, the FAR requires that escalators be independent of the contractor's prices and be permitted only when the nature of the sale requires it (such as the sale of as volatile a commodity as fuel). As the court explained it, "the policy behind requiring use of 'established prices' is to avoid contracts subject to the operational whims of individual contractors." Tesoro, 405 F.3d at 1347.

---

[7] Chevron reads too much into the comment in our appellate brief that we did not consider the appellate court's review to be a "beauty contest" of individual price references. Indeed, we did not and do not here, because it is not for the courts to determine whether one EPA clause is better than another from a business, pricing or economic standpoint. That choice is the agency's and can be voided only upon a finding that it is illegal. In any event, our argument does not dictate how the court itself actually decided the appeal.

Even if the court intended to effect a *sub silentio* remand on the question of whether a PMM-based clause was a market-based clause, the FAR itself requires nothing more than the clause be "market-based" – not that it move with Platts or that it meet any particular standard of precision. Indeed, Chevron offers no new legal standard. Rather, it simply seeks to remove the unambiguous standard the parties agreed upon years ago.[8] And, rooted as it is in the post hoc arguments of economists and industry-watchers, Chevron's approach relegates the parties to observers, not makers, of their agreements.

Nonetheless, the complaint asserts that the PMM clauses could not be legal, because they were "not market-based, were not designed or intended to be used to set or adjust prices, and did not reflect at least the fair market value of military fuel" (Compl. ¶ 43). As we noted in our moving brief, these standards cannot be found in the regulation or in Tesoro. Rather than defend the sufficiency of these proffered legal tests, Chevron relies upon the opinion offered by its consultants concerning an appropriate price reference. The difficulty with relying upon opinions, even if taken as fact, is that, absent a legally-cognizable cause of action, the facts are immaterial to a court of law.

In sum, the materiality of the opinions rests upon the degree to which they can plumb the simple regulatory requirement that an EPA clause be "market-based." But, there is little room for doing so. Indeed, in Tesoro, the court was able to decide the legality of the DESC clause with little more than the legal description of the PMM. Following the appellate court's lead, our

[8] Chevron's reference to Beta Systems, Inc. v. United States, 838 F.2d 1179 (Fed. Cir. 1988), does not supply that standard either. At issue there was a Defense Department FAR supplement not applicable here, which supplied specific criteria for *cost index*-type clauses. Indeed, the existence of such a detailed provision suggests that, if the agencies had wished to further regulate EPA clauses to the degree Chevron suggests, they would have done so. Where the regulating authorities having stayed their hand, the courts should not regulate.

moving brief established that the PMM was "market-based" upon the same basis. Thus, we noted that a statute requires refiners and sellers of petroleum products to report actual sales data to DOE. 15 U.S.C. § 772. It is this data upon which the PMM is based. See Def. PFF 15. Because the prices are established in sales between fuel sellers and buyers, it surely can be said that the EPA clause was based upon market prices, and satisfies the FAR 15.804-3 requirement that market prices be established in the ordinary course of business between buyers and sellers free to bargain.

While apparently acknowledging that DESC was within its rights to use a "proxy" for JP-4, Chevron's consultants assume that the reference must reflect the same "composition" as JP-4. But, even assuming the consultants' chemistry is correct, that level of precision is not required by Tesoro or the FAR. FAR 16.203-1(a)(1) requires only that adjustments based upon established prices be "based on increases or decreases from an agreed-upon level in published or otherwise established prices of specific items or the contract end items." (Emphasis added). Thus, the prices of the precise end items need not be used. To the same effect, FAR 16.203-4(b) ("Adjustment based on established prices -- semistandard supplies") acknowledges that EPA clauses are appropriate for "semistandard" supplies, defined as those for which "the prices can be reasonably related to the prices of *nearly equivalent standard supplies* that have an established catalog or market price." (Emphasis added). Here, for example, because sales of JP-4 jet fuel were not reported by the PMM, the contract provided that the price of compositionally-related fuels would provide the benchmark for price adjustments. As we have explained, JP-4 is a kerosene and naphtha-based fuel. Naphtha can be blended into JP-4 and is an intermediate product in the manufacture of gasoline. Accordingly, gasoline and kerosene became the agreed-upon supplies whose price changes would provide the reference for JP-4. Chevron's insistence

that the parties may not agree to adjust the price of a particular blend of fuel based upon a reference that does not specifically report the sale of that blend simply is not correct. [9]

C. Chevron's FAR 15.802(b) Allegation Does Not State A Cause of Action

In our moving brief, we demonstrated that Chevron's effort to root its core complaint in a violation of FAR § 15.802(b) (currently codified at FAR 15.402(a)), does not state a claim upon which relief can be granted, because it does not create an enforceable right for contractors.[10] See Short Bros., PLC v. United States, 65 Fed. Cl. 695, 764-65 (2005) ("The FAR provisions cited by Chevron purport to do no more than to provide internal government direction. For example, FAR § 15.802 (1993), entitled "Policy," only requires that the contracting officer "[p]urchase supplies and services from responsible sources at fair and reasonable prices [.]" FAR § 15.802(b) . . . It does not afford a judicial remedy").[11] We further explained that that provision was found

[9] Chevron's consultants' report also is flawed because its key conclusion (that PMM does not track "fair market value") is based solely upon the fact that PMM and Platts do not necessarily track each other. Yet, there is no requirement that they do. The report also is marred by statements for which there is no evidence, including the premise of its "index number" theory (as noted in our fact discussion) that the PMM mixes types of fuel. The report's assertion that the reference formula for JP-4 includes "sales of supplies destined to serve individual consumers at retail outlets" (Pl. App. 619) is similarly misleading. In fact, the formula included 70 percent gasoline of "Unleaded Regular Gasoline All Refiners Sales *for Resale*" (Pl. App. 745 (emphasis added)), which is tracked separately in the PMM from retail sales. SA 10, 19, 25-6. The report's assertion that the PMM also does not report "military" jet fuel is of the same caliber. In fact, EIA captures data for "kerosene-type jet fuel," including military jet fuels JP-5 and JP-8. SA 2 at 19 (item 13).

[10] FAR 15.402(a) provides that the contracting officer "must- (a) Purchase supplies and services from responsible sources at fair and reasonable prices."

[11] Chevron's effort to distinguish Short Bros. is limited to noting that it was not limited to the proposition for which we cite it, and that plaintiff sought a different contract type. Nonetheless, the holding we cited is correct, and the plaintiff in Short Brothers also sought money, as Chevron does here. Chevron seeks to distinguish All Phase Environmental, on the ground that the GAO did not, among other things, discuss the purpose of FAR 15.402. To the contrary, the GAO noted that the agency's concern was in not paying more than warranted.

in that part of the regulation that was concerned with obtaining adequate price competition, so that the Government was assured of paying a reasonable price.

To address our analysis, Chevron relies upon the regulation, the dictionary (definition of "fair"), and guidance to contracting officers and auditors found in the Armed Services Pricing Manual ("ASPM"), which suggests that a price should be fair to both sides. However, even if Chevron were entitled to bring a FAR 15.402-based claim to this Court, the complaint still fails to state a claim, because FAR 15.402 concerns *bid and award* prices – not *adjusted* prices, which are calculated during contract performance, based upon the movement of the EPA clause. Accordingly, the ASPM refers to "price" in the singular and to "current market conditions," not subsequent adjusted prices. As we have explained, the contractors set their offer prices and no contractor has suggested that its offer prices were unreasonable.

In any event, the ASPM guidance, the dictionary's definition of fairness, and Chevron's other secondary references amount to nothing more than good advice for contracting officers interested in working with contented, motivated contractors, who are not looking to file claims.[12] However, they do not establish the existence of an enforceable interest.

Moreover, to suggest that the FAR, which was issued against a backdrop of long-established principles of commercial law (including the principle of unilateral mistake, which the FAR addresses), intended to add a cause of action not rooted in mistake is as preposterous as it is

[12] Indeed, the declarations in the record submitted by the contracting officer, John Walker (App. 3 ¶ 8) and the DESC Price Analysis and Pre-negotiation Briefing Memoranda (Pl. App. 144-70, 206-78) explain how prices were determined fair and reasonable. The undisputed facts show that prices were determined fair and reasonable based upon competition and, in many cases, comparison with market prices. See FAR 15.404-1(b)(2)(i) ("normally, adequate price competition establishes price reasonableness").

illogical.[13] Indeed, if, as Chevron argues, the contracting officer's obligation to assess price reasonableness were actionable, contract pricing never would be binding, because contractors who failed to realize the *post hoc* demands of their owners or investors could occasion this Court's intervention with no more substantial an allegation than "our price was unfair!" Chevron suggests that is not true, because courts routinely adjust prices. But, they do so upon discernible standards – not generalized claims of "unfairness," unrooted in recognized causes of action.[14]

II. Chevron's Alternative Illegality Theories In Counts II-VI Must Be Dismissed

A. Count II (Misrepresentation)

In our moving brief, we established that the misrepresentation count (DESC "misrepresented and otherwise failed to disclose that PMM and other indexes were not designed or intended to be used to set or adjust prices and did not reflect at least fair market value" (Compl. ¶ 60)) should be dismissed, because there is no such applicable rule for EPA clauses. Chevron's brief does not suggest one or that the Government actually misrepresented anything. Instead, Chevron asserts that, because the complaint *alleged* a "misrepresentation," for the purposes of our motion, it is an established fact. Pl. Br. 35. However, misrepresentation is an

[13] See Nash & Cibinic, Formation of Government Contracts (3rd Ed. 1998) at 1279 ("The primary focus of these requirements is to ensure that the Government does not pay unreasonably high prices," although they caution that "prices that are unreasonably low must also be dealt with before an award is made, because they could be evidence of mistake, non-responsibility, lack of understanding of the work, or a buy-in"). Chevron's own argument makes this connection, asserting that it is grounded in a misrepresentation. Pl. Br. 33.

[14] Chevron acknowledges that its claim cannot stand on FAR 15.402 alone, when it argues that "the determination of price reasonableness was, in essence a sham: that DESC knew that the PMM did not reflect the marketplace, [and] misrepresented what it knew for its own benefit." Pl. Br. 33 (emphasis added). In other words, as Chevron's misrepresentation count goes, so goes its FAR 15.402 count. As we have explained, Chevron has yet to put a fact in evidence that amounts to a misrepresentation or establishes its fanciful conspiracy theory.

allegation of law, which we need not accept. In fact, the entire point of our motion is to challenge it. Accordingly, absent any material fact pertaining to an actual misrepresentation, that count now must be dismissed.

B. Count III ("Breach of Contract") and Count IV ("Implied-In-Fact Contract")

In our moving brief, we established that Chevron's breach of contract count and implied-in-fact contract counts should be dismissed, because there is no ground for striking the parties' own unambiguous agreement. We also established that an "implied-in-fact contract cannot exist if an express contract already covers the same subject matter." Trauma Service Group v. United States, 104 F.3d 1321, 1326 (Fed. Cir. 1997).

Other than asserting that the contract "expressly" requires the payment of "fair market value," Chevron cites no language to contradict the unambiguous language of the contract's pricing clause. Instead, Chevron attempts to oust that clause obliquely, reasoning that the Spearin doctrine (Government warrants that design specifications will yield satisfactory result) and principles of contract reformation somehow trump a contract's unambiguous language.[15] But, the plain language of the contract's pricing clause does not permit such machinations. We do not necessarily disagree that if, as a matter of law, the pricing clause were stricken, that reformation could be available. Nor do we necessarily disagree that the remedy would include

[15] Chevron alludes to the "implied" promise to pay fair market value found in Barrett, 242 F.3d 1060. Pl. Br. 40. However, in that case, the contract was assumed to be invalid, and the court was looking for evidence of an implied in fact contract. Here, should we reach such a remedy phase, we would expect the parties to adduce evidence concerning the fact of any such implied agreement. Absent agreement upon what "fair market value" means, it is unlikely the parties are in any position to agree upon what, specifically, that might be. Notably, the denouement of Barrett was the trial court's finding that, based upon the presumed implied-in-fact agreement, the Government overpaid for three of the four contracts at issue. Barrett v. United States, 50 Fed. Cl. 567, 569-70 (2001). We understand that Chevron would dispute the existence of such an implied-in-fact agreement.

reviewing the parties' dealings to search for an implied arrangement; but, until this contract is voided through some other cause of action, these counts unnecessarily bloat the complaint.

C. Count V ("Failure of Consideration and Frustration of Purpose")

Count V presents a further unnecessary multiplication of the charges. Chevron seeks to avoid the dismissal of Count V, by asserting that the matter is not "ripe for decision," because "DESC offers no evidence" concerning the degree of frustration. Pl. Br. 44. However, it is Chevron that bears the burden of proof in advancing evidence of its purported frustration. Moreover, Chevron's reply acknowledges that the count is grounded "on the voiding of DESC's pricing clause on the grounds of illegality." Pl. Br. 44. Accordingly, the dismissal of Chevron's remaining illegality counts would result in the dismissal of this count (conversely, were it not to be dismissed, the frustration count would be superfluous) and, therefore, serves no purpose.

D. Count VI (Mistake)

In our moving brief, we demonstrated that Count VI must be dismissed for the same reason as the other alternative causes of action, and that Chevron failed to meet the basic elements of proof of a mistake claim, including that, at the time of their agreement, the parties shared a mistaken belief "regarding a fact" concerning a "basic assumption underlying the contract." See Dairyland Power Coop. v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994).

The reply asserts that the complaint's focus in this Count is the purpose of the PMM and what it is intended to measure. Pl. Br. 45. But, Chevron's reply fails to identify any belief that it held concerning the PMM – let alone one held by DESC. As we have explained, the PMM reports on actual sales data required to be reported by statute. Chevron itself was required to supply the information that was the basic ingredient of the PMM. Chevron has failed to show why the purpose of the PMM or why EIA collects PMM data is material to an unambiguous

contract provision that was never alleged to operate or be administered or interpreted improperly.[16] In sum, Chevron's mistake pleading lacks a factual premise.

III. Chevron's Takings Claim Should Be Dismissed

Chevron's extended response to our demonstration that it fails to state a Fifth Amendment takings claim, Pl. Br. 46-53, confirms our central point: that Chevron cannot cite a single judicial decision holding that a compensable "taking" can occur when the Government acquires property from a willing seller, pursuant to a contract that is later (for purposes of argument) held to be "illegal" or void. This is hardly surprising, as such a rule would convert every "illegal contract" claim involving real or personal property into a takings claim. "Chevron alleges that the contracts were unlawful, and thus DESC physically possessed fuel to which it had no right." Id. at 50. This conclusion concerning the Government's "rights," however, does not follow from the premise of illegality. Indeed, under Chevron's logic, Chevron could be liable to a suit by the Government for funds paid to Chevron (e.g., United States v. Wurts, 303 U.S. 414, 415 (1937)), because it would likewise be true that "Chevron possessed Government money [paid under the contract] to which it had no right."

In truth, of course, both parties rightfully took ownership of the consideration freely exchanged under the fuel supply contracts; both parties received exactly that for which they contracted; and these voluntary transactions had none of the aspects of a physical or regulatory taking. In fact, a contract constitutes a right to payment of damages in the event of a failure of performance. As long as the right to such damages remains intact, as it does here, no taking has occurred. See, e.g., La Van v. United States, 382 F.3d 1340, 1352 (Fed. Cir. 2004).

[16] Chevron's reliance upon Beta Systems does not supply its missing factual ingredient. Not only are the facts of that case not suggested here by any evidence, that case involved a DFAR supplement and specific EPA clause criteria not applicable here.

Chevron's argument that its constitutional claim is "substantially identical" to that in Osprey Pacific Corp. v. United States, 41 Fed. Cl. 250 (1998), also cannot bear scrutiny. Pl. Br. 48. Among other important distinctions, plaintiff in Osprey was a third party to the contract under which the Government asserted ownership of the boat, and plaintiff did not willingly deliver its property to the Government for remuneration, as did Chevron. Nor is it true that "courts have consistently permitted [a] contractor to pursue takings claims in addition to breach of contract claims" when the contractor is dissatisfied with the price it received. Id. at 51.

In the first case cited by Chevron to support the latter assertion, Pi Electronics Corp. v United States, 55 Fed. Cl. 279 (2003), the property right allegedly "taken," through disclosure, was a trade secret, which plaintiff did not agree to convey to the Government. Id. at 281-83. Chevron, by contrast, freely passed title to its fuel for consumption by the military. In Armstrong v. United States, 364 U.S. 40 (1960), also cited by Chevron, the plaintiffs were not Government "contractors," but subcontractors who asserted liens in the subject of the contract. Those plaintiffs were not attempting to convert contract claims into takings claims. In Scan-Tech Security v. United States, 46 Fed. Cl. 326 (2000), the Court held sensibly that "[i]f the express writings of the parties encompass[ed] the [Government's] right to possession" – as DESC's fuel contracts undeniably did – plaintiffs' "takings claim should be dismissed" and replaced with contract claims. Id. at 332. Similarly, in Integrated Logistics Support Systems, Int'l v. United States, 42 Fed. Cl. 30 (1998), the Court could not "conclude that the contract conferred expressly upon defendant rights of possession, use, ownership, and alienation in the materials . . . ." Id. at 35. No such ambiguity exists in the contracts at issue.

Chevron was not coerced to bid for or perform these contracts, and the assertion that DESC "abrogated Chevron's rights" by awarding lucrative contracts in a proprietary capacity

refutes itself. Pl. Br. 47 n. 51. No authority supports the argument that such free exchanges of a commodity for money in a competitive market can be recharacterized, years after the fact, as a compensable Fifth Amendment taking if the private seller can find some way to undo what both parties understood to be the contracts. Further, even if Chevron were to prevail, as the Federal Circuit held in Barrett, only the pricing mechanism would be stricken. The remainder of the agreements, including the Government's right to receive the fuel, would stand, or would, at a minimum, be "implied in fact" from the parties' conduct. Accordingly, there is no basis upon which to allege the fuel was "taken" for use by the sovereign within the meaning of the Constitution.

## IV. Chevron's Small Business Program Complaints Must Be Dismissed

### A. The Court Lacks Jurisdiction To Entertain The Fifth Amendment Complaint

In our moving brief, we demonstrated that this Court possesses no jurisdiction to entertain claims based upon the Fifth Amendment's equal protection clause. Chevron claims to skirt that rule, because it has "express contracts" tainted by the award. Pl. Br. 53-54. But, here, Chevron has no award based upon any purported equal protection violation.[17] Moreover, the test is not whether a contractor has a contract, it is whether the contract "underlies its claim." Trauma Service Group, 104 F.3d at 1324. Here, Chevron's contract is, at best, incidental to its claim, which concerns the award of set-aside portions it presumably was not awarded. By contrast, the cases upon which Chevron relies, such as Urban Data Sys., Inc. v. United States, 699 F.2d 1147 (Fed. Cir. 1983), Gould v. United States, 67 F.3d 925 (Fed. Cir. 930 (Fed. Cir. 1995), and Trauma Service Group, concern claims that contract terms (including their proper

[17] A further symptom of the sheer creativity of the complaint is Chevron's failure to include any evidence that the premise of its argument has any basis in fact, such as a declaration or document explaining how the purported violation affected its contracts.

interpretation in light of applicable statutes or regulations) were illegal or supported the requested relief. See, e.g., Trauma Service, 104 F.3d 1321, 1325 ("TSG contends the MOA is an express contract"); Gould, 67 F.3d at 929 ("The illegality in this case, if there is one, turns on questions of fact and the terms of the contract in dispute"); LaBarge Prods., Inc. v. West, 46 F.3d 1547 (Fed. Cir. 1995) (pricing provision formed in violation of an auction procedure was reviewable). Here, Chevron has failed to identify any of *its* contract terms that were written in violation of any statute or regulation.

Chevron also insists that the "Federal Circuit already has expressly held that there is Tucker Act jurisdiction over this precise type of claim." Pl. Br. 54 (citing Rothe Dev. Corp. v. United States Dept. of Defense, 262 F. 3d 1306 (Fed. Cir. 2001)). However, this is not a Rothe claim. Rothe was a disappointed bidder. It did not seek damages arising from a contract, nor did the court assert its jurisdiction on that basis. Rothe alleged that the application of a 10 percent evaluation preference to a small disadvantaged business bid deprived Rothe of obtaining a contract. Thus, it was upon its bid protest jurisdiction (then based upon the premise that, "[u]nder the Tucker Act an unsuccessful bidder can recover its bid preparation costs from the Government on the theory that failure to evaluate a 'bid honestly and fairly' breaches an implied-in-fact contract of fair dealing") that the court entertained the appeal. Rothe, at 1317 (citing Coflexip & Servs., Inc. v. United States, 961 F. 2d 951, 952-953 (Fed. Cir. 1992)). By contrast, Chevron's claim alleges that the Fifth Amendment (which, if anything, would have deprived Chevron of a contract) entitles Chevron to recover damages for supplies that it provided pursuant to an express contract. Pl. Br. 54-5 (the Fifth Amendment claim "relates to its express contracts with DESC"). Rothe provides no grounds for this Court's jurisdiction.

Chevron's claim also lacks a proven factual premise. Its stated premise is that the "contracts contained an illegal term that resulted in it receiving less than fair market value for the fuel it sold to DESC." Pl. Br. 55. However, Chevron identifies no term of its contract that violates the Fifth Amendment. That is not surprising, because the preference clause is inoperative in a contract awarded to a contractor, such as Chevron, that does not obtain the evaluation preference. For firms that actually obtain the preference, the relevant clause requires that the resultant contract be performed by a qualifying minority owned concern. See, e.g., Def. App. 11 ("SDB concerns must supply petroleum product from an SDB manufacturer, who complies with the petroleum product size standards at 13 CFR 121, to be eligible for the evaluation preference")).

B. DESC's Small Business Program Is Not Improper

Chevron argues that DESC's match price method for conducting partial small business set aside procurements violates the Office of Federal Procurement Policy ("OFPP") Act, 41 U.S.C. § 423, the FAR "prohibition" on auction techniques, and the FAR's method of awarding the set-aside portion of the procurement separately. Pl. Br. 56-65. We demonstrated in our moving brief that the DESC program follows published guidance, did not constitute a prohibited "auction," and had no effect upon Chevron.

An "auction" is the "direct bidding of price between two competing offerors." DGS Contract Servs., Inc. v. United States, 43 Fed. Cl. 227, 239 (1999). The contracting officer's declaration explains that there is no such auctioning.[18] Rather, the small business offeror is given the opportunity to match the price the Government otherwise would pay, adjusted for the transportation cost the Government would incur. The offeror agrees to match or not. If it does,

[18] The declaration is supported by the relevant clauses at App. 10-23.

the offeror is awarded the set-aside portion. The result is that there is no back and forth between one offeror and another. If and when that ever occurred in a solicitation in which Chevron participated, that meant that Chevron would have been awarded no contract for that amount. This method is consistent with the FAR and authorized agency clauses, which we have reproduced at Def. App. 10-23, and is contemplated by 41 U.S.C. § 423 (b)(3), the initial version of which provided that information may be released to "a person authorized by the head of such agency or the contracting officer." 41 U.S.C. § 423 (b)(3).

The statute was amended in 1996, but still authorizes release in accordance with "applicable agency . . .procedures." 41 U.S.C. § 423 (h)(1). As we explained, the Government's match price method of conducting partial small business set-aside negotiations follows authorized agency procedures and the FAR itself. Thus, for example, FAR 52.219-7(b)(3) provides that: "The set-aside portion will be awarded at the highest unit price(s) in the contract(s) for the non-set-aside portion, adjusted to reflect transportation and other costs appropriate for the selected contractor(s)." App. 16 (emphasis added). The clause further provides that "negotiations" will be conducted with the small business offerors to achieve this result. Chevron fails to explain how this clause would work unless the contracting officer were to disclose the match price. Similarly, the DESC clause I237.07 provides that "The price for the set-aside portion of this procurement will be negotiated by the Contracting Officer based upon prices the Government would otherwise pay under this solicitation had there been no set-aside for supply of the location at which the set-aside is placed, adjusted for transportation charges and other factors." App. 10.

In addition to its lacking any basis in fact (i.e, that there was any auction affecting any of its contracts), Chevron's argument is flawed by its premise that there is an outright ban on price

disclosure. See Pl. Br. 58 (asserting that DESC's program violates FAR 15.610(d)(3) because it "indicat[es] to an offeror a cost or price that it must meet to obtain further consideration" and "otherwise furnish[es] information about other offerors' prices"). First, the FAR disclosure prohibitions at issue concern "auctions." As we have shown, DESC's small-business program is not an auction. Second, as we have shown, the particular disclosures at issue are authorized. Third, there is no general ban on price disclosure. See MTB Group, Inc., B-295463, 2005 CPD ¶ 40 at 2 (neither the OFPP Act not the FAR contain an "absolute prohibition against disclosure of price information, and both make clear that prices can be disclosed under certain circumstances") (citing DGS Contract Servs., 43 Fed. Cl. at 236).

Chevron also complains that DESC should award the set-aside procurement separately from the rest of the procurement. Pl. Br. 60-65. Chevron has not shown how it might ground its generalized complaint concerning the conduct of procurements generally in a cause of action arising out of one of its contracts.[19] Accordingly, Chevron has presented only a facial attack upon DESC's small business set-aside program over which this Court lacks jurisdiction. In any event, as we explained in our motion, the Comptroller General has found that DESC's

[19] Its purported basis is that "large businesses seeking award of substantial volumes of fuel are forced to bid low enough that small businesses will not accept the resulting match price offered to them, thereupon the award remains with the large business as the otherwise successful offeror." Pl. Br. 64. However, Chevron provides no evidence in support of its speculative argument. Therefore, the time has come for this allegation to be dismissed. Moreover, the FAR itself provides for matching awards. Thus, we fail to see the basis for characterizing a purported bidding strategy aimed at excluding small businesses as "forced." In any event, we see no reason why any business would lower its offer specifically to contend with small-business set asides, when there are other competitors, including small businesses who bid on the non set-aside portion, with which to contend before final award.

procedures are consistent with applicable law and regulation. B-230556, March 23, 1989. App. 118.[20]

V. Waiver and Estoppel Bar Chevron's Claims

A. Introduction

Our moving brief established that, even if the FAR were to confer some unrealized right, Chevron elected to accept the pricing clause it did and, through years of inaction, now is estopped from pursuing any such imagined right in litigation. Our moving brief also demonstrated that Chevron's alternate illegality arguments and the common law causes of action are based upon the same faulty premise, i.e., that the Government has a legal duty to use escalators based upon price references that are "intended or designed" to be used as prices references, and to ensure that contracts result in payments that the contractor is satisfied amount to "fair market value." Accordingly, the common law causes of action rise or fall with Chevron's illegality allegation.

[20] Chevron's assertion that the GAO decision was issued before the OFPPA is unavailing. Pl. Br. 62, n. 68. First, the deviation is not relevant to whether a match price set-aside constitutes an auction. Second, the prohibition of auctions existed in FAR 15.610, well before the opinion was issued. See App. 14-15. Chevron's insistence that it requires discovery regarding deviations and that the contracting officer concedes that DESC "violates the requirements of the FAR" (Pl. Br. 62) is a straw man that avoids our principal arguments. Chevron consistently conflates and confuses its auction argument with its "must first award non set-aside quantities" argument -- in its affirmative case, its criticism of our argument, and its assertion that discovery is required. See, e.g., Compl. ¶ 46; Pl. Br. 60 ("DESC's match price system violates the FAR because it discloses competitors bid or pricing information"). Concerning the merits of Chevron's auction argument, our point simply is that a match-price set-aside is not an auction. Regarding the "award first" assertion, our point is that Chevron has failed to explain how any purported violation affected its contract. Chevron's assertion that it may rest solely upon its allegation that the match price program "damaged Plaintiffs" (Pl. Br. 64, n.71 (quoting Second Amended Complaint)) -- without offering any evidence to that effect -- ignores its burden to raise a genuine issue and underscores the fact that it has not been harmed by any purported small business law violation.

In Hermes II, 58 Fed. Cl. 409, this Court held that the contractor's allegation that the PMM violated the FAR could be waived. See also Sunoco v. United States, 59 Fed. Cl. 390, 398 (2004) ("Having dissected both Type I and Type II cases, the Court adopts the Type II rationale. The mere existence of the Type II line of cases shows that waiver of contract illegalities by government contractors is, at the very least, possible in some cases."); Calcasieu v. United States, 2003 WL 22049528 at 11 ("This court draws from *AT& T III* and *V* the cautionary lesson that waiver may apply in the circumstance of this case, given an appropriate record").[21]

The Hermes II Court also held that the requisite "intelligent waiver" could be discerned from the contractor's general sophistication and lengthy failure to signal its dissatisfaction whatsoever. Id. at 416-18. As the Court observed:

> It is almost universally conceded that "'wherever a contract not already fully performed is continued in spite of a known breach, the wronged party cannot avail himself of that excuse . . . . As a general proposition, one side cannot continue after a material breach by the other . . ., act as if the contract remains fully in force (although stopping performance would be fair and convenient), run up damages, and then go suddenly to court.'"

Id. at 418 (citing Ling-Temco-Vought, Inc. v. United States, 201 Ct. Cl. 135, 146 (1973) (quoting Northern Helex Co. v. United States, 197 Ct. Cl. 118, 125-26 (1972)); see also Hermes II, 58 Fed. Cl. at 413 (a "key factual distinction" to be that Hermes "astonishingly waited

[21] The judges in Sunoco and Calcasieu deferred a final ruling on the waiver issue, pending additional discovery. Other judges of the Court have disagreed about whether the claims could be waived. See, e.g., Tesoro v. United States, 58 Fed. Cl. 65 (2003), La Gloria v. United States, 56 Fed. Cl. 211 (2003), Gold Line Refining v. United States, 54 Fed. Cl. 285 (2002) (same judge following La Gloria), Navajo v. United States, 58 Fed. Cl. 200, 213 (2003) (same judge following La Gloria). However, the Court in Tesoro certified the question for interlocutory review (although, because the Federal Circuit concluded that the PMM-based was legal, the waiver question was not reached in the appeal).

fourteen years after entering the first PMM-based contract before suing in this court, and waited eight years after entering the last PMM-based contract before litigating").

As explained in our original motion for summary judgment, estoppel also is applicable. Estoppel requires that the party asserting estoppel rely to its detriment upon its opponent's action or inaction. E.g., E. Walters & Co., Inc. v. United States, 217 Ct. Cl. 254, 576 F.2d 362 (1978). Here, because of its superior knowledge of its circumstances, and its extensive experience with the clauses at issue, Chevron was in the best position to assess the efficacy of the EPA clauses regarding its own situation (including any inherent uncertainty that might have existed). By adopting the EPA clauses in its offers with the text of the FAR available to it for consultation, Chevron signaled its intent to forego any benefits contained in the FAR. That Chevron continued to offer these clauses, coupled with its failure to protest, clearly prejudiced the Government, because, as subsequent events showed, the Government could have obtained a deviation. Either of these would have been a "relatively painless alternative" to the after-the-fact, competition-free, speculative recovery Chevron now seeks. Indeed, as did the contractor in Ling-Temco-Vought, Chevron has "in effect retained all options for itself . . . made its calculations entirely in its own favor, without proper consideration of the defendant's position," and violated the "basic principle calling for fair treatment of both parties." 201 Ct. Cl. at 148, 475 F.2d at 638.

In its response, Chevron insists that waiver has not been proven and that, as a matter of law, may not be proven. However, as we did in Hermes II, we have demonstrated all that we must to prove waiver. Given the opportunity to rebut our evidence, and to demonstrate that it did not intend to waive any presumed benefit of FAR 16.203-1, and is not estopped from pursuing that benefit now, Chevron fails to adduce any fact that might prevent the entry of

summary judgment. Chevron also fails to demonstrate the need for discovery. See Gary-Williams v. United States, No. 03-2106C (Fed. Cl.) (Order of April 20, 2006) (denying, without prejudice, virtually identical application for RCFC 56(f) motion to refuse our motion and permit discovery); Calcasieu v. United States, No. 02-1219C (Fed. Cl.) (Order of March 6, 2006)(denying a virtually identical application).

B. Chevron Has Waived Its Claims As A Matter Of Fact

The key factor to be established in a case involving the waiver of a regulatory benefit is the contractor's presumed knowledge of the regulation. Hermes II, 58 Fed. Cl. 409, 416. Here, Chevron is presumed to have knowledge of the FAR, especially those portions relating to its contract pricing. Indeed, the content of the FAR provision at issue was fixed well before Chevron executed its first contract, and Chevron never complained that the EPA clause was ambiguous or functioned in a manner other than that suggested by its plain language. Estoppel is established by Chevron's persistent silence and the inherent prejudice to the Government of Chevron's complaining now that it objects to contracts awarded and performed years ago.

In an effort to demonstrate that it has not waived, Chevron relies principally upon the declarations of sales managers, from the period 1980 to 1989, and 1992-2001, whose declaration asserts that: (1) "Chevron did not . . . intend that it would be paid less than the fair market value of fuel or at any time intend to relinquish the right of payment of fair market value;" and (2) "Chevron was not aware at the time it entered the fuel contracts that, as I understand is alleged, DESC awarded the contracts in violation of law." Pl. App. 638-40. Chevron also relies upon a declaration of the official who certified Chevron's "initial claims," who asserts that Chevron filed claims when it "first learned that remedies were available to permit payment of fair market

value in accordance with what I understand was Chevron's intent in entering the contracts." Pl. App. 642.

None of these allegations indicates that further discovery is required. All are insufficient to prevent a finding of waiver. First, the declarations are based upon the conclusory and erroneous legal premise that Chevron's contracts were illegal, and that Chevron enjoyed the right to the payment of "fair market value," a term the declarants do not define. See Behm v. United States, 68 Fed. Cl. 395, 407 (2005) (conclusory declaration does not create issue of uncontroverted fact). In fact, the declarants do not assert that any Chevron revenue expectation was not met or that Chevron was not paid fair market value. As we have explained, contract prices were those offered by Chevron, according to an unambiguous pricing provision. Chevron has never asserted that the provision was incomprehensible, misperformed, or that it failed to meet expectations. So general and lacking in personal knowledge are the declarations that they fail to identify the illegality or deficiency that might have contradicted Chevron's alleged "intent." As this Court has explained, an "allegation of its intent not to waive a claim when it signed the modifications is insufficient to raise a genuine issue of material fact so as to preclude summary judgment for the government." Safeco Credit v. United States, 44 Fed. Cl. 406, 420 (1999). As such, the declarations are insufficient to contradict our motion.

Apparently unable to assert directly that it lacked critical knowledge, Chevron relies upon its consultants' report to "infer" Chevron's intent not to waive – principally, the consultants' observations that: Chevron had "only" eleven "annual observations" of the PMM; that there is a "random [PMM] variation with the marketplace;" and Chevron "could not have understood that its bids would consistently receive less than fair market value." Pl. Br. 69-71. Chevron misses the point. Even assuming (it never having been claimed directly) that a

contractor as large and experienced as Chevron consistently intended one result and achieved another, Chevron has not established that it did not know that the regulation at issue existed, and that it did not intentionally agree to a contract that included a PMM-based clause.

Moreover, the consultants' report is an unsuitable vehicle for establishing Chevron's intent and knowledge. The report's very conclusion underscores that – because, although the consultants might very well have discouraged Chevron from entering into contracts with PMM-based EPA clauses, when Chevron had to make a business judgment, it reached the opposite conclusion. Indeed, if Chevron's knowledge of the information offered by its consultants was important, presumably, Chevron would have gathered that knowledge, or (more likely) did so, and determined that it was not material.

The consultants' report also is unsuitable, because it does not establish even what it purports to measure, i.e., whether the PMM EPA clause is "market-based." As we explained in our response to Chevron's proposed facts and in our discussion of the facts above, the consultants' report is based upon an apples to oranges comparison of unspecified Platts data that tracks the spot market and an industry-wide census that tracks all sales, the PMM. See Def. Response to Pl. PFF 18. Thus, the fact that changes between certain PMM data and certain Platts data may not match is irrelevant – both to the legality of the clauses at issue and, evidently, to 19 years of Chevron's business judgment. Indeed, FAR 16.203-1 requires only that established prices-type adjustments be "based on increases or decreases from an agreed-upon level in published or otherwise established prices of specific items or the contract end items." It does not require particular price references or ones that are identical to each other.

At best, Chevron's consultants have demonstrated that, in general, a contractor might make an error in judgment concerning a future fact, i.e, specific payments, but that is not the basis for voiding 39 contracts years after performance.

Underscoring the lengths to which it must go to keep this litigation afloat, Chevron seeks to rebut the contracting officer's declaration that Chevron did not object to the legality of the PMM, by focusing upon the fact that Mr. Walker did not "allege that he was involved in a *single one* of Chevron's contracts." Pl. Br. 71. What is startling about this is the fact that Chevron knows very well that Mr. Walker was involved with at least some of Chevron's contracts. See Pl. App. 657, 663, 675, 687, 693, 699, 708, 719, 738, 741, 750, 759, 769, 779, 795. Chevron also knows that Mr. Walker's declaration was "based on [his] review of the files." App. 5 ¶ 13.[22] What is more startling is the fact that, given the opportunity to directly rebut Mr. Walker's statement, Chevron has failed to do so. Accordingly, for the purposes of our motion, it now can be taken that Chevron failed to protest the inclusion of PMM in its contracts.[23]

---

[22] In a footnote, Chevron declares it has established the "inaccuracy" of Mr. Walker's statement in a similar case, Calcasieu v. United States. Pl. Br. 71, n. 75. In fact, there is no apparent conflict in the document Chevron offers in opposition to Mr. Walker's statement. The document is a letter from DESC to Calcasieu, not a letter of complaint from Calcasieu. From the response, it appears that Calcasieu was not complaining about the accuracy of the PMM, but its ability to determine its offer price when the PMM was not yet available for the reference month. Pl. App. 96. DESC resolved this problem in 1987 when it changed the reference month. Def. PFF 24.

[23] Instead, Chevron relies upon the allegation that DESC had received objections to PMM from "suppliers" as early as 1984. Pl. Br. 72. Chevron also asserts that "every known objection . . . was rejected out of hand." Id. In fact, what Chevron is referring to is the complaint of the plaintiff in MAPCO, which asserted that the PMM was "non-indicative of our marketplace," and noted its unique situation, i.e., its location in Alaska and non-access to continental markets. Pl. App. 201. However, neither Chevron (nor any other contractor it has identified) has made any such objection or explained the relevance of MAPCO's situation to its own. The "rejection" to which Chevron refers is a DESC internal memorandum, explaining that its policy was to have common "EPA references." Pl. App. 205. The memorandum explained that the "[u]se of different escalation references in a competitive procurement renders meaningful price evaluation in a competitive procurement difficult, if not impossible," but that, "in the case of Alaska, the

Chevron's final effort to rebut our waiver defense is its "unclean hands" conspiracy theory. Pl. Br. 73. As we explained in our recitation of the facts, above, the theory is that: DESC knew that its use of the PMM was corrupt; DESC concluded that the price of fuel would, in the future, move in one direction; the PMM and all of the references DESC used would report movement in the opposite direction; that movement always would favor DESC's customers; and, somehow, the fuel industry never would detect this or, upon learning it, bid eagerly nonetheless. As we explained, not only is the story not credible, it depends upon partial quotations and innuendo not supported by the evidence.

C. Chevron Has Waived Its Claims As A Matter Of Law

Chevron argues that it may not be prevented from asserting its entitlement to a legal price, relying upon: (1) the principle that an illegality concerning the effectuation of a national purpose may not be waived (citing cases such as Pittsburgh C.C. & St. L. Ry. Co. v. Fink, 250 U.S. 577 (1919); Sprague Steamship Co. v. United States, 172 F.Supp. 674 (Ct. Cl. 1959); Urban Data Sys., Inc. v. United States, 699 F.2d 1147 (Fed. Cir. 1983)); (2) cases holding that, where a rule is made for the protection of contractors, it may not be waived (Beta Sys., 838 F.2d 1179, and its progeny, including Cessna Aircraft v. Dalton, 126 F.3d 1442 (Fed. Cir. 1997)); (3) the absence of a statute limitations (citing Thomas v. United States, 125 Ct .Cl. 76, 80 (1953) and Louisville and Nashville R.R. Co. v. Cent. Iron and Coal Co., 265 U.S. 59, 65 (1924)).

proposed common escalation reference may not be obtainable . . . [Thus,] [i]f the proposed EPA reference is rejected by all Alaska based offerors, a common EPA reference based on Alaska product postings will be appropriate." Pl. App. 205. In short, the problem was with MAPCO's portion of the Alaskan market, a common reference was required for competition purposes, and, if that was not obtainable, DESC was prepared to accept something else. None of this pertains to Chevron.

These are the same arguments that were rejected in Hermes II. Chevron's central premise is that contractors may not waive clauses such as this one. But, it is well-established that public contractors may waive rights and benefits, and may be estopped from belatedly seeking to reassert them. E.g., Shutte v. Thompson, 82 U.S. 151 (1872). Even statutory benefits may be waived. United States v. Mezzanatto, 513 U.S. 196, 201 (1995) ("Rather than deeming waiver presumptively unavailable absent some sort of enabling clause, we instead have adhered to the opposite presumption."). Overcoming that presumption requires a showing, deducible from the text of a statute or legislative history, that Congress itself intended to preclude waiver. Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628 (1985); accord Rough Diamond Co. v. United States, 351 F.2d 636, 639 (Ct. Cl. 1965) ("the basic test in deciding whether a purchaser could recover would always be the particular Congressional will reflected in the particular piece of legislation under scrutiny"). The burden is on the party opposing waiver to show that Congress intended to preclude it. Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 226 (1987).

To be sure, where Congress has clearly expressed broad public policy, courts are reluctant to permit the evisceration of that policy by the parties' consent. See Clark v. United States, 95 U.S. 539 (1877) (refusing to permit waiver of statute designed to "prevent and punish fraud" by requiring contract to be in writing); Urban Data Sys., Inc. v. United States, 699 F.2d 1147 (Fed. Cir. 1983) (statutory prohibition against cost-plus-percentage-of-cost contracts). But, a party does not thwart public policy by declining a benefit contained in a regulation or other law. Brooklyn Sav. Bank v. O'Neill, 324 U.S. 697, 705 (1945); Millmaster Intl. Inc. v. United States, 427 F. 2d 811, 814 (Cust. Ct. 1970) (importers may waive benefits of Tariff Act, because waiver will not interfere with any "manifest statutory purpose").

Not every contracting irregularity, however, requires a contract's *post hoc* invalidation or reformation. In fact, the jurisprudence of this circuit is replete with references to contractor waivers, including Hermes II. E.g., American Telephone and Telegraph Co. v. United States, 307 F.3d 1374 (Fed. Cir. 2002) (AT&T V); Whittaker Electronic Systems v. Dalton, 124 F.3d 1443 (Fed. Cir. 1997); E. Walters & Co., Inc. v. United States, 217 Ct. Cl. 254, 576 F.2d 362 (1978) (per curiam); Ling-Temco-Vought, Inc. v. United States, 201 Ct. Cl. 135, 148, 149, 475 F.2d 630, 638 (1973).

In order to determine whether waiver may be found, a case-by-case analysis is required. The Restatement (Second) of Contracts explains this analysis as follows:

> (1) . . . an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against enforcement of the term.
>
> (2) In weighing the interest in the enforcement of a term, account is taken of:
> (a) the parties' justified expectations,
> (b) any special public interest in the enforcement of the particular term.
>
> (3) In weighing a public policy against enforcement of a term, account is taken of
>
> (a) the strength of that policy as manifested by legislation [including regulations] or judicial decision,
> (b) the likelihood that refusal to enforce the term will further that policy,
> (c) the seriousness of any misconduct involved and the extent to which it was deliberate, and
> (d) the directness of the connection between that misconduct and the term.

Restatement § 178.

Given the facts here – that: there is no congressional statement of purpose; that the public is unaffected by Clause B19.33 (it cannot be shown to either over or understate prices, nor to dampen competition); Chevron, an experienced refiner, bid with full awareness of the escalator; Chevron never complained about B19.33; Chevron continued to bid on the contracts; and Chevron did not submit a claim until one contractor prevailed upon a since-invalidated cause of action -- the analysis could not advance Chevron's case.

Moreover, where a rule affecting a contract's formation or administration is waivable, a contractor cannot simply continue contract performance, without protesting the breach, or it will be deemed to have waived. Ling-Temco-Vought, Inc. v. United States, 475 F.2d 630, 637 (Ct. Cl. 1973); accord Federal Elec. Corp. v. United States, 486 F.2d 1377 (Ct. Cl. 1973). E. Walters & Co., Inc. v. United States, 576 F.2d 362 (Ct. Cl. 1978), is the controlling application of this rule. There, a supplier claimed that the Government had violated a FAR predecessor (the ASPR) by exercising an option that, in effect, permitted the Government to procure additional fuses at a lower price than if it had purchased the entire amount in a single order.[24] The ASPR prohibited the Government from exercising an option when "the option quantities represent known requirements for which procurement funds are available," and the Government had just such a requirement. 576 F.2d at 365. Based upon the ASPR, Walters assumed that the option would not be exercised for the funded requirement. Later, Walters learned that its assumption was wrong, but it said nothing when the Government exercised the option. After delivery, Walters submitted a claim seeking the higher price. The contracting officer and the board of contract appeals concluded that the claim was waived. Id. at 366.

[24] The price schedule included price ranges such that unit prices increased with order size. The solicitation specified, however, that the Government could order a base amount, then, at its option, purchase an additional 50 percent of the base amount at the base price.

On appeal, the court held that the option provision was "in direct conflict with" the ASPR, but that Walters consciously chose to "fully perform the contract as if there were contemporaneous agreement of the parties on the proper interpretation of the terms of he [solicitation]," and "the Government was prejudiced." Id. at 368. The court first stated that the provision at issue was not actionable, but added: "Nor did plaintiff timely protest the exercise of the first option. The board was correct in characterizing this silence until after final delivery as a waiver." Id. at 367. The court added:

> [T]he doctrine of estoppel is also for application. Had plaintiff protested the use of the option provision at the time of award, defendant would have been in a position to either reaffirm its use of the option provision, in apparent disregard of the ASPR prohibition, with the further knowledge that it could later be faced with a claim for the [higher] price; or it could have elected instead, to award the non set-aside quantity in the next least expensive manner . . . . Plaintiff's silence deprived the Government of that relatively painless alternative.

Id.

Walters reflects well-established logic in this circuit. In Whittaker Electronic Systems v. Dalton, 124 F.3d 1443 (Fed. Cir. 1997), for example, the contractor attempted to avoid the payment terms of an option it had performed, alleging the option was invoked in violation of DAR §1-1502(b)(ii). Although it assumed a regulatory violation, the court, following Walters, rejected the claim because the contractor substantially completed the contract before asserting its claim. This, the court held, "constituted a waiver of the grounds for rescinding or voiding the contract because of a violation of the regulation, even assuming the option clause indeed violated the regulation." 124 F.3d at 1446. A contractor cannot recover "where it fails to raise the problem prior to execution, or even prior to litigation . . . ." Id.

Chevron seeks to distinguish Whittaker, by arguing that the waived violation was not "inherent in the award of the contract." Pl. Br. 78. As the Hermes court explained, however, both Whittaker and Walters involved violations of the FAR, every bit as inherent in the award as the provisions here. 58 Fed. Cl. at 15. Indeed, in AT&T V, 307 F.3d at 1381, the Court cited Whittaker and Walters for the proposition that a contractor's failure to "have raised the issues it now presents . . . at the time of contract negotiations" amounted to a waiver. But even if the exercise of the option in Whittaker (and not the award) were the proper focal point, the contractor's waiver occurred when it failed to protest before the option was exercised, a circumstance indistinguishable from what has occurred here, where plaintiff has failed to provide timely notice of the alleged illegality.

Similarly, in Union Pacific R.R. v. United States, 847 F.2d 1567 (Fed. Cir. 1988), the court invoked equitable estoppel and refused to entertain a contractor's argument that longstanding contract provisions violated tax laws. The court explained that the railroad could have signed the contract under protest to preserve its claim. Id. at 1570. See also Hartford Accident & Indem. Co. v. United States, 127 F. Supp. 565, 567 (Ct. Cl. 1955) (surety that executed performance and payment bonds with knowledge of terms of Government contract was estopped to assert that contract was executed without authority); PCL Construction Services, Inc. v. United States, 41 Fed. Cl. 242, 252 (1998) (contractor waived objection to provision that "was apparent on the face of the solicitation").

In American Telephone & Telegraph Co. v. United States, 177 F.3d 1368 (Fed. Cir. 1999) (en banc) ("AT&T III"), Judge Plager's opinion (dissenting-in-part, concurring-in-part) explained the logic underlying the Walters approach. There, AT&T asserted that its contract was void ab initio, because the Navy failed to take the steps necessary to authorize its contract as

a fixed-price contract. Id. at 1371. Thus, AT&T claimed, it was entitled to relief in quantum meruit. The majority disagreed, explaining that the law does not favor invalidation of a fully-performed contract, based upon governmental noncompliance with internal reporting procedures. Id. at 1375-76. Judge Plager would have held that the contract was invalid, but would have denied a remedy, because AT&T was aware of the missing authorization, and bid nonetheless.

In words firmly rooted in the logic of Walters that are applicable here, Judge Plager explained the reasoning behind waiver:

> AT&T has no rightful claim to another penny of public money. It agreed to build and sell a product to the Government for a fixed price. It performed its end of the deal, and delivered the goods. The Government likewise performed its part of the deal; it paid AT&T the agreed-upon price . . . .
>
> AT&T now seeks to take advantage of the fact that the deal it made with the Government did not result in an enforceable contract, which it likely knew (and certainly should have known) when it proposed to enter into the agreement. AT&T demands more money for which it has been fully paid to do. The answer to that facially nonsensical demand is, in a word, "no."

Id. at 1383-84.

Failing to show that a FAR 16.2 violation is not waivable, Chevron relies upon Chris Berg, Inc. v. United States, 426 F. 2d 314 (Ct. Cl. 1970), and its offspring, Beta Systems, 838 F. 2d 1179, LaBarge Prods., Inc. v. West, 46 F.3d 1547, 1557 (Fed. Cir. 1995), and Cessna Aircraft Co. v. Dalton, 126 F.3d 1442 (Fed. Cir. 1997), in which it was held that contractors were not bound by their estoppel, acquiescence or failure to protest. These do not relieve Chevron of its analytical burden. First, the rule cited in Chris Berg was developed in a series of cases arising under the Merchant Ship Sales Act of 1946, a statute that the court held involved important public policy. Those cases, including Nautilus Shipping Corp. v. United States, 141 Ct. Cl. 391

(1958), and Rough Diamond, 351 F.2d 636, concerned contracts for the sale of Government-owned vessels, by which ship purchasers contracted to pay higher prices than specified by the Act. In ordering refunds to the purchasers, the court held that the statute embodied a strong and clearly discernable congressional purpose. As the court summarized its rulings years later:

> The marine statutes, we thought, embodied the Congressional wish that the Government's surplus ships should be sold at prices, uniform for all purchasers, and ascertainable by mathematical application of the statutory formula, properly interpreted; this Congressional purpose was strong enough to override any general legal doctrine, applicable in other situations, but which, if applied in the instant situation, would result in different persons paying different prices for the same type of ship . . .

Rough Diamond, 351 F.2d at 639-40 (internal quotation marks omitted). There is no legislative mandate regarding the EPA clauses at issue. It simply is not a matter of national consequence when a seller agrees to an escalation clause.

Second, Chris Berg and Beta involved Government overreaching in the face of timely protests by contractors who insisted that the law be observed. Chris Berg was a mistake-in-bid case, a unique species of cases. There, the question was how to treat a bid mistake, and the contractor insisted from the outset that the mistaken bid was its intended bid. In Beta Systems, there was similar overreaching, as the contractor protested, at the outset, the Government's refusal to write the contract as the contractor insisted the regulation required. Here, there is no question concerning the intent of Chevron's offers or satisfaction with its contracts. Third, estoppel could not lie in these cases, as both contractors timely protested the clauses at issue. Thus, statements in those cases concerning acquiescence or failure to protest are dicta.

Reliance upon LaBarge, 46 F.3d 1547, and Cessna, 126 F.3d 1442, also is inapt. In Cessna, waiver was not at issue, because the regulation was held not to confer a benefit upon the

contractor. In LaBarge, 46 F.3d 1547, the Court was asked to determine whether a contractor, who alleged its bid was the product of an improper bid auction, had raised a contractual theory that satisfied the board's jurisdictional requirement. The Government asserted that the contractor had failed to do so, and that its allegations were of the kind "ordinarily made in pre-award bid protests, not after the award of contract." Id. at 1552. The Court responded by citing Chris Berg for the proposition that an unlawful contract may be the basis for a claim, even if accompanied by initial adherence to the unlawful contract. Id. However, on the merits, the Government argued that the contractor had waived any such cause of action. Id. at 1556. That argument, however, the Court specifically refused to entertain, inasmuch as it found no illegal auction or harm to the contractor. Id. Notably, the Court did not reject the argument out of hand, as being precluded by Chris Berg or its progeny. Thus, LaBarge cannot be cited as authority for a no waiver rule. Moreover, as the Hermes I Court noted, LaBarge complained in a bid protest and "did not significantly delay any legal challenge" to the Government's actions, as Chevron has here. 58 Fed. Cl. at 14.

Chevron attempts to draw support from the statement in AT&T III, that, concerning unlawful contracts fully performed, "courts have variously sustained the contract, reformed it to correct the illegal term, or allowed recovery under an implied contract theory." 177 F.3d at 1376. Although that may be true in general, it does not address whether a remedy may be barred if waived. In fact, even in the AT&T litigation, the lower court eventually adopted none of those alternatives and dismissed the case for lack of an enforceable claim.

Chevron also purports to have debunked the applicability of Federal Crop Ins. v. Merrill, 332 U.S. 380 (1947), one of the bases of the Hermes II decision, arguing that it cannot support Chevron's presumed knowledge of the law, because, under that reasoning, it also should be

presumed to know it is entitled to receive a "legal" price, but could not have known that its contracts were illegal when signed. But, contractors are deemed to know the law. Federal Crop Ins., 332 U.S. 380. Here, Chevron waived its claims because it knew that the EPA clauses were in its contracts, and that the clauses were based upon the PMM.[25]

Chevron argues that Hermes II "proves too much" because a "contractor could never seek a remedy under an illegal contract." Pl. Br. 82. But, that does not follow logically from Hermes II at all. Its holding was that a contractor knowing of a legal deficiency in its contract may not sleep on its rights. Chevron's reliance upon Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173 (1942), Pittsburgh Ry. Co., 250 U.S. 577, and Louisville and Nashville R.R. Co., U.S. 59, 65 (1924), Costanza Coal Min. Co. v. Weirton Steel Co., 150 F.2d 929 (4th Cir. 1945), cases where courts refused to apply waiver, is inapposite, because the issue in those cases was whether a particular law (national pricing schemes of great importance to the public) could be waived. Thus, the very element missing from Chevron's analysis here, (i.e., that the rule is a matter of important public policy) was the deciding factor in those cases. See, e.g., Sola Electric, 317 U.S. at 177 ("Local rules of estoppel which would fasten upon the public as well as the petitioner the burden of an agreement in violation of the Sherman Act must yield to the Act's declaration that such agreements are unlawful, and to the public policy of the Act which in the public interest precludes the enforcement of such unlawful agreements"); Costanza Coal, 150 F.2d at 935 ("The purposes are stated in Sec. 1 of the Act wherein it is declared that regulation of the sale and distribution of bituminous coal is imperative for the protection of interstate

[25] Chevron also appears to assume that waiver could not occur until a court interprets a regulation, arguing that it filed a claim as soon as it knew such lawsuits could be filed. But, if that were the rule, the doctrine of presumed knowledge of the law would be eviscerated. Hermes II, 58 Fed. Cl. at 416-17.

commerce and such coal, and that existing practices of distribution and marketing thereof waste the resources of the nation and disorganize interstate commerce therein so that regulation of prices and unfair methods of competition are necessary”).

Finally, Chevron argues that waiver should be precluded on the basis of the Christian doctrine. Pl. Br. 76. Christian does not apply to every regulatory provision, however – only those “mandatory clauses that express a significant or deeply ingrained strand of public procurement policy.” General Eng'g. & Mach. Works v. O’Keefe, 991 F. 2d 775, 779 (Fed. Cir. 1993). No such strand has been identified or seems apparent.

CONCLUSION

For these reasons, defendant respectfully requests that the Court dismiss the Second Amended Complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Steven J. Gillingham
STEVEN J. GILLINGHAM
Assistant Director
Commercial Litigation Branch
Civil Division
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Department of Justice
Washington, D.C. 20530
Tele: (202) 616-2311
Fax: (202) 353-7988

OF COUNSEL:

DONALD S. TRACY
Trial Attorney
Defense Supply Center Richmond
Richmond, VA 23297

HOWARD M. KAUFER
Assistant Counsel
Office of Counsel
Defense Energy Support Center
Ft. Belvoir, VA

Attorneys for Defendant

June 19, 2006

## CERTIFICATE OF FILING

I hereby certify that on June 19, 2006, a copy of the foregoing document was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Steven J. Gillingham

# SUPPLEMENTAL APPENDIX

Page 506

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BARRETT REFINING CORPORATION, )
Plaintiff, )
v. ) No.: 96-15C
) 96-724C
THE UNITED STATES, ) 96-725C
) 96-726C
Defendant. ) 97-321C

Courtroom 3
National Courts Building
717 Madison Place, N.W.
Washington, D.C.
Wednesday,
July 29, 1998

The parties met, pursuant to the notice of the Judge, at 9:07 a.m.

BEFORE: HON. ERIC G. BRUGGINK
Associate Judge

APPEARANCES:

For the Plaintiff:

JAMES D. BACHMAN, ESQ.
ALICE D'ONAFRIO
Doyle & Bachman
919 18th Street, N.W.
Washington, D.C. 20006
(202) 659-4240

JOHN A. BARRETT, JR.
President, Barrett Refining Corp.
1210 Gordon Cooper Drive
Shawnee, Oklahoma 74801

Page 507

APPEARANCES: (continued)

For the Defendant:

SHERRY L. FLOYD, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 616-8278

KAREN E. SCHOOLS, ESQ.
Defense Fuel Supply Center (DFSC-G)
8725 John J. Kingman Road, Suite 4950
Fort Belvoir, Virginia 22060-6222
(703) 767-5010

//
//
//
//
//
//
//
//

Page 508

CONTENTS

| VOIR WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | DIRE |
|---|---|---|---|---|---|
| For the Defendant: | | | | | |
| Robert Myrben | 514 | 524 | 531 | 532 | – |
| Henry Steven Prime | 533 | 556 | 564 | – | – |
| John Harold Ayers | 568 | 588 | – | – | – |
| Edith Duhaine | 589 | 614 | – | – | – |
| John S. Cook | 618 | 632 | – | – | – |
| Lawrence Calvin Ervin | 634 | 656 | 668 | 670 | – |
| George Roland Schink | 671 | – | – | – | – |

//
//
//
//

Page 509

EXHIBITS

| PLAINTIFF'S EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
|---|---|---|---|
| 226 | 561 | – | Bid evaluation model |

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

Page 617

AFTERNOON SESSION
1:25 p.m.
THE CLERK: Court is back in session.
Whereupon,
EDITH DUHAINE
having been previously duly sworn, was recalled as a witness herein and was examined and testified further as follows:
THE COURT: All right, Mr. Bachman, are your ready to proceed?
MR. BACHMAN: Yes, Your Honor, I have no further questions of this witness.
THE COURT: All right.
Any redirect?
MS. SCHOOLS: No other questions, Your Honor.
THE COURT: Thank you very much. You may step down.
(Witness excused.)
THE COURT: Ready for your next witness?
MS. FLOYD: Yes, Your Honor. The Government calls Mr. John Cook as its next witness.
THE COURT: Mr. Cook, if you would raise your right hand.

Page 618

Whereupon,
JOHN S. COOK
having been first duly sworn, was called as a witness herein and was examined and testified as follows:
THE COURT: Thank you. Have a seat.
DIRECT EXAMINATION
BY MS. FLOYD:
*Q Could you please state your full name for the record?*
A John S. Cook.
*Q By whom are you employed?*
A The Department of Energy, the Energy Information Administration.
*Q What is your title?*
A I am currently director of the Petroleum Division within the Office of Oil and Gas.
*Q Are you located in Washington, D.C.?*
A Yes.
*Q Can you state what your educational background is, please?*
A I have a Ph.D. in economics and Master's Degrees in both economics and mathematics.
*Q Can you elaborate on your experience following your Ph.D.?*
A I spent three years teaching graduate-level

Page 619

economics courses at the University of South Carolina; five years at the Bureau of Labor Statistics, first as an economist and then as a Branch Chief, doing research on service industry pricing; and then the last 18 years at the Department and the Energy Information Administration with petroleum statistics.
*Q All right. Can you describe your responsibilities in your current position?*
A Okay. Basically, we do petroleum analyses and short-term forecasting functions. We collect a lot of data on crude oil and refined products, supplies, and prices, and we publish them in the PMM.
THE COURT: What is PMM?
THE WITNESS: I'm sorry. That's the Petroleum Marketing Monthly.
THE COURT: It is your own publication?
THE WITNESS: It's our own publication. It comes out monthly. It has average prices for crude oil and gasoline, distillates, those kinds of things. We publish them at the state level and at regional levels, like the East Coast and national-level figures.
THE COURT: Okay.
BY MS. FLOYD:
*Q Can you describe, also, what the Energy Information Administration is?*

Page 620

A Basically, it does two things. For all the energy sources, including coal, electricity, and natural gas, as well as petroleum, we do analyses, special studies for Congress and other interested parties, short-term and long-term forecasting and collect and publish data on coal, electricity, the various energy sources.
THE COURT: Does that satisfy some statutory duty?
THE WITNESS: Yes. The Agency was formed in '77 by the Department of Energy Act. The data programs themselves are required by the Federal Energy Emergency Act. There are a number of other statutes that require a centralized energy data base for prices and supplies, and so these programs are all in response to those legislative mandates.
THE COURT: Well, who is your primary customer or client for that data?
THE WITNESS: Virtually, every sector of the market uses the data. State energy offices are a key user, given that the data are at the state level. They not only use it to forecast and to track the market, but, for example, they work with Health and Human Services to assist the poor in paying their energy bills. You get a price spike like we saw in heating oil in 1996, and a lot of the low-income families can't pay their bills.
Congress will pass a supplementary appropriation,

Page 621

and these price data are used, along with others, to allocate out the extra funding to the various states.

Most – know, the heating oil is consumed in the Northeast, which is also where the higher prices are, so those states, in using those data, qualify for a larger share of the allocation.

A lot of other examples – the Bureau of Economic Analysis uses the price data as input to various tables that they do in preparing the gross domestic product. BLS themselves uses the data in putting out their International Pricing Index.

GAO, like us, has used the price data on a number of occasions to analyze the factors driving prices up, like in '96, when we had gasoline spikes.

The Northeast Congressional Coalition, some 200 state Congressional offices, are very attune to the data, again, because they tend to be the consuming states in the Northeast and pay the higher prices. So they have a number of programs that they watch, including the Low-Income Energy Assistance Program, the Weatherization Programs, and Energy Efficiency Programs, where the data are used to help them formulate legislation and what not.

THE COURT: Is it just retail prices you track, or –

THE WITNESS: No, both wholesale and resale –

Page 622

retail. For example, in gasoline, you got it all. It's broken out by the type of gasoline we formulated – conventional, what have you, bulk transactions at the wholesale level, spot – in other words, transactions – Rack transactions and dealer tank wagons are all identified.

The retail level, you have, basically, just two categories. Sales – pump sales, through company outlets, and other end-user sales.

The distillate market is broken out into the various standard end-use categories – residential, industrial, commercial, and what have you.

The wholesale transactions are basically just A-category.

THE COURT: Such as what?

THE WITNESS: It includes all types of transactions, spots, and contracts, but they're not broken out. The wholesale market, basically, is only broken out into bulk, rack, what have you, in the gasoline for the gasoline –

THE COURT: By product?

THE WITNESS: – price. The other products are not as detailed at the wholesale level. Gasoline is, but not the distillates and resids. There's more detail in the retail end of the distillates then there is for gasoline, primarily because of the, the consumer – or the customer

Page 623

use.

Again, the states and various energy committees and staffers – the Northeast Midwest Coalition – are heavy users of the data and were involved in developing the forms, and these seem to be the categories that they were most interested in.

THE COURT: We are talking about actual purchasers using the data, or Governmental entities that are not doing purchasing?

THE WITNESS: More Governmental users.

THE COURT: Is there some statutory duty on the part of the sellers or the buyers to make – report the data?

THE WITNESS: Yes, Your Honor, it is mandatory. Again, the FEA Act makes it mandatory that all energy firms report these kinds of data to the Department. There are –

THE COURT: Is it data at the microscopic level, or is it – is their lumping together of sales, or how does that work?

THE WITNESS: Well, a refiner, again for gasoline, will have to – for each state that they do business in, report for each of these categories the total amount of monthly sales, bulk transactions, for example, or retail outlet transactions, and the average price of all those transactions that occurred in that month.

Page 624

So they will have to keep detailed accounting, computerized accounting records, to report that data to us. And once the data comes in, their, their process – aggregated, averaged up to the state level across all the companies that report to us, and then averaged further to regional levels and national levels.

THE COURT: What actually gets printed in your report?

THE WITNESS: Okay. For gasoline, again, you'll have – for the State of Virginia, you'll have an average price for reformulated gasoline –

THE COURT: We are talking about at the wholesale level?

THE WITNESS: Both. That's what –

THE COURT: All right.

THE WITNESS: – I was going to say. For reformulated gasoline, you'll have the pump price, the retail price. You'll also have the rack price. At the wholesale level, the bulk price, the dealer tank wagon price, and you'll have it split further for conventional gasoline.

Central Virginia uses conventional, so they'll be prices state level that aren't, per se, you know, Central Virginia, just not disaggregated that far. But, you know, it's a common use of the data since that's where that

Page 625

consumption occurs.
Heating oil – on the retail side, you'd have for Virginia residential prices, industrial prices, commercial prices, agricultural prices, and then you would have the wholesale price.
BY MS. FLOYD:
*Q I would like to have you turn to Defendant's Exhibit 145, page 75, and that should be in a binder right on your left, probably fourth binder in on 45, and then if you could, turn to page 75 of Exhibit 145.*
A Page 75?
*Q I am sorry. Exhibit 145.*
A Okay. You lift it out of here, right? Okay.
*Q And page 75.*
A Okay.
*Q Okay. At page 76, can you identify what this document is? It extends to page 89.*
A Okay. This is the form, the 782A that we collect these data I was talking about on.
(The document referred to was marked for identification as Defendant's Exhibit 145.)
*Q Is this the track form that is used, to your knowledge?*
A Yes. You can tell from the numbers in the right-

Page 626

hand corner.
*Q Can you explain how this form is used, with particular attention to kerosene-based jet fuel?*
A Okay. Well, the form itself is mailed – or companies sometimes get them electronically now – to the various refiners that are expected to fill the forms out, and within 20 to 30 days after the reference month, which, for example, if it's January of this year, 1998, and they've kept their records, they would simply report for all the states that they do jet fuel business in. The total volume on line 213 –
*Q And –*
A – the average price –
*Q – what page of the document are you referring to?*
A Well, I'm using – I think it's 78.
*Q Okay. Can you –*
A Page 78.
*Q Where is 213?*
A That's the fourth line down for jet fuel.
*Q Under "Part 4, Monthly State Sales of Other Petroleum Products"?*
A Right. They report any retail sales and wholesale sales, for example.
*Q How would they report this?*
A Well, they can fill it out if it comes out of

Page 627

their computer records, depending on how automated they are.
They get a printout, and they should have a system that would give them this specific price, and they can transcribe it over. Some of them actually have these forms computerized, where they can take data directly out of their data base and put it on the form and then e-mail it to us, so that they don't have to even transcribe it any longer.
But, basically, they keep the totals and the average prices, and they put them on these lines and mail them to us.
*Q Okay.*
THE COURT: How much time do they have to get this data in for any particular period?
THE WITNESS: It's due 30 days after the reference month, so that'd be the end of February for January data. If it isn't in by 10 days after that, they'll get a call to remind them that the form is due.
THE COURT: Does that happen very often?
THE WITNESS: Yes. It's not unusual to have a non-response, initial anyway, early in the cycle, especially with downsizing going on in the industry and what not. Resources are tight, and – but they get them in. The response rate is pretty close to 100 percent – 97 percent.
THE COURT: When you get late data, do you plug it in to the period that it originally belonged in, or –

Page 628

THE WITNESS: Yes. We have a preliminary and a final publication system. The preliminary data for January would come out, and 60 days later, the March/April time frame, and we might not have full reporting by then, so we would impute for the handful of missing jet fuel refiners, but then by the following month, when the data are final, we'd have virtually all of them, and those data would go in for January and come out in April or May.
BY MS. FLOYD:
*Q Okay. This form that we have in front of us, has this form been modified over the years?*
A Yes, it has. With the Clean Air Act and the introduction of reformulated gasoline, that's when we detail the gasoline products to the degree that you now see them on the previous page.
*Q But in terms of the kerosene-type jet fuel, has this form remained pretty much the same since the period, say, 1991?*
A Yes, ma'am.
*Q Now, when the Energy Information Administration reports this data, can you describe the manner in which it reports the information that you've obtained from this group of people.*
A Okay. It comes out in the Petroleum Marketing Monthly, in hard copy, to a subscriber list. Respondents

Page 629

get it for free – not for free since they had to supply the data – but, in return.

It goes out to many of the customers that I mentioned earlier in hard copy, but it's also put on the Internet, and we have electronic bulletin boards, where it's made available.

THE COURT: Uh-huh.

THE WITNESS: – for customers who want to pull it in more quickly.

Company analysts, for example, will load the data into their spread sheets for tracking markets, as quickly as they can get it off the Internet, which is usually three weeks earlier than the hard copy.

THE COURT: Is the term "price" defined anywhere in your instructions?

THE WITNESS: Types of prices, but not the term "price" itself. It is –

THE COURT: What I gather from what I have heard is that people have different means of coming up with a net price to a customer, in lieu of discounts and add-ons and everything else. What are you asking for?

THE WITNESS: Yes, indeed. Any discounts or premium that are charged for a given type of transaction are to be included in the averages that are reported to us. So in residential heating oil, if the sale is to a certain

Page 630

customer, cash or paid within seven days or something like that, that would be one price.

That would be averaged up for that company, compared to other customers that may be on a different arrangement, a credit arrangement, or a capped fixed price arrangement, or what have you, a full-service contract, or whatever.

Lots of different types of residential prices to their customers they might have for that state and that month, and they're all averaged together and reported for that month.

BY MS. FLOYD:

*Q If, say, a company has a posted price with a discount, what would you want to be reported to you?*

A The actual average – the actual transactions price. If for that family – that heating oil firm, actually billed them for posted minus the discount, and, you know, even if taxes were involved and what not, we would – we'd want the taxes taken out, and that's the way we do this. But we will want the actual average price for that company over all of the transactions for that state for that month, so for that customer, it would be what you said – posted minus the discount today.

If they pay cash, that's the way it is. It's posted minus some kind of discount for paying right away.

Page 631

*Q Okay. I believe you indicated earlier that the data is filed on a state-wide basis. Is that correct?*

A Yes.

*Q How is it reported to subscribers of the data theory? Does it report on a state-wide basis, or is it reported in groups? How do you report these?*

A You mean in the publication, the Monthly?

*Q Yes, the publication.*

A It's state level. There are summary tables in the front, 18 to 20 of them, that are national level and have a time series for, say, gasoline retail prices. And in the detail table or for each of these little individual gasoline markets by state.

*Q Now, have any changes in the processing or the methodology been made in the collection of data or the processing of data or the analysis of data or the recording of data with respect to the Petroleum Marketing Monthly since 1990?*

A No, no methodological changes recognizing that we – we sample in heating oil, for example – the bulk of that residential market is conducted by small mom-and-pop-type firms, and we have a sample of those wholesalers and distributors, and we will resample from time to time. But that's not a change, that's part of the program.

In jet fuel, we have a census of refiners only, so

Page 632

it's irrelevant in that case. It just goes every month, all the refiners, and they do what I said, and we add them up, and that's it. We've been doing that for 18 years.

MS. FLOYD: I have no further questions, Your Honor.

CROSS-EXAMINATION

BY MR. BACHMAN:

*Q In connection with your purpose at Department of Energy for preparing this publication, do you believe it's your responsibility to prepare the PMM to be used as a price index for contracting purposes by industry in buying and selling refined products? Do you publish the PMM for purposes of using it as a price index, like OPIS or Platt's?*

A We're not opposed to it being used for that purpose. We don't, per se, collect the data and justify its collection with OMB for that specific use.

We justify its collection on the basis of its general value in measuring actual average prices, wholesale and retail, for everything from crude oil from the wellhead to the pump for state energy offices or various federal agencies, and most especially for Congressional committees for analysis purposes, forecasting, market tracking, all those uses.

It's, it's, it happens to be useful, according to oil companies and DFSC for indexing, as well, but we didn't

specifically design it for that.
Q Okay. Your statutory authorization, were you mandated to prepare it for that purpose, or is it for the purpose of, like, advising Congress on the fuel costs for the poor, heating oil cost?
A It's more the latter.
Q What is the latter? I –
A Advising Congress on market conditions, state energy offices on market conditions, price behavior, in general.
Q Okay. If there was an error in this index, could a refiner sue you?
A Never had one sue me.
Q Do you believe you have a fiduciary obligation to the refining industry in connection with the publication of this index, if it's even intended as an index?
A No. I think I have a responsibility to protect their data, to keep it confidential. If they were going to sue me, it might be over that, that I had somehow leaked their proprietary data out, but they owe me the data for market tracking purposes, and they're supposed to make it accurate to me, and to the best of my knowledge, especially in jet fuel, it's a very accurate series.
Q Do you track your data with OPIS and/or Platt's?
A We compare it with a number of things, not just



OPIS and Platt's, recognizing that there's a lot of products here. For gasoline, for example, we track our data – price data with BLS, the volume data with another EI series, we refer to as the Products Supplied Series. We also track it with federal highway usage data. Heating oil, likewise – our prices are compared with BLS prices.

MR. BACHMAN: I have no further questions, Your Honor.

MS. FLOYD: I have no redirect, Your Honor.

THE COURT: All right. Thank you, sir. You can step down.

(Witness excused.)

MS. FLOYD: Your Honor, Mr. Larry Ervin will be our next witness, and Ms. Karen Schools will be examining him.

THE COURT: All right. All right. Mr. Ervin, if you would raise your right hand.

Whereupon,

LAWRENCE CALVIN ERVIN

having been first duly sworn, was called as a witness herein and was examined and testified as follows:

THE COURT: Thank you, have a seat.

//

//



DIRECT EXAMINATION

BY MS. SCHOOLS:

Q Good afternoon. What is your full name?
A Lawrence Calvin Ervin.
Q What is your current position?
A I'm the Acting Director of the Office of Market Research and Competition at the Defense Energy Support Center.
Q What is your educational background?
A I attended the University of Maryland in College Park, up the road here. I received a Bachelor's of Arts in economics in 1975, and a Master's of Science in Agricultural and Resource Economics in 1980.
Q How long have you been employed by the Defense Fuel Supply Center?
A Since September of 1980.
Q What positions have you held at the Defense Fuel Supply Center?
A I've been employed as a staff member in the office where I – which I currently direct, as – I've been employed as an industry economist, as a market research analyst, as the liaison officer and manager of the Center's Strategic Petroleum Reserve Program and also as Acting Director – I was also called Acting Chief during one period when our organization was slightly different.



Q What have your responsibilities been in these positions?
A Analysis of industry information, pricing data, supply statistics, news, and current event-type analysis. Analyses of pricing material and provision of pricing-related material to other offices at the Field Center, mostly, our Comptroller and our Procurement Divisions, our buying divisions.
Q As part of your responsibilities in the Office of Market Research, did you assist in developing the EPA clauses that appear in DFSC's contracts?
A Yes, I did.
Q Why was an EPA clause included in these contracts?
A We wanted our prices to reflect, as closely as possible, market levels for the same or similar commercial fuels in the marketplace. We wanted our prices to – and I think the concern there is, at least partly, that they not be, you know, reflect too poorly on the upside, obviously, that we wanted the prices to go up and also down when market prices of the similar fuels went down. So, it was mainly a case of risk sharing, I guess, with our contractors of the market price fluctuations.
Q Was your office involved in the selection of escalators that were used in the EPA clause?
A Yes.

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - X
LA GLORIA OIL AND GAS :
COMPANY, :
Plaintiff, :
vs. : No. 02-465C
THE UNITED STATES, : (Judge Hewitt)
Defendant. :
- - - - - - - - - - - - - - X Pages 1-50

Deposition of JACOB BOURNAZIAN
District of Columbia
Wednesday, December 3, 2003

Reported by: Marilyn Feldman, RPR
Job No. 156784

0

2

December 3, 2003
10:00 a.m.

the PMM back to the 1980s?

A. Yes.

Q. Are they all currently employed by EIA?

A. Yes.

Q. To your knowledge, none of the project managers from the PMM from the early 1980s to now have left the agency; is that correct?

0 10

A. Yes.

Q. Let's turn to the first request, request no. 17, which is on page 6 of Plaintiff's Exhibit 2. Request 17 reads: "All documents relating to communications between DESC and EIA concerning use of the PMM index to adjust prices in DESC's price adjustment clauses."

What efforts did you undertake to collect documents in response to that and what did you find?

A. First, in response to that request there was confusion in our organization on the use of the term "indices" because that's not a term we use and we don't -- an index is a ratio of two numbers with a baseline being in the denominator, but we only publish statistics prices. So my assumption is you meant just price data when you used the word index. Is that correct?

Q. I think that's a fair assumption.

A. Okay. So the efforts in responding to 17, everyone was asked to check if they have any

U.S. DEPARTMENT OF ENERGY
Energy Information Administration

Form Expires: 12/31/93

EIA-782A:

# REFINERS'/GAS PLANT OPERATORS' MONTHLY PETROLEUM PRODUCT SALES REPORT

**Schedule I**

This report is mandatory under Public Law 93-275. Failure to comply may result in criminal fines, civil penalties and other sanctions as provided by law. *For the provisions concerning the confidentiality of information submitted on this form, see Section VI of the instructions.* Public reporting burden for this collection of information is estimated to average 14.4 hours per response, including the time of reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Energy Information Administration, Office of Statistical Standards EI-73, Mail Station: 2F-081 Forrestal, 1000 Independence Ave. SW, Washington, DC 20585; and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.

## PART I. IDENTIFICATION DATA

*Complete items 1 thru 7 for new respondents and corrections to label only.*

1. Name
2. Name of Contact Person
3. Contact's Telephone Number ( ) –
4. Street/Box/RFD
5. City
6. State
7. Zip Code

*For assistance in completing this form, call (800) 638-8812.*

8. Reference Month — Mo | Yr

9. Type of Report (Check one)
(1) ☐ Original
(2) ☐ Revision, to Report Dated: Mo | Day | Yr

10. The Number of States For Which You Are Reporting

11. Date of This Report — Mo | Day | Yr

12. Type of Entity (Check one)
(1) ☐ Refiner/Gas Plant Operator
(2) ☐ Reseller
(3) ☐ Reseller/Retailer
(4) ☐ Retailer

13. Which of the following best describes this firm at the end of this reference month?
(1) ☐ In operation
(2) ☐ Temporarily or seasonally inactive
(3) ☐ Sold or leased to another . . . See the Specific Instructions
(4) ☐ Permanently ceased operation . . . See the Specific Instructions

## PART II. CERTIFICATION

I certify that the information provided herein and appended hereto is true and accurate to the best of my knowledge.

14. Name
15. Title
16. Signature
17. Date of Signing

Title 18 USC 1001 makes it a criminal offense for any person knowingly and willingly to make to any Agency or Department of the United States any false, fictitious or fraudulent statements as to any matter within its jurisdiction.

# REFINERS'/GAS PLANT OPERATORS' MONTHLY PETROLEUM PRODUCT SALES REPORT

Schedule II

IDENTIFICATION DATA

| | | |
|---|---|---|
| Firm Name | 2. DOE Identification Number | 3. Page ___ of ___ |
| Reference Month (Mo / Yr) | 5. Type of Report (Check one) (1) ☐ Original (2) ☐ Revision, to Report Dated (Mo / Da / Yr) | |
| 6. Enter the abbreviation of the state for which this schedule is being filed. A separate Schedule II should be filed for each state. *(See Appendix A for state abbreviations.)* | | STATE |

## PART III. MONTHLY STATE SALES OF FINISHED MOTOR GASOLINE *(Report volumes in thousands gal.; prices in $0.000 per gal.)*

| Line No. | Product *(Refer to definitions)* Finished Motor Gasoline | RETAIL SALES (Direct Sales to End-Users): Sales Through Company-Operated Retail Outlets (1) Volume *(a)* | Unit Price *(b)* | Sales to Other End-Users (2) Volume *(c)* | Unit Price *(d)* | WHOLESALE SALES (Sales for Resale) (3) Volume *(e)* | Unit Price *(f)* |
|---|---|---|---|---|---|---|---|
| 7 | Leaded Regular | | | | | | |
| 8.1 | Unleaded Regular | | | | | | |
| 8.2 | Unleaded Midgrade | | | | | | |
| 9 | Premium | | | | | | |

## PART IV. MONTHLY STATE SALES OF NO. 2 DISTILLATES *(Report volumes in thousands gal.; prices in $0.000 per gal.)*

| | Product *(Refer to definitions)* | RETAIL SALES (Direct Sales to End-Users): Residential Sales (1) Volume *(a)* | Unit Price *(b)* | Commercial/ Institutional Sales (2) Volume *(c)* | Unit Price *(d)* | Industrial Sales (3) Volume *(e)* | Unit Price *(f)* | Sales Through Company-Operated Retail Outlets (4) Volume *(g)* | Unit Price *(h)* | Sales to Other End-Users (Includes Sales to Utilities and Agriculture) (5) Volume *(i)* | Unit Price *(j)* | WHOLESALE SALES (Sales for Resale) (6) Volume *(k)* | Unit Price *(l)* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10 | No. 2 Diesel Fuel | | | | | | | | | | | | |
| 11 | No. 2 Fuel Oil | | | | | | | | | | | | |

## PART V. MONTHLY STATE SALES OF OTHER PETROLEUM PRODUCTS *(Report volumes in thousands gal.; prices in $0.000 per gal.)*

| Line No. | Product *(Refer to definitions)* | RETAIL SALES (Direct Sales to End-Users) (1) Volume *(a)* | Unit Price *(b)* | WHOLESALE SALES (Sales for Resale) (2) Volume *(c)* | Unit Price *(d)* |
|---|---|---|---|---|---|
| 12 | No. 1 Distillate | | | | |
| 13 | Kerosene | | | | |
| 14 | Aviation Gasoline (Finished) | | | | |
| 15 | Kerosene-type Jet Fuel | | | | |
| 16 | No. 4 Fuel Oil | | | | |
| 17 | Residual Fuel Oil with 1 percent or less Sulfur | | | | |
| 18 | Residual Fuel Oil with greater than 1 percent Sulfur | | | | |
| 19 | Propane, Consumer Grade | | | | |

EIA-782A (1-89)

☆ U.S.G.P.O. 1989-617-010/00755

U.S. DEPARTMENT OF ENERGY
Energy Information Administration

Form Expires: 12/31/93

# INSTRUCTIONS FOR FILING THE EIA-782A: REFINERS'/GAS PLANT OPERATORS' MONTHLY PETROLEUM PRODUCT SALES REPORT

## GENERAL INFORMATION

### I. Purpose

The EIA-782A is designed to provide data on the sales of selected petroleum products (volumes and prices) to various categories of end-users and resellers by type of seller at the State level.

These data are collected pursuant to the provisions of the Federal Energy Administration (FEA) Act of 1974, P.L. 93-275. The data are used by the Department of Energy (DOE) in reviewing petroleum product supply, demand and price changes.

### II. Who Must Submit

Any firm that directly or indirectly controls a refinery or gas plant must prepare and file the EIA-782A each month.

### III. What and Where to Submit

Submit a single Schedule I as a cover sheet, and a separate Schedule II for each State in which the respondent sells one or more of the listed products. Send the completed EIA-782A to:

U.S. Department of Energy
Energy Information Administration
EI-43
Mail Station: BG-094 Forrestal
Washington, D.C. 20585

> Certified computer printouts that are generally in the format of the EIA-782A will be accepted. Request DOE approval in advance by calling the number below if you plan to submit computer printouts.

If you have any questions concerning any of the EIA-782A instructions, call toll free (800) 638-8812. Firms located in Maryland should call (301) 495-8440.

### IV. When to Submit

The EIA-782A must be submitted to DOE no later than 30 calendar days after the close of each reference month. For example, if the reference month is June 1990, the report must be submitted to DOE by July 30, 1990.

### V. Sanctions

This report is mandatory under Public Law 93-275. Failure to comply with reporting requirements may result in criminal fines, civil penalties, and other sanctions as provided by law.

## GENERAL INFORMATION (Continued)

VI. Provisions Regarding Confidentiality of Information

The information contained on this form will be kept confidential and not disclosed to the public to the extent that it satisfies the criteria for exemption under the Freedom of Information Act (FOIA), 5 U.S.C. §552, the DOE regulations, 10 C.F.R. §1004.11, implementing the FOIA, and the Trade Secrets Act, 18 U.S.C. §1905.

Upon receipt of a request for this information under the FOIA, the DOE shall make a final determination whether the information is exempt from disclosure in accordance with the procedures and criteria provided in the regulations. To assist us in this determination, respondents should demonstrate to the DOE that, for example, their information contains trade secrets or commercial or financial information whose release would be likely to cause substantial harm to their company's competitive position. A letter accompanying the submission that explains (on an element-by-element basis) the reasons why the information would be likely to cause the respondent substantial competitive harm if released to the public would aid in this determination. A new justification does not need to be provided each time information is submitted on the form, if the company has previously submitted a justification for that information and the justification has not changed.

Except as otherwise provided by law, the information may be made available in response to an order of a Court of competent jurisdiction, or, upon request, to other components of the DOE, to any Committee of Congress, the General Accounting Office, or other Congressional agencies authorized by law to receive such information. Detailed provisions of the restrictions on the disclosure of this information can be found in the Policy on the Disclosure of Individually Identifiable Energy Information in the Possession of the EIA (45 Federal Register 59812 (1980)).

## GENERAL INSTRUCTIONS

I. To avoid double counting, respondents are to exclude sales to other companies (and their subsidiaries) who also report on the EIA-782A. A list of these companies is provided periodically to all respondents. Additional copies are available upon request.

II. Report all volumes in thousands of gallons; e.g., report 6,500 gallons as 7, and 6,400 gallons as 6. Leave both volume and price blank if no volumes were sold. Enter 1 for volumes between 0 and 1,499. Note: One barrel is equal to 42 gallons.

III. Enter data reflecting sales made during the reference month only. Exclude from all calculations any material prior period adjustments for volumes and/or prices, and revise the report(s) for the appropriate prior period(s).

Revisions to prior month's reports are required if previously reported prices or volume data are in error by more than plus or minus five percent (5%). All revisions must be submitted within 120 days after the end of the reference month. However, EIA must be notified of significant changes discovered after this date and will determine if a late resubmission is required.

Do not report negative volumes or prices; resubmit earlier reports instead.

IV. Report unit prices in decimals of U.S. dollars, expressed to the nearest tenth of a cent (e.g., $1.065). Unit prices are to be determined by dividing the total revenues derived from the sales of the product during the reference month by the total number of gallons sold. The unit price is the same as the weighted average price for all sales of that particular product to a particular group of customers or class-of-trade. The reported unit price should exclude all taxes on the sale of the petroleum product such as Federal, State, and local excise or sales taxes. Taxes in obtaining, importing, or producing petroleum products (such as crude oil or product importation tariffs, domestic crude oil taxes, facilities taxes, etc.) should not be excluded from

**GENERAL INSTRUCTIONS (Continued)**

sales prices for EIA reporting purposes. For example, even though upstream expenses such as the Superfund tax may be shown as a separate line item on invoices of product sales, they should not be excluded from the reported sales price. Transportation costs that are paid as part of the sales price at the point of sale should be included in the reported unit price. Do not calculate unit prices using rounded volumes.

V. Report only the data for the products listed: DOE is not seeking full coverage of all petroleum products sold.

VI. Exclude amounts supplied to exchange partners except where the amount given up exceeds the amount received and the imbalance is invoiced as a sale during the reference month.

VII. If firms do not maintain information sufficient to provide actual sales volumes and unit prices by the customer categories specified on the forms, estimates of sales volumes and unit prices may be provided. The basis for the estimates must be consistent with the standard accounting records maintained by the firm. The estimating procedure and data supporting the estimates should result in a reasonably accurate estimate which will be subject to review.

VIII. Report sales in the State where the transfer of title occurred. For FOB sales at a refinery/terminal, the State is the one in which the refinery/terminal is located. For delivered sales (by any mode of conveyance), the State is the one in which the buyer received the product (see Appendix A for a list of State abbreviations). If transfer of title occurs in the United States, volumes sold for export should be included under "Wholesale Sales." Residual fuel oil sales for vessel bunkering should be reported under "Retail Sales." No. 2 distillate sales for vessel bunkering should be reported under "Commercial/Institutional Sales."

IX. Report the entire firm's sales of the selected products. This includes sales made directly by the parent, affiliates, subsidiaries; or through commissioned agents. Exclude sales made among the parent firm, subsidiaries, and affiliates; i.e., intrafirm transfers/sales.

## SPECIFIC INSTRUCTIONS

**Schedule I**
**Part I**
**Identification Data**

| Item | Instruction |
|---|---|
| 1 thru 7 | Complete items 1 thru 7 if you are a new respondent, or if information shown on the label is incomplete or incorrect. If changes need to be made, cross out the inappropriate information on the label and enter the correct information in the space(s) to the right of the label. |
| 8 | Enter the month and year of the reference month. |
| 9 | Check the type of report that is being submitted. |
| 10 | Enter the number of Schedule II pages submitted with Schedule I. This will reflect the total number of States for which reports are being submitted. |
| 11 | Enter the date this report is being filed. |
| 12 | Mark the appropriate type of entity according to the definitions provided. Refiners operating in more than one capacity should mark "Refiner/Gas Plant Operator." Firms engaging in both |

## SPECIFIC INSTRUCTIONS (Continued)

reselling and retailing should mark "Reseller/Retailer." Firms which directly or indirectly control a refiner should mark "Refiner/Gas Plant Operator." Firms which directly or indirectly control a gas plant operator should mark "Refiner/Gas Plant Operator." The type of entity should not change from month to month but should reflect the activity of the firm throughout the year.

13 Enter the status of the firm at the end of the reference month. If the firm has been sold, leased, or permanently ceased operation, submit a letter to DOE stating the reason for the change in status. If the firm has been sold or leased, provide the name and address of the new company, and the date of the transfer. If the firm has permanently ceased operation, provide the date the firm ceased operation. You may include the letter with your monthly report or send it separately to the address shown on Page 1.

**Schedule I**
**Part II**
**Certification**

| Item | Instruction |
|---|---|
| 14 thru 17 | Enter the name and title of the individual designated by the company to sign the certification. The individual must sign in the space provided on the form and enter the date of the signing. |

**Schedule II**
**Identification Data**

| Item | Instruction |
|---|---|
| 1 | Enter the name of the reporting firm. |
| 2 | Enter the 10-digit identification number assigned to the reporting firm for this survey. This is the number printed in the upper left corner of the company identification labels which have been provided to you. |
| 3 | Sequentially assign a page number to each Schedule II page. Enter the total number of pages being submitted in item 10 on Schedule I. |
| 4 | Enter the month and year of the reference month for which this schedule is being submitted. |
| 5 | Check whether this is an original or revised report. |
| 6 | Enter the abbreviation for the State. See Appendix A for a list of State abbreviations. |

**Schedule II**
**Part III**
**Monthly State Sales of**
**Finished Motor Gasoline**

| Item | Instruction |
|---|---|
| 7 thru 9 | Include in the column headed "Sales to Other End-Users" all direct sales to end-users that were not made through company-operated retail outlets. Sales made to retail outlets other than those operated directly by the reporting company, its affiliates, or subsidiaries, should be included in the wholesale sales category (Sales for Resale). |

Report gasoline sales volumes and prices by grade in accordance with their classification at the time of sale. The intent of this form is to capture sales volumes and prices for gasoline sold as leaded regular, unleaded regular, premium (both leaded and unleaded), and a "midgrade" of unleaded gasoline that lies between unleaded regular and premium in both octane and price. For the majority of the United States, the octane ranges (R+M/2) below are appropriate for distinguishing among the four classes of gasoline to be reported:

**Leaded Regular** - Greater than or equal to 87, and less than or equal to 90 octane.

**Unleaded Regular** - Greater than or equal to 85, but less than 88 octane.

**Unleaded Midgrade** - Equal to, or greater than 88, but less than, or equal to 90 octane.

**Premium** - Greater than 90 octane, leaded or unleaded.

In general, automotive octane requirements are lower at high altitudes. Therefore, in some areas of the United States, such as the Rocky Mountain States, the octane ranges for the gasoline grades above may be 2 or more octane points lower. For other aspects of gasoline specifications, please see the Definitions section.

Blends of gasoline containing ethanol or other oxygenates should be reported according to the above criteria. Do not report ethanol (alcohol) sold separately for blending purposes.

Schedule II
Part IV
Monthly State Sales of
No. 2 Distillates

| Item | Instruction |
| --- | --- |
| 10 and 11 | Report volume and price data in accordance with **what the product was sold as, regardless of the actual specifications of that product.** If a No. 2 distillate was sold as a diesel fuel, report that volume and price in the category "No. 2 Diesel Fuel;" if a No. 2 distillate was sold as a heating or fuel oil, report that volume and price in the category "No. 2 Fuel Oil" even if that product conformed to the higher specifications of a diesel fuel. If sales of a No. 2 distillate were made for which no determination can be made as to whether the product was specifically sold as either a fuel oil or diesel fuel, sales volumes and prices should be classified in accordance with **your best estimate of the intended use** of the product regardless of the product specification; i.e., sales of No. 2 distillate that you believe will be used for heating purposes or as a boiler fuel should be reported under "No. 2 Fuel Oil," sales of No. 2 distillate that you believe will be used as transportation fuels should be reported as "No. 2 Diesel Fuel." |

Include under the category "Residential Sales" those sales of No. 2 fuel oil to individual customers or households (as opposed to businesses or institutions). Sales to apartment buildings/complexes or other multi-family dwellings should be excluded from the "Residential Sales" category but included in the "Commercial/Institutional Sales" category. For those sales to residential facilities for which the respondent is unsure as to where those sales are to be reported, respondents are asked to report those sales in the category that, in their best judgment, is more appropriate.

Include under the category "Commercial/Institutional Sales" those sales of either No. 2 fuel oil or No. 2 diesel fuel to firms engaged in transportation, wholesale or retail trade, finance, insurance and real estate. Also include sales to apartment buildings/complexes, and other multi-family dwellings, hotels and office buildings or complexes, sales to local, State or Federal

Governmental facilities or organizations, along with military sales including those directed to post exchanges. Sales to schools, hospitals, religious institutions, universities or other government-supported organizations are also to be included in this category.

Include under the category "Industrial Sales" those sales of either No. 2 fuel oil or No. 2 diesel fuel to public or private firms engaged in mining, construction, or manufacturing.

Include under the category "Sales Through Company-Operated Retail Outlets" those sales of No. 2 diesel fuel made through company-operated retail outlets which are subject to motor fuel gallonage taxes. Refer to the definition of company-operated retail outlets.

Include under the category "Sales to Other End-Users" (e.g., sales to agricultural customers or to utilities) sales of either No. 2 fuel oil or No. 2 diesel fuel to end-use customers not included in any of the above four categories.

**Schedule II**
**Part V**
**Monthly State Sales of Other Petroleum Products**

| Item | Instruction |
|---|---|
| 1:2 thru 19 | Include under the category "Retail Sales" all direct sales to end-users. Include under the category "Wholesale Sales" all sales to resellers. |

## DEFINITIONS

1. Affiliate/Subsidiary - Entities directly or indirectly controlled by a parent.

2. *ASTM* - The acronym for the American Society for Testing and Materials.

3. *Aviation Gasoline (Finished)* - All special grades of gasoline for use in aviation reciprocating engines, as given in ASTM Specification D 910 and Military Specification MIL-G-5572. Excludes blending components which will be used in blending or compounding into finished aviation gasoline.

4. *Commercial/Institutional* - Firms engaged in transportation, wholesale or retail trade, finance, insurance, and real estate. Also included are apartment buildings/complexes and other multi-family dwellings, hotels, and office buildings or complexes, local, State or Federal facilities or organizations including the military, schools, hospitals, religious institutions, universities and all other government-supported organizations.

5. *Company-Operated Retail Outlet* - Any retail outlet (e.g., service station) selling gasoline or diesel fuel which is under the direct control of the firm filing this report by virtue of the ability to set the retail product price and directly collect all or part of the retail margin. This category includes retail outlets: (1) being operated by salaried employees of the company and/or its subsidiaries and affiliates, and/or (2) involving personnel services contracted by the firm.

6. *Distillate Fuel Oil* - A general classification for one of the petroleum fractions produced in conventional distillation operations. It is used primarily for space heating, on- and off-highway diesel engine fuel (including railroad engine fuel and fuel for agricultural machinery), and

electric power generation. Included are products known as No. 1, No. 2, and No. 4 fuel oils; and No. 1, No. 2, and No. 4 diesel fuels.

a. *No. 1 Distillate* - A petroleum distillate which meets the specifications for No. 1 Heating or Fuel Oil as defined in ASTM D 396 and/or the specifications for No. 1 Diesel Fuel as defined in ASTM Specification D 975.

(1) *No. 1 Diesel Fuel* - A volatile distillate fuel oil with a boiling range between 300-575°F and used in high-speed diesel engines generally operated under wide variations in speed and load. Includes type C-B diesel fuel used for city buses and similar operations. Properties are defined in ASTM Specification D 975.

(2) *No. 1 Fuel Oil* - A light distillate fuel oil intended for use in vaporizing pot-type burners. ASTM Specification D 396 specifies for this grade maximum distillation temperatures of 400°F at the 10-percent point and 550°F at the 90-percent point, and kinematic viscosities between 1.4 and 2.2 centistokes at 100°F.

b. *No. 2 Distillate* - A petroleum distillate which meets the specifications for No. 2 Heating or Fuel Oil as defined in ASTM D 396 and/or the specifications for No. 2 Diesel Fuel as defined in ASTM Specification D 975.

(1) *No. 2 Diesel Fuel* - A gas oil type distillate of lower volatility with distillation temperatures at the 90-percent point between 540-640°F for use in high-speed diesel engines generally operated under uniform speed and load conditions. Includes Type R-R diesel fuel used for railroad locomotive engines, and Type T-T for diesel-engine trucks. Properties are defined in ASTM Specification D 975.

(2) *No. 2 Fuel Oil* - A distillate fuel oil for use in atomizing type burners for domestic heating or for moderate capacity commercial-industrial burner units. ASTM Specification D 396 specifies for this grade distillation temperatures at the 90-percent point between 540°F and 640°F, and kinematic viscosities between 2.0 and 3.6 centistokes at 100°F.

c. *No. 4 Fuel* - A fuel oil for commercial burner installations not equipped with preheating facilities. It is used extensively in industrial plants. This grade is a blend of distillate fuel oil and residual fuel oil stocks that conforms to ASTM Specification D 396 or Federal Specification VV-F-815C; its kinematic viscosity is between 5.8 and 26.4 centistokes at 100°F. Also included is No. 4-D, a fuel oil for low- and medium-speed diesel engines that conforms to ASTM Specification D 975.

7. *Finished Motor Gasoline* - A complex mixture of relatively volatile hydrocarbons, with or without small quantities of additives, blended to form a fuel suitable for use in spark-ignition engines. Specification for motor gasoline, as given in ASTM Specification D 439-88 or Federal Specification VV-G-1690B, include a boiling range of 122° to 158°F at the 10-percent point to 365° to 374°F at the 90-percent point and a Reid vapor pressure range from 9 to 15 psi. "Motor gasoline" includes finished leaded gasoline, finished unleaded gasoline, and gasohol. Blendstock is excluded until blending has been completed. (Alcohol that is to be used in the blending of gasohol is also excluded.)

a. *Leaded Regular Gasoline* - Gasoline having an antiknock index (R+M/2) greater than or equal to 87 and less than or equal to 90, and containing more than 0.05 grams of lead or 0.005 grams of phosphorus per gallon.

**DEFINITIONS (Continued)**

b. *Unleaded Regular Gasoline* - Gasoline having an antiknock index (R+M/2) greater than or equal to 85 and less than 88, and containing not more than 0.05 grams of lead or 0.005 grams of phosphorus per gallon.

c. *Unleaded Midgrade Gasoline* - Gasoline having an antiknock index (R+M/2) greater than or equal to 88 and less than or equal to 90, and containing not more than 0.05 grams of lead or 0.005 grams of phosphorus per gallon.

d. *Premium Gasoline* - Gasoline having an antiknock index (R+M/2) greater than 90. Includes both LEADED premium gasoline as well as UNLEADED premium gasoline.

(1) *Leaded Premium Gasoline* - Gasoline having an antiknock index (R+M/2) greater than 90, and containing more than 0.05 grams of lead or 0.005 grams of phosphorus per gallon.

(2) *Unleaded Premium Gasoline* - Gasoline having an antiknock index (R+M/2) greater than 90, and containing not more than 0.05 grams of lead or 0.005 grams of phosphorus per gallon.

Note: For this survey, gasoline sales should be reported by grade in accordance with their classification at the time of sale. In general, automotive octane requirements are lower at high altitudes. Therefore, in some areas of the United States, such as the Rocky Mountain States, the octane ranges for the gasoline grades above may be 2 or more octane points lower.

8. *Firm* - Any association, company, corporation, estate, individual, joint-venture, partnership, or sole proprietorship or any other entity, however organized, including charitable, educational, or other charitable institutions, and the Federal government including operations, departments, Federal agencies, and other instrumentalities, and State and local governments.

9. *Gas Plant Operator* - Any firm, including a gas plant owner, which operates a gas plant and keeps the gas plant records. A gas plant is a facility in which natural gas liquids are separated from natural gas, or in which natural gas liquids are fractionated or otherwise separated into natural gas liquid products or both.

10. *Gasohol* - A blend of finished motor gasoline (leaded or unleaded) and alcohol (generally ethanol but sometimes methanol), limited to 10 percent by volume of alcohol. For the purpose of this survey report gasohol in the grade of gasoline in which it was sold.

11. *Industrial* - Firms engaged in mining, construction, or manufacturing.

12. *Kerosene* - A petroleum distillate that has a maximum distillation temperature of 401 degrees F at the 10-percent recovery point, a final boiling point of 572 degrees F, and a minimum flash point of 100 degrees F. Included are the two classifications recognized by ASTM Specification D 3699: No. 1-K and No. 2-K, and all grades of kerosene called range or stove oil which have properties similar to No. 1 fuel oil, but with a gravity of about 43° API and a maximum endpoint of 625°F. Kerosene is used in space heaters, cook stoves, and water heaters and is suitable for use as an illuminant when burned in wick lamps.

**DEFINITIONS (Continued)**

13. *Kerosene-type Jet Fuel* - A quality kerosene product with a maximum distillation temperature of 400 degrees F at the 10-percent recovery point and a final maximum boiling point of 572 degrees F. The fuel is designated in ASTM Specification D1655 and Military Specification MIL-T-5624L (Grades JP-5 and JP-8). A relatively low-freezing point distillate of the kerosene type used primarily for commercial turbojet and turboprop aircraft engines.

14. *Parent* - A firm that directly or indirectly controls another entity.

15. *Propane, Consumer Grade* - A normally gaseous paraffinic compound ($C_3H_8$), which includes all products covered by Natural Gas Policy Act Specifications for commercial and HD-5 propane and ASTM Specification D 1835. EXCLUDES: feedstock propanes, which are propanes not classified as consumer grade propanes, including the propane portion of any natural gas liquid mixes, i.e., butane-propane mix.

16. *Reference Month* - The calendar month and year to which the reported cost, price, and volume information relates.

17. *Refiner* - A firm or the part of a firm that refines products or blends and substantially changes products, or refines liquid hydrocarbons from oil and gas field gases, or recovers liquefied petroleum gases incident to petroleum refining and sells those products to resellers, retailers, reseller/retailers or ultimate consumers. "Refiner" includes any owner of products which contracts to have those products refined and then sells the refined products to resellers, retailers, or ultimate consumers.

18. *Reseller* - A firm (other than a refiner) that carries on the trade or business of purchasing refined petroleum products and reselling them to purchasers other than ultimate consumers.

19. *Reseller/Retailer* - A firm (other than a refiner) that carries on the trade or business activities of both a reseller and a retailer; i.e., purchasing refined petroleum products and reselling them to purchasers who may be either ultimate or other than ultimate consumers.

20. *Residential* - In cases of sales of No. 2 Fuel Oil, includes individual customers or households (as opposed to businesses or institutions) who ostensibly use the fuel in a residence. Sales to apartment buildings/complexes or to other multi-family dwellings are excluded from the "Residential Sales" category and are included in the "Commercial/Institutional Sales" category.

21. *Residual Fuel Oils* - The topped crude of refinery operations, which includes No. 5 and No. 6 fuel oils as defined in ASTM Specification D 396 and Federal Specification VV-F-815C, Navy Special fuel oil as defined in Military Specification MIL-F-859E including Amendment 2 (NATO Symbol F-77), and Bunker C fuel oil. Residual fuel oil is used for the production of electric power, space heating, vessel bunkering, and various industrial purposes.

22. *Retailer* - A firm (other than a refiner, reseller, or reseller/retailer) that carries on the trade or business of purchasing refined petroleum products and reselling them to ultimate consumers.

23. *Sale* - The transfer of title from the seller to a buyer for a price. EXCLUDE: Intrafirm transfers, product consumed directly by the reporting firm, or sales of bonded fuel. Also exclude products delivered/loaned to exchange partners except where the amount given up exceeds the amount received and the differential is invoiced as a sale during the reference month.

24. *Unit Price* - Total revenue derived from the sale of product during the reference month divided by the total volume sold; also known as the weighted average price. Total revenue should exclude all taxes but include transportation costs that were paid as part of the purchase price.

25. *United States* - The 50 States and the District of Columbia.

## APPENDIX A

### LIST OF STANDARD STATE ABBREVIATIONS

AL ... Alabama
AK ... Alaska
AZ ... Arizona
AR ... Arkansas
CA ... California
CO ... Colorado
CT ... Connecticut
DE ... Delaware
DC ... District of Columbia
FL ... Florida
GA ... Georgia
HI ... Hawaii
ID ... Idaho
IL ... Illinois
IN ... Indiana
IA ... Iowa
KS ... Kansas
KY ... Kentucky
LA ... Louisiana
ME ... Maine
MD ... Maryland
MA ... Massachussetts
MI ... Michigan
MN ... Minnesota
MS ... Mississippi
MO ... Missouri
MT ... Montana
NE ... Nebraska
NV ... Nevada
NH ... New Hampshire
NJ ... New Jersey
NM ... New Mexico
NY ... New York
NC ... North Carolina
ND ... North Dakota
OH ... Ohio
OK ... Oklahoma
OR ... Oregon
PA ... Pennsylvania
RI ... Rhode Island
SC ... South Carolina
SD ... South Dakota
TN ... Tennessee
TX ... Texas
UT ... Utah
VT ... Vermont
VA ... Virginia
WA ... Washington
WV ... West Virginia
WI ... Wisconsin
WY ... Wyoming

# A Comparison of Selected EIA-782 Data with Data From Other Sources

by Jacob Bournazian

## Introduction

The Energy Information Administration (EIA) EIA-782 survey series collects data on petroleum markets to fulfill legislative mandates from Congress and to provide comprehensive information for evaluating market behavior. It includes three surveys: Form EIA-782A, "Refiners'/Gas Plant Operators' Monthly Petroleum Product Sales Report;" Form EIA-782B, "Resellers'/Retailers' Monthly Petroleum Product Sales Report;" and Form EIA-782C, "Monthly Report of Prime Supplier Sales of Petroleum Products Sold for Local Consumption." Any reference to the EIA-782 prices refers to the series that includes both the EIA-782A and EIA-782B surveys. Any reference to the EIA-782 volumes refers to the EIA-782C survey series. Any reference to the specific survey is identified as such. This article compares the data from the EIA-782 survey series with other sources to assess the quality of the EIA-782 data. Significant differences and trends among data series may indicate the need for changes in data collection and processing, the reporting population, survey or sample design, or may simply reflect conceptual differences across surveys.

The following data sources were used to compare with the EIA-782 series.
For prices:

- The Bureau of Labor Statistics (BLS) Office of Consumer Price Index (CPI) data for retail prices of motor gasoline and residential No. 2 fuel oil.
- The BLS Office of Producer Prices (PPI) data for wholesale prices of motor gasoline, No. 2 fuel oil and diesel fuel, and kerosene-type jet fuel.
- Oil Price Information Service (OPIS), a privately owned petroleum news and information source, for retail prices of on-highway diesel fuel.
- Form EIA-888, "On-Highway Diesel Fuel Price Survey," for retail prices of on-highway diesel fuel.
- Form EIA-878, "Motor Gasoline Price Survey," for retail pump prices of gasoline.

For volumes:

- Form EIA-821, "Annual Fuel Oil and Kerosene Sales Report," for retail volumes of distillate and residual fuel oil.

- EIA's *Petroleum Supply Annual (PSA)* product supplied for volumes of distillate fuel oil, residual fuel oil, and motor gasoline.

- Federal Highway Administration (FHWA) for retail volumes of motor gasoline.

A more detailed description of each data source is contained in the Notes section at the end of this article.

## Overview

The EIA-782 prices track closely with other EIA surveys and OPIS prices while the BLS prices are higher than EIA-782 prices. The EIA-782C volume data were compared with data from other EIA surveys and the FHWA data series. The EIA-782C volumes for motor gasoline and distillate fuel follow closely with the other data series. However, the EIA-782C residual fuel volumes are significantly below the levels shown by other EIA surveys. The following sections of this article discuss the differences among the price and volume data sources for No. 2 distillate fuel oil and diesel fuel, gasoline, kerosene-type jet fuel, and residual fuel.

## Price Comparisons

Tables FE1 – FE6 show that EIA-782 national prices are generally lower than the BLS, EIA-878, and EIA-888 price data series and follow OPIS prices closely. Retail EIA-782 prices include data from both the EIA-782A and EIA-782B surveys. Differences in the survey methodology across the surveys explain some of the price differences.

- The BLS, EIA-878, EIA-888, and OPIS prices include taxes, whereas EIA-782 prices exclude taxes. For Tables FE3 and FE5, a U.S.-total-weighted Federal and State tax provided by the FHWA is deducted from BLS, EIA-878, EIA-888, and OPIS retail prices. No adjustment was made to the BLS, EIA-878, EIA-888, and OPIS prices for local sales taxes and other State and local fuel taxes such as environmental taxes, underground storage tank taxes, and transportation use taxes because there were not sufficient data available for making adjustments at the U.S. level.

- BLS retail prices are collected from urban areas, whereas EIA-782, EIA-878, and EIA-888 prices are collected from both rural and urban areas across a region or state. The BLS wholesale prices used to calculate the Producer Price Index are collected from a sample of refiners and represent the refiners' selling price for the selected refined products. The EIA-782 gasoline, No. 2 fuel oil and diesel prices are collected from a census of refiners and a sample of resellers and retailers. EIA resale prices represent sales to a seller who will resell the product, i.e., sales by refiners that are not to the ultimate consumer. In most transactions, the wholesale price and resale price are the same. However, there are circumstances where a

refiner may make a wholesale sale to an ultimate consumer. EIA began using the term "Reseller" in 1983 to exclude wholesale transactions to ultimate consumers.

- The EIA-782 uses current period volume weights, while BLS, the EIA-878 and EIA-888 use fixed weights to compute weighted average prices.

- The EIA-782 prices represent all sales during the month, while BLS prices represent the average of outlet prices collected on different days across the first three weeks of the month. The EIA-878 and the EIA-888 weekly surveys also represent a point in time in the week. In this article, the annual EIA-878 and EIA-888 prices were calculated using simple arithmetic means of the published weekly prices.

### Residential No. 2 Fuel Oil

Table FE1 shows BLS prices are 3 to 5 percent higher than EIA-782 prices from 1995 through 2003. The difference between the two series widened from 3 to 5 percent after 1999 and then declined to the usual 3 percent level after 2001. BLS prices are obtained from urban areas only and do not reflect complete geographic coverage for this product. EIA-782 prices are volume weighted price estimates.

**Table FE1. 'U.S. Residential No. 2 Distillate Prices, 1995-2003**

| | (Cents per gallon) | | |
|---|---|---|---|
| Year | EIA-782 | BLS | Percentage BLS/EIA-782 |
| 1995 | 86.7 | 89.3 | 103.00% |
| 1996 | 98.9 | 101.9 | 103.03% |
| 1997 | 98.4 | 101.4 | 103.05% |
| 1998 | 85.2 | 88.0 | 103.29% |
| 1999 | 87.6 | 90.0 | 102.74% |
| 2000 | 131.1 | 136.0 | 103.74% |
| 2001 | 125.0 | 131.0 | 104.80% |
| 2002 | 112.9 | 116.2 | 102.88% |
| 2003 | 135.6 | 140.0 | 103.28% |

EIA Source: Table 18 Petroleum Marketing Monthly.

### No. 2 Fuel Oil Resale

Table FE2 shows BLS wholesale prices vary widely with EIA-782A resale prices between a range of 5 to 14 percent higher than EIA-782A. The differential between the series has decreased during the past 2 years. One possible reason is that the EIA-782A prices are current period volume weighted averages, and larger volume sales by refiners at lower prices receive greater

weight in calculating EIA-782A prices. The BLS prices are calculated using weights derived from other (non-current) time periods. BLS does adjust their weights on a monthly basis.

**Table FE2 U.S. Refiner Resale No. 2 Fuel Oil Prices, 1995-2003**

| Year | (Cents per gallon) EIA-782A | BLS | Percentage BLS/EIA-782A |
|---|---|---|---|
| 1995 | 51.1 | 56.6 | 110.80% |
| 1996 | 63.9 | 69.4 | 108.66% |
| 1997 | 59.0 | 64.9 | 110.04% |
| 1998 | 42.2 | 48.2 | 114.22% |
| 1999 | 49.3 | 55.9 | 113.32% |
| 2000 | 88.6 | 93.3 | 105.32% |
| 2001 | 75.6 | 84.5 | 111.79% |
| 2002 | 69.4 | 74.8 | 107.77% |
| 2003 | 87.9 | 95.6 | 108.75% |

EIA Source: Table 4 Petroleum Marketing Monthly.

### Diesel Fuel On-Highway

Table FE3 shows the annual estimates for EIA-782, EIA-888, and OPIS retail on-highway diesel fuel prices from 1995-2003. EIA-782, EIA-888, and OPIS prices vary mostly by 1 to 2 percent and track closely over this time period. Although State and Federal diesel fuel taxes were subtracted from the OPIS and EIA-888 prices, no adjustment was made for local sales taxes, and additional State and/or local taxes relating for environmental regulations and transportation use.

**Table FE3. U.S. Retail On-Highway Diesel Fuel Prices, 1995-2003**

| | (Cents per gallon) | | | Percentage | |
|---|---|---|---|---|---|
| Year | EIA-782 | EIA-888 | OPIS | EIA-888/ EIA-782 | OPIS/ EIA-782 |
| 1995 | 67.0 | 67.5 | 66.0 | 100.72% | 98.53% |
| 1996 | 78.8 | 80.0 | 78.8 | 101.55% | 100.05% |
| 1997 | 74.5 | 75.8 | 74.7 | 101.79% | 100.24% |
| 1998 | 59.3 | 60.2 | 58.9 | 101.52% | 99.26% |
| 1999 | 68.5 | 67.7 | 66.5 | 98.83% | 97.10% |
| 2000 | 103.6 | 104.5 | 103.7 | 100.87% | 100.14% |
| 2001 | 94.3 | 95.4 | 94.4 | 101.20% | 100.15% |
| 2002 | 86.2 | 87.3 | 86.6 | 101.28% | 100.44% |
| 2003 | 104.4 | 105.6 | 104.6 | 101.12% | 100.19% |

EIA Source: Table 16 Petroleum Marketing Monthly for EIA-782 data.

OPIS prices are a compilation of different sources obtained from several credit card issuers and do not reflect complete sales coverage for this product. Outlets from leading truckstop chains, as well as outlets participating in a price and credit reporting service report daily retail prices to OPIS. Approximately 4,500 price quotes are reported daily. In this article, the annual OPIS prices at the U.S. level were calculated using simple arithmetic means based on an average of the prices reported as of Monday of each week of the year.

The EIA-888 prices are based on a sample of 350 outlets. The sample uses a probability proportional to size sampling technique. The U.S. average is calculated using a weighted average of the regional prices where the weights are volumes reported on another EIA survey at the time of sample selection.

### Diesel Fuel Resale

Table FE4 shows the annual estimates for EIA-782A resale and BLS wholesale prices for No. 2 diesel fuel. BLS prices are consistently higher with the difference doubling from 7% in 2002 to 14% in 2003. This product category contains prices for both low and high sulfur diesel fuel. The EIA-782A volume weighted averages reflect the relative importance of these two sulfur categories reported by refiners in the calculation of the average price.

Table FE4. U.S. Refiner Resale No. 2 Diesel Fuel Prices, 1994-2003

| | (Cents per gallon) | | Percentage |
|---|---|---|---|
| Year | EIA-782A | BLS | BLS/782A |
| 1994 | 52.9 | 56.0 | 105.94% |
| 1995 | 53.8 | 57.0 | 105.87% |
| 1996 | 65.9 | 69.9 | 106.06% |
| 1997 | 60.6 | 64.6 | 106.52% |
| 1998 | 44.4 | 47.4 | 106.83% |
| 1999 | 54.6 | 57.1 | 104.58% |
| 2000 | 89.8 | 93.1 | 103.69% |
| 2001 | 78.4 | 83.6 | 106.66% |
| 2002 | 72.4 | 77.7 | 107.35% |
| 2003 | 88.3 | 100.9 | 114.29% |

EIA Source: Table 4 Petroleum Marketing Monthly.

### Motor Gasoline - Retail

Table FE5 shows the annual estimates for EIA-782, EIA-878, and BLS retail prices from 1994-2003. This paper only discusses the prices for regular grade gasoline. BLS prices vary between 5 and 8 percent above the EIA-782 prices. EIA-878 prices vary between 1 and 6 percent above EIA-782 prices during the same time period. Even though both BLS and EIA-878 prices have been adjusted for federal and state taxes, these prices still contain additional taxes relating to local sales taxes and highway use taxes that could not be removed for this analysis. As a result, the EIA-782 prices should be lower than these other series.

**Table FE5. U.S. Retail Motor Gasoline Prices, Regular Grade, 1994-2003**

| | (Cents per gallon) | | | Percentage | |
|---|---|---|---|---|---|
| Year | EIA-782 | EIA-878 | BLS | EIA-878/EIA-782 | BLS/EIA-782 |
| 1994 | 69.4 | 70.1 | 73.9 | 101.01% | 106.48% |
| 1995 | 72.5 | 73.7 | 77.3 | 101.66% | 106.62% |
| 1996 | 81.2 | 85.0 | 85.7 | 104.68% | 105.54% |
| 1997 | 80.0 | 82.0 | 85.5 | 102.50% | 106.88% |
| 1998 | 62.5 | 64.4 | 67.4 | 103.04% | 107.84% |
| 1999 | 73.0 | 75.2 | 78.2 | 103.01% | 107.12% |
| 2000 | 106.6 | 109.6 | 112.2 | 102.81% | 105.28% |
| 2001 | 99.6 | 103.2 | 107.3 | 103.61% | 107.76% |
| 2002 | 91.6 | 96.1 | 97.4 | 104.91% | 106.33% |
| 2003 | 111.0 | 117.2 | 120.2 | 105.59% | 108.26% |

EIA Source: Table 31 Petroleum Marketing Annual for EIA-782 data.

The annual BLS prices were calculated using simple arithmetic mean of monthly prices. The BLS monthly prices are calculated based on approximately 900 price quotes. Approximately 25 to 35 prices are collected from outlets in each published geographic area. EIA-782 prices represent all sales transactions through company-operated outlets by all refiners and a sample of resellers/retailers throughout the U.S. There are limitations in comparing a simple average data series with a volume weighted average price series across months because of the effect of volume changes throughout the year on the annual price estimate.

The EIA-878 also uses fixed volume weights for calculating U.S. prices based on approximately 800 price quotes each week. Separate outlet weights are used based on the sampled outlet's number of pumps, a proxy for sales volume, to obtain weekly averages for the specific formulations, grades and geographic areas. The weights used in aggregating grades, formulations and geographic areas are derived using volume data from the EIA-782C "Monthly Report of Prime Suppliers Sales of Petroleum Products Sold for Local Consumption," and demographic data from the Bureau of the Census and Department of Transportation on population, number of gasoline stations and number of vehicles. A simple average of weekly prices was calculated to obtain the annual average price. The EIA-782 prices utilize all sales transactions throughout the reference month, whereas the EIA-878 prices are Monday morning prices as of 8:00 A.M.

### Motor Gasoline - Resale

Table FE6 shows the annual estimates for EIA-782A and BLS resale motor gasoline prices from 1994 – 2003. Except for 1994, the BLS prices vary between 1 and 3 percent from the EIA-782A during this ten-year period. The data track closely during 1998 – 2002 despite increased price volatility in the gasoline markets during this time period. The difference widened during 2003 when there were strong price increases in gasoline markets.

**Table FE6. U.S. Refiner Resale Motor Gasoline Prices, Regular Grade, 1994-2003**

| | (Cents per gallon) | | Percentage |
|---|---|---|---|
| Year | EIA-782A | BLS | BLS/EIA-782 |
| 1994 | 56.6 | 59.2 | 104.64% |
| 1995 | 59.3 | 60.9 | 102.68% |
| 1996 | 68.5 | 70.7 | 103.26% |
| 1997 | 67.3 | 69.6 | 103.41% |
| 1998 | 49.9 | 51.1 | 102.42% |
| 1999 | 62.0 | 62.3 | 100.51% |
| 2000 | 94.2 | 92.5 | 98.14% |
| 2001 | 86.5 | 87.9 | 101.58% |
| 2002 | 80.6 | 81.0 | 100.51% |
| 2003 | 98.1 | 100.6 | 102.54% |

EIA Source: Table 6 Petroleum Marketing Annual.

### Kerosene-Type Jet Fuel - Resale

Table FE7 shows the annual estimates for EIA-782A refiner resale kerosene-type jet fuel prices and BLS wholesale kerosene-type jet fuel prices from 1994 – 2003. The two price series vary between 1 and 5 percent during 1994 – 1998. The price differential narrows after 1998 and remains stable at approximately 1 percent. BLS wholesale prices are expected to be similar to EIA-782A resale prices since EIA kerosene-type jet fuel prices are collected from a census of refiners on Form EIA-782A and BLS collects from a sample of refiners.

**Table FE 7. U.S. Kerosene-Type Jet Fuel Resale Prices, 1994-2003**

| | (Cents per gallon) | | Percentage |
|---|---|---|---|
| Year | EIA-782A | BLS | BLS/EIA-782A |
| 1994 | 53.4 | 53.8 | 100.75% |
| 1995 | 53.9 | 55.1 | 102.23% |
| 1996 | 64.6 | 67.6 | 104.64% |
| 1997 | 61.3 | 64.0 | 104.40% |
| 1998 | 45.0 | 46.7 | 103.83% |
| 1999 | 53.3 | 53.9 | 101.16% |
| 2000 | 88.0 | 89.1 | 101.21% |
| 2001 | 76.3 | 78.2 | 102.52% |
| 2002 | 71.6 | 72.2 | 100.78% |
| 2003 | 87.2 | 87.3 | 100.08% |

EIA Source: Table 4 Petroleum Marketing Monthly.

## Volume Comparisons

EIA-782C volumes are compared with volumes reported in the EIA-821, the *PSA*, and the FHWA data series. Product supplied in the *PSA* is an estimate of the demand for petroleum products. It is calculated by adding and subtracting volumes as they move in and out of the primary distribution stream. Sales volume data from the EIA-821 reflect the transfer of product title from a seller to a buyer whereas the EIA-782C measures sales into the States where the products are ultimately consumed. FHWA doesn't collect actual sales data on gasoline and diesel fuel. States report their fuel volumes to FHWA based on the beginning inventory at the terminal facility minus exports plus shipments to the terminal during the reporting cycle. The difference in survey populations, concepts and methodology underlie some of the differences that exist between the EIA-821, the *PSA*, and the FHWA data series.

### Distillate Fuel Oil

Table FE8 shows volumes of distillate fuel oil for the EIA-782C, EIA-821, and *PSA* series from 1993 through 2002. EIA-782C volumes have been below EIA-821 volumes since 1993 and below *PSA* volumes since 1997. The differential continues to grow wider after 1999. Table FE8 also shows that the difference between the EIA-782C and EIA-821 volumes is greater than the difference between the EIA-782C and the *PSA* volumes.

**Table FE8. U.S. Distillate Fuel Oil Volumes, 1993-2002**

| | (Million Gallons) | | | Percentage | |
|---|---|---|---|---|---|
| | | | | EIA-821/ | PSA/ |
| Year | EIA-782C | EIA-821 | PSA | EIA-782C | EIA-782C |
| 1993 | 48,029 | 48,290 | 46,622 | 100.54% | 97.07% |
| 1994 | 49,188 | 50,424 | 48,477 | 102.51% | 98.55% |
| 1995 | 49,332 | 51,469 | 49,158 | 104.33% | 99.65% |
| 1996 | 51,753 | 53,379 | 51,731 | 103.14% | 99.96% |
| 1997 | 51,903 | 54,366 | 52,665 | 104.75% | 101.47% |
| 1998 | 52,371 | 55,306 | 53,064 | 105.60% | 101.32% |
| 1999 | 54,614 | 57,573 | 54,759 | 105.42% | 100.27% |
| 2000 | 55,670 | 59,601 | 57,217 | 107.06% | 102.78% |
| 2001 | 57,344 | 59,911 | 58,971 | 104.48% | 102.84% |
| 2002 | 55,237 | 59,343 | 57,885 | 107.43% | 104.79% |

EIA Source: Table 50 Petroleum Marketing Annual for EIA-782C data.
Table S5 Petroleum Supply Annual for PSA data.
Table 1 Fuel Oil and Kerosense Sales, 2002 for EIA-821 data.

All three data series show a decline in volume from 2001 – 2002. Although Table FE8 shows total distillate volumes, a closer review of the energy use sector volumes in the EIA-821 data series (not shown in this table) provide some explanation for the variation between the data series. EIA-821 data show that sales of distillate fuel oil declined in the industrial, commercial and electric power sectors as moderate natural gas prices reduced the opportunities and need for fuel switching from natural gas to distillate. One possible source for the widening gap between EIA-821 and EIA-782C volumes is the sales reported for on-highway use, which comprised 58% of all distillate sales in 2002 in the EIA-821 data series. The EIA-821 on-highway energy use sector shows an increase of approximately 27% since 1996 and is the largest component contributing to the increase in distillate volumes for that survey during the past 7 years. The EIA-821 volumes for on-highway use are obtained from the Federal Highway Administration and used in place of data reported for this category. However, some EIA-821 respondents may report sales to commercial and institutional fleet vehicles in the commercial use category rather than in the on-highway use category. If the commercial category contains some on-highway use volumes, and exogenous data are used to replace the data for on-highway use, then some double counting of distillate volumes for transportation use on the EIA-821 may occur. If sales to fleet vehicles, which are reported in the commercial category, are increasing at approximately the same rate as other distillate sales for other on-highway use, then the amount of double counting of distillate sales in the EIA-821 survey may also be increasing over the past seven years, and may contribute to any differences between the EIA-782C and EIA-821 data series.

### Motor Gasoline

Table FE9 shows volumes of motor gasoline from the EIA-782C, *PSA*, and FHWA series from 1993 through 2002.

**Table FE9. U.S. Motor Gasoline Volumes, 1993-2002**

| | (Million Gallons) | | | Percentage | |
|---|---|---|---|---|---|
| Year | EIA-782C | PSA | FHWA | PSA / EIA-782C | FHWA / EIA-782C |
| 1993 | 117,886 | 114,607 | 116,614 | 97.22% | 98.92% |
| 1994 | 120,151 | 116,523 | 118,531 | 96.98% | 98.65% |
| 1995 | 122,582 | 119,405 | 120,876 | 97.41% | 98.61% |
| 1996 | 123,904 | 120,969 | 123,327 | 97.63% | 99.53% |
| 1997 | 125,632 | 122,901 | 125,045 | 97.83% | 99.53% |
| 1998 | 128,696 | 126,518 | 128,504 | 98.31% | 99.85% |
| 1999 | 131,066 | 129,247 | 132,261 | 98.61% | 100.91% |
| 2000 | 129,173 | 129,876 | 132,280 | 100.54% | 102.41% |
| 2001 | 132,029 | 131,991 | 134,110 | 99.97% | 101.58% |
| 2002 | 135,164 | 135,640 | 137,664 | 100.35% | 101.85% |

EIA Source: Table 48 Petroleum Marketing Annual for EIA-782C data.
Table S4 Petroleum Supply Annual for PSA data.

EIA-782C and *PSA*

Table FE9 shows the differential between the EIA-782C volumes and the *PSA* volumes narrowed during the past ten years with the difference being within 1% since 1999. One reason the differential narrowed during the 1990s was that the *PSA* improved its coverage of downstream blending of finished motor gasoline by including gasoline blenders in the survey reporting population. Blending of fuel ethanol, methanol, methyl tertiary butyl ether (MTBE), and other blend stock with gasoline often occurs downstream from the refineries.

EIA-782C and FHWA

Table FE9 also shows that EIA-782C volumes generally track closely with the FHWA motor gasoline volumes and the differential has remained at 2 percent since 2000. FHWA estimates the gasoline consumption by the federal, state, and local government since these volumes are not taxed. Also, FHWA has various models to estimate non-highway use in each state. FHWA estimates federal government highway gasoline use based on information obtained from federal agencies. State-reported federal use of gasoline in excess of the FHWA estimate is presumed to be either civilian non-highway or military use and is eliminated from the Federal figure reported by the State. The constant level of the difference in volumes between these two series may be due to some under coverage of the market by the EIA-782C or differences in how FHWA estimates gasoline sales for off-highway and government use.

### Residual Fuel Oil

Table FE10 shows volumes of residual fuel oil from the EIA-782C, EIA-821, and *PSA* from 1993 through 2002.

**Table FE10. U.S. Residual Fuel Oil Volumes, 1993-2002**

| | (Million Gallons) | | | Percentage | |
|---|---|---|---|---|---|
| Year | EIA-782C | EIA-821 | PSA | EIA-821/ EIA-782C | PSA/ EIA-782C |
| 1993 | 13,555 | 15,064 | 16,559 | 111.13% | 122.16% |
| 1994 | 12,753 | 14,825 | 15,652 | 116.25% | 122.73% |
| 1995 | 9,623 | 12,318 | 13,061 | 128.01% | 135.73% |
| 1996 | 10,610 | 13,257 | 13,000 | 124.95% | 122.53% |
| 1997 | 10,583 | 12,504 | 12,218 | 118.15% | 115.45% |
| 1998 | 11,513 | 14,730 | 13,598 | 127.94% | 118.11% |
| 1999 | 10,259 | 13,328 | 12,724 | 129.92% | 124.03% |
| 2000 | 9,733 | 13,211 | 13,375 | 135.73% | 137.42% |
| 2001 | 10,285 | 13,609 | 13,508 | 132.32% | 131.34% |
| 2002 | 8,259 | 10,362 | 10,731 | 125.46% | 129.93% |

EIA Source: Table 49 Petroleum Marketing Annual for EIA-782C data.
Table S6 Petroleum Supply Annual for PSA data.
Table 2 Fuel Oil and Kerosene Sales, 2002 for EIA-821 data.

EIA-782C vs. *PSA* and EIA-821

Table FE10 shows the EIA-782C is significantly below the *PSA* and EIA-821 data series. The difference between the EIA-782C and the other two series is quite large and fluctuates relative to the EIA-782C from 11% in 1993 to a high of 37% in 2000. The gap between the EIA-782C and the EIA-821 has slightly declined since 2000 but there remains a significant gap of 25% in 2002. The gap between the EIA-782C and *PSA* data has remained at approximately 30% since 2001. The large and continuous divergence between the EIA-782C and the other two series indicates that the EIA-782C is missing some residual fuel oil sales.

Residual fuel oil sales plunged in 2002, with the EIA-782C volumes declining by 20%, EIA-821 declined by 24% and *PSA* declined by 21%. Although Table FE10 shows total residual fuel volumes, a closer review of the energy use sector volumes in the EIA-821 data series (not shown in this table) provide some explanation for the variation between the data series. Environmental regulations restricting fuel use, abundant supplies and moderate prices for natural gas prices all contributed to the sharp decline in residual fuel sales. The EIA-821 data series shows electric power and vessel bunkering, the largest categories for residual fuel, falling by 37% and 10% respectively,during 2002. The gap between the EIA-782C and the EIA-821 narrowed by 7% but the gap between the EIA-782C and PSA remained approximately the same between 2001 and 2002. The narrowing of the large gap between the EIA-782C and the EIA-821 from 2001 to 2002 suggests that the sales related to fuel switching from natural gas to residual fuel that occurred on a large scale during 2001 may contribute to the divergence between the EIA-782C and the EIA-821 and *PSA* data series.

**Table FE11. EIA-821 and EIA-782C U.S. Residual Fuel Oil Volumes by PADD, 2000-2002**

| | (Million Gallons) | | |
|---|---|---|---|
| | **2000** | **2001** | **2002** |
| EIA-782C US Residual Fuel Oil | 9,733 | 10,285 | 8,259 |
| EIA-821 US Residual Fuel Oil | 13,211 | 13,546 | 10,362 |
| Percentage EIA-782C/EIA-821 | 73.67% | 75.93% | 79.70% |
| | **Percentage Across PADDs EIA-782C/EIA-821** | | |
| PADD 1 | 73.75% | 73.63% | 76.62% |
| PAD Subdistrict 1A | 101.11% | 83.18% | 96.66% |
| PAD Subdistrict 1B | 87.42% | 87.84% | 86.02% |
| PAD Subdistrict 1C | 55.20% | 59.69% | 64.65% |
| PADD 2 | 48.20% | 48.47% | 60.40% |
| PADD 3 | 67.68% | 80.70% | 82.06% |
| PADD 4 | 328.57% | 332.71% | 297.10% |
| PADD 5 | 83.47% | 82.49% | 87.66% |

EIA Source: Table 49 Petroleum Marketing Annual for EIA-782C data.
Table 2 Fuel Oil and Kerosene Sales, 2002 for EIA-821 data.

Table FE11 compares the EIA-782C and EIA-821 volumes for 2000 – 2002 across the five PADD regions. The data show that during this time period, the 782C data are missing significant volumes in PAD Sub-district 1C and in PADDs 2 and 3. Although, the EIA-782C volumes are approximately 3 times as high as the EIA-821 volumes in PADD 4, PADD 4 is the smallest market with approximately 3% of total US residual fuel sales. Sub-district 1C comprises approximately 25% of U.S. residual fuel sales and PADD 3 constitutes approximately 15%. Additional research is needed, mainly in PAD Sub-district 1C and PADD 3, to determine the causes for the divergence between the EIA-782C and EIA-821 data series.

## Summary

The EIA-782 petroleum product prices were compared with alternative sources from other EIA surveys, BLS, and OPIS prices. The EIA-782 prices tracked closely with other EIA surveys and OPIS prices. BLS prices were higher than EIA-782 prices, and the price differences widened in 2003 across all products. Some difference was expected between these two series because EIA collects prices from a census of refiners and BLS collects prices from a sample of refiners. The EIA-782C volume data were compared with data from other EIA surveys and the FHWA series. The EIA-782C volumes for motor gasoline and distillate fuel track closely with the other data series. However, the EIA-782C residual fuel volumes are significantly below the levels shown by other EIA surveys. The large difference between the EIA-782C residual fuel volumes and the other data sources requires further investigation into the reporting practices of the EIA-782C respondents for this product. Other differences exist among the data sources because of different reporting populations, geographic and/or market coverage, survey design, methodology, reference period intervals, and product and energy-use sector definitions.

## Notes

### Data Sources

The Form EIA-782A, "Refiners'/Gas Plant Operators' Monthly Petroleum Product Sales Report," collects monthly price and volume data at the State level for 14 petroleum products for various retail and wholesale marketing categories. It is a census of refiners and gas plant operators. The frame is updated on an ongoing basis using respondent lists from surveys such as the Form EIA-810, "Monthly Refinery Report;" the Form EIA-816, "Monthly Natural Gas Liquids Report;" and industry trade publications. Currently, 110 companies respond to the EIA-782A survey.

The Form EIA-782B, "Resellers'/Retailers' Monthly Petroleum Product Sales Report," is sent to a sample of resellers and retailers of motor gasoline, distillate, propane, and residual fuel oil. Respondents to Form EIA-863, "Petroleum Product Sales Identification Survey," are used as the sampling frame of resellers and retailers for the EIA-782B. Firms having 5 percent or more of

sales in a State are selected with certainty. The remaining companies on the frame are sampled using probability proportional to size methodology by geographic area, product, and type of sale. The EIA-782B sample includes approximately 2,000 companies.

The Form EIA-782C, "Monthly Report of Prime Supplier Sales of Petroleum Products Sold for Local Consumption," collects volumes of prime supplier sales of selected petroleum products into States where they are locally sold and consumed. A prime supplier is a firm that produces, imports, or transports any of the selected petroleum products across State boundaries and local marketing areas and sells the product to local distributors, local retailers, or end users. This survey provides an accurate measure of consumption in most States. Currently, 183 firms respond to the EIA-782C survey.

Data collected on the Forms EIA-782A, EIA-782B, and EIA-782C are published in the *Petroleum Marketing Monthly (PMM)* and the *Petroleum Marketing Annual (PMA)*.

In addition, production, import, and export data collected by EIA's Petroleum Division are published in the *Petroleum Supply Monthly (PSM)* and the *Petroleum Supply Annual (PSA)*. The Petroleum Division uses the Petroleum Supply Reporting System (PSRS) for data collection. The PSRS is composed of a family of data collection survey forms, data processing systems, and publications systems. Detailed data on refinery and natural gas plant operations, bulk terminal and pipeline stocks, petroleum products imports, and movements of petroleum products among Petroleum Administration for Defense (PAD) districts are collected monthly. Figures for product supply originate from Forms EIA-810, "Monthly Refinery Report;" EIA-811, "Monthly Bulk Terminal Report;" EIA-812, "Monthly Product Pipeline Report;" EIA-813, "Monthly Crude Oil Report;" EIA-814, "Monthly Imports Report;" EIA-816, "Monthly Natural Gas Liquids Report;" and EIA-817, "Monthly Tanker and Barge Movement Report." Aggregate export data obtained from the Bureau of the Census are also included in computations for the *PSM* and *PSA*. The *PMA* and the *PSA* may contain revisions of the data published in the *PMM* and the *PSM*, respectively, due to late submissions or revisions to the monthly data.

The Form EIA-821, "Annual Fuel Oil and Kerosene Sales Report," collects data on the sales to end users of distillate fuel oil, residual fuel oil, and kerosene. The sample size is approximately 4,000 for 2002. The data are used to determine the level of sales by energy-use category and product at the State, regional, and national levels. The sampling frame for the EIA-821 is also derived from the respondents to Form EIA-863. The EIA-863 is a quadrennial census used to collect information on size, type, and geographic location of firms selling petroleum products. Data from the Federal Highway Administration (FHWA) of the U.S. Department of Transportation replace EIA-821 data reported as on-highway diesel sales.

The Highway Statistics Division of the FHWA collects information related to highway transportation. Sales volumes of motor gasoline are published on a calendar year basis and are a

cumulative tabulation of gross gallons of gasoline reported by wholesale distributors to State motor fuel tax agencies. The FHWA collects information on finished motor gasoline, with no distinction made among motor gasoline grades. The data include gasoline for both highway and non-highway use. The FHWA includes gasohol but excludes exports, fuels for military use, and dealer transfers.

The Bureau of Labor Statistics (BLS) publishes the aggregate index for household fuels and its component indexes for motor fuels. Retail prices are collected monthly by BLS representatives in the urban areas, and support the estimation of the Consumer Price Index (CPI). Wholesale prices are collected monthly and support the estimation of the Producer Price Index (PPI).

The CPI and PPI use fixed volume weights to measure the change in price over time. The CPI measures the change in prices for a defined market basket of goods and services and the PPI measures the change in prices received by domestic producers for their output. Approximately 900 retail prices are collected for regular grade gasoline in approximately 87 urban areas across the country and include all taxes directly associated with the purchase and the use of the items. The 87 areas cover 39 States and the District of Columbia. The PPI collects prices from a sample of domestic refiners. Although most PPI prices are collected on one particular day of the month, the prices for refined petroleum products are commonly an average of prices during the first 10 working days of the month, or the prices received by oil refineries on the 10th working day of each month.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CHEVRON U.S.A. INC., And TEXACO INC., And TEXACO DOWNSTREAM LLC, Plaintiffs, v. THE UNITED STATES, Defendant. | ) | No. 03-288C (Chief Judge Damich) |

DECLARATION OF JOHN R. WALKER

1. My name is John R. Walker and I am a contracting officer with the Defense Energy Support Center (DESC). I have been with DESC since 1983, except for a period from 1987-1989, when I worked for the Naval Sea Systems Command. I have been a DESC contracting officer since 1989.

2. Based on my review of DESC files, prior to DESC's decision to use a common economic price adjustment (EPA) clause, DESC allowed suppliers to propose their own EPA clause. DESC has only two domestic contract files from that time period, and received a copy of third contract during this litigation. In each of these contracts, all of which involved large volumes of JP-4, the suppliers of JP-4 to DESC proposed an EPA clause based, in part or in whole, on gasoline prices. I have attached three examples to this declaration. In the first example, Ashland Petroleum Company, Contract DLA600-

81-D-0354[1], pages 38-51 of the Supplemental Appendix, proposed the use of its own sales prices for gasoline and kerosene in a 60 percent – 40 percent ratio. The product component in the EPA clause is at page 8 of the Ashland contract, page 45 of the Supplemental Appendix. In the second example, Gulf Oil Co., Contract DLA600-81-D-0445[2], pages 52-60 of the Supplemental Appendix, proposed the use of its own sales prices for gasoline and jet fuel in a 50 percent – 50 percent ratio. The product component in the EPA clause is at page 8 of the Gulf contract, page 59 of the Supplemental Appendix. In the third example, Phillips Petroleum, Contract DLA600-81-D-3037, pages 61-69 of the Supplemental Appendix, proposed the use of its posted price for house brand gasoline, unleaded gasoline, and dual purpose fuel oil, in a one-third ratio of each, to adjust JP-4 prices. The product component in the EPA clause is at page 7 of the Phillips contract, page 67 of the Supplemental Appendix.

[1] The Ashland contract is the subject of the same type of claim filed by Chevron. Marathon Ashland Petroleum, LLC v. United States, Fed. Cl. No. 02-1218C. The contract is part of the claim submission.

[2] The Gulf Oil contract was Exhibit A of a November 3, 2003, filing by plaintiff in Flint Hills Resources, LP v. United States, Fed Cl. No. 02-0462C.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 6-19-06

JOHN R. WALKER
Contracting Officer

# AWARD/CONTRACT

Page 1 of 14

1. CONTRACT (Proc. Inst. Ident.) NO.: DLA600-81-D-0354
3. EFFECTIVE DATE: 80 OCT 31.
3. REQUISITION/PURCHASE REQUEST/PROJECT NO.: SEE RFP FILE FOR CONSOLIDATED PRs
4. CERTIFIED FOR NATIONAL DEFENSE UNDER BDSA REG. 2 AND/OR DMS REG. 1. RATING:

5. ISSUED BY: CODE SC0600
DEFENSE FUEL SUPPLY CENTER
CAMERON STATION TWX 710-832-0600
ALEXANDRIA, VIRGINIA 22314 2.2a/2.2d
ATTN: B. ALLEN/DFSC-PD/47453

6. ADMINISTERED BY (If other than block 5): CODE
PRE-AWARD SURVEY - NONE

7. DELIVERY: FOB DESTINATION / OTHER (See below) [X] SEE SCHEDULE

8. CONTRACTOR CODE 81355 FACILITY CODE
NAME AND ADDRESS:
ASHLAND PETROLEUM COMPANY
1409 WINCHESTER AVENUE
ASHLAND, KY 41101

9. DISCOUNT FOR PROMPT PAYMENT: NET 30 DAYS

10. SUBMIT INVOICES (4 copies unless otherwise specified) TO ADDRESS SHOWN IN BLOCK: SEE BLOCK 12

11. SHIP TO/MARK FOR: CODE
SEE SCHEDULE

12. PAYMENT WILL BE MADE BY: CODE SP4900
DEFENSE FUEL SUPPLY CENTER
CAMERON STATION, BUILDING 5
ATTN: DFSC-CDX
ALEXANDRIA, VIRGINIA 22314

13. THIS PROCUREMENT WAS [ ] ADVERTISED, [X] NEGOTIATED, PURSUANT TO: [X] 10 U.S.C. 2304 (a)(10) [ ] 41 U.S.C. 252 (c)( )

14. ACCOUNTING AND APPROPRIATION DATA
SEE CLAUSE L150

| 15. ITEM NO. | 16. SUPPLIES/SERVICES | 17. QUANTITY | 18. UNIT | 19. UNIT PRICE | 20. AMOUNT |
|---|---|---|---|---|---|
| | (a) This document confirms and incorporates by reference Award wire dated 31 Oct 80.<br><br>(b) A copy of Clause E12 (Contract Schedule) and various other clauses agreed to by the parties are attached hereto for informational purposes. In addition, pages 1 through 6 and 102 through 139 of RFP DLA600-80-R-0161 dated 80 May 28 and Amendments 0001 - 0008 are also attached for convenience and informational purposes. The following clauses are deleted: E19.03, L94, L97, L176, L176.01, L176.03. | | | | |

Estimated TOTAL AMOUNT OF CONTRACT $ 146,829,719

CONTRACTING OFFICER WILL COMPLETE BLOCK 22 OR 26 AS APPLICABLE.

22. [X] CONTRACTOR'S NEGOTIATED AGREEMENT (Contractor is required to sign this document and return 2 copies to issuing office.) Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. (Attachments are listed herein.)

26. [ ] AWARD (Contractor is not required to sign this document.) Your offer on Solicitation Number ____, including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary.

23. NAME OF CONTRACTOR
BY: Foy H. Wade (Signature of person authorized to sign)

27. UNITED STATES OF AMERICA
BY: John D. Hilliard (Signature of Contracting Officer)

24. NAME AND TITLE OF SIGNER (Type or print): Foy H. Wade, Manager Aviation Fuels Division
25. DATE SIGNED: 11/24/80

28. NAME OF CONTRACTING OFFICER (Type or print): JOHN D. HILLIARD
29. DATE SIGNED: 0 3 DEC 1980

SCHEDULE DLA600-81-D-0354

SUPPLIES –

E12 SUPPLIES TO BE FURNISHED (DFSC 1988 MAY)

(A) The supplies to be furnished hereunder, F.O.B. delivery points, method of delivery and estimated quantities are as follows.

a(B) Prices indicated hereunder are subject to Clause E19.12, ECONOMIC PRICE ADJUSTMENT

| ITEM NUMBER | ESTIMATED QUANTITY GALS | METHOD OF DELIVERY | UNIT PRICE W/FSII |
|---|---|---|---|
| | DFSC | JP-4 | NSN 9130-00-256-8613 |
| 0101 | 31,400,000 | B | $.84790 |
| FOB Origin delivery of 31,400,000 gallons at Ashland, KY. | | | |
| 0201 | 41,469,632 | B | $.84790 |
| FOB Origin delivery of 41,469,632 gallons at Buffalo, NY. | | | |
| 0301 | 30,000,000 | P | $.90190 W/O FSII |
| FOB Origin delivery of 30,000,000 gallons at St. Paul Park, MN. | | | |
| 0401 | 1,100,000 | TT | $.87210 |
| Destination delivery of 1,100,000 gallons to Youngstown, MA. | | | |
| 0501 | 4,680,000 | B | $.85720 |
| Destination delivery of 4,680,000 gallons to DFSP Cincinnati, OH. | | | |
| 0601 | 7,640,000 | P | $.86130 |
| Destination delivery of 7,640,000 gallons to Rickenbacker AFB, OH. | | | |
| 0701 | 2,000,000 | TT | $.87350 |
| FOB Destination delivery of 2,000,000 gallons to Manfield, MA OH. | | | |
| 0801 | 8,000,000 | P | $.86440 |
| Destination delivery of 8,000,000 gallons to Wright Patterson AFB, OH. | | | |
| 0901 | 240,000 | TT | $.88720 |
| Destination delivery of 240,000 gallons to ONG Akron, Canton, OH. (Requires truck equipped with pump). | | | |
| 1001 | 4,200,000 | TT | $.85760 |
| Destination delivery of 4,200,000 gallons to Shewmaker Field, Louisville, KY. | | | |

A600-81-D-0354

| ITEM NUMBER | ESTIMATED QUANTITY GALS | METHOD OF DELIVERY | UNIT PRICE |
|---|---|---|---|
| | DFSC | JP-4 | NSN 9130-00-256-8613 |
| 1101 | 600,000 | TT | $.86380 |

Destination delivery of 600,000 gallons to Fort Knox, KY.

| | | | |
|---|---|---|---|
| 1201 | 180,000 | TT | $.86420 |

Destination delivery of 180,000 gallons to Kentucky NG Frankfort, KY.

| | | | |
|---|---|---|---|
| 1301 | 9,000,000 | TT | $.86880 |

Destination delivery of 9,000,000 gallons to Greater Pittsburg Apt, PA.

| | | | |
|---|---|---|---|
| 1401 | 1,800,000 | TT | $.93530 |

Destination delivery of 1,800,000 gallons to Kanawha Co. Arpt. Charleston, W. VA.

| | | | |
|---|---|---|---|
| 1501 | 130,000 | TT | $.91160 |

Destination delivery of 130,000 gallons to West Virginia Air National Guard Parkersburg, W. VA.

| | | | |
|---|---|---|---|
| 1601 | 6,200,000 | TT | $.86010 |

Destination delivery of 6,200,000 gallons to Niagara Falls International Airport, N.Y.

| | | | |
|---|---|---|---|
| 1701 | 500,000 | TT | $.89340 |

FOB Destination delivery of 500,000 gallons to NASA Lewis Res Ctr, Cleveland,MA, OH.

| | | | |
|---|---|---|---|
| 1801 | 4,200,000 | TT | $.89470 |

FOB Destination delivery of 4,200,000 gallons to Hulman Field, Terre Haute, IN.

| | | | |
|---|---|---|---|
| 1901 | 3,110,000 | TT | $.88590 |

FOB Destination delivery of 3,110,000 gallons to Allison Dev. GMC, Indianapolis, IN.

| | | | |
|---|---|---|---|
| 2001 | 9,500,000 | TT | $.89540 |

FOB Destination delivery of 9,500,000 gallons to Ft. Campbell, KY.

DLA600-81-D-0354

| ITEM NUMBER | ESTIMATED QUANTITY GALS DFSC | METHOD OF DELIVERY JP-5 | UNIT PRICE NSN 9130-00-273-2379 |
|---|---|---|---|
| 2101 | 15,000 | TT | $ .96657 |

Destination delivery of 15,000 gallons to Wright-Patterson AFB

| | | | |
|---|---|---|---|
| 2201 | 1,980,000 | TT | $.92260 |

Destination delivery of 1,980,000 gallons to G. E. Evandale

| | | | |
|---|---|---|---|
| 2301 | 864,000 | TT | $.94414 |

Destination delivery of 864,000 gallons to GE Peebles, OH

| | | | |
|---|---|---|---|
| 2401 | 200,000 | TT | $.94708 |

Destination delivery of 200,000 gallons to Allison DIV GMC, Indianapolis, IN

| | | | |
|---|---|---|---|
| 2501 | 20,000 | TT | $.90900 |

Origin delivery of 20,000 gallons at Covington, KY

NOTES: 1. The Small Business, Labor Surplus Area and Small Disadvantaged Minority Business Concerns Subcontracting Program Clauses in this contract will be administered by the cognizant Defense Contract Administration Services Region, which is:

DCASR Cleveland
A. J. Celebreeze Federal Bldg.
1240 E. 9th Street
Cleveland, OH 44199

2. JP-5 supplied under this contract will have a minimum flash point of 130 degrees Fahrenheit and a freeze point of -44° Fahrenheit.

3. Unless the parties agree otherwise, the minimum/maximum quantities for individual deliveries shall be as follows:

| PRODUCT | M.O.D. | SHIPPING POINT | MINIMUM | MAXIMUM |
|---|---|---|---|---|
| JP-4 | B | Catlettsburg, KY | NONE | 20,000 bbls each with 5 days reblending between barges |
| JP-4 | P | Columbus, OH | 300,000* gallons | NONE |
| JP-4 | P | Medway, OH | 300,000* gallons | NONE |

*Unless mutually agreed by Ashland representative.

4. The term barge used above shall include lake tanker.

5. The quantity shown in the schedule is for the first program year. The ordering period shall be Date of Award through 30 Sep 81. Deliveries against item 0301 shall not begin for 6 to 8 weeks unless by mutual agreement.

The quantity applicable for the second through fifth program years in accordance with Clause H1.08.200, Deliveries and Contract Periods (DFSC 1980 APR) for each line item shall be the same.

6. Line item 2101 shall have a minimum flash point of 135 degrees Fahrenheit. The delivery dates against this item shall be by mutual agreement of the parties.

7. Reference Clause L171, Subcontracting Plan for Small Business and Small Disadvantaged Business Concerns (1979 JUL). The negotiated subcontracting plan as submitted by Ashland Petroleum Co. by letter dated 10 October 1980 is hereby incorporated and made a part of the contract. (See Attachment A).

E19.12 ECONOMIC PRICE ADJUSTMENT (DFSC 1980 MAY)

The Contractor represents that the unit prices set forth in this contract do not include any contingency allowance to cover the possibility of increase in the published or posted prices referenced in the Contractor's bid or proposal.

PART A

As used throughout this Section:

(a) The term "listed items" means the items of Section E of the Schedule that are listed in the Reference Price Tabulation of Part C of this Section and are the only items to which escalation shall apply, unless otherwise provided in the contract schedule.

(b) The term "base price" means the unit price set forth opposite the item in Section E of the Schedule.

(c) The term "reference price" means the price set forth in this Section with which the base price is to fluctuate.

(d) The term "date of delivery" means

(i) the date and time vessel begins to load where contract calls for delivery at origin into tanker or barge;

(ii) the date and time vessel begins to discharge where contract calls for delivery at destination by tanker or barge;

(iii) the date and time product commences to move past the specified f.o.b. point where contract calls for delivery into storage by pipeline;

(iv) the date product is received for all methods of delivery other than (i), (ii), and (iii) above.

PART B

(a) The Contractor shall notify the Contracting Officer, Defense Fuel Supply Center, Cameron Station, Alexandria, Va., 22314 of any change in the reference price by telegram dated (preferably confirmed promptly by letter), registered letter mailed, or unregistered letter received, within fourteen (14) days from the date thereof.

(i) In the event the Contractor fails to notify the Contracting Officer of any increase in reference price, such increase shall apply only to deliveries made on and after the date of receipt by the Contracting Officer of a written notification from the Contractor of such increase.

(ii) In the event the Contractor fails to give notice of a decrease in the reference price, such decrease shall apply to all deliveries made on or subsequent to the date of such decrease.

(iii) The Contracting Officer will issue a Change Order to this contract to reflect any change pursuant to this Section.

(b) Notwithstanding any provision of this Section to the contrary, the prices payable under this contract shall in no event exceed any of the following:

(i) the Contractor's legal prices under the Federal Energy Administration's Mandatory Petroleum Price Regulations, if applicable.

(c) In the event the reference price product is not subject to Department of Energy price control, Contractor warrants as follows:

(i) The prices to be invoiced hereunder for listed items shall be computed in accordance with these economic price adjustment provisions:

(ii) During the term of this contract, substantial sales to non-government customers of the reference price product are made by Contractor at prices which move directly with the posted reference price.

(iii) During the term of this contract, each change in reference price furnished under this economic price adjustment clause will be reflected in corresponding price changes in sale of the reference price product to non-government customers except where constrained by contract.

(d) In the event the reference price product is subject to Department of Energy price controls, Contractor warrants as follows:

E19.12 (Cont'd)

(i) The prices to be invoiced hereunder for listed items shall be computed in accordance with these economic price adjustment provisions.

(ii) The reference price is a price posted by Contractor for a product which, as of the contract award date, is subject to Mandatory Price and Allocation controls under regulations issued by the Department of Energy (DOE) (10 Code of Federal Regulations, Parts 210, 211, 212).

(iii) During the term of this contract, while DOE Mandatory Price and Allocation controls are in effect, substantial sales to non-government customers of the reference price product are made by Contractor at prices which move directly with the posted reference price.

(iv) Any change in the reference price furnished for the purpose of economic price adjustment hereunder will not exceed contractor's maximum allowable price for the reference price product under DOE Mandatory Petroleum Price Regulation.

(v) During the term of this contract, while DOE Mandatory Price and Allocation controls are in effect, each change in reference price furnished under this economic price adjustment clause will be reflected in corresponding price changes in sales by the reference price product to non-government customers except where constrained by contract.

(e) In connection with the warranties in (c) and (d) above, Contractor agrees that the Contracting Officer or his designated representative, who are employees of the U.S. Government, shall have the right to examine books, records, documents, and other data of the Contractor as may be required to verify Contractor's compliance.

(f) The Contractor shall have the right to appeal under the Clause entitled "Disputes" from any determination made by the Contracting Officer under this Clause.

(g) No change in contract price shall be processed under this clause until verification of posting change has been received by the Contracting Officer.

(h) In the event the reference price is discontinued, or its method of calculation is altered substantially, the parties shall mutually agree upon an appropriate and comparable substitute for determining the price adjustment described herein. This contract shall be amended to reflect such substitute reference price, effective on the date prior reference price is discontinued or altered. In the event the parties fail to agree on an appropriate substitute, the matter shall be resolved in accordance with the Disputes clause of the contract.

(i) Notwithstanding any other provision of the clause, no upward adjustment shall apply to supplies which are required to be delivered prior to the effective date of the adjustment unless the Contractor's failure to deliver in accordance with the delivery schedule arises from causes beyond the control and without the fault or negligence of the Contractor within the meaning of the clause of this contract entitled "Default", in which case the contract shall be amended to make an equitable extension of the delivery schedule.

PART C

(a) The prices payable under this contract for listed items shall be the base price for the listed item increased or decreased by the amount, determined according to the formula in paragraph (b) below, that the reference price for the listed item shall have been increased or decreased to and including the date of delivery.

(b) The amount of increase or decrease in the base price shall be
(check appropriate box and complete applicable blanks)

[X] the same number of cents, or fractions thereof, that the reference price increases or decreases per like unit of measure.

[ ] the number of cents, or fractions thereof, determined by the ratio of $________ per gallon for each $________ per barrel that the reference price increases or decreases.

[ ] the number of cents, or fractions thereof, at the rate of $__________ per gallon for each full $__________ per barrel that the reference price increases or decreases.

(c) The reference price with which the base price for the item is to fluctuate and which is more fully defined in the tabulation to follow) is
(check appropriate box and complete applicable blanks)

[X] price posted by [ ] the average of the prices posted by

DLA600-81-D-0354

E19.12 (Cont'd)

Ashland Petroleum Co.
(name of company)

(name of company)

(name of company)

(name of company)

(name of company)

(name of company)

(The name of the company or companies posting the reference price shall be identified in Column II of the following tabulation by the number appearing opposite the name of the company(s)).

| I<br>ITEM NO.<br>(LISTED ITEMS) | II<br>NAME OF COMPANY(S) | III<br>COMPANY NAME OF PRODUCT | IV<br>LOCATION WHERE POSTED PRICE IS APPLICABLE | V<br>METHOD OF DELIVERY APPLICABLE TO THE POSTED PRICE | VI<br>POSTED PRICE PAY AS OF 10-31-80 | VII<br>MAXIMUM PRICE PAYABLE UNDER CONTRACT ** |
|---|---|---|---|---|---|---|
| 0101-0201<br>0401-2001 | Ashland | Reg Gas (60%)<br>Kerosene (40%) | Catlettsburg, KY for Ohio Shipments | TT | $.9215<br>$.8910 | See Clause E19.09 |

Base reference price calculated as follows:

60% $.9215 + 40% $.8910 = $.9093 Base Reference Price

| | | | | | | |
|---|---|---|---|---|---|---|
| 0301 | Ashland | Reg Gas (60%)<br>Kerosene(40%) | St. Paul Park | TT | $.925<br>$.91 | |

Base Reference Price calculated as follows:

60% $.925 + 40% $.91 = $.919 Base Reference Price

| | | | | | | |
|---|---|---|---|---|---|---|
| 2101-2501 | Ashland | Kerosene | Louisville | TT | $.889 Base Reference Price | |

*EXCLUDES ALL TAXES
**INCLUDING ANY TAX INCLUDED IN THE BASE PRICE

DLA600-81-D-0354

E19.09 UPWARD CEILINGS ON ECONOMIC PRICE ADJUSTMENT/PRICE ESCALATION (DPSC 1979 MAR)

Contractor agrees that the total increase in any unit price pursuant to the Economic Price Adjustment/Price Escalation provision of this contract shall not exceed 50 percent of the original base price for individual contract items, except in the situations provided hereafter.

1. If at any time the contractor has reason to believe that within the near future a price adjustment will be required under the Economic Price Adjustment/Price Escalation provision of this contract and that the resultant adjustment when added to the latest contract price for the item(s) in question will exceed the current contract ceiling price for the item(s), the contractor shall notify the Contracting Officer of the expected increase. At the same time, the contractor shall propose a revised ceiling which it believes to be sufficient to permit completion of remaining contract performance. Contractor's proposal shall be supported by appropriate explanations and documentation. The parties agree to promptly undertake negotiations regarding the proposed new ceiling.

2. If, in the absence of an agreement on a new ceiling, notice is given by the contractor of an actual price change which results in a unit price for contract item(s) which exceeds the current ceiling, the contractor will have no further obligation under this contract to fill pending or future orders for the specific line item(s) in question as of the effective date of the increase, as long as the unit price exceeds the ceiling. If, however, notwithstanding the lack of agreement on a new ceiling, the Contracting Officer indicates in writing that the Government is prepared to purchase the line item(s) for the price as adjusted under the Economic Price Adjustment/Price Escalation provisions beyond the current ceiling, the contractor will be obligated to continue to honor orders placed for the specific line item in question.

E11.01 FREIGHT RATE ADJUSTMENTS (DESC 1978 MAY)

(a) In the event that a change occurs in any freight rate identified below, the price for the item affected by such change in freight rate shall be increased or decreased by the same number of cents or fractions thereof per like unit or [illegible] freight rate is increased or decreased, notwithstanding any [illegible] provision in this contract to the contrary. There shall be no change in price for any item delivered prior to the effective date of any change in freight rates.

(b) The term "freight rate", as used herein, means the common carrier freight rate between the final shipping point and the delivery point for the item shown in the Schedule.

(c) The Contractor shall notify the Contracting Officer, Defense Fuel Supply Center, Cameron Station, Alexandria, Va., 22314, in writing, of any change in the freight rate by telegram dated, registered letter mailed, or unregistered letter received, within fourteen (14) days from the date thereof.

(i) In the event the Contractor fails to notify the Contracting Officer of any increase in freight rate, such increase shall apply only to deliveries made on or after the date of receipt by the Contracting Officer of a written notification from the Contractor of such increase.

(ii) In the event the Contractor fails to give notice of a decrease in freight rate, such decrease shall apply to all deliveries made on or subsequent to the date of such decrease.

(iii) The Contracting Officer will promptly issue a modification to this contract to reflect any change in rate, provided, however, that with respect to increase, Contractor has furnished sufficient documentation to permit the Contracting Officer to verify such increases.

(d) The items to which this Section applies and the applicable tariffs are as follows:

| ITEM NOS. | BASE FREIGHT RATES | TARIFF OR TENDER | FRT. RATE W/FUEL SURCHARGE | PUBLISHED BY |
|---|---|---|---|---|
| 0401 | $.0214 | BCC 2006 B, Sect. 2 | $.0242 (13%) | Bulk Carriers |
| 0501 | $.0093 | Ashland Petroleum Co. | | |
| 0601 | $.0036 | | | |
| 0701 | $.0256 | Item 415 | None | Oh. River Pipeline Co. |
| 0801 | $.0026 | | | Ray Molder Cont. |
| 0901 | $.0337 | BCC 2006 B, Sect. 2 | $.0393 (13%) | Sohio Pipeline Co |
| 1001 | $.0086 | KTCC 5, Item 345 | Also includes pump charge) | Bulk Carriers |
| 1101 | $.0141 | KTCC 5, Item 345 | $.0097 (13%) | Kentucky Bulk Carriers Conf. |
| 1201 | $.0144 | KTCC 5, Item 345 | $.0159 (13%) | |
| 1301 | $.0209 | PA. 4, Sect. 1B | $.0163 (13%) | |
| 1401 | $.0773 | BCC 2004 A, Sect. 4 | None | PA Carriers |
| 1501 | $.0564 | BCC 2004 A, Sect. 4 | $.0874 (13%) | Bulk Carriers |
| 1601 | $.0114 | BCCNY-7, Item 1530 | $.0637 (13%) | " |
| 1701 | $.0403 | BCC 2006 B, Sect. 2 | $.0122 (7%) | " |
| 1801 | $.0414 | BCC 2001, Item 1090 | $.0455 (13%) | " |
| 1901 | $.0336 | BCC 2001, Item 1090 | $.0468 (13%) | " |
| 2001 | $.0420 | KTCC5, Item 345 | $.0380 (13%) | " |
| 2101 | $.0244 | BCC 2001, Sect. 2 | $.047 (13%) | Kentucky Bulk |
| 2201 | $.0120 | BCC 2001, Sect. 2 | $.02757 (13%) | Bulk Carriers |
| 2301 | $.0311 | BCC 2001, Item 1100 | $.01356 (13%) | Bulk Carriers |
| 2401 | $.0337 | BCC 2001, Item 1080 | $.03514 (13%) | " |
| | | | $.03808 (13%) | " |

10

I3.02 TRANSPORT TRUCKS AND TRUCK AND TRAILER FREE TIME AND DETENTION RATES (DFSC 1979 MAY)

Upon arrival of Contractors transport truck or truck and trailer, the receiving activity shall promptly designate the tanks into which the load is to be discharged. Free time will commence at the time the discharge hose is connected to fill pipe at the delivery point specified, and will end when discharge is completed. For items involving multiple drops, time between drops will not be included in free time. Contractor shall be paid for detention beyond free time for delays caused by the Government. A minimum of one hour free time is required. Rate for detention shall be comparable to regulated tariffs governing the local area of receiving activity.

(a) Free time for unloading transport truck or truck and trailer: 1-1/2 hours

(b) Rate for detention beyond the free time: $6.25 per each 15 minutes.

The above will not be considered in the evaluation of offers for award, except that free time of less than one hour or detention rates not comparable to regulated tariffs may render an offer unacceptable/bid nonresponsive.

UNLESS OFFEROR INDICATES OTHERWISE, FREE TIME WILL BE CONSIDERED UNLIMITED.

DLA600-81-D-0354

I14.200 INSPECTION AND ACCEPTANCE (DESC 1979 NOV)

On deliveries F.O.B. origin, acceptance of the supplies furnished hereunder will take place at origin notwithstanding that inspection by the Government may take place elsewhere prior to acceptance. On deliveries F.O.B. destination, acceptance of the supplies furnished hereunder will take place at destination notwithstanding that inspection by the Government may take place elsewhere prior to acceptance. The office responsible for inspection, in behalf of the Government, shall be as follows:

| ITEM(S) | SOURCE OF PRODUCT AND/OR SHIPPING POINT | INSPECTOR(S) |
|---|---|---|
| 0201, 1601 | Ashland Petroleum Co.<br>Station B, Box F<br>Buffalo, Erie Co., N.Y.<br>14207<br>(285 Employees) | DCASMA Syracuse<br>U.S. Courthouse and Fed. Bldg.<br>100 S. Clinton Street<br>Syracuse, NY 13260 |
| 0401, 1701, 0901<br>1301, 1401, 1501 | Ashland Petroleum Co.<br>Freedom, Beaver Co. PA<br>15042<br>(130 Employees) | DCASMA Pittsburgh<br>1610 - S. Federal Building<br>1000 Liberty Ave<br>Pittsburgh, PA. 15222 |
| 0701 | Ashland Petroleum Co.<br>Glessner Avenue<br>Findlay, Hancock Co. OH<br>45840 | DCASMA Dayton<br>% Defense, Electronics Supply<br>Center Bldg 1<br>Dayton, OH. 45444 |
| 0601 | Ashland Petroleum Co.<br>3855 Fisher Road<br>Columbus, OH 43228 | DCASMA Dayton<br>% Defense, Electronics Supply<br>Center Bldg 1<br>Dayton, OH. 45444 |
| 0801 | Ashland Petroleum Co.<br>Midway Terminal<br>4741 Osborn Road<br>Midway, OH. 45341 | DCASMA Dayton<br>% Defense, Electronics Supply<br>Center Bldg 1<br>Dayton, OH. 45444 |
| 0301 | Ashland Petroleum Co.<br>St. Paul Park, MN. | DCASMA Twin Cities<br>2305 Ford Parkway<br>St. Paul, MN. 55116 |
| 0101, 0501 | Ashland Petroleum Co.<br>1409 Winchester Avenue<br>Ashland, Boyd Co. KY.<br>41101<br>(750 Employees) | DCASMA Cincinnati<br>Federal Bldg.<br>550 Main Street<br>Cincinnati, OH. 45202 |

DLA600-81-D-0354

I14.200 INSPECTION AND ACCEPTANCE (DFSC 1979 NOV) (Cont'd)

| ITEM(S) | SOURCE OF PRODUCT AND/OR SHIPPING POINT | INSPECTOR(S) |
|---|---|---|
| 1801, 1901, 1001<br>2001, 1101, 1201 | Ashland Petroleum Co.<br>4510 Algonguin Parkway<br>Louisville, Jefferson<br>Co., KY 40211<br>(110 Employees) | DCASMA Cincinnati<br>Federal Bldg.<br>550 Main Street<br>Cincinnati, OH. 45202 |
| 2101, 2201, 2301<br>2401, 2501 | Ashland Petroleum Co.<br>30th & James Streets<br>Latonia Station<br>Covington, KY. 41015 | DCASMA Cincinnati<br>Federal Bldg.<br>550 Main Street<br>Cincinnati, OH. 45202 |

L150 PREPARATION AND SUBMISSION OF INVOICES (DFSC 1978 NOV)

(a) ORDERS BY THE DEPARTMENT OF DEFENSE

(i) PAYING OFFICE:

(A) Orders placed by the Defense Fuel Supply Center or its designee as shown on Source Identification and Ordering Authorization (SIOATH) Forms - Invoices for Product payable against Defense Logistics Agency (Defense Fuel Supply Center) funds as cited on the Order for Supplies or Services, DD Form 1155, will be paid by the Defense Logistics Agency Administrative Support Center by mailing invoices to:

Defense Fuel Supply Center
ATTN: DFSC-CDX
Cameron Station, Bldg. 5
Alexandria, Virginia 22314

(B) ORDERS PLACED BY OTHER DEPARTMENT OF DEFENSE ACTIVITIES—Invoices shall be forwarded to the applicable Paying Office in accordance with instructions contained on the order.

(ii) SUBMISSION OF INVOICES AND CERTIFICATION OF RECEIPT

(A) Invoices submitted for payment shall be submitted in quadruplicate and shall contain the contract number, order number, name of tanker and cargo number, item number, contract description of supplies or services, sizes, quantities, unit prices, extended total, and if shipment is made on Government Bill of Lading, Bill of Lading number.

(B) CERTIFICATION OF RECEIPT

(1) F.O.B. DESTINATION DELIVERIES—For orders placed by the Defense Fuel Supply Center or its designee the consignee will certify Material Inspection and Receiving Report, DD Form 250 or DD Form 250-1 as applicable, and forward four copies (one of which will contain an original signature) to the payment office specified in paragraph (a)(i)(A) above. The signed copy will have the following information stamped, printed or typed on it: ORIGINAL RECEIVING REPORT FOR PAYMENT OF INVOICE.

For all other orders the consignee will certify Material Inspection and Receiving Report, DD Form 250 or DD Form 250-1 as applicable, and forward two copies to the appropriate paying office.

In either situation above if the consignee is not a U.S. organization, the authorized U.S. representative as indicated in the Source Identification and Ordering Authorization will certify the DD Form 250 or 250-1.

(2) F.O.B. ORIGIN DELIVERIES—For orders placed by the Defense Fuel Supply Center or its designee the Contractor shall support each invoice for payment with four copies (one of which will contain an original signature) of the Material Inspection and Receiving Report, DD Form 250 or DD Form 250-1 as applicable. The signed copy will have the following information stamped, printed or typed on it: ORIGINAL RECEIVING REPORT FOR PAYMENT OF INVOICE. The Material Inspection and Receiving Reports will be signed by the Quality Assurance Representative to certify acceptance of the product prior to submission of the invoices. These supporting documents will be mailed, with the invoice to the payment office specified in paragraph (a)(i)(A) above.

For all other orders the Contractor shall support each invoice with two copies of Material Inspection and Receiving Report, DD Form 250 or DD Form 250-1 as applicable.

The Material Inspection and Receiving Reports will be signed by the Quality Assurance Representative to certify acceptance of the product prior to submission with invoices. Duplicate signatures are acceptable.

(b) ORDERS BY OTHER FEDERAL AGENCIES—On orders placed by activities of Federal Departments, other than the Dept. of Defense, invoices shall be submitted as instructed by those activities. Such activities placing orders under this contract shall furnish the Contractor with the name and proper address of the activity to whom invoices shall be rendered and the name and address of the Disbursing Officer responsible for payment. Such activities shall also indicate the procedure for processing tax exemption certificates.

(c) CLASSIFIED CONTRACTS—To prevent disclosure of classified information, invoices submitted under classified contracts shall be so prepared that the supplies or services covered thereby can be identified only by reference to the contract. For example, the invoices may state "Contract DLA600—————. Item 2, -000 at $0.15 - $750,000". The security classification shown on the contract shall not appear on the invoices.

(d) PAYMENT—Unless expressly otherwise specified in the Schedule, payment of invoices will be made in United States currency.

STANDARD FORM 26, JULY 1966
GENERAL SERVICES ADMINISTRATION
FED. PROC. REG. (41CFR) 1-16.101

# AWARD/CONTRACT

PAGE 1 OF 9

1. CONTRACT (Proc. Inst. Ident.) NO.: DLA600-81-D-0445
2. EFFECTIVE DATE: 81 APR 24
3. REQUISITION/PURCHASE REQUEST/PROJECT NO.: SEE RFP FILE CONSOLIDATED PRs
4. CERTIFIED FOR NATIONAL DEFENSE UNDER BDSA REG. 2 AND/OR DMS REG. 1. RATING:

5. ISSUED BY CODE SC0600
DEFENSE FUEL SUPPLY CENTER
CAMERON STATION TWX 710-832-0600 2.2a
ALEXANDRIA, VIRGINIA 22314 2.2c
ATTN: H. CIBOROWSKI/DFSC-PD/202-274-7453

6. ADMINISTERED BY (If other than block 5) CODE
PRE-AWARD SURVEY - NONE

7. DELIVERY
☐ FOB DESTINATION
☒ OTHER (See below) SEE SCHEDULE

8. CONTRACTOR CODE 6G077 FACILITY CODE
NAME AND ADDRESS (Street, city, county, State, and ZIP code)
GULF OIL CO, US
PRODUCT SUPPLY DEPARTMENT
P.O. BOX 1524
HOUSTON, TX 77001

9. DISCOUNT FOR PROMPT PAYMENT
NET 30 DAYS

10. SUBMIT INVOICES (4 copies unless otherwise specified) TO ADDRESS SHOWN IN BLOCK
SEE BLOCK 12

11. SHIP TO/MARK FOR CODE
SEE SCHEDULE

12. PAYMENT WILL BE MADE BY CODE SA4900
DEFENSE FUEL SUPPLY CENTER
CAMERON STATION, BUILDING 5
ATTN: DFSC-CDX
ALEXANDRIA, VIRGINIA 22314

13. THIS PROCUREMENT WAS ☐ ADVERTISED, ☒ NEGOTIATED, PURSUANT TO: ☒ 10 U.S.C. 2304 (a)( 10) ☐ 41 U.S.C. 252 (c)( )

14. ACCOUNTING AND APPROPRIATION DATA
SEE CLAUSE L150

| 15. ITEM NO. | 16. SUPPLIES/SERVICES | 17. QUANTITY | 18. UNIT | 19. UNIT PRICE | 20. AMOUNT |
|---|---|---|---|---|---|
| | (a) This document confirms and incorporates by reference the wire Notice of Award dated 24 Apr 81 as amended by wire dated 30 APR 81. | | | | |
| | (b) A copy of Clause E12 (Contract Schedule) and various other clauses agreed to by the parties are attached hereto for informational purposes. In addition, pages 2 through 5 and pages 108 through 147 of RFP DLA600-81-R-0061, dated 80 Oct 16 and Amendments 0001-0005 are also attached for convenience and informational purposes. The following clauses are deleted: E19.04, L94, L97, L176, L176.01, L176.03 and L195. | | | | |

21. Estimated 5 yr TOTAL AMOUNT OF CONTRACT $ 361,953,000.

CONTRACTING OFFICER WILL COMPLETE BLOCK 22 OR 26 AS APPLICABLE

22. ☒ CONTRACTOR'S NEGOTIATED AGREEMENT (Contractor is required to sign this document and return 2 copies to issuing office.) Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. (Attachments are listed herein.)

26. ☐ AWARD (Contractor is not required to sign this document.) Your offer on Solicitation Number ____, including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary.

23. NAME OF CONTRACTOR
BY [signature]
(Signature of person authorized to sign)

27. UNITED STATES OF AMERICA
BY [signature: Marie G. Pagan]
(Signature of Contracting Officer)

24. NAME AND TITLE OF SIGNER (Type or print)
Charles H. Nelson
General Mgr.-Prod. Supply

25. DATE SIGNED
6/1/81

28. NAME OF CONTRACTING OFFICER (Type or print)
MARIE G. PAGAN

29. DATE SIGNED
1981 JUL 13

103

* U.S. GOVERNMENT PRINTING OFFICE: 1966 OF—215-165—1041

SCHEDULE

SUPPLIES – DLA600-81-D-0445

E12 SUPPLIES TO BE FURNISHED (DFSC 1968 MAY)

(A) The supplies to be furnished hereunder, F.O.B. delivery points, method of delivery and estimated quantities are as follows.

(B) Prices indicated hereunder are subject to E19.12, ECONOMIC PRICE ADJUSTMENT (DFSC 1980 MAY)

| ITEM NUMBER | ESTIMATED QUANTITY GALS | METHOD OF DELIVERY | UNIT PRICE |
|---|---|---|---|
| | DFSC | JP-5 | NSN 9130-00-273-2379 |
| 0101 | 90,000,000 | TK | $1.093000 w/FSII |

Origin Delivery of 90,000,000 gallons at Port Arthur, TX.

| | | | |
|---|---|---|---|
| | 45,000,000 | TK | $1.093000 w/FSII |

Origin Delivery of 45,000,000 gallons at Port Arthur, TX (2nd through 5th Program Years)

| | | | |
|---|---|---|---|
| | DFSC | JP-4 | NSN 9130-00-256-8613 |
| 0201 | 63,000,000 | TK | $1.061000 w/FSII |

Origin Delivery of 63,000,000 gallons at Port Arthur, TX.

NOTES: 1. The ordering period on this contract is:

(a) JP-5

| QUANTITY (GALS) | PROGRAM YEAR | ORDERING PERIOD |
|---|---|---|
| 90,000,000 | FIRST | Date of Award through 31 Mar 82. |
| 45,000,000 | SECOND | 1 Apr 82 through 31 Mar 83 |
| 45,000,000 | THIRD | 1 Apr 83 through 31 Mar 84 |
| 45,000,000 | FOURTH | 1 Apr 84 through 31 Mar 85 |
| 45,000,000 | FIFTH | 1 Apr 85 through 31 Mar 86 |

(b) JP-4 – Date of award through 31 Mar 82.

2. Under Clause F16.01, TURBINE FUEL, AVIATION, GRADES JP-4 AND JP-5, which incorporates specification MIL-T-5624L, corrosion inhibitor is required. Accordingly, the contractor shall be allowed thirty days from date of award to provide for the installation of corrosion inhibitor injection facilities. Until such facilities are installed, JP-4 without corrosion inhibitor will not be acceptable to the Army or the Air Force; JP-5 without corrosion inhibitor will be acceptable to the Navy during this thirty (30) day period. The Delivery Period for JP-4 shall begin 30 days after date of award.

E12 - SUPPLIES (Cont'd)

DLA600-81-D-0445

NOTES: (Cont'd)

3. The Small Business, Labor Surplus Area and Disadvantaged Business Concerns Subcontracting Program Clauses in this contract will be administered by the cognizant Defense Contract Administration Services Region cited below:

DCASR DALLAS
ATTN: SMALL BUSINESS SPECIALIST
Merchandise Mart Bldg.
500 South Ervay Street
Dallas, TX 75201

4. The amount included in price per gallon for JP-5 ordered with Fuel System Icing Inhibitor (FSII) is $.0062. Item 0101 shall be decreased by $.0062 per gallon for product ordered without FSII.

5. The amount included in price per gallon for JP-4 ordered with Fuel System Icing Inhibitor (FSII) is $.0040. Item 0201 shall be decreased by $.0040 per gallon for product ordered without FSII.

6. Unless the parties otherwise agree, the maximum/minimum quantities available for individual deliveries shall be as shown below:

| ITEM | SHIPPING POINT | PRODUCT | MOD | MAXIMUM (BBLS) | MINIMUM (BBLS) |
|---|---|---|---|---|---|
| 0101 | Port Arthur, TX | JP-5 | TK | 200,000 | 130,000 |
| 0201 | Port Arthur, TX | JP-4 | TK | 135,000 | 75,000 |

7. Notwithstanding Amend 0003 to the solicitation under Clause H1.09, DETERMINATION OF QUANTITY, the 1980 American Edition of Table 6B of the ASTM-IP-API Petroleum Measurement Tables (ASTM Designation D-1250) will be used.

8. Under Clause H52, TANKER DEMURRAGE AND LOADING CONDITIONS, paragraph (e)(ii)(4) is deleted and the following substituted in lieu thereof:

"If for any reason the Contractor is delayed in loading the tanker, or there is a delay in releasing the tanker for sailing, because of action of the Inspector, the ship's Master or her crew that arises through no fault of the Contractor, such basic allowed laytime shall be increased by the duration of such delay."

As a result of the above change: DFSC Clause H52 has been renumbered H52.100 with a date of 1981 MAR.

DLA600-81-D-0445

9. Reference is made to Clause L171, SUBCONTRACTING PLAN FOR SMALL BUSINESS AND SMALL DISADVANTAGED BUSINESS CONCERNS (1980 AUG). The negotiated subcontracting plan and supplemental as submitted by Gulf dated 2 and 24 Mar 81 is incorporated and made a material part of the contract. (See Attachment A)

10. The correct clause number for the clause entitled "Minimum Quantity" which is cited in clauses L31.200, LIMITATION OF PRICE AND CONTRACTOR OBLIGATIONS, and L81.05, INDEFINITE QUANTITY: SCOPE OF CONTRACT, is L81.07 in lieu of as indicated.

H1.08.200 DELIVERIES AND CONTRACT PERIOD (DFSC 1980 APR)

(a) The period of this contract during which the Ordering Officer may order pursuant to the clause entitled: INDEFINITE QUANTITY: SCOPE OF CONTRACT is from date of award through the following periods, as applicable:

| | | |
|---|---|---|
| First Program Year | - | 31 Mar 1982 |
| Second Program Year | - | 31 Mar 1983 |
| Third Program Year | - | 31 Mar 1984 |
| Fourth Program Year | - | 31 Mar 1985 |
| Fifth Program Year | - | 31 Mar 1986 |

(b) Notwithstanding paragraph (a) above, except at its option, Contractor shall not be required to make delivery hereunder prior to: 01 April 1981.

(c) In so far as practicable, the Government will attempt to lift in approximately equal monthly quantities throughout each applicable program year. The following applies to suppliers which offered product over the period 01 Apr 1981 through the applicable period indicated in (a) above:

(i) When the Government calls for delivery on a daily basis, the supplier shall not be required, except at its option, to make deliveries of any grade of product at a daily rate which is in excess of the contract quantity for each applicable program year of such grade of product for delivery at or shipment from each designated refinery or bulk plant location, divided by 335 days: or

(ii) When the Government calls for delivery on other than a daily basis, the contractor shall not be required to accumulate, except at its option, any such product at any such location and to subsequently make deliveries in excess of 9.09% in any one month, of the contract quantity for each applicable program year of the applicable grade of product. However, where the supplier offered a greater quantity for individual tanker loading, the supplier will deliver that greater quantity if the Government has so controlled its orders in past month or months as to permit an accumulation of the greater quantity. The supplier will be required to deliver in excess of 9.09% per month of the applicable program year's quantity if the delivery is to be made F.O.B. tanker at origin and no other quantities have been ordered for delivery during the applicable month and the 30,000 bbls., minimum under paragraph (d) below is greater than such 9.09% quantity.

(d) Except at its option, the Contractor shall not be required to deliver F.O.B. tanker at origin in any one delivery a quantity of product(s) which is less than 30,000 bbls. except, when on the last delivery, the quantity available pursuant to the Clause entitled INDEFINITE QUANTITY; SCOPE OF CONTRACT, is less than 30,000 barrels.

The above Clause H1.08.200 supersedes that which appears on page 114 of the solicitation portion of the award document.

E19.09-1 UPWARD CEILINGS ON ECONOMIC PRICE ADJUSTMENT (DFSC 1981 FEB) DLA600-81-D-0445

(a) As used throughout this clause, the term "base price" will mean:

(1) During the first program year, the original contract price.

(2) During any subsequent program year, either the effective contract price as of the start of the subsequent program year or the price agreed upon, as of the start of the subsequent program year, pursuant to the Price Review provisions of the contract.

(b) The Contractor agrees that the total increase in any contract line item unit price, pursuant to the Economic Price Adjustment provisions of this contract, shall not exceed 50 percent of the base price in any applicable program year, except as provided hereafter.

(1) If, at any time the contractor has reason to believe that within the near future, a price adjustment under the Economic Price Adjustment Provisions of this contract will result in an adjusted unit price which exceeds the current ceiling price for the applicable item(s), he shall promptly notify the Contracting Officer of the expected increase. The notification shall include the Contractor's proposal of a revised ceiling which he believes is sufficient to permit contract completion. The proposal shall include the appropriate explanation(s) and/or documentation. Both parties shall promptly attempt to reach agreement on a new ceiling.

(2) If, in the absence of agreement on a new ceiling, the Contractor experiences a price increase which results in an adjusted unit price above the current ceiling, he shall promptly notify the Contracting Officer. Absent a new ceiling and as long as the applicable unit price(s) exceed the current ceiling, the Contractor is not obligated to fill either pending or future orders for the applicable line items, as of the effective date of the price increase. If, however, notwithstanding the lack of agreement on a new ceiling, the Contracting Officer indicates in writing that the Government is prepared to purchase the line items in question for the price(s) as adjusted beyond the current ceiling, the Contractor shall continue to honor such orders.

E19.12 ECONOMIC PRICE ADJUSTMENT (DFSC 1980 MAY)

The Contractor represents that the unit prices set forth in this contract do not include any contingency allowance to cover the possibility of increase in the published or posted prices referenced in the Contractor's bid or proposal.

PART A

As used throughout this Section:

(a) The term "listed items" means the items of Section E of the Schedule that are listed in the Reference Price Tabulation of Part C of this Section and are the only items to which escalation shall apply, unless otherwise provided in the contract schedule.

(b) The term "base price" means the unit price set forth opposite the item in Section E of the Schedule.

(c) The term "reference price" means the price set forth in this Section with which the base price is to fluctuate.

(d) The term "date of delivery" means

(i) the date and time vessel begins to load where contract calls for delivery at origin into tanker or barge;

(ii) the date and time vessel begins to discharge where contract calls for delivery at destination by tanker or barge;

(iii) the date and time product commences to move past the specified f.o.b. point where contract calls for delivery into storage by pipeline;

(iv) the date product is received for all methods of delivery other than (i), (ii), and (iii) above.

PART B

(a) The Contractor shall notify the Contracting Officer, Defense Fuel Supply Center, Cameron Station, Alexandria, Va., 22314 of any change in the reference price by telegram dated (preferably confirmed promptly by letter), registered letter mailed, or unregistered letter received, within fourteen (14) days from the date thereof.

(i) In the event the Contractor fails to notify the Contracting Officer of any increase in reference price, such increase shall apply only to deliveries made on and after the date of receipt by the Contracting Officer of a written notification from the Contractor of such increase.

(ii) In the event the Contractor fails to give notice of a decrease in the reference price, such decrease shall apply to all deliveries made on or subsequent to the date of such decrease.

(iii) The Contracting Officer will issue a Change Order to this contract to reflect any change pursuant to this Section.

(b) Notwithstanding any provision of this Section to the contrary, the prices payable under this contract shall in no event exceed any of the following:

(i) the maximum prices shown in column VII, of the Reference Price Tabulation,

or

(ii) the Contractor's legal prices under the Federal Energy Administration's Mandatory Petroleum Price Regulations, if applicable.

(c) In the event the reference price product is not subject to Department of Energy price control, Contractor warrants as follows:

(i) The prices to be invoiced hereunder for listed items shall be computed in accordance with these economic price adjustment provisions:

(ii) During the term of this contract, substantial sales to non-government customers of the reference price product are made by Contractor at prices which move directly with the posted reference price.

(iii) During the term of this contract, each change in reference price furnished under this economic price adjustment clause will be reflected in corresponding price changes in sale of the reference price product to non-government customers except where constrained by contract.

(d) In the event the reference price product is subject to Department of Energy price controls, Contractor warrants as follows:

(i) The prices to be invoiced hereunder for listed items shall be computed in accordance with these economic price adjustment provisions.

(ii) The reference price is a price posted by Contractor for a product which, as of the contract award date, is subject to Mandatory Price and Allocation controls under regulations issued by the Department of Energy (DOE) (10 Code of Federal Regulations, Parts 210, 211, 212).

(iii) During the term of this contract, while DOE Mandatory Price and Allocation controls are in effect, sustantial sales to non-government customers of the reference price product are made by Contractor at prices which move directly with the posted reference price.

(iv) Any change in the reference price furnished for the purpose of economic price adjustment hereunder will not exceed contractor's maximum allowable price for the reference price product under DOE Mandatory Petroleum Price Regulation.

(v) During the term of this contract, while DOE Mandatory Price and Allocation controls are in effect, each change in reference price furnished under this economic price adjustment clause will be reflected in corresponding price changes in sales by the reference price product to non-government customers except where constrained by contract.

(e) In connection with the warranties in (c) and (d) above, Contractor agrees that the Contracting Officer or his designated representative, who are employees of the U.S. Government, shall have the right to examine books, records, documents, and other data of the Contractor as may be required to verify Contractor's compliance.

(f) The Contractor shall have the right to appeal under the Clause entitled "Disputes" from any determination made by the Contracting Officer under this Clause.

(g) No change in contract price shall be processed under this clause until verification of posting change has been received by the Contracting Officer.

(h) In the event the reference price is discontinued, or its method of calculation is altered substantially, the parties shall mutually agree upon an appropriate and comparable substitute for determining the price adjustment described herein. This contract shall be amended to reflect such substitute reference price, effective on the date prior reference price is discontinued or altered. In the event the parties fail to agree on an appropriate substitute, the matter shall be resolved in accordance with the Disputes clause of the contract.

(i) Notwithstanding any other provision of the clause, no upward adjustment shall apply to supplies which are required to be delivered prior to the effective date of the adjustment unless the Contractor's failure to deliver in accordance with the delivery schedule arises from causes beyond the control and without the fault or negligence of the Contractor within the meaning of the clause of this contract entitled "Default", in which case the contract shall be amended to make an equitable extension of the delivery schedule.

PART C

(a) The prices payable under this contract for listed items shall be the base price for the listed item increased or decreased by the amount, determined according to the formula in paragraph (b) below, that the reference price for the listed item shall have been increased or decreased to and including the date of delivery.

(b) The amount of increase or decrease in the base price shall be
(check appropriate box and complete applicable blanks)

[x] the same number of cents, or fractions thereof, that the reference price increases or decreases per like unit of measure.

[ ] the number of cents, or fractions thereof, determined by the ratio of $________ per gallon for each $_______ per barrel that the reference price increases or decreases.

[ ] the number of cents, or fractions thereof, at the rate of $__________ per gallon for each full $_________ per barrel that the reference price increases or decreases.

(c) The reference price with which the base price for the item is to fluctuate and which is more fully defined in the tabulation to follow) is
(check appropriate box and complete applicable blanks)

[ ] price posted by

[x] the average of the prices posted by

E19.12 (Cont'd) DLA600-81-D-0445

| | |
|---|---|
| (name of company) | GULF OIL CO (name of company) |
| (name of company) | (name of company) |
| (name of company) | (name of company) |

(The name of the company or companies posting the reference price shall be identified in Column II of the following tabulation by the number appearing opposite the name of the company(s)).

| I ITEM NO. (LISTED ITEMS) | II NAME OF COMPANY(S) | III COMPANY NAME OF PRODUCT | IV LOCATION WHERE POSTED PRICE IS APPLICABLE | V METHOD OF DELIVERY APPLICABLE TO THE POSTED PRICE | VI POSTED PRICE PAY AS OF See Below* | VII MAXIMUM PRICE PAYABLE UNDER CONTRACT ** |
|---|---|---|---|---|---|---|
| 0101 | Gulf Oil Co. - U.S. | Gulf's major Airport Jet Fuel prices Airline Accounts Sched. | Gulf Head-quarters Houston, TX | F.O.B. Airport Terminal | 1.0910+ 3/11/81 | See Clause E19.09-1 |
| 0201 | Gulf Oil Co. - U.S. | Gulf's major Airport Jet Fuel Prices as above | Gulf Head-quarters Houston, TX | F.O. B. Airport Terminal | 1.0910 x 50%+ 3/11/81 | See Clause E19.09-1 |
| | | Gulf's Good Gulf Gaso. Dealer Tank wagon Posting Houston, TX | Gulf Mkt. Houston District Houston, TX | F.O.B. Truck Delivery Rack | 1.1020 x 50%+ 3/2 0/81 — 1.0965++ | |

+AVERAGE OF THE POSTED PRICE

*EXCLUDES ALL TAXES
**INCLUDING ANY TAX INCLUDED IN THE BASE PRICE

++THE REFERENCE PRICE FOR ITEM 0201 IS 50% OF GULF'S GOOD GULF GASOLINE DEALER TANK WAGON PRICE POSTED AT HOUSTON, TX PLUS 50% OF THE AVERAGE OF GULF'S MAJOR AIRPORT JET FUEL PRICES-AIRLINE ACCOUNTS POSTED PRICE AT HOUSTON, TX.

DLA600-81-D-0445

I14.200 INSPECTION AND ACCEPTANCE (DFSC 1979 NOV)

On deliveries F.O.B. origin, acceptance of the supplies furnished hereunder will take place at origin notwithstanding that inspection by the Government may take place elsewhere prior to acceptance. On deliveries F.O.B. destination, acceptance of the supplies furnished hereunder will take place at destination notwithstanding that inspection by the Government may take place elsewhere prior to acceptance. The office responsible for inspection, in behalf of the Government, shall be as follows:

| ITEM(S) | SOURCE OF PRODUCT AND/OR SHIPPING POINT | INSPECTOR(S) |
|---|---|---|
| 0101<br>0201 | GULF OIL CORP.<br>PORT ARTHUR REFINERY<br>PORT ARTHUR, TX 77640 | DCASMA SAN ANTONIO<br>615 EAST HOUSTON ST<br>P.O. BOX 1040, MAIN POST OFFICE<br>SAN ANTONIO, TX 78294 |

STANDARD FORM 26, JULY 1966
GENERAL SERVICES ADMINISTRATION
FED. PROC. REG. (41CFR) 1-16.101

# AWARD/CONTRACT

PAGE 1 OF 9

1. CONTRACT (Proc. Inst. Ident.) NO. DLA600-81-D-3037
2. EFFECTIVE DATE 81 OCT 09
3. REQUISITION/PURCHASE REQUEST/PROJECT NO. SEE RFP FILE CONSOLIDATED PRS
4. CERTIFIED FOR NATIONAL DEFENSE UNDER BSDA REG. 2 AND/OR DMS REG. 1. RATING:

5. ISSUED BY CODE SC0600
DEFENSE FUEL SUPPLY CENTER
CAMERON STATION TWX 710-832-0600
ALEXANDRIA, VIRGINIA 22314
BUYER/SYMBOL- John P. Plott/DFSC-PD
PHONE (202) 274-7453 2.1b 2.2b

6. ADMINISTERED BY (If other than block 5) CODE
PRE-AWARD SURVEY - NONE

7. DELIVERY
☐ FOB DESTINATION
☒ OTHER (See below) SEE SCHEDULE

8. CONTRACTOR CODE 46935 FACILITY CODE
NAME AND ADDRESS (Street, city, county, State, and ZIP code)
Phillips Petroleum Company
ATTN: E. Beisser
758 Adams Bldg.
Bartlesville, OK 74004

9. DISCOUNT FOR PROMPT PAYMENT
NET 30 DAYS

10. SUBMIT INVOICES (4 copies unless otherwise specified) TO ADDRESS SHOWN IN BLOCK
SEE BLOCK 12

11. SHIP TO/MARK FOR CODE

12. PAYMENT WILL BE MADE BY CODE SA4900
DEFENSE FUEL SUPPLY CENTER
CAMERON STATION, BUILDING 5
ATTN: DFSC-CDX
ALEXANDRIA, VA 22314

13. THIS PROCUREMENT WAS ☐ ADVERTISED, ☒ NEGOTIATED, PURSUANT TO: ☒ 10 U.S.C. 2304 (a)(10) ☐ 41 U.S.C. 252 (c)( )

14. ACCOUNTING AND APPROPRIATION DATA

SEE CLAUSE L150

| 15. ITEM NO | 16. SUPPLIES/SERVICES | 17. QUANTITY | 18. UNIT | 19. UNIT PRICE | 20. AMOUNT |
|---|---|---|---|---|---|

(a) This document confirms and incorporates by reference the wire Notice of Award dated 09 OCTOBER 1981.

(b) A copy of Clause E12.01 (Contract Schedule) and various other clauses agreed to by the parties are attached hereto for informational purposes. Solicitation RFP DLA600-81-R-0161 dated 81 April 03 and Amendments 0001 through 0010 are incorporated by reference except for the following clauses which are deleted: E19.04, E19.14, L94, L97, L176, L176.01 and L176.03.

21. ESTIMATED TOTAL AMOUNT OF CONTRACT $ 2,404,498.40

CONTRACTING OFFICER WILL COMPLETE BLOCK 22 OR 26 AS APPLICABLE

22. ☒ CONTRACTOR'S NEGOTIATED AGREEMENT (Contractor is required to sign this document and return 2 copies to issuing office.) Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. (Attachments are listed herein.)

26. ☐ AWARD (Contractor is not required to sign this document.) Your offer on Solicitation Number ______ including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary.

23. NAME OF CONTRACTOR PHILLIPS PETROLEUM COMPANY
BY [signature] (Signature of person authorized to sign)

27. UNITED STATES OF AMERICA
BY [signature: Marie G. Pagan] (Signature of Contracting Officer)

24. NAME AND TITLE OF SIGNER (Type or print)
E. J. Beisser, Manager
Aviation Sales

25. DATE SIGNED 11/9/81

28. NAME OF CONTRACTING OFFICER (Type or print)
MARIE G. PAGAN

29. DATE SIGNED 1981

61

26-103

U.S. GOVERNMENT PRINTING OFFICE: 1966

DLA600-81-D-3037

SCHEDULE

E12.01 SUPPLIES TO BE FURNISHED (DFSC 1981 JUL)

(A) The supplies to be furnished hereunder, F.O.B. delivery points, methods of delivery and estimated quantities are as follows:

(B) Prices indicated hereunder are subject to the economic price adjustment provisions of clause E19.12.

| ITEM NUMBER | ESTIMATED QUANTITY GALS | METHOD OF DELIVERY | UNIT PRICE |
|---|---|---|---|
| | DFSC | JP-4 | NSN 9130-00-256-8613 |
| 0101 | 20,160,000 | P | $1.052300 w/o FSII |
| Origin delivery of 20,160,000 gallons at Woods Cross, UT. | | | |
| 0201 | 6,820,000 | TT | $1.028000 w/FSII |
| Origin delivery of 6,820,000 gallons at Great Falls, MT. | | | |
| 0301 | 30,660,000 | P | $ .991700 w/o FSII |
| Origin delivery of 30,660,000 gallons at Kansas City, KS. | | | |
| | DFSC | AVGAS 100/130 | NSN 9130-00-179-1122 |
| 0401 | 800,000 | TT | $1.280000 |
| Origin delivery of 800,000 gallons at Borger, TX. | | | |
| 0501 | 275,000 | TT | $1.290000 |
| Origin delivery of 275,000 gallons at Albuquerque, NM. | | | |
| 0601 | 110,000 | TT | $1.292000 |
| Origin delivery of 110,000 gallons at Denver, CO. | | | |
| 0701 | 23,000 | TT | $1.286000 |
| Origin delivery of 23,000 gallons at Kansas City, KS. | | | |
| 0801 | 916,000 | TT | $1.29400 |
| Origin delivery of 916,000 gallons at E. Chicago, IN. | | | |
| 0901 | 2,205,000 | TT | $1.290000 |
| Origin delivery of 2,205,000 gallons at Clermont, IN. | | | |
| 1001 | 6,401,130 | TK | $1.280000 |
| Origin delivery of 6,401,130 gallons at Freeport, TX. | | | |

NOTES: a. Contractor will provide deballasting at Freeport, TX not to exceed 14,000 barrels.

b. Contractor does not have bunker fuel at Freeport, TX.

c. Contractor shall have the right to delete any undelivered balance at Great Falls, MT, and add this balance to the volume at Kansas City, KS without penalty at any time upon 60 days prior written notice to the Contracting Officer at the prevailing contract price for item 0301.

d. Unless the parties agree otherwise, the maximum/minimum quantities available for individual deliveries shall be as follows:

| ITEM | PRODUCT | MOD | MAXIMUM (BBLS) | MINIMUM (BBLS) |
|---|---|---|---|---|
| 0101 | JP-4 | P | 22,000 | 10,000 |
| 0301 | JP-4 | P | 30,000 | 25,000 |
| 1001 | AVGAS 100/130 | TK | 42,000 | 20,000 |

e. Payments shall be de to the address shown on the ices.

ADDITIONAL NOTES:

f. Clause H1.08, DELIVERIES AND CONTRACT PERIOD, is modified to reflect a monthly pro-rata of 50 percent for a total quantity of 17,000 gallons for item number 0301 for Oct and Nov 81. The ordering period for this quantity is date of award through 30 Nov 81. The remaining quantity for item 0301 remains at a monthly pro-rata of 8.33 percent with the ordering period being date of award through 30 Sep 82.

E19.09 UPWARD CEILINGS ON ECONOMIC PRICE ADJUSTMENT/PRICE ESCALATION (DFSC 1979 MAR)

Contractor agrees that the total increase in any unit price pursuant to the Economic Price Adjustment/Price Escalation provision of this contract shall not exceed (50 percent of the original base price for individual contract items, except in the situations provided hereafter.

1. If at any time the contractor has reason to believe that within the near future a price adjustment will be required under the Economic Price Adjustment/Price Escalation provision of this contract and that the resultant adjustment when added to the latest contract price for the item(s) in question will exceed the current contract ceiling price for the item(s), the contractor shall notify the Contracting Officer of the expected increase. At the same time, the contractor shall propose a revised ceiling which it believes to be sufficient to permit completion of remaining contract performance. Contractor's proposal shall be supported by appropriate explanations and documentation. The parties agree to promptly undertake negotiations regarding the proposed new ceiling.

2. If, in the absence of an agreement on a new ceiling, notice is given by the contractor of an actual price change which results in a unit price for contract item(s) which exceeds the current ceiling, the contractor will have no further obligation under this contract to fill pending or future orders for the specific line item(s) in question as of the effective date of the increase, as long as the unit price exceeds the ceiling. If, however, notwithstanding the lack of agreement on a new ceiling, the Contracting Officer indicates in writing that the Government is prepared to purchase the line item(s) for the price as adjusted under the Economic Price Adjustment/Price Escalation provisions beyond the current ceiling, the contractor will be obligated to continue to honor orders placed for the specific line item in question.

E19.12 ECONOMIC PRICE ADJUSTMENT (DFSC 1980 MAY)

The Contractor represents that the unit prices set forth in this contract do not include any contingency allowance to cover the possibility of increase in the published or posted prices referenced in the Contractor's bid or proposal.

PART A

As used throughout this Section:

(a) The term "listed items" means the items of Section E of the Schedule that are listed in the Reference Price Tabulation of Part C of this Section and are the only items to which escalation shall apply, unless otherwise provided in the contract schedule.

(b) The term "base price" means the unit price set forth opposite the item in Section E of the Schedule.

(c) The term "reference price" means the price set forth in this Section with which the base price is to fluctuate.

(d) The term "date of delivery" means

(i) the date and time vessel begins to load where contract calls for delivery at origin into tanker or barge;

(ii) the date and time vessel begins to discharge where contract calls for delivery at destination by tanker or barge;

(iii) the date and time product commences to move past the specified f.o.b. point where contract calls for delivery into storage by pipeline;

(iv) the date product is received for all methods of delivery other than (i), (ii), and (iii) above.

PART B

(a) The Contractor shall notify the Contracting Officer, Defense Fuel Supply Center, Cameron Station, Alexandria, Va., 22314 of any change in the reference price by telegram dated (preferably confirmed promptly by letter), registered letter mailed, or unregistered letter received, within fourteen (14) days from the date thereof.

(i) In the event the Contractor fails to notify the Contracting Officer of any increase in reference price, such increase shall apply only to deliveries made on and after the date of receipt by the Contracting Officer of a written notification from the Contractor of such increase.

(ii) In the event the Contractor fails to give notice of a decrease in the reference price, such decrease shall apply to all deliveries made on or subsequent to the date of such decrease.

(iii) The Contracting Officer will issue a Change Order to this contract to reflect any change pursuant to this Section.

(b) Notwithstanding any provision of this Section to the contrary, the prices payable under this contract shall in no event exceed any of the following:

(i) the maximum prices shown in column VII of the Reference Price Tabulation,

or

(ii) the Contractor's legal prices under the Federal Energy Administration's Mandatory Petroleum Price Regulations, if applicable.

(c) In the event the reference price product is not subject to Department of Energy price control, Contractor warrants as follows:

(i) The prices to be invoiced hereunder for listed items shall be computed in accordance with these economic price adjustment provisions:

(ii) During the term of this contract, substantial sales to non-government customers of the reference price product are made by Contractor at prices which move directly with the posted reference price.

(iii) During the term of this contract, each change in reference price furnished under this economic price adjustment clause will be reflected in corresponding price changes in sale of the reference price product to non-government customers except where constrained by contract.

(d) In the event the reference price product is subject to Department of Energy price controls, Contractor warrants as follows:

E19.12 (Cont'd)

(i) The prices to be invoiced hereunder for listed items shall be computed in accordance with these economic price adjustment provisions.

(ii) The reference price is a price posted by Contractor for a product which, as of the contract award date, is subject to Mandatory Price and Allocation controls under regulations issued by the Department of Energy (DOE) (10 Code of Federal Regulations, Parts 210, 211, 212).

(iii) During the term of this contract, while DOE Mandatory Price and Allocation controls are in effect, sustantial sales to non-government customers of the reference price product are made by Contractor at prices which move directly with the posted reference price.

(iv) Any change in the reference price furnished for the purpose of economic price adjustment hereunder will not exceed contractor's maximum allowable price for the reference price product under DOE Mandatory Petroleum Price Regulation.

(v) During the term of this contract, while DOE Mandatory Price and Allocation controls are in effect, each change in reference price furnished under this economic price adjustment clause will be reflected in corresponding price changes in sales by the reference price product to non-government customers except where constrained by contract.

(e) In connection with the warranties in (c) and (d) above, Contractor agrees that the Contracting Officer or his designated representative, who are employees of the U.S. Government, shall have the right to examine books, records, documents, and other data of the Contractor as may be required to verify Contractor's compliance.

(f) The Contractor shall have the right to appeal under the Clause entitled "Disputes" from any determination made by the Contracting Officer under this Clause.

(g) No change in contract price shall be processed under this clause until verification of posting change has been received by the Contracting Officer.

(h) In the event the reference price is discontinued, or its method of calculation is altered substantially, the parties shall mutually agree upon an appropriate and comparable substitute for determining the price adjustment described herein. This contract shall be amended to reflect such substitute reference price, effective on the date prior reference price is discontinued or altered. In the event the parties fail to agree on an appropriate substitute, the matter shall be resolved in accordance with the Disputes clause of the contract.

(i) Notwithstanding any other provision of the clause, no upward adjustment shall apply to supplies which are required to be delivered prior to the effective date of the adjustment unless the Contractor's failure to deliver in accordance with the delivery schedule arises from causes beyond the control and without the fault or negligence of the Contractor within the meaning of the clause of this contract entitled "Default", in which case the contract shall be amended to make an equitable extension of the delivery schedule.

PART C

(a) The prices payable under this contract for listed items shall be the base price for the listed item increased or decreased by the amount, determined according to the formula in paragraph (b) below, that the reference price for the listed item shall have been increased or decreased to and including the date of delivery.

(b) The amount of increase or decrease in the base price shall be
(check appropriate box and complete applicable blanks)

[X] the same number of cents, or fractions thereof, that the reference price increases or decreases per like unit of measure.

[ ] the number of cents, or fractions thereof, determined by the ratio of $_________ per gallon for each $_______ per barrel that the reference price increases or decreases.

[ ] the number of cents, or fractions thereof, at the rate of $___________ per gallon for each full $_________ per barrel that the reference price increases or decreases.

E19.12 (Cont'd)

(c) The reference price with which the base price for the item is to fluctuate and which is more fully defined in the tabulation to follow) is

(check appropriate box and complete applicable blanks)

[ ] price posted by | [X] the average of the prices posted by

______________________ (name of company) | Phillips Petroleum Co. (name of company)

______________________ (name of company) | ______________________ (name of company)

______________________ (name of company) | ______________________ (name of company)

(The name of the company or companies posting the reference price shall be identified in Colmumn II of the following tabulation by the number appearing opposite the name of the company(s)).

| I ITEM NO. (LISTED ITEMS) | II NAME OF COMPANY(S) | III COMPANY NAME OF PRODUCT | IV LOCATION WHERE POSTED PRICE IS APPLICABLE | V METHOD OF DELIVERY APPLICABLE TO THE POSTED PRICE | VI POSTED PRICE PAY AS OF 1 OCT 81 * | VII MAXIMUM PRICE PAYABLE UNDER CONTRACT ** |
|---|---|---|---|---|---|---|
| JP-4 | | | | | | |
| 0101 | Phillips Petroleum Postings | Housebrand Unleaded Dual Purpose | Woods Cross, Utah | P | $1.05983 | Per E19.09 |
| 0201 | Phillips Petroleum Postings | Housebrand Unleaded Dual Purpose | Great Falls, Montana | T | $1.043000 | Per E19.09 |
| 0301 | Phillips Petroleum Postings | Housebrand Unleaded Dual Purpose | Kansas City, Kansas | P | $1.019170 | Per E19.09 |
| AVGAS 100/130 | | | | | | |
| 0401 | Phillips Petroleum Postings | AVGAS 100LL | Borger, Texas | T | $1.280000 | Per E19.09 |
| 0501 | Phillips Petroleum | AVGAS 100LL | Albuquerque, New Mexico | T | $1.290000 | Per E19.09 |
| 0601 | Phillips Petroleum Postings | AVGAS 100LL | Denver, Colorado | T | $1.292000 | Per E19.09 |
| 0701 | Phillips Petroleum Postings | AVGAS 100LL | Kansas City, Kansas | T | $1.286000 | Per E19.09 |

E19.12 (Cont'd)

| I ITEM NO. (LISTED ITEMS) | II NAME OF COMPANY(S) | III COMPANY NAME OF PRODUCT | IV LOCATION WHERE POSTED PRICE IS APPLICABLE | V METHOD OF DELIVERY APPLICABLE TO THE POSTED PRICE | VI POSTED PRICE PAY AS OF 01 OCT 81* | VII MAXIMUM PRICE PAYABLE UNDER CONTRACT ** |
|---|---|---|---|---|---|---|
| AVGAS 100/130 CONTINUED | | | | | | |
| 0801 | Phillips Petroleum Postings | AVGAS 100OLL | E. Chicgo, Indiana | T | $1.294000 | Per E19.09, |
| 0901 | Phillips Petroleum Postings | AVGAS 100LL | Clermont, Indiana | T | $1.29000 | Per E19.09 |
| 1001 | Phillips Petroleum Postings | AVGAS 100LL | Freeport, Texas | TK | $1.280000 | Per E19.09 |

Prices fro AVGAS 100/130 will change cent for cent with changes in Phillips' AVGAS 100LL postings for the respective locations. The base references for items 0101 through 0301 are calculated using an average of 33 1/3 percent of each of these Phillips' postings - Housebrand Gasoline, Unleaded Gasoline & Dual Purpose Fuel Oil - at the respective locations. The postings in effect on the 1st day of the month determine the price for the 1st through the 15th and the postings in effect on the 16th day of the month determine the price for the 16th through the remainder of the month.

*EXCLUDES ALL TAXES
**INCLUDING ANY TAX INCLUDED IN THE BASE PRICE

I14.02 INSPECTION AND ACCEPTANCE (DFSC 1979 NOV)

On deliveries F.O.B. origin, acceptance of the supplies furnished hereunder will take place at origin notwithstanding that inspection by the Government may take place elsewhere prior to acceptance. On deliveries F.O.B. destination, acceptance of the supplies furnished hereunder will take place at destination notwithstanding that inspection by the Government may take place elsewhere prior to acceptance. The office responsible for inspection, in behalf of the Government, shall be as follows:

| ITEM(S) | SOURCE OF PRODUCT AND/OR SHIPPING POINT | INSPECTOR(S) |
|---|---|---|
| 0101 | Phillips Petroleum Company<br>3935-800 W. Woods<br>Woods Cross, Davis County<br>Utah 84087 | DCASMA Denver<br>701 W. Hampden Avenue<br>(Suite E-3210)<br>Englewood, CO 80154 |
| 0201 | Phillips Petroleum Company<br>Box 1239 Smelters Ave & 10 St<br>Great Falls, Cascade County,<br>Montana 59401 | DCASMA Seattle<br>Bldg. 5D Naval Support Activity<br>7500 Sand Point Way NE<br>Seattle, WA 98115 |
| 0301<br>0701 | Phillips Petroleum Company<br>209 Fairfax Rd, Zone 15<br>Wyandotte County<br>Kansas City, Kansas 66115 | DCASMA St. Louis<br>1136 Washington Ave.<br>St. Louis, MO 63101 |
| 0401 | Phillips Petroleum Company<br>Borger Refinery, North End of<br>Texas Road West of Hwy. 119<br>Box 271, Hutchinson County<br>Borger, Texas 79007 | DCASMA Dallas<br>Merchandise Mart Bldg.<br>500 S. Ervay St.<br>Dallas, TX 75201 |
| 0501 | Phillips Petroleum Company<br>6 Miles South of Central Ave.<br>on Hwy. 47, P.O. Box 908<br>Bernalillo County<br>Albuquerque, NM 87103 | DCASMA Phoenix<br>3800 N. Central Avenue<br>Phoenix, AZ 85012 |
| 0601 | Phillips Petroleum Company<br>Denver Terminal<br>56th St. & Colorado Blvd.<br>P.O. Box 68, Arapahoe County<br>Commerce City, Colorado 80022 | DCASMA Denver<br>701 W. Hampden Avenue<br>(Suite E-3210)<br>Englewood, CO 80154 |
| 0801 | Phillips Pipe Line Company<br>400 E. Columbus Drive<br>Lake County<br>E. Chicago, Indiana 46312 | DCASMA Chicago<br>O'Hare International Airport<br>P.O. Box 66911<br>Chicago, IL 60666 |
| 0901 | Phillips Petroleum Company<br>Box 34176, Marion County<br>Clermont, Indiana 46234 | DCASMA Indianapolis<br>Building 1 Finance Ctr USA<br>Fort Benjamin Harrison,<br>IN 46249 |
| 1001 | Phillips Petroleum Company<br>Sweeney Refinery & Petro-<br>Chemical Complex<br>Hwy 24 P.O. Box 866<br>Sweeney, TX 77480 | DCASMA San Antonio<br>615 E. Houston St.<br>P.O. Box 1040<br>San Antonio, TX 7829[illegible] |

CONOCO

Conoco Inc.
P.O. Box 2197
Houston, TX 77252

December 18, 1986

General Griffith
Defense Fuel Supply Center
Cameron Station
Alexandria, VA 22304-6160

Dear General Griffith,

This letter is in regard to the method used to determine the bid award for JP-4. It is Conoco's opinion that a new method using current, readily available, published information should be substituted for the present calculation. This change would give bidders and the government the opportunity to make a more realistic evaluation.

Conoco has no complaint with the way the PMM is calculated and used but with the timing of its availability. A major flaw in the process is the PMM Journal lags three months from the designated month, thus the suppliers must guess the reference price prior to bidding. Due to the fact that there are numerous terminals used in the reference price calculation, it is difficult to forecast the PMM using information available within Conoco or the industry. Since the reference price is based on a single month's market activity, there is no way of predicting with certainty what the actual reference number will be. This makes bidding JP-4 a real "gamble". Even in a public auction, a minimum bid is given from which to start the bidding process.

Furthermore, prior to the final bid, the government sends each bidder a target price. This year's inland target price was 36 cents/gallon. The actual June PMM Reference Price was 50.69 cents/gallon or 14.69 cents/gallon higher. Hence, there is no logical correlation between target price and PMM price.

Based on the large discrepancy seen in the last bid cycle, a new JP-4 price calculation is needed. Changing the bid process to one that uses readily available information takes away the uncertainty from both the bidder and the government. This protects both parties from losing money due to the actual reference price being higher or lower than projected.

We realize how difficult it is to determine an index that represents all of the activity in a particular PAD. By changing the current calculation to one that utilizes readily available information this would enable all of those involved to make viable decisions about what the "real" value is for JP-4.

Please let me know your thoughts on this matter. I will be looking forward to hearing from you.

Franklin P. Perez
Manager,
Administration & Supply
Specialty Products Division
Wholesale Marketing

cc: Gordon Regan, Jr., Houston
Dennis Neff, Houston
Toby Casteel, Houston
Paul Madison, Houston
Chuck Minard, Houston
Sally Anderson, Houston
Don Unruh, Houston
Bill Cayan, Houston

scau